UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN MICHIGAN

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

V

BLUE SKY VISION, LLC,

Defendant.

Case No. 1:20-cv-00285

HON. JUDGE PAUL L. MALONEY

Karen L. Brooks (IL ARDC#6285816)
Equal Employment Opportunity Commission
477 Michigan Ave., Room 865
Detroit, MI 48226

Catherine A. Tracey (P63161)
MILLER JOHNSON
Attorneys for Blue Sky Vision, LLC
45 Ottawa Ave. SW, Ste. 1100
Grand Rapids, MI 49503
(616) 831-1700
traceyc@millerjohnson.com

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Blue Sky Vision, LLC ("BSV") through its attorneys, MILLER JOHNSON, and pursuant to Fed. R. Civ. P. 56(c), moves the Court for an Order granting its motion for summary judgment and dismissing the Plaintiff's Complaint with prejudice. In support of this Motion, BSV relied upon its Brief in Support and the attached exhibits. The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of its motion; opposing counsel has not yet responded.

WHEREFORE, Defendant requests the Court to enter an Order granting its Motion and awarding it costs as the prevailing party.

Dated: May 27, 2021

By *__/s/ Catherine A. Tracey__*

Catherine A. Tracey (P63161)
45 Ottawa Ave. SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1700
traceyc@millerjohnson.com

LOCAL RULE CERTIFICATION: I, Catherine A. Tracey, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10 ½ characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.12(d)(3).

*/s/ Catherine A. Tracey*
Catherine A. Tracey (P63161)

**CERTIFICATION OF SERVICE**

I HEREBY CERTIFY that on May 27, 2020 the foregoing document was electronically served upon all parties and/or attorneys of record to the above cause herein via email correspondence as disclosed on the pleadings on May 27, 2021 via ECF Filing.

Date: May 27, 2020 By: */s/ Catherine A. Tracey*
Catherine A. Tracey (P63161)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN MICHIGAN

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

Case No. 1:20-cv-00285

V

HON. JUDGE PAUL L. MALONEY

BLUE SKY VISION, LLC,

Defendant.

Karen L. Brooks (IL ARDC#6285816)
Equal Employment Opportunity Commission
477 Michigan Ave., Room 865
Detroit, MI 48226

Catherine A. Tracey (P63161)
MILLER JOHNSON
Attorneys for Blue Sky Vision, LLC
45 Ottawa Ave. SW, Ste. 1100
Grand Rapids, MI 49503
(616) 831-1700
traceyc@millerjohnson.com

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents


**INTRODUCTION** .......... **1**

**STATEMENT OF UNDISPUTED FACTS** .......... **2**

**I. Blue Sky Vision's Company Background and Structure** .......... 2

**II. BSV's Decision to Hire Jansma As An Optometrist** .......... 2

**III. BSV Staff Report That Jansma's Behavior Is Inconsistent with BSV's Mission and Core Values** .......... 4

**IV. Jansma Discloses He Has a Medical Condition And That The Medical Condition Impacts An Essential Job Function** .......... 9

**V. BSV Offers Jansma The Opportunity To Resign** .......... 10

**VI. Jansma's Decision Not to Resign and Agreement to a Medical Evaluation** .......... 12

**VII. BSV'a Termination Of Jansma's Employment** .......... 19

**ARGUMENT** .......... **20**

**I. SUMMARY JUDGMENT STANDARD** .......... **20**

**II. THE EEOC'S ADA CLAIMS MUST BE DISMISSED BECAUSE THE EEOC CANNOT ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION, BSV'S EMPLOYMENT ACTIONS WERE BASED ON LEGITIMATE, NON-DISCRIMINATORY FACTORS AND THE EEOC HAS NOT DEMONSTRATED PRETEXT.** .......... **20**

**A. JANSMA CANNOT ESTABLISH THAT HE WAS QUALIFIED TO PERFORM THE ESSENTIAL FUNCTIONS OF HIS JOB.** .......... **21**

**B. JANSMA CANNOT ESTABLISH THAT HE SUFFERED AN ADVERSE EMPLOYMENT ACTION.** .......... **23**

**i. BSV'S REQUESTED MEDICAL EXAMINATION AND INQUIRY WAS LAWFUL BECAUSE IT WAS JOB RELATED AND CONSISTENT WITH BUSINESS NECESSITY.** .......... **24**

**1. THERE WAS SUFFICIENT EVIDENCE TO LEAD BSV TO REASONABLY BELIEVE THAT JANSMA COULD NOT PERFORM THE ESSENTIAL FUNCTIONS OF HIS JOB.** .......... **24**

**2. Alternatively, Jansma Posed A Direct Threat To The Health Or Safety Of BSV's Patients That Necessitated A Medical Examination And Inquiry**………………..… **25**

**i. BSV'S MEDICAL EXAMINATION AND INQUIRY WERE APPROPRIATELY NARROW IN SCOPE.................................................................27**

**III. BSV'S EMPLOYMENT ACTIONS WERE BASED ON LEGITIMATE, NON-DISCRIMINATORY FACTORS AND THE EEOC HAS NOT DEMONSTRATED PRETEXT. ....................................................29**

**C. BSV Placed Jansma On A Leave Of Absence So He Could Undergo An Examination To Determine His Fitness For Duty, A Legitimate, Non-Discriminatory Reason** .....31

**D. BSV Terminated Jansma's Employment Because He Refused To Allow BSV To Make A Determination On His Fitness For Duty** ....................................................................33

**CONCLUSION ..........................................................................................................................32**

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.* ........ 25

*Ang. v. Proctor & Gamble Co.* ........ 27

*Arendale v. City of Memphis*, ........ 25

*Babb v. Maryville Anesthesiologists P.C.* ........ 26

*Jackson v. Regal Beloit American, Inc*. ........ 33

*James v. Goodyear Tire & Rubber Co*. ........ 32

*James v. James Marine, Inc*. ........ 33

*Keith v. County of Oakland* ........ 27

*Kocsis v. Multi-Care Mgtmt., Inc.* ........ 34

*Krevinghaus v. Hills & Dales Hospital* ........ 28, 29

*Kroll v. White Lake Ambulance Auth* ........ 29, 30

*Laster v. City of Kalamazoo* ........ 25

*Lewis v. Humboldt v. Acquisition Corp.* ........ 26

*Moore v. Board of Educ. Of Johnson City Schs* ........ 37

*Romans v. Mich. Dep't of Human Servs.* ........ 35

*Sullivan v. River Valley Sch. Dist.* ........ 29, 32, 33, 34

*Talley v. Family Dollar Stores of Ohio, Inc* ........ 26

*Wagner v. Sherwin-Williams Co* ........ 26

**Statutes**

42 U.S.C. § 12111(3) ........ 30

42 U.S.C. § 12111(8) ........ 26

42 U.S.C. §§ 12102(1), 12112(a) ........ 26

42 USC § 12112(d)(4)(A) ........ 29

**Rules**

Fed. R. Civ. R. 56(a) ........ 25

**Regulations**

29 C.F.R. § 1620.2(r) ........ 30

29 C.F.R. § 1630.2(r) ........ 30

29 CFR § 1630.2(n)(2) ........ 27

## INTRODUCTION

Plaintiff Equal Employment Opportunity Commission ("EEOC") filed this disability discrimination lawsuit against Defendant Blue Sky Vision ("BSV"), on behalf of BSV's former employee, Dr. Randall Jansma. BSV discharged Jansma after he told BSV that he has a vision impairment that prevents him from seeing half of the visual field, yet refused to participate in a medical evaluation to determine whether he could perform his job duties as an Optometrist – including examining patients' eyes for diseases or defects – without jeopardizing patient safety.

Before BSV even knew of Dr. Janmsa's vision impairment, serious concerns had arisen over Jansma's behavior and ability to successfully practice as an Optometrist at BSV. BSV had hired Jansma after it acquired his private practice in June 2018, but quickly began receiving reports from multiple sources about his rude and offensive behavior; refusal to learn BSV's electronic medical record ("EMR") systems; and demands for staffing support beyond what other Optometrists received. By early August 2018, BSV had trouble finding staff to work with him.

In September 2018, BSV met with Jansma and offered him the opportunity to resign because of his behavior issues and apparent dissatisfaction with the partnership. BSV had learned of Jansma's vision impairment shortly before, and was understandably concerned that it *could* pose patient safety issues, but that was not the driving force behind the meeting. Jansma initially agreed to resign, but after BSV declined his payout request and release from his non-compete, he elected to continue his employment. BSV therefore told Jansma that, if he did not want to resign, he would need to undergo a medical evaluation to determine whether he could safely perform his job duties. Again, Jansma initially agreed, so BSV placed him on *paid* leave pending the results of that evaluation. However, after nearly three weeks of Jansma attempting to avoid the evaluation and six weeks after Jansma ceased all communication, BSV finally decided to terminate his employment for refusing to communicate with BSV while on paid leave for over two months.

The EEOC claims that BSV made medical inquiries in connection with the medical evaluation that were overly broad, and discharged Dr. Jansma for not agreeing to them. That claim, however, is based on a flawed interpretation of how BSV's medical evaluation forms worked; indeed, both Jansma and Dr. Christopher Glisson (the neuro-ophthalmologist Jansma had selected for the medical examination) acknowledged that the information BSV would have received (had Jansma cooperated) would have been limited in scope. Because the undisputed evidence shows that Jansma was discharged due to his refusal to undergo (or even communicate about) an objectively necessary medical evaluation – not because BSV "regarded" him as disabled or made an overly broad medical inquiry – summary judgment of his claims ADA claims should be granted.

## STATEMENT OF UNDISPUTED FACTS

### I. Blue Sky Vision's Company Background and Structure.

Formed in 2017, Blue Sky Vision ("BSV") is a partnership of doctors and clinics that provide eye care services throughout various locations in Michigan. (Hamilton 12-13,[1] Pl. Ex. 1[2]). BSV is made up of doctor partners that have joined BSV as a group (as is the case with larger entities such as Grand Rapids Ophthalmology ("GRO") and Shoreline Vision ("Shoreline")), and doctor partners that have joined existing BSV clinics individually. (Hamilton 13). All BSV Optometrists practice at "top of license," meaning they are responsible for diagnosing diseases and other abnormalities, like retinal detachments, glaucoma and other medical conditions of the eye. (Dabrowski 42[3]; Pl. Ex.11).

### II. BSV's Decision to Hire Jansma As An Optometrist.

[1] Excerpts from Hamilton's deposition are attached as **Exhibit 1**.
[2] Individual Plaintiff's Exhibits are cited as "Pl. Ex. ___" and all Plaintiff's Exhibits are attached as **Exhibit 11**.
[3] Excerpts from Dabrowski's deposition are attached as **Exhibit 2**.

In 2018, after being the sole provider in his own Optometry practice for over 30 years and contemplating retirement within the next 3 to 5, Dr. Jansma advertised that his practice was available for partnership or sale. (Jansma 29, 33, 54[4]). BSV's Senior Associate for Business Development, Brian Hamilton, responded to Jansma's advertisement. (Jansma 28, 30; Pl. Ex. 2, 3, 5). Hamilton was in charge of BSV's "partnership process," which included identifying potential partners; considering whether there was alignment on values and partnership goals; evaluating and negotiating the potential partner's financials and employment terms; and completing legal and financial due diligence. (Hamilton 11, 15-21; Pl. Ex. 1).

Consistent with this process, over the course of several months, Hamilton arranged meetings between Jansma, BSV management, and GRO's lead Optometrist, Dr. Phil VanderLugt; evaluated details related to Jansma's practices' financials, including the number of patients BSV could anticipate may transfer their eye care to BSV; and negotiated with Jansma over employment terms, such as BSV's non-compete clause. (Jansma 31, Vanderlugt 18-21[5], Hamilton 33-34; Pl. Ex. 3, 5). On June 5, 2018, BSV and Jansma agreed to the terms of a practice purchase and employment agreement, and on June 11, 2018, Jansma began employment with BSV. (Jansma 36; Pl. Ex. 6). Consistent with his desire to wind-down towards retirement, Jansma was hired on a part-time basis: one day per week at GRO's 68th Street location, one day per week at GRO's Grandville location, and one day per week at Shoreline Vision's Fremont location. (Jansma 35).

All of BSV's clinics use electronic medical records ("EMR"), but GRO and Shoreline have different EMR systems. (Jansma 158-59). Jansma had used paper records exclusively during his 30 years in private practice, so BSV understood that it would be challenging for him to learn to use EMRs, particularly 2 different EMR systems. (Jansma 14; Hamilton 49;

[4] Excerpts from Jansma's deposition are attached as **Exhibit 3**.
[5] Excerpts from VanderLugt's deposition are attached **Exhibit 4**.

Pl. Ex. 8). During the partnership process, they therefore discussed providing a scribe to Jansma to help him become acclimated. (Jansma 14, 40; Pl. Ex. 8). At BSV, scribes work alongside a provider during patient visits and are responsible for entering information about the patient's visit into the EMR, such as plan of care, measurements, test information, and any other information related to the provider's assessment and findings. (Desiraju 60[6]; Cassens 24[7]). Other than to provide initial EMR training and support to new providers, scribes are assigned only to providers who see at least 30 patients per day. (Dunleavy 45[8]). Jansma's understanding was that he would have a permanent, full-time scribe, but that was not BSV's understanding and nothing in the practice purchase or employment agreements (which both contained merger clauses) included any promise of or reference to a permanent scribe. (Jansma 39, 56-57; Pl. Ex. 7).

## III. BSV Staff Report That Jansma's Behavior Is Inconsistent with BSV's Mission and Core Values

It became clear, almost immediately, that BSV's and Jansma's expectations about their partnership and his behavior were not in alignment. (Jansma 41; Pl. Ex. 8). Even before his first day of work, while going through new hire paperwork, BSV's Vice President of Human Resources had to tell him that he had been inappropriate, after he made what she considered a sexually inappropriate joke to her. (Dabrowski 15). Then, on his first day of work, he went to the wrong office and was upset that he was expected to see patients, even though that had been discussed with him. (Dunleavy 64- 65). Also, within Jansma's first two weeks of employment, Jansma complained in writing about not having a full-time scribe on two different occasions: (1) after his first day of work, Jansma complained that Shoreline was not providing a scribe "all the time" and was "pushing him to learn their EMR;" and (2) about a week later, after GRO's Director

[6] Excerpts from Desiraju's deposition are attached as **Exhibit 5**.
[7] Excerpts from Cassen's deposition are attached as **Exhibit 6**.
[8] Excerpts from Dunleavy's deposition are attached as **Exhibit 7**.

of Clinical Operations, Amy Dunleavy, told Jansma that she would be removing the scribe at GRO at some point, Jansma responded that he had been "promised a scribe" during negotiations. (Pl. Ex. 8). Jansma copied Hamilton on his email to Dunleavy, but Hamilton did not agree with Jansma; instead, Hamilton clarified that while they did discuss providing a scribe to get Jansma up to speed (which Hamilton assumed may take a couple months), the scribe was never intended to be permanent. (Pl. Ex. 8). Jansma did not object to Hamilton's clarification; rather, he *thanked* Hamilton and stated that he would "really appreciate making the scribe permanent." (Pl. Ex 8).

Despite initially accepting Hamilton's characterization of their discussions about the scribe, Jansma continued to demand a full-time scribe and complain that it had been promised. (Jansma 55; Def. Ex. 2[9]). For the first few weeks, Jansma would not even touch a computer keyboard, which made the scribes uncomfortable because their job was to train him to work on his own and he was refusing to do so (Dunleavy 43-44). Multiple BSV staff members at different clinics had to become involved in explaining to Jansma that he did not qualify for a permanent full-time scribe, and that he would be required to learn BSV's EMR system. (Jansma 40-41; Pl. Ex. 7, 8, 29; Def. Ex. 2). Despite these clear communications about BSV's standards, by late July 2018, Jansma was *still* telling Dunleavy that he would "not back down on having a full time scribe immediately." (Def. Ex. 2; Jansma 58). Jansma's insistence on a scribe created issues for BSV as it became more and more difficult to find scribes who were willing to work with Jansma, and other Optometrists had started to complain that Jansma's patient load did not warrant a full-time scribe. (Jansma 65-66, 78). Toward the end of his employment, BSV had to assign a scribe to enter his hand-written exam notes into the EMR afterwards. (Jansma 58-59; Dunleavy 57).

[9] Individual Defendant's Exhibits are cited as "Def. Ex. ___" and all Defendant's Exhibits are attached as **Exhibit 12**.

BSV also received multiple reports of Jansma treating staff in a rude, condescending and even sexist manner. (Def. Ex. 2, Def. Ex. 3). For instance, Michelle Cassens, the Executive Director at Shoreline, reported to BSV's Chief Operating Officer, Surya Desiraju, that "many of [Jansma's] interactions with staff and management have been hurtful and insulting." (Def. Ex 2). Cassens recalled hearing that, after working with Jansma, one Ophthalmic Assistant was "in tears" and asked not to work with him again; Cassens also recalled hearing that Jansma had raised his voice with front desk staff and they felt they were treated poorly by him. (Cassens, 44-45).[10] When asked about Cassens' report during his deposition, Jansma denied being "hurtful and insulting," but acknowledged one incident where "one young girl" - referring to an adult female employee – "misinterpreted something." (Jansma 52). Jansma explained that the "young girl" was scribing for him, and he said: "okay, let's hurry up, let's go" and she "took it like [he] was reprimanding her or something" and being "offensive," but "[he] wasn't." *Id.* During his deposition, Jansma discounted the adult female employee's reaction by describing her as "just too young to sort of understand it" and "just a tenderhearted thing." (Jansma 51-52).

GRO's Director, Amy Dunleavy, also reported concerns about Jansma treating staff in a rude, condescending and sexist manner[11]. (Def. Ex. 3).For instance, staff complained that when Jansma would become frustrated with the EMR system, he would raise his voice or behave rudely toward the Optical Technicians. For example, staff reported that Jansma would walk away from them and tell them to "figure it out" when something would happen that he did not like. (Def. Ex. 3). Both technicians and scribes had complained that he was "condescending toward scribes

---

[10] Jansma denies treating staff poorly, but does not deny that these reports were made to management (Jansma 51).
[11] Dunleavy testified that she spoke to Jansma, in person, during weekly meetings about the feedback she was getting from scribes; told him his behavior would not be tolerated; and explained she was having trouble finding scribes to work with him. (Dunleavy 50). Jansma responded that they were oversensitive because they were women; were overreacting; and found no fault with his own behavior. (Dunleavy 54). Jansma denies that Dunleavy met with him.

and patients at times," and at least two scribes at GRO felt he was "sometimes sexist." (Def. Ex. 3). Toward the end of his employment, a female scribe also complained that, after a patient had left the room, Jansma had rubbed her shoulders and back as she was completing the chart; that scribe was no longer comfortable working alone with Jansma (Dunleavy 70).

BSV also received multiple reports that Jansma had made disparaging comments about patients, which BSV staff members found inappropriate. (Def. Ex. 3). For instance, staff expressed concern that Jansma had refused care to patients who had a negative balance at his previous, private practice, which was inconsistent with BSV policy as BSV did not believe in withholding services based on inability to pay (Jansma 51-53; Cassens 39; Def. Ex. 2). Staff also reported that Jansma would make snide comments about patients' hygiene, gender, and income (insurance)" and that he had been "very rude with making comments about patient's ethnicity, race, gender, income, and sexual orientation." (Def. Ex 2; Dunleavy 40-44).

During Jansma's deposition, he proclaimed that – from his perspective – he is "never condescending," "never" sexist, and would "of course not" have made derogatory comments or done things to make his coworkers uneasy. (Jansma 73, 76). Jansma, however, made the following comments that could be considered offensive *during his deposition*:

- Jansma relayed a personal story stating that he thought it was "ridiculous" that a 5 foot 4 inch woman wanted to be a police officer (Jansma 10);

- As described above, Jansma referred to an adult female BSV staff member as a "young girl," suggested that she was "too young" to understand his joke, and called her a "tenderhearted thing" (Jansma 53-53, 73-74);

- Jansma stated that an attorney not affiliated with this suit had "short man syndrome," that women don't "usually have [short man syndrome]" and that he "loves short women" (Jansma 116); and

- When describing a "little disagreement" he had with his subsequent employer, he recounted an incident where a mother had brought her two "very overweight" daughters in for an exam, including one who was around

3 years old. The children were not behaving, so Jansma asked the mother to stay behind after the exam, and proceeded to "give [her] a couple tips" on raising her girls. The girls' mother submitted a complaint, the employer agreed that Jansma should not be "schooling parents" and discharged him. (Jansma 133, 135). Notably, Jansma's reference to the little girls' weight was completely gratuitous and had absolutely nothing to do with his discipline.

- Describing another patient complaint he received at a subsequent employer, Jansma explained that he had made a joke where he asked a male patient if he was "going to do that woman thing . . . and change his mind?" While the patients found the joke to be sexist, Jansma disagreed and indicated that he has "done that forever and everybody has just laughed," does not "consider that still at this point a sexist joke," and that the only reasons the patients actually complained about either encounter is because "people are just so touchy about things nowadays." (Jansma Dep.134-135).

By August or September of 2018, these concerns had made it increasingly difficult for clinic managers to find staff to assign to work with Jansma, particularly since they did not feel comfortable requiring any female staff to work with Jansma. (Jansma 77-78; Def. Exs. 2, 3). Dunleavy had even resorting to buying a male scribe lunch because he had been willing to be assigned to Jansma when others were not. (Def. Ex. 3). In early September 2018, at the request of GRO President, Zach Smith, Dunleavy began collecting data explaining why staff members did not want to scribe for him. (Def. Ex. 3).

Things were not much better operationally, from both BSV's and Jansma's perspective. (Jansma 91). According to Jansma, in addition to the scribe, BSV was not meeting his expectations because they changed their expectations related to his expected patient volume; gave him a schedule that was "confusing;" did not have things "ready to go" for him when he arrived in the morning; and disagreed with his belief that patients should be required to pay a balance owed to Jansma's prior practice before being seen for care at BSV. (Jansma 42-47, 83, 86). Jansma also wanted Shoreline staff to help with the A/R from his private practice, which Shoreline did not think was an appropriate use of their resources. (Def. Ex. 2; Jansma 46-49, 63-64; Cassens 41-42).

Staff reported that Jansma dropped off boxes of patient charts that were part of his A/R at Shoreline's office, using a dolly, and then left the female staff (without offering the dolly) to transport the heavy boxes. (Jansma 47-49; Cassens 43-44). When this was raised with Jansma, his reaction was that "they were making a mountain out of a molehill" and "just whining." (Jansma 48-49). Both Shoreline and GRO also received an inordinate amount of returned letter notices, from patients that had been in Jansma's database and whom BSV had expected may become patients of BSV, but the addresses were not correct. (Def. Ex. 2).

Finally, Jansma's competence had come into question. One staff member shared "grave concerns" about Jansma's ability to work independently on BSV's EMR systems, as she had observed he could not even operate a mouse (Def. Ex. 2)[12]. BSV also received a patient complaint that Jansma had a "bad bedside manner and didn't really trust his diagnosis." (Dunleavy 58; Pl. Ex. 32). One of GRO's Ophthalmologist's also questioned whether Jansma was making appropriate patient referrals (Pl. Ex. 25; Dunleavy 55-56).

## IV. Jansma Discloses He Has a Medical Condition And That The Medical Condition Impacts An Essential Job Function

After Vanderlugt had been presented with a list of frustrations and complaints about Jansma, and during a conversation about Jansma's continued insistence on a full-time permanent scribe, Jansma told Vanderlugt that he had trouble seeing part of the EMR because he had homonymous hemianopia. (Jansma 82, 160; VanderLugt 38, 43). Homonymous hemianopia is a neurological disorder, typically resulting from a stroke, whereby there is a defect in a portion of an individual's visual field. (Glazer 14[13]). Jansma's homonymous hemianopia was caused by a stroke in 2012, and visual field tests conducted at that time indicated that there was a significant

[12] Jansma claims this is not true; he just had a "personality conflict" with that employee who had "looked down her nose at him just from the very start." (Jansma 49).
[13] Excerpts from Glazer's deposition are attached as **Exhibit 8**.

defect resulting in loss of half of the visual field in each eye. (Jansma 18; Glazer 19). As Jansma described, in textbooks used to educate Optometrists like himself, the visual field defect is described as substantial; nearly all of half a patient's side vision on one side is gone. (Jansma 19; Glazer 14). Neuro-ophthalmologists, rather than ophthalmologists, would evaluate the impact of a homonymous hemianopia on an individual's ability to safely do their job. (Glazer 29-31).

After his stroke, Jansma never bothered to have an objective medical evaluation conducted to determine whether his homonymous hemianopia could cause him to miss anything when he examined patients;[14] instead, as a solo practitioner with no oversight, he self-diagnosed his condition by going into his office, looking through the scopes and deciding on his own that he could see everything. (Jansma 19). Since 2012, Jansma has relied upon turning his head to the right or intentionally scanning his eye to the right to compensate for what he otherwise would not be able to see. (Jansma 22). Upon learning of Jansma's condition in late September, Vanderlugt recognized that "it could be of concern for performing an eye exam safely," so he consulted BSV Ophthalmologist Dr. Yosef Gindzen on the matter. (Vanderlugt 47-48; Pl. Ex. 11). Gindzen, who Vanderlugt identified as a "physician partner who would be our probably lead in that area," agreed that Jansma's homonymous hemianopia could "potentially be problem." (Vanderlugt 48).

## V. BSV Offers Jansma The Opportunity To Resign

By September 2018, BSV management determined that they needed to meet with Jansma to address the serious and ongoing performance issues being reported by BSV staff. [15]

[14] Jansma had recently declared personal bankruptcy, due to an investment that created over one million dollars in personal liability, and had substantial concerns about the financial impact of retiring early. (Jansma 33, 110, 143). Jansma's concerns about his personal financial situation remained as of October 16, 2018. (Jansma 110).

[15] Although Jansma states no one at BSV ever talked to him about any behavioral issues before September 25, 2018, he admits that BSV did talk to him about the patient volume required for a full-time scribe and that BSV would not refuse care to patients that owed money to his previous private practice. (Jansma 63, 63). He also knew staff were upset about him "offloading" his patient files on Shoreline staff (Jansma 48). Dunleavy testified that she met with him weekly and discussed the feedback she had been getting (Dunleavy 50), and Vanderlugt testified that he met

(Desirjau 65; Dunleavey 34). By that time – which was only around 3 months into Jansma's employment with BSV – even BSV's Chief Executive Officer Bill Hughson, had become involved. Hughson had spoken to staff and BSV, as well as Jansma himself, and concluded that Jansma was "fundamentally" unhappy with the partnership. (Desiraju 63-65; Jansma 90; Pl. Ex. 19).

On September 25, 2018, BSV's Chief Operating Officer, Surya Desiraju coordinated a meeting with Jansma and Dr. Vanderlugt to discuss the behavior issues and BSV's impression that the partnership did not seem to be meeting either party's expectations. (Desiraju 65). As Jansma acknowledged in his deposition testimony, he was not happy with the partnership and felt mislead by the misunderstanding over the scribe. (Jansma 91). According to Jansma, during the September meeting, Vanderlugt told Jansma that Jansma was not taking advantage of BSV's "collegial atmosphere" and that some senior members "think you are a liability;" (Jansma 89). Based on the behavior issues and because neither BSV nor Jansma was fulfilled by the partnership, Desiraju – extending a professional courtesy – offered Jansma the chance to resign. (Jansma 89; Desiraju 65-67, 77). Desiraju did not terminate Jansma, and did not intend to terminate Jansma during the meeting. (Desiraju 80). If Jansma had elected not to resign, but continue with the partnership, Desiraju intended to initiate a performance improvement plan and/or progressive discipline, as a formal step to address Jansma's performance issues. (Desiraju 73-78).

Although surprised by BSV's offer, Jansma agreed that he would submit a letter of resignation ***if and only if*** BSV would agree to certain terms, including paying out his salary, lifting his restrictive covenants and continuing his health insurance. (Desiraju 101; Jansma 87- 88; Pl. Ex. 9). Jansma had also been disappointed with how things were going at BSV, and during this

---

with Jansma and discussed staff complaints about his behavior, including an incident of inappropriately touching a staff member. (Vanderlugt 39).

deposition, acknowledged that if the staff reports about his behaviors were true that BSV had a right to be concerned. (Jansma 54, 63, 66, 67, 76, 80, 90-91).

## VI. Jansma's Decision Not to Resign and Agreement to a Medical Evaluation

Over the next week and a half, BSV believed that Jansma intended to submit a resignation letter, but despite follow ups by BSV, Jansma never submitted it. (Desiraju 101; Jansma 88; Pl. Ex. 9, 14). As Jansma explained, he no longer trusted BSV because he felt "they hadn't lived up to what they said in [my] employment contract," so he "wanted to get everything in writing." (Jansma 93). At that point, according to Jansma, "everything was nebulous," and "until [BSV] laid out concrete things, [he was] certainly not tendering his resignation (Jansma 93).

By October 5, 2018, Dabrowski had learned that Jansma had a medical condition and that someone with that medical condition could have difficulty performing the function of an Optometrist at BSV, and had learned that Jansma was "having difficulty seeing" certain areas of the computer screen. (Dabrowski 24-26). On or about October 5, 2018, Dabrowksi contacted Jansma to provide him with two alternatives: (1) resign under the terms offered by BSV; or (2) continue employment on leave pending a medical evaluation by a neuro-ophthalmologist to determine whether Jansma could safely perform his job duties. (Dabrowski 40-42). Dabrowski wanted the medical evaluation completed because, in addition to knowing about Jansma's homonymous hemianopia, she had become aware that he had been having difficulty seeing parts of the computer screen; those issues together caused BSV to question Jansma's ability to safely treat patients because all of BSV's Optometrists are responsible for the diagnosing medical conditions, retinal detachments and other things." (Dabrowski 49, 42) Jansma selected the medical

evaluation route, so that day, BSV placed Jansma on a paid leave of absence pending the results of the medical evaluation.[16] (Dabrowski 50).

A. The Medical Evaluation Forms.

On October 8, 2018, Dabrowski sent Jansma an email asking him to select a neuro-ophthalmologist from outside of the BSV-provider network to whom Jansma could go for an independent evaluation. (Jansma 94; Def. Ex. 4). Included in the same email, Dabrowski provided a copy of the packet of information that would go to Jansma's selected neuro-ophthalmologist. (Janms 100; Def. Ex. 4; Pl. Ex. 14). That packet contained three interrelated documents: (1) a letter from Dabrowski to the neuro-ophthalmologist asking 10 specific questions about the nature of Jansma's homonymous hemianopia and its impact (if any) on his ability to safely perform his job duties as an Optometrist at BSV ("the Evaluation Letter"); (2) a medical authorization form that, once signed by Jansma, would allow the neuro-ophthalmologist to respond directly to BSV with the answers to the questions in BSV's letter ("the Release"), and (3) a copy of the BSV Optomestrist job description to inform the doctor of Jansma's specific BSV Optometrist job duties (collectively referred to as the "Evaluation Forms"). (Jansma 107, Pl. Ex. 14).

The introductory paragraphs of the Evaluation Letter described the reasons for the requested evaluation and the narrow scope of medical information needed, as follows:

> Dr. Jansma has notified BSV that he has homonymous hemianopia, **which has created concerns about whether Dr. Jansma can safely perform his job as an Optometrist, with or without reasonable accommodation**.
>
> **In order to appropriately evaluate and respond to *this issue*, we need more information about *Dr. Jansma's impairment(s) and whether he can perform his job with or without any accommodation*.**

[16] BSV had also continued to pay Jansma since September 25, 2018. (Dabrowski 45, 49).

> In order to assist you in responding to the questions below, we have attached a list of the essential functions of Dr. Jansma's position. Specifically, **is he able to thoroughly exam the eye to find pathology, including seeing the entire surface and internal structures of the eye without missing areas of concern which can lead to irreversible loss of vision or missing systemic diseases that could be diagnosed based on ocular findings. We want to be sure that Dr. Jansma is not placed in a job position that he is unable to perform and/or that could place patients or others at risk.** Please note that the attached list is specific to Dr. Jansma's current job at BSV. In the event that he seeks a different position, BSV will likely ask you to provide an opinion with regard to that particular position.
>
> **Please answer the below questions. We have enclosed a release signed by Dr. Jansma giving you permission to respond directly to BSV.**

(Pl. Ex. 14).

The Evaluation Letter goes on to ask 10 questions about Jansma's impairment, any accommodations needed and whether he poses a safety risk. *Id.*

The "enclosed release," referred to in the last sentence of the Evaluation Letter, is a form document entitled Authorization for Release of Health Information ("the Authorization"). *Id.* Paragraph 1 of the Authorization states Jansma's name and date of birth. Paragraph 2 - if Jansma had completed the Authorization as requested – would "authorize [Dr. Glisson] to release or disclose health information (as disclosed below) of the above named individual (referring to Jansma) to: Blue Sky Vision ("BSV"). (*Id.;* Jansma 106). Paragraph 6 of the Authorization contains a "description of the information [Jansma] authorize[s] for use or disclosure," and broadly lists types of medical records and information that Dr. Glisson would not possess, have access to

or seek access to as part of the evaluation, like dental records, pharmacy records, and mental health and substance abuse records" (Jansma 99; Glisson 21[17]).

Jansma did not object to BSV sending him for a medical evaluation for the purposes described in the Evaluation Letter; he even agreed that the questions to the doctor posed by BSV were related to his job duties as an Optometrist for BSV. (Jansma 102, 105). Jansma, however, took issue with the following paragraph:

> Please note that the attached list [referring to the job description] is specific to Dr. Jansma's current job at BSV. *In the event that he seeks a different position, BSV will likely ask you to provide an opinion with regard to that particular position.*

(Jansma 103). Jansma incorrectly thought that this sentence would enable Blue Sky Vision to weigh in on different employment outside of BSV, when in fact, it only clarified that if Jansma sought another position with BSV, then BSV would likely ask for another medical opinion based on the essential job functions of the new position. (Jansma 103-05; Pl. Ex. 14).

Jansma (and the EEOC) also misinterpreted Paragraph 6 of the Authorization, as broadly entitling BSV to information about Jansma's medical background, including dental records, mental health records, and substance abuse records. (Jansma 102). The Authorization, however, does not authorize BSV to gather any medical information about Jansma, including the records listed in Paragraph 6; in fact, it does not even authorize Glisson to *gather or access* that health information. (Pl. Ex. 14). It merely authorizes Dr. Glisson to "release or disclose" health information he has about Jansma to BSV. In other words, the Authorization only allows BSV to receive "health information" – as defined in Paragraph 6 – from Dr. Glisson. (Pl. Ex. 14). And as Plaintiff and Dr. Glisson acknowledged, as part of an eye examination, an eye doctor would not

[17] The deposition of Christopher Glisson was taken on April 15, 2021 and is cited as "Glisson __." Cited portions of the deposition are attached as **Exhibit 9**.

go searching through a patient's medical records to obtain information about a patient's medical condition that's not relevant to the reason the patient is being seen. (Jansma 99; Glisson 21). Accordingly, Dr. Glisson would not have any of the irrelevant health information described in Paragraph 6 of the Authorization, which he could even pass on to BSV; he would only have the health information he obtains from Jansma related to the examination. (Pl. Ex. 14; Jansma 99).

Moreover, as Jansma himself acknowledged, reading the Evaluation Letter together with the Authorization, what the Authorization does is give Dr. Glisson permission to respond to "the questions" included in the Letter directly to BSV. (Jansma 107; Pl. Ex. 14). As a result, even if Dr. Glisson had more medical information about Jansma than was necessary to determine whether he can safely perform his job (which he would not), BSV does not ask for that information in either the Evaluation Letter or Authorization. (Pl. Ex. 14). Jansma's (and the EEOC's) concern that, by signing the Authorization, Jansma would be broadly authorizing BSV – or anyone else – to gather or share medical records unrelated to his medical evaluation is therefore misplaced. *Id.*

B. Jansma's Failure to Communicate or Otherwise Cooperate With BSV's Attempt To Coordinate A Medical Examination While On Paid Leave.

Despite being on a *paid* leave, Jansma was neither timely nor cooperative in responding to BSV's requests for information to enable it to schedule a medical evaluation. (Jansma 108-121; Def. Ex. 4). Indeed, Jansma did not respond at all to Dabrowski's October 8th request to select a neuro-ophthalmologist, so on October 16th (over a week later), Dabrowski sent Jansma a follow-up email, asking that he respond with his preferred neuro-ophthalmologist by close of business the following day, October 17, 2018. (Jansma 108; Def. Ex. 4). Dabrowski explained that, if he did not respond, BSV would interpret that to mean that he did not want to undergo the evaluation and was voluntarily resigning his position. (Def. Ex. 4). Jansma did not respond by end of business October 17, 2018. (Jansma 112-113; Def. Ex 4). Over a full day later,

after close of business on October 18th, Jansma finally responded, saying he had missed Dabrowski's email, but had met with an attorney the day before and would be in touch "to advise regarding my next course of action." (Def. Ex. 4). Jansma did not provide any of the information Dabrowski requested in order to facilitate his medical evaluation. *Id.* Dabrowski therefore followed up (again) on October 19, 2019, explaining that Jansma was free to consult an attorney, but that they needed to move forward with the evaluation, and again, asked him to select a neuro-ophthalmologist. *Id.* Dabrowski set a deadline of October 22, 2018 for Jansma to provide the name of the neuro-ophthalmologist he selected. *Id.* This time, Jansma responded to say that he had contacted the EEOC and would have a meeting with them in the near future; but again, he did not provide the information Dabrowski had requested. (Jansma 114-115; Def. Ex. 4). Dabrowski therefore responded that, since Jansma did not provide the requested information, despite multiple requests, BSV considered him to have voluntarily ended his employment, effective that day. (Jansma 117; Def. Ex 4). Notably, this was nearly three weeks after Jansma had agreed to the medical evaluation (which he acknowledges was reasonable) and had been on paid leave. *Id.*

Late that night, Jansma responded to Dabrowski to make it "very clear" that he was not voluntarily quitting his position. (Jansma 114-115; Def. Ex. 4). Despite the fact that it had been three weeks since BSV requested a medical evaluation, Dabrowski had always given him at least 24 hours to respond to requests for information (usually more), and Jansma had already consulted with an employment attorney, he excused his repeated failures to communicate by stating: "not knowing my rights in this unusual situation has taken more time than you have allowed me when you want immediate responses to your requests." *Id.* Dabrowski responded the next morning, explaining that the purpose of the medical evaluation that BSV had been requesting was to facilitate his return to work, as long as he could safety perform his job duties. (Jansma 117;

Def. Ex. 4). She recognized that he may not have fully understood his obligation to continue working with BSV to have that evaluation completed, but clarified that he did need to cooperate and complete a medical evaluation by one of the specialists BSV recommended. (Def. Ex. 4). Though Jansma had already missed multiple deadlines for selecting a neuro-ophthalmologist, Dabrowski agreed that BSV would "not consider [Jansma] a voluntary quit if, as [BSV] has now requested four times over the course of two weeks, [he would] advise BSV which specialist he prefers and cooperate in completing a medical evaluation." (Def. Ex. 4).

On October 24, 2018, Jansma responded to Dabrowski. (Jansma 117-121; Def. Ex. 4). For the very first time after three weeks of Dabrowski trying to schedule the medical evaluation, Jansma expressed concern about its "scope;" specifically, he stated:

> The testing that Blue Sky has proposed is overreaching in its scope. It seeks to delve into my entire medical history, which is an invasion of my privacy. Only history germane to my condition may be accessed.

(Def. Ex. 4). Jansma did not mention the Authorization or any of the language contained in the Evaluation Forms; he simply complained of the scope of "the testing." Jansma went on to say:

> The issues I have listed above, as well as Blue Sky's intent if I am deemed fit to practice, with or without accommodation, need to be set forth before I agree to, and have testing performed. In other words, I need to know the outcome if I am deemed fit to practice. Will I remain employed, as a practicing optometrist, with Blue Sky Vision, LLC, in a non-hostile environment that accommodates me? This needs to be set forth in writing. If that is the case, I select Dr. Glisson to examine me. I will set the appointment. It will occur after my meeting with the EEOC, which should occur during the next 2-4 weeks.

(Def. Ex. 4).

Dabrowski responded that same day, explaining her understanding of why BSV transitioned from negotiations over his resignation to discussions of a medical evaluation (i.e.,

because he had not resigned, but had made BSV aware of his condition). (Jansma 112; Def. Ex. 4). She also explained that "the medical evaluation has always been the tool that would enable you to return to work, as long as one of the specialists you were given to choose from confirms that you can safely perform your job duties, with or without reasonable accommodation;" Dabrowski "apologized if that was not sufficiently clear to [him,] but that has always been the case." (Def. Ex. 4). Dabrowski also assured Jansma that the scope of the medical evaluation would be limited:

> I also want to make it clear that **Blue Sky is not interested in any medical information about you beyond whether the nature and extent of your homonymous hemianopia prevents you from safely performing your job duties**. If you are deemed safe to return to work, with or without reasonable accommodations, you may return and will not be subjected to a hostile environment.

(Jansma 118, 120-121; Def. Ex. 4).

Jansma believes that he spoke to Dabrowski after this exchange, and that his conversation with her was similar to what he said in his email – that the evaluation "needed to pertain just to [his] eye condition." (Jansma 126).

Dabrowski emailed Jansma on October 29, 2018, with the updated Evaluation Letter and Release directed to Dr. Glisson; asked him to complete and return the form and invited him to let her know if he had any questions. (Jansma 126-127; Def. Ex. 4). Jansma did not respond. *Id.* On November 8, 2018, Dabrowski emailed Jansma again to follow up, let him know she had been in contact with Dr. Glisson's office about scheduling his appointment, and that he would be hearing from them. She also reminded him to return the Authorization form. (Jansma 127; Def. Ex. 4). Again, Jansma did not respond. *Id.*

**VII. BSV'a Termination Of Jansma's Employment.**

Despite Dabrowski's reassurances about the limited scope of the medical evaluation and Jansma's ability to return to a non-hostile work environment, Jansma never

scheduled an evaluation with Dr. Glisson. (Dabrowski 90; Glisson 23). Nor did he respond to Dabrowski's last two emails to explain that he remained concerned about the scope of the evaluation, or that he needed to have any forms revised. (Jansma Dep. 126-127; Def. Ex. 4). Because Jansma had been on paid leave for over two months without making any effort to cooperate with BSV's efforts to determine whether he could safely perform his job duties, or even communicate with BSV about his concerns, BSV terminated his employment on December 5, 2018. (Jansma 127-128; Pl. Ex. 16).

## ARGUMENT

### I. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. R. 56(a). In making this determination, the court will view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). A mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Plaintiff cannot "rely on conjecture or conclusory accusations." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008). Plaintiff must show specific facts that reveal a genuine issue for trial. *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

### II. The EEOC's ADA Claims Must Be Dismissed Because The EEOC Cannot Establish A Prima Facie Case of Discrimination, BSV's Employment Actions Were Based on Legitimate, Non-Discriminatory Factors and the EEOC Has Not Demonstrated Pretext.

Title I of the Americans with Disabilities Act ("ADA") prohibits covered employers from discriminating against a qualified individual because the individual is disabled, has a record of being disabled, or because the employer "regards" the individual as disabled. 42 U.S.C. §§ 12102(1), 12112(a). The EEOC claims that BSV "regarded" Jansma as disabled. To establish a prima facie case of discrimination in a "regarded as" ADA claim, the employee must show that (1) his employer regarded him as disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008); *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019); *Lewis v. Humboldt v. Acquisition Corp*., 681 F. 3d 312, 321 (6th Cir. 2012) (en banc). The EEOC cannot establish that Jansma was otherwise qualified for the position or that he suffered an adverse employment decision.

### A. Jansma Cannot Establish That He Was Qualified To Perform The Essential Functions Of His Job.

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Thus, if an individual's disability renders him unable to perform an "essential function" of his job, he is not a "qualified individual" under the ADA. In such an instance, the ADA does not require an employer to continue employing the disabled employee, nor does it require the employer to offer that employee an accommodation. *Wagner v. Sherwin-Williams Co.*, No, 15-5975, 647 Fed. Appx. 645, 647, 2016 WL 2641257, at *2 (6th Cir. May 10, 2016).

A job function may be considered essential for several reasons, including the following: (i) the function may be essential because the reason the position exists is to perform that function; (ii) the function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) the function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform that particular function. 29 CFR § 1630.2(n)(2). Factors to consider when determining whether a job function is essential include: (1) the employer's judgment, (2) the written job description, (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs. *Keith v. County of Oakland*, 703 F. 3d 918, 925-26 (6th Cir. 2013) (citing 29 CFR 1620.2(n)(3). Additionally, to be qualified for a position, an employee must be performing his job duties consistent with the employer's legitimate expectations. *Ang. v. Proctor & Gamble Co.,* 932 F.2d 540 (6th Cir).

Reports of Jansma's rude, disrespectful and unprofessional treatment of co-workers and patients, as well as his outright refusal to acclimate to BSV's policies and procedures were inconsistent with BSV's expectations of its work environment. (*see* Pl. Ex. 1; Pl. Ex. 11). Jansma himself admits that if the reports about his behavior were true, BSV had reason to be concerned. (Jansma 54, 63, 66, 67, 76, 80). All of these reported and demonstrated behaviors were sufficient to cause BSV to conclude that Jansma was not performing his duties consistent with BSV's legitimate expectations. And although BSV did not discharge him for those reasons, given it had not implemented progressive discipline yet, it does not change the fact that BSV was dissatisfied.

Moreover, Jansma's refusal to even communicate with BSV about his medical evaluation – while he was on paid leave – did not meet BSV's legitimate expectations. Jansma

now claims that the reason he objected to the medical evaluation is that he interpreted the forms as overly broad and thought (incorrectly) that would have allowed BSV to share information with future employers. But Jansma never even mentioned to BSV that he had a concern about the forms; the only thing he said to BSV – 3 weeks after he had been presented with the forms – was that the "testing" was overly broad and delved into his entire medical history. And after BSV assured him that they would not be seeking that overly broad information and sent updated forms, he simply stopped communicating with BSV, while continuing to collect a paycheck.

For these reasons, BSV validly determined that Jansma's behavior was evidence that he could not perform the essential functions of his job. As such, Jansma is not a "qualified individual" under the ADA and the EEOC's case must be dismissed.

**B. Jansma Cannot Establish That He Suffered An Adverse Employment Action.**

Even if Jansma could perform the essential functions of his job, the EEOC cannot demonstrate an adverse employment action. The EEOC alleges that BSV's placement of Jansma on leave of absence, BSV's request for a medical evaluation, and BSV's decision to terminate his employment meet that standard. The three, however, are interrelated and therefore do not qualify as "adverse." *Krevinghaus v. Hills & Dales Hospital*, 190 F.Supp.3d 694, 701 (E.D. Mich. 2016).

BSV placed Jansma on a leave of absence so that a physician could determine, via a medical examination and inquiry, whether he could safely perform his essential job functions. (Pl. Ex. 14; Def. Ex. 4). Jansma was then terminated because he failed to cooperate with and allow BSV to make that determination. (Def. Ex. 4; Pl. Ex. 16).Thus, if Jansma was *improperly* sent for a medical examination and inquiry, then that would be an adverse action, as would the termination and leave of absence. If, on the other hand, he was properly sent for a medical examination and inquiry, and that medical examination and inquiry could not be completed for reasons related to

his noncooperation, then neither his termination nor his leave of absence were adverse employment actions. *Krevinghausl*, 190 F.Supp.3d 694, 702 (E.D. Mich. 2016).

**i. BSV's Requested Medical Examination And Inquiry Was Lawful Because It Was Job Related And Consistent With Business Necessity.**

An employer may request that an employee undergo a medical examination where the employer "had a reasonable basis for believing that the employee was unable to perform the essential functions of his job or that he posed a direct threat to his own safety or the safety of others. *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 624 (6th Cir. 2014). The burden is on the employer to show that the required evaluation was "job related and consistent with business necessity." 42 USC § 12112(d)(4)(A). For an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)**Error! Bookmark not defined.**. BSV had a reasonable basis for believing that Jansma was both unable to perform the essential functions of his job and that he posed a direct threat to the safety of others.

**1. There Was Sufficient Evidence To Lead BSV To Reasonably Believe That Jansma Could Not Perform the Essential Functions of His Job.**

It is undisputed that Jansma told individuals at BSV that he had trouble seeing pop-ups on the computer screen when using the EMR, and that using the EMR system was an essential job function. (Jansma 159). Thus, Jansma's own admissions that his medical condition affected his ability to do his job provided BSV a reasonable basis that he was unable to perform the essential functions of his job.

**2. Alternatively, Jansma Posed A Direct Threat To The Health Or Safety Of BSV's Patients That Necessitated A Medical Examination And Inquiry.**

An employee poses a "direct threat" when he creates a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation. 42 U.S.C. § 12111(3). An assessment of whether the employee poses a direct threat must be individualized to the employee's abilities and job functions and "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence. 29 C.F.R. § 1630.2(r). In determining whether a direct threat exists, the court should consider: (i) duration of the risk, (ii) the nature and severity of the potential harm, (iii) the likelihood that the potential harm will occur, and (iv) the imminence of the potential harm. 29 C.F.R. § 1620.2(r). Reasonable medical judgment" could direct an employer to consult with a medical professional, to survey relevant medical literature, to take stock of common knowledge regarding well-known medical conditions, or to take some other action that evidences reliance on medical knowledge. *Kroll*, 763 F.3d 619, 626 (6th Cir. 2014). An employer must do more than follow its own lay intuition regarding the threat posed by an employee's potential medical condition. *Id.*

Jansma's job duties as a BSV Optometrist required him to "diagnose, manage, and treat conditions and diseases of the human eye and visual system," by "examin[ing] eyes and visual systems." (*see* Pl. Ex. 11). Thus, an inability to properly examine eyes - because he cannot properly see - could lead Jansma to miss diagnoses of disease or other impairments "that could result in blindness or worse for a patient outcome." (Dabrowski 46). Dabrowski, prior to making the decision to request a medical evaluation, was informed of Jansma's medical condition; that someone with that condition could have difficulty performing the function of an Optometrist at BSV, and that Jansma was "having difficulty seeing" certain areas of the computer screen. (Dabrowski 25, 26). Based on this information, it was reasonable for Dabrowski to believe that Jansma could present a risk to the health or safety of others.

BSV did not follow its own lay intuition regarding the threat posed by Jansma's potential medical condition because, as eye care specialists themselves, BSV Optometrists and Ophthalmologists are uniquely positioned to understand the medical literature regarding homonymous hemianopia. As Jansma himself demonstrated during his deposition, an Optometrist "know[s]" the condition because "as an eye doctor . . you study this." (Jansma 18, 19). Furthermore, an Optometrist- through his or her schooling- would understand that a homonymous hemianopia would result in the entire side of a visual field of an affected individual to be "blacked out", and "just gone." (Jansma 19). Finally, Jansma indicated that even an eye doctor looking at Jansma's own visual field test results would think, "holy smokes, this guy can't see squat." (Jansma 18). Consistent with Jansma's testimony about what the textbooks would say, when Jansma disclosed his condition – and the condition's impact on his ability to complete a job function- to Vanderlugt in September 2018, Vanderlugt immediately recognized that "it could be of concern for performing an eye exam safely." (Vanderlugt 47; Pl. Ex. 11). Vanderlugt's reaction to Jansma's disclosures is consistent with Jansma's own testimony about what the relevant medical literature would tell an Optometrist about the condition.

Furthermore, assuming *arguendo* that a BSV Optometrist's own medical knowledge regarding homonymous hemianopia is not sufficient to qualify as a "reasonable medical judgment," Vanderlugt consulted with a BSV Ophthalmologist, Dr. Gindzen, on the issue. (Vanderlugt 47-48). Identified by Vanderlugt as a "physician partner who would be our probably lead in that area," Gindzen agreed that Jansma's homonymous hemianopia could "potentially be problem." (Vanderlugt 48). However, both Gindzen and Vanderlugt acknowledged that "there can be differences in depths of hemainopias" and without the relevant information about Jansma's specific condition, it would be "hard" to form a solid opinion. (Vanderlugt 48).

Finally, it is undisputed that - even Jansma himself - acknowledged that it would be reasonable for BSV to conduct an evaluation based on the nature of his condition. (Jansma 102, 120, 162).

**i. BSV's Medical Examination And Inquiry Were Appropriately Narrow In Scope.**

Once the employer provides sufficient justification for its request for a medical examination or disability inquiry, the scope of the examination and inquiry "must remain appropriately narrow." *James v. Goodyear Tire & Rubber Co.*, 354 Fed.Appx. 246, 249 (6th Cir. 2009).The examination and inquiry must be "restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Sullivan*, 197 F.3d 804, 812-813 (6th Cir, 1999).

Jansma agreed that, by September 2018, BSV had a reasonable basis to want to be sure that he could safely perform his duties, and did not object to BSV's desire to send him for a medical evaluation, for the purposes it described to him in writing, because it was related to his job as an Optometrist at BSV (Jansma 102, 120, 162).

Further, the scope of the required medical examination was "appropriately narrow," despite Plaintiff's flawed interpretation of how the medical authorization form that BSV presented to Jansma would operate. The medical evaluation forms provided to Jansma, which referred to one another and worked together as a package, included a (1) letter from BSV to the neuro-ophthalmologist who Jansma selected, Dr. Glisson, with an explanation of BSV's safety concerns and specific questions related to Jansma's ability to safely perform his job duties; (2) a job description for the Optometrist position at BSV; and (3) a medical authorization form, which authorized the ***Dr. Glisson*** to communicate medical information ***to BSV***. (*see* Pl. Ex. 14). Further, the letter specifically limits the intent of the medical authorization form by specifically instructing

Dr. Glisson to "[p]lease answer the below questions. We have enclosed a release signed by Dr. Jansma giving you permission to respond directly to BSV." *Id*.

It is undisputed that: (1) Jansma had no objections to the scope of the evaluation, as described in a letter to the neuro-ophthalmologist of his choosing; (2) Jansma understood that the medical authorization form allowed the neuro-ophthalmologist of his choosing – Dr. Glisson – to answer BSV's questions and return the answers to BSV; (3) Jansma understood that when he would go to an eye doctor for a visit related to his eye, he knew that the doctor would not seek out medical records or attempt to obtain information about his medical condition that would not be relevant to the reason why he was being seen, and (4) the only records that the neuro-ophthalmologist that Jansma chose would have ever requested would have been limited to only those pertinent to Jansma's vision issues. (Jansma 99, 105, 107; Glisson 20-21). Further, when Jansma presented concerns about the scope of the medical examination that BSV had requested, BSV addressed his concerns by providing reassurance that BSV would not delve into his medical history not germane to this health condition, and that upon a determining that he could safely perform his job duties an Optometrist, he would return and not be subject to a hostile work environment. (Jansma 121). Finally, it is undisputed that BSV's written communication to him on October 24th, 2018 addressed his concerns. (Jansma 122).

This case is wholly different than the prohibition on an employer's request for an employee's complete medical records and the cases whereby an employer required the employee to produce such a record before the employee was eligible to participate in the medical examination. *See James v. James Marine, Inc*., 805 F.Supp.2d 340, 350 (W.D. Kentucky, 2011); *Jackson v. Regal Beloit American, Inc*., 2018 WL 3078760 (E.D. Kentucky, June 21, 2018). Jansma's complete medical records would never have been required for Jansma to complete BSV's

requested medical examination. BSV never actually requested or required Jansma to produce his complete medical records, BSV never intended to request or require Jansma's complete medical records and communicated this to Jansma on multiple occasions. Likewise, the neuro-ophthalmologist Jansma chose would have never requested or required Jansma to produce his complete medical records to participate in BSV's requested medical examination.

Because the EEOC's arguments that Jansma was subjected to an improper medical examination and inquiry are meritless, it cannot demonstrate that it was an adverse employment action. *Sullivan*, 197 F.3d at 813 ("[A]n examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination."). The EEOC's confusion about BSV's requested medical examination does not create a genuine issue of material fact where the undisputed facts in this case demonstrate the scope of the employer's request is sufficiently narrow.

Therefore, because Jansma was properly sent for a medical examination and inquiry, his leave of absence was not an adverse employment action. And because Jansma was properly sent for a medical examination and inquiry and that medical examination and inquiry could not be completed for reasons related to Jansma's own noncooperation, his termination was not an adverse employment actions. As such, the EEOC's claim fail and must be dismissed.

## III. BSV's Employment Actions Were Based on Legitimate, Non-Discriminatory Factors and the EEOC Has Not Demonstrated Pretext.

If the plaintiff establishes a prima facie case of discrimination under the ADA, the burden shifts to the employer to set forth a legitimate, nondiscriminatory reason for the adverse employment action it took against the plaintiff. *Kocsis v. Multi-Care Mgtmt., Inc.*, 97 F.3d 876, 883 (6th Cir, 1996). If the employer carries this burden, the burden shifts back to the employee, who must introduce evidence showing that the employer's proffered explanation was pretextual by showing: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did

not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's actions. *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012). Assuming *arguendo* that either the leave of absence or the termination were adverse employment actions, both were based on legitimate, non-discriminatory reasons for which the EEOC cannot establish pretext.

### A. BSV Placed Jansma On A Leave Of Absence So He Could Undergo An Examination To Determine His Fitness For Duty, A Legitimate, Non-Discriminatory Reason

BSV's decision to place Jansma on a paid leave of absence was lawful for the same reason its request that he undergo a medical examination was lawful: It had reason to believe that Jansma could not perform some essential aspects of his job and/or he could have posed a direct threat to the health and safety of others. (*see* supra II(B)(i)(1)-(2)). The Sixth Circuit has upheld requiring mental and physical examinations as precondition to returning to work. *See Pesterfield v. TVA*, 941 F.2d 437-38 (6th Cir. 1991). To infer perception of disability under the circumstances present in this case would "unnecessarily inhibit employers from any inquiry regarding the status of behavior on the part of an employee that the employer may perceive as inappropriate for the employment environment." *Kvintus v. RL Polk & Co.*, 3 F.Supp. 2d 788, 796 (E.D. Mich. 1988)

### B. BSV Terminated Jansma's Employment Because He Refused To Allow BSV To Make A Determination On His Fitness For Duty.

BSV's decision to terminate Jansma's employment was lawful for the same reason its request that he undergo a medical examination was lawful: There was genuine reason to doubt whether Jansma could safely perform some essential aspects of his job and Jansma refused to provide any information with which BSV could have made such a determination. (*see* supra II(B)(i)(1)-(3)). It is undisputed that: (1) Jansma agreed that by September 25, 2018, BSV had a reasonable basis to want to be sure that he could safely perform his job duties at work; (2) Jansma

did not object to BSV sending him for a medical evaluation for the purpose described in Dabrowski's October 8, 2018 email attachment; (3) Jansma agreed to undergo a medical evaluation if BSV addressed his concerns in writing; (4) On October 24, 2018, BSV did address Jansma's concerns in writing; (5) Jansma did not communicate with Dabrowski at any point via email between October 25, 2018 and December 5, 2018; and (7) Jansma did not actually cooperate with BSV's request that he undergo a medical examination and sign a release form to allow Dr. Glisson to communicate with BSV. (Jansma 102, 120, 121, 122, 127; Glisson 23; Def. Ex. 16).

It is further undisputed that BSV told Jansma that the reasons it was terminating his employment was due to his refusal to allow BSV to "progress [the fitness of duty assessment] forward," despite BSV's repeated attempts to engage with him over the course of more than two months. (*see* Pl. Ex. 16). Jansma has not presented any evidence that his refusal to engage did not actually motivate BSV's decision or that it was insufficient to motivate such a decision; on the contrary, it is undisputed that Dabrowski proved over-and-over again that she was willing to provide him additional time to respond to her requests for information. Despite those good faith efforts, Jansma still characterized Dabrowski's attempts to move the process forward by setting response deadlines as "games they would play" and even took the position that giving him 16 days to select a neuro-ophthalmologist – while he was on paid leave – was too "immediate". (Jansma 108-09, 115). Rather, it was only after Jansma failed to respond to any communications from Dabrowski over a nearly six week time span that BSV no longer believed that Jasma would cooperate. (*see* Pl. Ex. 16). Consistent the Sixth's Circuit's decisions in other cases where it has upheld terminations for refusing to submit to a medical exam (*See Sullivan*, 197 F.3d 804, 812 (6th Cir. 1999) (citing *Moore v. Board of Educ. Of Johnson City Schs*., 134 F.3d 781, 783 (6th Cir.

1998)), this court should determine BSV's termination of Jansma was similarly permissible under the ADA.

## CONCLUSION

For the foregoing reasons, Defendant requests that the Court grant summary judgment and dismiss Plaintiff's claims in their entirety and with prejudice. Oral Argument Requested.

MILLER JOHNSON
Attorneys for Defendant Blue Sky Vision, LLC

Dated: May 27, 2021

By *<u>/s/ Catherine A. Tracey</u>*
Catherine A. Tracey (P63161)
45 Ottawa Ave. SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1700

## Certificate Of Compliance

1. This brief complies with the type-volume limitation of W.D. Mich. LCivR 7.2(b)(i) because this brief contains 10,152 words, excluding the parts of the brief exempted by W. D. Mich. LCivR 7.2(b)(i).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 for Windows in 12-point Times New Roman font.

Dated: May 27, 2021

By *<u>/s/ Catherine A. Tracey</u>*
Catherine A. Tracey (P63161)
45 Ottawa Ave. SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1700