# 3

for music, then for premed. Grand Valley State for the same things -- well, Grand Valley State for music. I got a degree in that and then for premed. I also got a Bachelor of Science in that and then went on to Ferris to get my Doctor of Optometry degree.
Q. When you were in undergrad, were you prelaw at some point?
A. Yes, actually. How about that?
Q. What drove you away from the legal profession?
A. You looked at that?
Q. I did.
A. Well, I met a very pretty girl, okay, and I was in music before that and she wanted to become a police officer, which I thought was ridiculous because she's about five foot four and I said, are you going to arrest me, really, and take me down? She lived next door to a policeman and that's how she wanted to get into that.
Well, I wanted to take classes with her, you know, so I thought I'd actually go into the counseling end of it, like be a parole officer or that kind of thing and I convinced her maybe to do the same thing. So we took classes together. So I actually have a minor in criminal justice and eventually, I steered her out of that into education, so she got a degree in education, as well, we both did, but for a while, we took classes together.
That's who I married, okay, for 43 years. That's how

Q. And you used paper medical records at that --
A. Say that again.
Q. You used paper medical records at that location, correct?
A. That's correct, yes. I'd looked into several electronic medical records. I just didn't find anything that I really liked. I was on the verge of one that I thought about doing, but most of them I felt I could do as well or better with paper than an electronic one. A couple of times I approached the staff with it and they felt the same way and so I made my own paper records and I had them tailored pretty well to do what I wanted.
Q. Okay. When you moved over to Blue Sky Vision and sold your practice, did you offer any of those employees the opportunity to move over to Blue Sky with you?
A. Yes, they were all offered the chance to apply.
Q. Did any of them apply, to your knowledge?
A. Yeah, Autumn did and Brittany and they both moved over. The other two did not.
Q. So Autumn and Brittany moved over to Blue Sky?
A. Yes.
Q. The other two did not. Do you know why they did not?
A. They sought employment elsewhere. One in Muskegon and the other one at Eyeglass World someplace. I don't know where. Sam went to Muskegon and Stephanie to Eyeglass World.

Q. Can you describe where you are holding your hand?
A. Oh, yeah, so can you see it now?
Q. I can. How is it being held up in relation to you?
A. It's to my right.
Q. Okay.
A. Okay. Now, if I move it here, I've got it. If I move it over a little bit, it's gone, okay? So what it's like for me, and this is the oddest thing, as an eye doctor and you study this and you look at this field, if I look at my fields it looks like, holy smokes, this guy can't see squat, but now having lived with it, it's so different. I mean, I see so much more than what it looks like on paper.
My world is -- I really have a panorama of vision. I can see all the way over from my left clear on over to here. It's all great. I mean, it drops off once I get over a little bit to the far right, but you see so much more than what it looks like when we look in the textbook, you know. So it's a marvelous thing how the brain compensates for that.
Anyway, so it's more like you have like a coffee cup there and you hold that up and then that area of the coffee cup, you can't see that, but the rest is fine. So it's not at all what it looks like when you look at it in a textbook.
Q. How does it look in a textbook?

A. It looked like that whole side is just blacked out, you know, on this side and on the other side. It's just gone, and that's really not how it is when you live with it in real life. It's interesting to live with it on the other side as a patient and knowing it as an eye doctor and then being able to correlate the two.

So the first thing I did after I got out of the hospital was to go right to my office and look through my scopes and things and say, hey, can I see what I need to see to do my job and I went, yes, I can. Thank you, Lord. Because everything I do is in front of me, straight in front of me. I don't look off to the side there to view my patients and I correct to 20-15. I can see 20 seconds of arc for stereopsis, so I'm just fine.

Just as a -- I don't know if you want this or not, but my daughter wanted to play tennis one day when she went to the state finals and won and she said, dad, you're not going to be able to play anymore and I said, well, we could try it and I could still play tennis with her. Now, she can beat me because I'm 38 years older than her, okay? So she'll drop it just over the net on me and I'm not going to run for those anymore, all right? But otherwise, I could still play tennis with her and do just fine and you would think I couldn't, but I can still do that.

I can still play music on the piano and on the

THE WITNESS: Okay. Let me say it this way. Let's say that we hold something up in that area and I am supposed to see it, but I don't. Now, I can turn my head and then see it. Now, we know I have missed it, right? Does that make sense to you?
Q. (By Ms. Tracey) It does, but you're relying on having to turn your head and see it?
A. Or turn my eye, one of the other.
Q. Okay. Turn your eye or your head and scan?
A. Correct. All right? That will never happen in terms of viewing the patient and their conditions, okay? I'll never have to do that to see anything with the patient, okay? Never. Everything is going to be straight ahead. I'll never have to turn to see something with the patient. We have the patient move their eyes for us. We never move ours.
MS. TRACEY: Sandy, can you pull up the records from Specialty Eye Institute?
Okay. Can you scroll to 112?
Q. (By Ms. Tracey) Dr. Jansma, these are medical records that we received from Speciality Eye Institute. Were you treated there?
A. Yes.
Q. And it says the date of service is May 16th of 2019. Were you treated there on that date?

A. Really -- well, two ways. I went to a convention in Philadelphia through Bausch & Lomb. My rep made me aware. There were two people chosen in Grand Rapids. I was one, Phil Vanderlugt was the other and Bausch & Lomb had a presentation there and Phil mentioned it to me.
Q. Who is Phil Vanderlugt?
A. Phil Vanderlugt is a doctor at Grand Rapids Ophthalmology and I had known Phil from before, not really well, but somewhat. He went to Ferris also and he mentioned that Grand Rapids Ophthalmology under the umbrella of Blue Sky was looking at picking up practices and maybe I'd be interested, so that was one way and then my wife also mentioned to me that she had heard the same thing.
Q. How did she hear that, if you know?
A. Through Brian Hamilton.
Q. Do you know why Brian Hamilton was contacting your wife?
A. Yeah, there was an ad in the MOA that she had placed.
Q. What's the MOA?
A. Michigan Optometric Association. They have a publication that goes out.
Q. Did you end up reaching out to Blue Sky Vision in response to that posting or did they reach out to you?
A. They reached out to us.
Q. How did they know you existed in order to reach out to you?

A. As I said, there was an ad there, so they reached out to us.
Q. Well, the ad is more typically a general announcement --
A. Yeah, it said --
Q. Did you respond to the ad?
A. -- to practices in the Western Michigan area available, you know, contact us and Brian Hamilton called and that's how things started.
Q. Oh, so you placed the ad?
A. My wife did, yes.
Q. Your wife placed the ad, okay. I'm sorry. I was confused.
A. It was coming from two different directions sort of, yeah.
Q. Got you. So you placed an ad about the availability of your practice --
A. Right.
Q. -- for partnership or sale. Why did you place that ad?
A. Well, I was looking towards retirement or at least -- you know, it takes time when you have a practice. You don't just sell it on a dime. So you figure there's going to be a transition period normally and it can take a few years and so, you know, quite often you will take an associate in and you have to work with them for a few years and that's how it goes, you know. So I was at the point where my thought, okay, let's start to at least bring somebody

in, work through this, let's see what happens here.
Q. At that time, what was your age?
A. 60 -- let me see. I just turned 68.
Q. 68 years young.
A. Yeah, I am, how about that? I don't feel 68, you know, but I am. So what, 60 -- gosh, when did this start? Because we consummated in 2018 and this was 2017 or '16, so I don't know, 63, maybe. Somewhere in there.
Q. I was just trying to make you do math.
A. Yeah, thanks. I'm good at math, really. So somewhere in there.
Q. So you said Brian Hamilton first contacted you?
A. Yeah, contacted my wife, actually. Her phone number was in there. They had a couple conversations and then we met, the three of us and had a conversation and there was a proposal that he laid out first and we sort of worked through things from there. That took some time. They were not particularly speedy, but it took a while just to work through some things and we came to terms.
MS. TRACEY: James, can you pull up Plaintiff's Exhibit 5?
COURT REPORTER: Are you talking Plaintiff's 5?
MS. TRACEY: Yes, Plaintiff's Exhibit 5.
MS. BROOKS: That's from Hamilton, James.
COURT REPORTER: I'm going to have to go back and

you issue noncompetes to your employees?
A. Well, when I was first out of school, of course, I looked into being in practice with different people. So I --
Q. How long ago was that?
A. 25 years ago or something. So I had been involved with things from different people, both corporate and private and whatever and so it's 5 miles, 7 miles, something like that. 25 miles is just egregious.
Q. Okay. So based on your experience from 25 years before, it was your position that 25 miles is egregious?
A. Yes, and then to say from every location, my goodness. Why, if you're in Traverse City or whatever, why should that be in there? That doesn't make any sense, you know. So I wanted it to make sense.
Q. You mentioned earlier that this transition to Blue Sky Vision was sort of part of your retirement plan. Am I characterizing that correctly?
A. Sure.
Q. Would it have been a financial hardship for you if you could not continue practicing for a certain period of time after you joined Blue Sky Vision?
A. Absolutely.
Q. How many years did you need after retirement in order to not suffer a financial hardship?
A. I was counting on at least three, but hoping for five,

of for Blue Sky Vision?
A. For them?
Q. Yes.
A. Yes. 68th Street, Grandville and Fremont. That's what they wanted.
Q. Is Fremont part of Shoreline Vision?
A. Yes.
Q. And where is 68th Street located?
A. 68th and Division, basically.
Q. Is that also part of Shoreline Vision?
A. No, that would be Grand Rapids Ophthalmology.
Q. And then Grandville, does that refer to Grand Rapids Ophthalmology?
A. Correct. Now, that's right in my backyard where I live, so that was great, but even 68th and Division was fine. That was right by my old office, only a mile, mile and a half away.
MS. TRACEY: Okay. Now, can you scroll up to the top of the page. All the way to the top. Thank you, James.
Q. (By Ms. Tracey) In that first paragraph, it says, "Regarding the schedule, I believe it would be best for me to start the week of June 11th, rather than June 4th." Do you see that?
A. Yes.
Q. Did you end up starting on June 11th?

A. Oh, boy. I'm quite sure I did. I'd have to think back a moment. Let me think for a second. I believe I did.
MS. TRACEY: James, can you replace this exhibit with Plaintiff's Exhibit 6?
Q. (By Ms. Tracey) I'll give you an opportunity to take a look at that, Dr. Jansma. Then if you could describe for me, I'd appreciate it.
A. Can you blow that up a little bit, James, or not?
MS. TRACEY: James can do anything.
THE WITNESS: You are just trying to get on his good side.
MS. TRACEY: That's right.
THE WITNESS: Okay. You can move that up, please. That's good.
I'm going to take a 30-second break.
MS. BROOKS: Dr. Jansma, did you say you needed to take a break?
THE WITNESS: I'm taking a 30-second break. It's a lot to process. Okay. I'm good.
MS. BROOKS: If you need to take a break --
THE WITNESS: No, I'm fine.
Good. Now, you are going to give me a test, right?
Q. (By Ms. Tracey) Well, thanks for your thorough review. I'm glad you took the time to do that.
Can you describe that document for me? Just

you just looked at on Exhibit 7?
A. No, these were things that Brian and I went back and forth on when we were negotiating.
Q. Do you know what role Brian had with Blue Sky Vision?
A. Procuring new practices. Bringing practices into the fold.
Q. Do you know if he had any responsibilities for operations with Blue Sky?
A. I don't know the exact scope of his role.
MS. TRACEY: James, can you pull up Plaintiff's Exhibit 8.
Q. (By Ms. Tracey) Actually, how did Brian respond when you said this is not what we agreed on?
A. He said he was going to look into it and have it taken care of.
Q. Did he respond to you by email or did he call you? Do you recall how you communicated about that?
A. I don't recall.
Q. Okay. Can you take a look at this email exchange for me?
A. Sure. Let's see here. I read the middle section. Can you scroll up or down, whatever, so I can see the top? Thank you. Okay. Just a minute.
Okay. So now if you would scroll whichever way I can see the top, please. Thank you.
Okay. Go ahead.

Q. Please describe that document for me.
A. Sure. So there is some back and forth in terms of the scribes and I'm indicating to Amy Dunleavy at one point that Brian had indicated to me that I would have a scribe because I was on two different EMRs in three different locations and that was what I was led to believe, that I would always have a scribe and that Brian is saying, gee, you know, I said he'd have a scribe for a while, but not permanently and if that's the case, then maybe we need to look at this again, basically, and that's sort of the gist of it.
Q. And that's an email -- Brian's response to you is dated June 26, 2018?
A. It looks like it.
Q. Is that correct?
A. Yeah.
Q. After Brian says that the scribe wasn't intended to be permanent, in that first sentence there at the top of the paragraph, can you read that for me?
A. Just show me where you are talking about.
Q. Yep. Start with, "Thank you for the clarification." Read that paragraph.
A. Oh, okay. "Thank you for the clarification. I feel a couple of months would be needed to learn both systems, however, I would really appreciate making the scribe

permanent. I am certain this would be the best fit overall."
Q. So you didn't disagree with Brian's characterization of the negotiations over the scribe in the sense that the scribe was intended to be temporary, correct?
A. I did disagree.
Q. Did you disagree in this email?
A. Maybe I did not come right out and say it, but I did disagree and we talked on the phone about that and he portrayed it to me as that I would be provided a scribe. Now, he is sort of backing up and saying there was a misunderstanding about it and -- but I'm trying to be -- I'm trying to go along with the program and say, well, okay, if that's what it's going to be, you know, I can be a team player and do this, but you said to me there were two different EMRs that I have to learn. Most people don't do that. They are on one system in Grand Rapids or would work in Fremont and that's a different one and we learn one or the other and we are in one location. I am in three locations with two different EMRs. That makes it difficult. So they were going to provide a scribe because of that.
Q. Okay. So the purpose of the scribe was to help you because you were working on two different EMRs in three locations and that was going to be new to you and

difficult to learn?
A. And that's messy and my schedule on top of that was -- even when I'm in Grand Rapids, those days alternated, like 68th and Grandville, those days flip-flopped back and forth. So it's all confusing, you know. And I'm never in the same room twice, so that, even though I'd walk in, okay, what room am I in, that was always different and there's a thing called a phoropter that's a bank of lenses that you look through and so my phoropter was never set up when I was there. I'd always have to track that down and then have them set it up.
Things were, you know, were just not like they should be and files that were supposed to be scanned in for me from my office would often not be in place when I would be there for my patients. It should have been done the night before, but they often would not be and so things were not running smoothly like they should be. There were a number of things like that.
Q. Did you feel frustrated by some of those things?
A. I wouldn't say frustrated, but I felt -- like it was in my office where I came in the morning, things were ready to go and things ran like a fine Swiss watch, you know? It was easier, certainly. So, you know, you're trying to work with this new system, but it's difficult when you're in different locations every day and different rooms every

day and things are not prepared properly and then if you ask for them to retrieve that record, they are acting as if it's a big imposition on them to do.
Q. Who is the they that you are asking to retrieve those documents?
A. Typically, a scribe. And I would have to say I'm at 68th and the records were kept at Grandville and they could call over and have them sent, you know, just send it over, but that meant that we have to call somebody, that person would have to pull the record, scan it, send it over. So it's a little bit extra work for them. It is sort of a pain, you know, but had they done it the day before, no problem, but they wouldn't have and so that would annoy them, you know. They didn't like that, but that sure helps me in my job if I have a heads-up on that patient coming in.
You know, if I had a patient previously where I was following a condition and now I don't know what that condition is, maybe I don't remember every single patient with every condition. It sure helps to know that when I walk in. Otherwise, I look sort of foolish.
Q. The issues that you are raising regarding documents or information not being available to you or prepped in advance, that wouldn't have been part of the negotiation process, correct, because that's not something that

occurred until later?
A. Correct. I mean, yeah, they are just supposed to have all of that in place, but no, that's not negotiation things, no.
Q. Okay, but they weren't meeting your expectations in terms of what you got there and the way that things were setup?
A. I guess that's true. I didn't really know just how that was going to go, if they are going to have records right there or at a central place. I didn't know how they were going to do that, exactly, you know.
Q. You mentioned that earlier when I was asking you about your response in this email to Brian Hamilton, where I said that you did not argue or you expressed appreciation for the clarification with respect to the scribe, but you did not challenge whether the agreement had been for the scribe to be permanent. You said you talked to Brian on the phone about that.
A. Right.
Q. When you talked to Brian on the phone, was that before this email exchange or was it after this email exchange?
A. I don't recall for sure.
Q. You don't know?
A. Well, that's three years ago.
Q. Sure.
A. Yeah.

MS. TRACEY: James, can you pull up the grouping called document A? And this is going to be Defendant's Exhibit 2.

(Whereupon Defendant's Deposition Exhibit Number 2 was marked for identification.)

Q. (By Ms. Tracey) Dr. Jansma, are you doing okay? I know I'm having you read a lot of things. If you need a break, let me know.

A. No, I'm just fine.

Q. Okay. This is kind of a lengthy set of documents, so take your time.

A. Okay.

Can you bring that down a little so I see the date, please. August 1, okay. I've got it.

That's funny, okay. I'm still reading. Lynda didn't like me from day one. I didn't care much for her.

Oh, my gosh.

Okay.

COURT REPORTER: That's the end of the document.

Q. (By Ms. Tracey) Dr. Jansma, I would describe those as a variety of email exchanges among Blue Sky staff members between July and August, early August of 2018. Would you agree with that characterization?

A. Sure, uh-huh.

Q. How would you describe these emails?

A. I would describe them all as massive miscommunication based on -- it all goes back to them promising me a scribe, 10 patients in the morning, 10 in the afternoon and them varying from that and that's where it all started and them getting away from that and me at one point digging my heels in and saying, gosh, guys, this is what you promised me and that's not what's happening. Finally, me backing up and saying, okay, I'm going to have to learn this because they are not going to deviate from it and that's where that is.

Also, some other things in terms of I had patients with past balances and in my office you can't continue to order product if you don't pay off your balance and they wanted to continue to sell them product, even though the balance wasn't paid. I think that's just logical, you have to pay off your balance and they were offended when I said, no, they should pay off their balance first.

Q. Well, the balance wasn't with Blue Sky Vision, though, it was with your previous practice, correct?

A. But I am now part of Blue Sky Vision. They had bought me out, so certainly they would have to pay that balance off and then order because I am now part of Blue Sky.

Q. Well, they had bought you out, but as part of that purchase would Blue Sky Vision have received the accounts receivable that came in from work you did before they

acquired you?
A. No, it was --
Q. It's not Blue Sky Vision's AR, it was yours?
A. It was agreed upon that I would get the accounts receivable.
Q. Correct.
A. Right.
Q. So those patients didn't owe Blue Sky Vision anything. They owed your prior practice for services rendered or purchases made, correct?
A. They owed it to me, but they were still coming to see me, so that needed to be paid to me before they could order something else.
Q. But Blue Sky Vision disagreed with your position on that, correct?
A. Well, we had a disagreement about that. What I'm saying is it's easy for them just to collect the fee at that point, give it to me and then it's done and there were a couple of things where they just exaggerated where I came and, sure, I had a dolly and I brought boxes of files in with those things finally because it was getting to be too cumbersome, so yeah, I brought --
Q. What was getting too cumbersome?
A. I had them at home.
Q. I'm sorry. When you are using they and them, it's a

little confusing. Can you --
A. Okay. I had boxes of files at home with accounts receivable, so I finally said, this is getting to be too much. Let me just bring them into the office. So I brought the files into the office at Fremont, offloaded them there. We're just going to put them in the system and call it good.
They just made a big deal about it and said, gosh, I left them there and they had to put them on an office chair and all this stuff and it was, like, oh, my goodness, really? I mean, they had come to my office before with much bigger boxes than that and toted them out. It was not a big deal at all. They're just whining about this at this point, you know. For goodness sake, these are not big boxes, you know.
Q. But that was your AR from a prior practice, correct? That was in Blue Sky Vision's problem, right?
A. At this point, I'm just saying I'm going to forgo the AR and just give you these boxes and we'll put them in the files and have it done so we don't have any more problems, you know. I'm just -- I'm just letting it go so we can get over this hump and now they are whining because they had to put them in office chairs and wheel them. I would have happily put them wherever they wanted.
Q. When you say you are going to put the AR in files, what do

you mean by that?
A. They had my files there in Fremont. The other files that were balances that were not owed, so now they've got all my files. They can put them in with the rest of the patient files. We'll just forget about the AR. Problem solved.
Q. So you were no longer going to collect the AR or work on collecting the AR?
A. Yeah, we just forget about it and that's that. So they are making a mountain out of a molehill and it was said in there I couldn't even operate the mouse. Are you kidding me? Of course, I could and I could do the EMR. Lynda just had a personality conflict with me from day one. She would look down her nose at me just from the very start. It was just a thing with her, you know.
Q. Okay. Well, let's talk through this.
MS. TRACEY: James, can you scroll up to the August 1st, 2018, email from Michelle to Surya? I think it was page four in this grouping maybe.
Q. (By Ms. Tracey) So let's talk about this first paragraph here where it says, "The question of a scribe in Fremont did not come up again, however, he cannot function without one at this time. Lynda, the supervisor, had been serving as his scribe. I had an opportunity to talk with Lynda this morning and she had grave concerns about Dr. Jansma

this is an email. If you could scroll up and make sure I'm right. This is from Michelle to Surya and it's talking about what Lynda said, right? So I just want to make sure that we are clear this is just Michelle's view of what Lynda said.

THE WITNESS: Let's also remember what they said about how the patients viewed me and how they liked me and had glowing things to say about me. Let's remember that, okay? Yes?

Q. (By Ms. Tracey) So in this email, this is from, as Karen clarified, this is from Michelle to Surya and so Michelle, to clarify, is recounting for Surya what Lynda reported to her. Is that correct?

A. I would say.

Q. And you disagree with the reporting from Lynda?

A. Absolutely.

Q. Do you have any basis to state that Lynda did not, in fact, report this to Michelle?

A. How would I know?

Q. Fair enough. Moving on to "Patients with balances." I think this is what we already just discussed.

A. Yeah, we've covered that.

Q. Going down to the second to last bullet point, it states, "Many of his interactions with staff and management have been hurtful and insulting. Sometimes he has apologized."

A. That's not true. I had one where one young girl misinterpreted something.
Q. What did she misinterpret?
A. Okay, let's hurry up, let's go, and I used to say this to my staff sometimes and I laughed afterwards and she was young enough, she didn't quite get it and so -- because we were behind a little bit and then I had to apologize to her. She was just too young to sort of understand it. That's the only thing I remember. There was nothing else other than that.
Q. I kind of missed a little bit of what you said at the beginning there, so there was a young --
A. Young girl that was scribing for me and I said, okay, let's hurry up, let's go, sort of like that, you know, and she took it like I was reprimanding her or something, but I wasn't in she was just a tenderhearted thing and she took it like I was, you know, being offensive, but I wasn't, so I recognized that and afterwards I said, oh, I'm sorry, I didn't mean to hurt your feelings. You know, I was just saying, okay, let's go, you know. Anyway, that's the only thing I can think of.
I never had any interactions with any other staff that were hurtful. I used to laugh and joke with them and we had a good time. That's just Lynda, again, being Lynda. She's the one that from day one just had a real

haughty attitude, looked down her nose at me from the start.
Q. Okay. So you're saying from your perspective then the way you that you spoke to the young female employee was not offensive, but you don't disagree that she felt offended?
A. Yeah, I think for a moment she did, but I certainly cleared that up and I got along with everybody there, you know, except Lynda didn't care for me much, but everybody else, you know, no, it was just fine.
Q. Now, this is, again, Michelle's email to Surya and she is characterizing your interactions with staff and management was hurtful and insulting. I understand that you disagree with that characterization and that you do not agree that you were ever hurtful or insulting towards staff. If Michelle's characterization were correct and that you had been hurtful and insulting towards staff, would you agree that would be a serious concern for Blue Sky Vision?
A. I'm not going to answer that.
Q. Well, you have to answer that.
MS. BROOKS: Well, let me just object that it calls for speculation about what Blue Sky -- but you do have to answer. Unless I tell you, I should have made that clear at the beginning, not to answer a question, if you understand the question, you have to answer.
THE WITNESS: I'm going to answer now. If this

purely speculative thing were true, it would be cause for concern, but it's purely speculative, it's hearsay to another person to another person and then coming to me and it's all baloney, okay? It's just a witch-hunt. I find this ludicrous. I ran two private practices for 30 years. I never had to raise my voice once, okay. My employees stayed for 5 years, 8 years, 10, 15, 20, 22, 25 and 28 years. Does that tell you something? And not one of them left with hard feelings. I think that speaks for itself.

MS. TRACEY: James, can you move down to --

THE WITNESS: Read the bottom one, the bottom bullet point. Read that a moment, please.

Q. (By Ms. Tracey) Mr. Jansma, I think I explained at the beginning of this, the way depositions work is I ask you questions and then you are responsible for responding. This is not your opportunity to ask me questions.

A. Okay. I'm just telling you.

MS. TRACEY: James, can you move to the July 23rd, 2018, email exchange. I believe it's Blue Sky Vision 271.

Q. (By Ms. Tracey) Dr. Jansma, by the way, have you -- I didn't see you on any of these emails copied or as a recipient. Have you seen any of these emails before today?

A. Never.

COURT REPORTER: Cathy, I'm not sure which document

I'm looking for.
MS. TRACEY: So Blue Sky Vision 271. It would be a July 23rd, 2018, email.
COURT REPORTER: Is that in this?
MS. TRACEY: I believe so. Can you go up? You're going so fast, I can keep up with you.
COURT REPORTER: I'm sorry.
MS. TRACEY: Can you go up? Further up. Further up. Further up. Stop right there for a sec. You can go further up. Sorry about this. This is the difficulties with Zoom.
All right. So starting there can you kind of scroll slowly through here and I can pinpoint it if I see it. So you're at the top, start going down. Further down. I think it may be on page 13 of this package. There we go. Can you scroll down a little bit here?
Q. (By Ms. Tracey) So in this email, there is a discussion about the scribe, correct?
A. You are asking me?
Q. Yes.
A. Okay. Yes.
Q. Would it be fair to say that in this email you are trying to sort of make your case once again for having a permanent full-time scribe?
A. Correct.

Q. This email, you see the date there is July 23rd, 2018?
A. Right.
Q. Earlier today we talked about a conversation that you had with Amy Dunlevy and Brian Hamilton about a month earlier in June about a scribe, right?
A. I believe that was the date. I'm not positive, but okay.
Q. Sure. And you were told at that point that a scribe was not going to be permanent, correct?
A. I'm not recalling if that was exactly the case.
Q. Okay. How about this? In June of 2018, were you receiving any communications from Blue Sky Vision to the effect that you were not going to have a permanent full-time scribe?
A. I was still not certain that was the case.
Q. Why were you not certain?
A. Because the communications that I had had with Brian all along, the fact was that I was supposed to have a scribe full-time.
Q. Well, in a communication reviewed earlier, Brian specifically said that the scribe was intended to be temporary, maybe for a couple of months, in order to help you adjust to the two EMR systems, right?
A. But that is not what he had said to me previously and now he is backing up on things and so now I am reasserting my case and saying, you know, this isn't really what you

said. When you brought me in, this is what you said and that's really a false pretense, so I'm going to back up now and say, you know what? This is what you promised me. This is what you said and this is the best for patient care, it's also what you said. My salary is based on that. Now, you are changing the rules, just like skating on a moving ice pond. Let's look at this again.
Q. So you're saying all along, and when you say all along, you are referring to the negotiations leading up to --
A. Absolutely.
Q. Not all along with respect to after you had joined Blue Sky Vision and moving forward, correct?
A. Part of what induced me to join Blue Sky.
Q. That wasn't my question. My question was after you joined Blue Sky and your employment started there, they weren't telling you at that point that you were going to get a permanent full-time scribe, were they?
A. I came in under the assumption that I was getting that and then they wanted to change the rules.
Q. Okay. But they changed those rules after you arrived, correct?
A. After what?
Q. After you arrived. After you became an employee of Blue Sky Vision, your position is they changed the rules?
A. Then I was ambushed.

Q. Okay.
A. I actually accepted less money for my practice because I felt it was -- it would be nice to have a scribe. I was willing to see more patients and have a scribe and I took less money for my practices because of it, okay?
Q. So would it be fair to say that because you feel that you had negotiated that there would be a scribe that you were frustrated by the fact that Blue Sky Vision wasn't providing one to you?
A. Sure. I felt it was unfair.
Q. So you continued to push for having a full-time scribe because you feel that was what was promised to you?
A. Exactly.
Q. Do you recall telling Amy Dunleavy that you wouldn't back down over the scribe issue?
A. I did say that until I realized that they weren't going to back down and then I went, well, if part of keeping my job is going to be learning this and so I went, okay, learn it. Just do it because they are not going to back down and they have the power, so you're just going to have to do it, so I did.
Q. When you say learn this stuff, what are you referring to?
A. Learn the two different EMRs, do them myself, not have a scribe. I realized this was not going away. They had changed the rules, but I didn't have the power. Sometimes

you don't. So I would have to learn them, do it their way even though they changed the rules. I couldn't fight it. It's like fighting the government. You know, sometimes you can't win, right?
Q. So early on were you resistant to learning the EMR because you felt that you shouldn't have to learn it because you were going to have a scribe?
A. Or at least learn a part of it but not have to do all my own scribing because I was promised differently, sure.
MS. TRACEY: James, can you scroll down? Further. This time I'm looking for document 219, so maybe it's up. Okay. A little further up, I think. Okay.
Q. (By Ms. Tracey) So this is an email from Michelle Cassens to Surya Desiraju dated July 30, 2018. Dr. Jansma, can you tell me who Michelle Cassens is? What her role was with Shoreline if you know.
A. I am not positive. I'm not sure if I've met her or not. I think she worked out of Muskegon, yeah.
Q. Well, her title here says executive director.
A. Yeah.
Q. Did you have any interaction with her ever?
A. Not that I recall. You know, working in Fremont, that is a ways away from Muskegon and -- yeah.
Q. Well, she says, "Please read the message below. These are the types of interactions our staff has had with

A. I got her the prescription, of course.
Q. Is there anything inaccurate in her summary, from your recollection?
A. Well, again, I don't believe that I said those things, but, again, it's almost 3 years ago, so I don't know for sure.
Q. Okay. So it's possible you said those things, but you don't remember?
MS. BROOKS: Objection, asked and answered.
Q. (By Ms. Tracey) You can answer.
A. I don't recall for sure.
Q. Is Ashley's description of this interaction was accurate, do you think it would be reasonable for Blue Sky Vision to be concerned about it?
A. Sure.
Q. During this time period that we discussed, so July through early August, do you remember having any conversations with anyone at Blue Sky Vision about any of these issues?
A. No.
Q. You didn't have any discussion over the patient balances?
A. Yes.
Q. Okay. What do you remember about that discussion or those discussions?
A. I asked if it would be possible if they could do billing for me on those and I would pay them for it.

Q. Okay. Do you remember them telling you that they were going to continue to -- that you had to continue to see patients who owed your previous practice a balance?
A. I don't recall if it was specific like that or not, but the point is they couldn't help me with the balances. I decided just to forgo them and we put the patient files in place and life went on.
MS. TRACEY: James, could you pull up Plaintiff's Exhibit 19 for me?
Q. (By Ms. Tracey) Dr. Jansma, please review that record, and then once you're done, please describe it for me.
A. Okay.
Q. Is this an email from Bill Hughson to Surya Desiraju, Zach Smith, Dan Hosler and Brian Hamilton dated August 13, 2018?
A. Okay.
Q. Okay, meaning yes?
A. Yes.
Q. In the second paragraph of that email it appears that Bill is describing a report that he received from Sam May. First of all, who is Bill Hughson, do you know?
A. He was the CEO or CFO. I think CEO, I believe, of Blue Sky.
Q. You know who Sam May is?
A. Yeah, she was one of the scribes.

Q. Okay. So Bill Hughson states that Sam reported that none of the other scribes had been able to get you to touch the computer at all.
A. That's blatantly untrue.
Q. Bill also reports that Sam indicated that she had gotten you to (reluctantly) try a little bit but you were very negative about the system and your ability to use it, complaining that you are a slow typer. If they are going to force me to use this system, they need to adjust his template to fewer patients, et cetera.
A. That's also blatantly untrue except the slow typer part. I am a slow typist, but I was not reluctant. I didn't ask for fewer patients and I had embraced the system, both of them at that point, and was learning them.
Q. She also states, "Fundamentally, he is really not happy." Would you agree with that or disagree with that?
A. I would disagree with that.
Q. Sam also reports that, "Other ODs without scribes were griping because you were getting a scribe and they weren't even though they were seeing more patients." Were you aware of any of those concerns from the other ODs?
A. I had heard that.
Q. Who had you heard that from?
A. I heard it from the scribes.
Q. Do you recall which scribes?

A. No. And I think through Amy Dunleavy.
Q. I know you just said that all these things that Sam said were untrue --
MS. BROOKS: Objection --
Q. (By Ms. Tracey) If they were true, but that be a legitimate source of concern for Blue Sky Vision?
MS. BROOKS: I'm going to object, it misstates what he said, but you may answer.
THE WITNESS: Yes.
Q. (By Ms. Tracey) Dr. Jansma, do you think I misstated what you said, that Sam's statements here are untrue?
A. Yeah, they are untrue.
MS. BROOKS: You said all -- go ahead. I'm sorry. I don't want to interrupt your testimony.
MS. TRACEY: No, I just want to make sure the record is clear. I don't want to mischaracterize what Dr. Jansma had said, so --
MS. BROOKS: I objected based on your statement that I know you said all these things were untrue.
MS. TRACEY: Oh, okay.
MS. BROOKS: The word "all."
THE WITNESS: I was quite clear in my answers.
Q. (By Ms. Tracey) It also states in the second paragraph from the bottom, "I don't see a great solution here. While Sam believes that Jansma can learn to use this

system, it's clear that he really doesn't want to." As of August 3rd, 2018, would you say that was an accurate statement that you didn't want to learn the computer system?
A. No.
Q. Would you agree that if that were true that as of August 3rd you didn't want to use the computer system, that would be a source of concern for Blue Sky Vision?
MS. BROOKS: Objection, compound, vague.
Q. (By Ms. Tracey) I'm sorry. I didn't hear your answer, Dr. Jansma.
A. If it was true, which it's not, yes.
Q. Okay.
A. They've gotten together and cooked this up.
Q. Who is they?
A. Blue Sky Vision and Grand Rapids Ophthalmology, but they've been doing that for years.
Q. What basis do you have to say that they cooked something up? Do you have personal knowledge of them cooking something up with respect to this or other --
A. Not personal knowledge of this. I'll withdraw that.
Q. The last sentence of the last paragraph says -- actually, I'll just say the whole paragraph. "Last we spoke, we felt the best thing was to have Amy and Phil sit down with him and talk about it. That's probably still the best

favorite scribe. I thought she was great and then her performance fell and I was, like, what's going on here, then I found out, you know.
Q. Okay, but that's not what it says here. That's not the reason the scribes are giving.
A. I know that. Yes, but that's not true. I don't make sexist remarks. I don't make racist remarks.
Q. Okay. So "Laura feels that he is condescending towards scribes and patients at times." Do you disagree that you are condescending at times?
A. I'm never condescending. I'm kind and compassionate. I make people feel at home and welcome.
Q. It says, "Also feels he is sometimes sexist."
A. Never.
Q. You disagree with that characterization?
A. I believe I just said that.
Q. Earlier today when we were talking about the experience that you had with one of the young female employees who you said became offended because you said something to the effect of go on, go on or you were trying to urge her to move more quickly. You referred to her as a young girl. Do you recall that?
A. Yes.
Q. Do you think that young female employees in the workplace may not like being referred to as young girls?

A. I didn't refer to her as a young girl.
Q. You didn't refer to her as a young girl in this deposition?
A. I did, but I did not call her that.
Q. To her face, you mean?
A. I didn't say that to her, but she was a young girl. She's probably 18 years old.
Q. Okay, but my question was do you think that a female employee in the workplace would appreciate being referred to as a girl?
A. Probably not and I wouldn't do that to her. As a 68-year-old man, okay, she's a young girl. I'm sorry. I wouldn't call her that because of the day and age that we live in, okay. The way I grew up, she would be a young girl. That's how I would characterize her. I wouldn't call her that.
Q. Well, you just did call her that.
A. In my mind, that's where she's going to fall, but I wouldn't call her that because of the climate we live in, okay.
Q. In the next paragraph, it says, "Megs was told by Sam May that he's horrible."
A. I'm sorry, what? Okay. Megs was told --
Q. "Megs was told by Sam May that he's horrible." Would you disagree that you were horrible towards people?

A. Uh-huh.
Q. Okay. In there it refers to some clinical concerns that Dr. Gohel expressed about you. Do you recall having any discussion with Dr. Gohel or anyone else about this issue?
A. None whatsoever.
Q. Then in the fourth sentence from the bottom, it says, "I have also been given some information from Melissa Anderson that you may want to touch base with her on feedback from her optical team. Her team has expressed some of the same concerns I am getting in clinic. Derogatory comments and an uneasiness when with him." Who is Melissa Anderson?
A. Let me think a moment. I don't know.
Q. Well, it says a reference to her optical team. Does that help refresh your memory?
A. I don't know, you know, it's a big staff.
Q. Do you recall making any derogatory comments or otherwise behaving in a way that would make people uneasy in the optical department?
A. Of course not.
Q. If you had made derogatory comments or done things that made coworkers uneasy, would you agree that would be a legitimate concern for Blue Sky Vision?
A. Yes.
MS. BROOKS: Objection, speculation.

MS. TRACEY: Okay. Can you scroll down, please?
Q. (By Ms. Tracey) So I am looking at the email from Amy Dunleavy to Jared Holmes on September 5th, 2018.
A. Right.
Q. Do you recall Jared Holmes?
A. I do.
Q. Who was Jared?
A. He was a scribe, op tech.
Q. What did you say? Did you say op tech?
A. A scribe or op tech.
Q. Oh, op tech, thank you.
How frequently did Jared scribe for you?
A. Fairly often.
Q. How would you describe your relationship with him?
A. Very good.
Q. You thought you got along well?
A. Yes.
Q. Did you ever have struggles with him or perceive any tension with him over using the computer?
A. No, I don't think so. He was helpful. Yeah.
Q. So from this email exchange that we are looking at, Amy Dunleavy is saying that she offered to buy Jared lunch because he agreed to stay and scribe for you because she couldn't find anyone else who would do it. Do you have any reason to believe that's not true?

A. No.
MS. TRACEY: James, scroll down, please.
Q. (By Ms. Tracey) Okay. Now I'm looking at an email from Amy Dunleavy to Zach Smith and Phil Vanderlugt dated September 5th and, again, Amy is explaining that "Getting a scribe for him has become increasingly difficult as some are refusing to work with him due to these complaints. I am not comfortable forcing someone to work with him."
Were you aware that Amy was having any trouble finding scribes to work with you?
A. No.
Q. Do you have any reason to believe that she was not, in fact, experiencing increasing difficulty finding scribes to work with you?
A. I have no idea.
MS. TRACEY: Can you scroll down, please? Actually, can you scroll up a little bit? Okay.
Q. (By Ms. Tracey) Dr. Jansma in this email that we were just talking about, the second sentence it says, "I have made a document and attached," referring to feedback that Amy was trying to solicit from scribes about you. Is that an accurate statement about what this says, what this email says?
A. I believe so.
MS. TRACEY: Can you scroll down?

Q. Do you disagree with any of the statements made?
A. I disagree with all of it.
Q. If that statement were true, would you believe that that would be something that would cause Blue Sky Vision concern?
A. Yes.
Q. The second bullet point says, "Tech/scribe believed that he is condescending towards scribes and patients at times. Also feels he is sometimes sexist. (This has come up with three of the scribes.)" Do you agree with the reporting from that text/scribe?
A. Yes.
Q. Do you think that if that were true, it would be a legitimate concern to Blue Sky Vision?
A. Yes.
Q. The final bullet point says, "Doctor can be condescending to patients and make snide comments after the patient leaves the room related to hygiene, gender, income (insurance.)" Have you ever done that?
A. No.
Q. If you had done that, would you agree that that would be a legitimate concern for Blue Sky Vision?
A. Yes.
MS. BROOKS: What part are we talking about?
MS. TRACEY: The last bullet point.

Q. Do you recall when that occurred?
A. I believe it was the latter part of August or early September.
Q. Tell me what you remember about that conversation.
A. That in the periphery of the right side of my vision, if I was working with the EMR and there were pop-up screens, pop-ups on the screen, that I would have difficulty seeing that if it popped up there and I didn't realize it at first, then I would not see that. So the scribe was saying to me, didn't you see that, and I'd go, no. Now, once I realized it was there, I went, oh, okay, I just need to look for that. And so I'd either turn my head or scan with my eyes once I knew it was there and then it was no problem.
Q. How did that come up?
A. As I said, I would be working with a scribe and, of course, most of them are these young kids and they just fly by and I am not a fast typist, as I said, so they're used to just flying around on the screens and the pop-up would occur over there and I wouldn't see it but, of course, they are sitting to my side to start with on my right and that's where would it pop up and because the screen is wide, a fairly wide screen, that actually made it worse for me. You'd think it would make it better, but it makes it worse.

A smaller screen, I would have seen it because it would've been more ahead of me. So it would pop up and they would think, okay, he sees that. He needs to make a choice and I wouldn't be making a choice and so once that occurred, then it would be, like, oh, okay. Things are popping up over there. So my first question is, could we make it pop up someplace else on the left. Well, we can't. So now I know that. Okay, so I just have to make sure that I'm looking over to the right, either turn my head or scan with my eye to make sure it's there.

Q. Do you remember having a conversation with Phil Vanderlugt regarding your need for a scribe and your insistence upon having a scribe?

A. Not a need for a scribe, but the fact that I was promised one and so that I would like to have a scribe. So it was not a need. It was what was promised and he was saying, can't you just play ball and get along? Don't you want to be like everybody else? And I said, it's not that, Phil, it's that this is what I was promised and he said, well, I sort of stuck my neck out for you, recommended you. Can't you just go along and I said, well, I will, don't worry, I'll be fine.

Q. Is that the context in which your medical condition came up with him, was it in the context of a conversation about the scribe?

I've looked at that, right?
Okay. All right.
Q. Are you all set?
A. Uh-huh.
MS. TRACEY: James, if you could scroll back down to BSV 207. I believe it might be the last page in that chain.
Q. (By Ms. Tracey) Okay. Dr. Jansma, I'm looking at the email correspondence from you to Surya Desiraju dated September 26, 2018. Can you tell me who Surya Desiraju is?
A. Gosh, I don't know his exact position. I met him once, okay, so I don't know. CEO, CFO, something or other. They had so many different things like that, so --
Q. Some acronym?
A. Pardon me?
Q. Some acronym?
A. Yeah, you know. I met him on that day.
Q. And you write,
"Hello Surya, I am formulating a letter of resignation. I know we are both in need of getting this process underway and over.
There are some things we talked about yesterday that either need to be in my letter or I need to see in writing from Blue Sky Vision, LLC. These things

include paying the balance of my salary and lifting all restrictive covenants. I'd also like the balance of patient files, which is $20,000 and my health insurance continued to the end of my proposed contract or the prorated amount of the 13-14k allotted for this. If this is agreeable to Blue Sky and I have this in writing, I am prepared to resign immediately."

So from this email, it sounds to me like what you're saying is you would voluntarily resign from Blue Sky Vision if and only if Blue Sky agreed in writing to certain terms that you spelled out.

MS. BROOKS: Objection, misstates the document.

MS. TRACEY: Well, the document speaks for itself, so I'll try to restate.

Q. (By Ms. Tracey) So from this email, it sounds like what you're saying is that you would voluntarily resign from Blue Sky Vision if and only if Blue Sky Vision agreed in writing to certain terms that you have spelled out which would include but would not necessarily be limited to paying out your salary, lifting restrictive covenants, continuing your health insurance. Is that correct?

MS. BROOKS: Same objection, but you can answer.

THE WITNESS: I believe that's true.

Q. (By Ms. Tracey) Would it be fair to say that assuming all

that happened, meaning Blue Sky Vision agreed to your terms, you were also in need of getting the resignation process underway and over, correct?
A. Yes.
Q. Let's talk about how we got there. You mentioned earlier that you had a meeting with Phil Vanderlugt and Surya Desiraju on September 25th, 2018, correct?
A. Right.
Q. When was that meeting scheduled if you can remember? I know it's been three years.
A. 4 or 4:30, something like that.
Q. Did you know about the meeting in advance?
A. Very shortly before, like either that day or the day before.
Q. Were you told about the reason for the meeting?
A. Pardon? No.
Q. Now, Phil Vanderlugt was present, Surya Desiraju was present. Was there anyone else present?
A. No.
Q. Describe to me what happened, to the best of your recollection, during that meeting?
A. Surya and I got there first. It was in a lunchroom, which was a very odd place to have it. People coming and going. I did not know Surya. We sort of introduced ourselves. He was all smiles and happy. Gee, it's nice to put a name

with a face, all this kind of thing. Here he was about to ask for my resignation. Very odd kind of thing. Like, no emotion. I mean, emotion like he's happy to meet me. Very strange.

So we waited in the lunchroom Phil was late. He came in, we sat down. Phil did most of the talking said, you know, it's just not working out. You're not taking advantage of the collegial atmosphere here and I have talked or we have talked, however he put it with sort of the senior members, Dr. Sheldon, Dr. Barrett, Dr. Kendall, Dr. Roosenberg (ph), maybe Dr. Randeree (ph), I can't remember, and they think you are a liability and we don't want to continue that and so it would be in your best interest to resign.

Q. How did you respond?

A. Well, I was in shell-shock. I felt blindsided and I really didn't answer. I just sat there for a bit and I said I'd get back to them. I didn't say I was going to resign.

Q. Would it be fair to say that by that point you had become pretty frustrated with Blue Sky Vision due to the lack of a scribe and, you know, as you recounted them going back on promises that you felt had been made during negotiations?

A. I was numb at that point. I can't say to you just how I

felt at that moment. I can tell you I was shook up enough -- I grew up in Grand Rapids my whole life, that when I got out to my car, I had to put the nav on to drive home, okay? By the time I got home, I felt like every muscle in my whole body had been pulled. That's how I felt.

Q. I wasn't really referring to how you felt during that meeting. I was referring to how you felt leading up to that meeting. You know, earlier in this deposition you've talked about the lack of a scribe and indicated that you felt that Blue Sky Vision was going back on that and changing the --

A. Sure, I characterized it as skating on a moving ice pond.

Q. Right.

A. And they kept changing the rules and Bill Hughson said to me at one time, I was in my car and pulled over in a parking lot and he's from Chicago and he said, do away with the West Michigan nice and describe it to me without that and I just said, well, Bill, and I said that it's like skating on a moving ice pond. The rules keep getting changed.

Q. When did you have this conversation with Bill?

A. I don't recall just when it was. I think in August sometime, you know, and I always hit it off really well with Bill, but I just -- pardon me?

Q. You were expressing some frustration with Bill about how things were going then?
A. No, I was quite calm and everything. I just said, it's difficult when things get changed like that and I'm just trying to work within the parameters the best I can, but it does make it difficult. I don't know if frustration is the best word. Disappointed. I was really disappointed, you know?
Q. Sure. Do you recall having any discussion during that meeting about the restrictive covenants that are in your employment agreement?
A. Yeah, let me think back a moment here. Yeah, I talked to them and said I would want the restrictive covenant lifted and Phil said, yeah, that shouldn't be a problem and my salary continued and Phil said again that shouldn't be a problem.
Q. Okay.
A. Yeah, the balance of my salary. That's how I put it, yeah.
Q. So as of September 26, as it indicates in here, you were formulating the letter of resignation on the condition that these other issues were addressed?
A. Yes.
MS. TRACEY: Can you scroll up for me, please? All the way to the beginning of the next email. There you go.

employment with BSV. We have not, however, received your letter of resignation. We are working on next steps and will be in contact."

At this point, were you still planning to resign?

A. Well, again, they had not indicated they were going to meet any of the things that I talked about. I certainly learned not to trust them at this point because they hadn't lived up to what they said in my employment contract, so I knew I better get everything in writing. So that's where it stood. So everything is nebulous. We'll be in touch with next steps. What does that mean? It doesn't mean a thing, you know, so until they lay out concrete things, I'm certainly not tendering my resignation.

MS. TRACEY: Could you scroll up, please? Scroll down a little further.

Q. (By Ms. Tracey) Okay. I'm looking at the email at the bottom of the page from you to Melissa dated September 28th. It looks like it's your response to her email indicating your father-in-law passed away and that was a reason why you had not sent in your letter of resignation; is that accurate?

A. At that point, I was very close to my father-in-law. That's part of it, you bet.

Q. Sure. I'm sorry for your loss.

A. Thank you.
MS. TRACEY: And then can you scroll up a little bit, please?
Q. (By Ms. Tracey) So would it be fair to say at this point, you know, as of September 28, you hadn't resigned and you hadn't really been terminated either, you were kind of in a holding pattern?
A. Yes. I didn't really know where things stood with them, either. They didn't clarify anything. I didn't know if I was employed, not employed. I had no idea.
Q. What happened next after this email exchange with Melissa?
A. I don't know exactly. At one point I got a check deposited and I went, oh, my gosh, is this a mistake? What's going on? You know, that was odd because I didn't know where things stood, so --
Q. So you were still getting paid by Blue Sky?
A. I was and I didn't know what to think, you know.
Q. After this September 28 email exchange with Melissa Dabrowski, when did you next communicate with somebody from Blue Sky Vision?
A. I don't recall.
Q. Do you recall having a telephone conference with Melissa Dabrowski about what she meant by next steps?
A. Yeah, we talked on the phone more than once.
Q. Okay. Do you remember talking to her on October 5th of

about having a medical evaluation done?
A. Yes.
Q. Related to your eye condition?
A. Yes.
Q. Now, we talked a little bit about some of your medical visits already today. When you go to see the eye doctor, what happens when you go to their office? When you go to see a new eye doctor, what do you do?
A. How much detail do you want?
Q. Start from the beginning. So you walk into their office, what do you do?
A. You are asked for your chief complaint, case history. They are going to take your visual acuity, your stereopsis, your intraocular pressure. They are going to do a refraction on you, going to dilate your eyes. Look at your eye health.
Q. When you go to the eye doctor for a visit related to your eye, does your eye doctor go and search through your medical records to obtain information about your medical condition that's not relevant to the reason why you are being seen?
A. Of course not.
MS. TRACEY: James, could you pull up Exhibit 14?
Q. (By Ms. Tracey) Dr. Jansma, if you could review this set of documents, I would appreciate it.

A. Okay. Go ahead. All right.
COURT REPORTER: That's the end of it.
MS. TRACEY: James, can you go back up to the top of this chain?
Q. (By Ms. Tracey) Okay. So, Dr. Jansma, so this looks -- I'm looking at the email from Melissa Dabrowski to you copying Surya Desiraju dated October 8, 2018. I think this is the same email that we just discussed in a different exhibit. Would you agree with that?
A. I believe so.
Q. And it looks as if Melissa has attached for your review the documents that are part of this exhibit including the letter to the doctor, the medical authorization form and the optometrist job description. Is that correct?
A. Right.
MS. TRACEY: Can you scroll down for me here, James? Perfect.
Q. (By Ms. Tracey) Okay. So this appears to be the draft letter that Melissa intended to send to the doctor that you selected; is that correct?
A. I believe so.
Q. And in it, it states,
"Dr. Jansma has notified BSV that he has homonymous hemianopia, which has created concerns about whether Dr. Jansma can safely perform his job

A. No.
Q. So you would agree that the information they are asking for, i.e., whether you are able to thoroughly examine the eye without missing anything as related to your job as an optometrist at Blue Sky Vision?
A. Yes.
MS. BROOKS: Are we talking about paragraph, the third paragraph?
MS. TRACEY: Yes, we are talking about the paragraph that I just read.
MS. BROOKS: Okay.
Q. (By Ms. Tracey) At the bottom of the third paragraph it says, "Please note that the attached list is specific to Dr. Jansma's current job at Blue Sky Vision." Then it goes on to list 10 different questions, correct?
A. Yes.
Q. Did you object to anything else in this letter?
A. Yes.
Q. What did you object to?
A. They want to pry into every medical record that I have ever had, including dental, counseling, anything you want to think of.
Q. I should've been more clear. I'm talking about this letter, so if you're looking at this letter with this list of 10 different questions, is there anything in this

letter that you objected to?
A. Yes --
MS. BROOKS: Can we scroll down, though?
MS. TRACEY: Sure, absolutely.
THE WITNESS: We did not read the last sentence. "In the event that he seeks a different position, Blue Sky Vision will likely ask you to provide an opinion with regards to that particular position." Sorry, but no. They cannot weigh in on different employment. They want to.
Q. (By Ms. Tracey) Why do you interpret that sentence as asking about different employment?
A. That's what it says, it's a different position.
Q. I think what it's saying is we are asking these questions with respect to or we want you to answer these questions with respect to his job as an optometrist, but if he someday had a different position, say that you wanted to become an ophthalmologist, this would not apply because Blue Sky Vision would have to provide an opinion with regard to that position.
A. But it doesn't say that. It's really unclear. What it says is if I have a different position. So to me that says, I get a job elsewhere, they can weigh in on it.
Q. But did you have a different position?
MS. BROOKS: Objection, what timeframe are we talking

about.
MS. TRACEY: The current timeframe. The timeframe in which the document would be completed by the doctor selected.
Q. (By Ms. Tracey) Right? This document is going to be completed by Dr. Glisson or Dr. Santos --
A. So I object to it on the basis I just said.
Q. I didn't hear you.
A. I object to it on the basis that I just said.
Q. Okay, but did you hear my question?
A. Repeat it, please.
Q. My question was, this document would be completed by Dr. Glisson or Dr. Santos, whichever you chose, after your evaluation, correct?
A. Yes.
Q. And at the time of that evaluation, your job position was as an optometrist, correct?
A. Correct.
Q. So that would be the job position that they would be completing this form and providing this information about, correct?
A. Yes and no.
Q. Why no?
A. You have to read that sentence again.
Q. Well, I have read the sentence.

A. It says a different position. That's not an optometrist then or is not as their optometrist, so that sentence is too vague.
Q. Well, but the sentence said in the event that you seek a different position.
A. Right, like that hamstrings --
Q. That you would likely have, but you haven't, right? So that's hypothetical.
A. It's too vague, too open-ended. It says to me if you want to go seek employment elsewhere as an optometrist and it can say it that way, we are going to weigh in and say whether you can work or not and that's how I interpret it.
Q. How would you conceive that the Sky Vision would be able to weigh in using this document on your position elsewhere?
A. That's what this is saying to me.
Q. That's how you personally interpret that sentence?
A. Yeah, it does.
Q. Any other objections?
A. Well, not in terms of the -- I'd want him to scan down again so I see the points.
Q. Sure, absolutely.
A. But in terms of being able to do my job or anything else, no, I'm fine with all that. I do everything there. It's all good. I am all fine with that.

Q. Okay.
MS. TRACEY: James, can you scroll down to the medical authorization form?
Q. (By Ms. Tracey) Dr. Jansma, did you object to this form?
A. Let's see here. Yeah, certainly.
Q. Okay. Let's talk through it. Let's look at paragraph two. It says, "I authorize...", would "I" be referring to you?
A. Sure.
Q. "I authorize...", blank, "...to release or disclose health information as disclosed below of the above-named individual to Blue Sky Vision." That blank, that would be Dr. Glisson or Dr. Santos, right, whoever you chose?
A. Right.
Q. And you would fill that in?
A. Right. My point with this whole thing is they want every piece of medical information I've ever had. That's ridiculous.
Q. Okay. That's your interpretation of this form, but that's why I'm trying to talk through it.
A. Sure.
Q. So looking at paragraph two, you would agree that this letter would authorize Dr. Glisson or Dr. Santos to disclose health information to Blue Sky Vision, right?
A. Yes.

Q. Earlier, we talked about Melissa's email to you and how she sent PDF attachments. Is this authorization part of the same PDF as the letter to the physician, to your recollection?
A. I believe so.
MS. TRACEY: Okay. Let's scroll back to page one of the letter.
Q. (By Ms. Tracey) The fourth paragraph which is directed to Dr. Glisson or Dr. Santos states, "Please answer the below questions. We have enclosed a release signed by Dr. Jansma giving you permission to respond directly to BSV."
So fair to say, what the authorization is doing is allowing Dr. Glisson to answer the questions in this form and send it back to Blue Sky Vision, right?
A. Yes.
MS. TRACEY: Okay. James, can you go back to Defendant's Exhibit 4. The last exhibit.
MS. BROOKS: What's exhibit was that we were just looking at, 14?
MS. TRACEY: Defendant's Exhibit 4. Oh, I'm sorry, the one we were just looking at?
MS. BROOKS: Yeah.
MS. TRACEY: That was Plaintiff's 14.
MS. BROOKS: Thank you.

MS. TRACEY: You're welcome.
Can you scroll up, please, to document 139?
Q. (By Ms. Tracey) Okay. So, Dr. Jansma, it's been a little while since you looked at this email, so I don't want to rush you if you need to read something again, but from my view of it, it looks like an October 16, 2018, email from Melissa Dabrowski to you where she's following up on the email and documents that she sent to you on October 8. Is that accurate?
A. Let's see here. You mean where she sends it on October 16 and says she needs a response by 5 p.m. on the 17th, a favorite trick that they used to do to me all the time? Is that what you mean?
Q. Well, that wasn't my question, but what do you mean by a favorite trick?
A. This is what they love to do to me. Send it, like, at 4 or 5 p.m. on the day before and want a response by the next day. These are the games they would play, okay? I'm just telling you. So now I'm going to read part of it to myself.
Okay. What would you like to know?
Q. Had you responded to the October 8 email? This indicates she did not receive a response from you.
A. I do not recall.
Q. You just said that this email -- well, correct me if I'm

wrong. My understanding of what you just testified to was that this email reflects the tricks they used to play by asking you to respond within a day or you said by 4 o'clock the previous day and to respond to the next day.
A. They used to like to do that or send it on a Friday like at 4. It's due over the weekend. Just things like that, but anyway go on.
Q. Okay. Do you think it was unreasonable for them to ask for a response from you between October 8th and October 17?
A. 16 to 17.
Q. Well, the initial request was put out there on October 8th, right?
A. Well, that's not really all that long considering everything that was going on. I don't think that's all that long and the stress that I would be under at that point.
Q. Well, you are being paid by Blue Sky Vision at that time, correct?
A. Yeah, but I really didn't know if I was employed or not. I mean, this was just pretty early on yet. You know, it only happened September 25.
Q. Right, but you were receiving a paycheck?
A. You know, you get paid every two weeks. If you do the math on that, I really didn't know where things were by

that point.
Q. Well, if you get paid every two weeks, you hadn't received a paycheck by this point?
A. I don't know whether I had at this point. I guess we'd have to figure that out. I didn't know. I didn't know if I was employed, if I wasn't, there was a lot of stress going on. I'd been blindsided. I was still reeling from this and trying to figure out what to do, so a lot of stress going on there and my whole game plan for life had been derailed. I figured on working five years. Now, I'm at that age, I don't know what the heck is going to go on. You know, it was pretty tough for me to figure it out.
Q. You were concerned about your personal financial situation at that time?
A. You're darn right.
Q. You mentioned earlier that you had declared bankruptcy in 2008 or around that point. Was that a personal bankruptcy or was that a bankruptcy associated with your business?
A. It was a personal bankruptcy. I invested in a car dealership with a crooked partner. He took the money and ran and Chrysler came after me for 5.5 million. You want to talk about stress? Okay.
Q. What's that?
A. Want to talk about stress?
MS. TRACEY: James, can you scroll up, please?

Q. (By Ms. Tracey) I'm looking at an email at the top of this document. It's from you to Melissa Dabrowski dated October 18th, 2018. The email states, "I did not see this email until this morning. I met with my attorney yesterday and have since forwarded this to him. He will be in touch to advise you regarding my course of action." Was that your response to Melissa's October 16th email?
A. I believe so. Yeah, I was, as I said, trying to see what to do next.
Q. And this was the day after the initial deadline that she stated in her October 16th email?
A. Apparently so.
Q. Why didn't you see this email on October 17th?
A. As I said, I was reeling at that time. I probably wasn't checking the email every day. You know, I wasn't functioning too well. I wasn't leaving the house. I was having groceries delivered. My wife --
Q. Well, didn't you meet with your attorney? In this email, it says I met with my attorney yesterday?
A. I got out to do that, but trust me, I wasn't doing real well, okay?
Q. When did you first contact an attorney?
A. I don't know exactly, but not long before that. Do you want his name?
Q. Yes.

A. Brad Glazier.
Q. You met with Brad in person? You left the house to do that?
A. Yes.
MS. TRACEY: James, could you scroll up, please?
Q. (By Ms. Tracey) I'm referring to an October 19, 2018, email from Melissa to you and in that is it fair to say she's asking you to confirm which physician you wanted to conduct a medical evaluation by October 22nd?
A. Okay.
Q. Would you agree that that's what she's asking you to do?
A. Let's see. Yes.
MS. TRACEY: Could you scroll up, please?
Q. (By Ms. Tracey) This is an email from you to Melissa on October 22nd, the date that Melissa had stated was the deadline, correct?
A. Right.
Q. And you state, "Melissa, after further evaluation, I was advised to contact the EEOC. I have filed a complaint with the EEOC and will have a meeting with them in the near future." Did you provide the name of a physician as Melissa had requested?
A. I'm not sure.
Q. Do you see anywhere in this email where you provided the name of a physician?

A. I just said, I'm not sure.
Q. Well, I'm asking if you see it in the email.
A. Pardon?
Q. I'm asking if you see it in the email?
A. No, I don't.
Q. Do you recall having any telephone communications with Melissa in which you provided the name of a physician?
A. No, I don't.
MS. TRACEY: Could you scroll up, please, James?
Q. (By Ms. Tracey) I'm looking at an October 22nd email from Melissa back to you. In there Melissa states,
"Your continued employment with BSV requires you to cooperate with us in attempting to schedule a medical evaluation so that we can determine whether you can safely perform your job duties. You committed to working through that process with us on October 5th, 2018, and we suggested independent doctors who could assess your condition on October 8th, 2018. Despite repeated follow-ups, we have not received an answer from you. Last Friday, I've asked you to select one of the doctors by the of the day today if you do not want Blue Sky Vision to interpret your refusal to move forward as a voluntary quit."
It then goes on to say that she's interpreting the fact that you still had not selected a doctor as your

decision to and employment and she would consider that your last day. Is that an accurate characterization of that email?
A. It is.
Q. By this time, had you expressed any concerns to Melissa about the scope of the evaluation?
A. I believe that's in a following email, if we can scroll to it.
Q. Okay. I was asking you if by this time, October 22nd at whatever time it was.
A. I believe that's forthcoming.
Q. Okay, but you hadn't expressed it by this point is my question?
A. I'm not sure.
MS. TRACEY: Okay. James, could you scroll up.
MS. BROOKS: This is defendant's exhibit what? I'm sorry.
MS. TRACEY: 4.
MS. BROOKS: 4?
MS. TRACEY: Yes.
MS. BROOKS: Thank you.
THE WITNESS: Yeah, you just went past it. There we go.
Q. (By Ms. Tracey) Is this your response to Melissa dated October 22nd, 2018, at 10:24 p.m.? I can't see the time

and date.
A. There it is. Scroll up a little bit and you'll catch the time and date, I think.
Q. Okay. Is that accurate?
A. Yep.
Q. So in the second sentence. Well, we will start with the first sentence. You say, "Please be very clear I am not voluntarily quitting my position. Not knowing my rights in this unusual situation has taken more time than you have allowed me when you want immediate responses to requests."
A. Very true.
Q. Melissa had given you the names of the physicians and related documents on October 8th, correct?
A. Uh-huh.
Q. Would you consider nearly three weeks immediate?
A. I can't answer the question the way you phrased it.
Q. Why? You used the term immediate. You said she wants immediate responses. She provided you the information October 8th. It's October 22nd. Would you consider that timeline immediate?
A. Yes.
Q. In the next paragraph you say, the attorney you'd spoken to has been tied up in trials and is unable to respond to the issues at hand within the time frames given. Is this

the same attorney, Brad Glazier?
A. That's true, yes. And he won his case. He wanted to let me know that. Very arrogant.
Q. Brad is very arrogant?
A. Yes. Short man syndrome.
Q. I'll have you know, I'm 5'1".
MS. BROOKS: I was about to say, I'm five feet tall, so --
THE WITNESS: Women don't usually have it, okay? I love short women, so, all right? My wife is 5'4", so I am good with that. They don't seem to have an issue.
MS. TRACEY: So if you could scroll down a little bit?
Q. (By Ms. Tracey) In that last paragraph you say, "I consider myself as continuing my employment with Blue Sky Vision and know that you will see that I am determining what the best plan is for me to follow so that I may return to work." Is that correct?
A. Yes.
Q. So at this point, you clearly haven't been terminated. You are going through this process to see if you can return to work, right?
A. Yes.
Q. And at this point, you still haven't complained about the scope of the evaluation. What you're telling them is that

you want to state who is going to evaluate you, right? Meaning you want your physician to evaluate you instead of one of the specialists who Blue Sky Vision proposed; is that correct?
A. Yes, that was something that was certainly being considered, yes.
MS. TRACEY: Can you scroll up, please?
Q. (By Ms. Tracey) This is Melissa's response to you on October 30th, 2018, at 4:29. Do you want to take a minute to read that or do you remember it?
A. I remember it.
Q. Would you agree that Melissa at that point sort of backed off on characterizing you as a voluntary quit and said that if you would advise Blue Sky Vision what specialist you would prefer and cooperate with completing that medical evaluation, you can do that, if you would just respond to her by the end of the close of the next business day?
A. Yes.
MS. TRACEY: Can you scroll up, please?
Q. (By Ms. Tracey) I'm looking at the email from you to Melissa Dabrowski on October 24th, 2018. Is this your response to Melissa's email?
A. Yes.
MS. TRACEY: Can you scroll down from that page?

Q. (By Ms. Tracey) In the third paragraph you state, "The testing Blue Sky has proposed is overreaching in its scope. It seeks to delve into my entire medical history, which is an invasion of my privacy. Only history germane to my condition may be accessed." Is that correct?
A. That's correct.
Q. Now, this is the first time you've mentioned the scope of the evaluation, right?
A. I believe so.
Q. This sentence, this first sentence you refer to testing, right?
A. I'm sorry. Where, now, at the very top?
Q. Yep. So you are referring to testing, right?
A. Let's see. Yes.
Q. You don't mention that sentence in the letter to the physician that had caused you concern, right?
A. I'm not following your question, I'm sorry.
Q. That's okay. I can ask a better question. So in this sentence, you are referring to the testing, meaning the evaluation, correct?
A. Okay.
Q. In this paragraph, you don't specifically reference the contents of the letter to the physician that Melissa provided to you, right? Do you delve into that level of detail?

A. What I'm saying is they asked for my resignation. That was it. There was never anything about my returning to work or helping me to do so or testing me and there was never anything like if you don't resign, here's what will happen. It was just open-ended and there's nothing beyond that. It was only once I said I'm consulting an attorney and I have filed a complaint with the EEOC that they then said, oh, oh, oh, guess what? Well, we'd like to help you. Hello. Then all of a sudden they were singing a different tune.
Q. You testified earlier that --
A. Now, we're concerned.
Q. What's that?
A. Now, we are concerned. Before that, they didn't care, okay? They just wanted my resignation, period.
Q. Okay, but the resignation didn't happen, right?
A. It doesn't matter. That's what they wanted, pure and simple, that's it, until I got my feet under me and said, well, guess what, here's what's going on, guys. Now, all of a sudden, oh, let's back the train up and here's some other things.
Q. But Dr. Jansma, they had requested the evaluation before you mentioned having an attorney, right?
A. You heard what I said.
Q. Well, you heard my question, right?

A. I don't know. I not sure.
Q. Well, in this email chain, you can correct me if I'm wrong, but Melissa requests, sends you the information about the evaluation on October 8, 2018. You responded on I believe it was October 22nd that you had met with an attorney, right?
A. I guess you would have to look back and see where she talks about me returning to work. I don't recall just when that was, but I don't think that really happened. For a while, they were just interested in the resignation, primarily, to start with. That's where it was. It was never about me, my well-being, returning to work. You know, that was not really a concern of theirs. Anyway --
Q. Well, would you agree that if you were to return to work, Blue Sky Vision has a reasonable basis to want to be sure that you can safely perform your job duties at work?
A. Yep.
Q. Yes?
A. Yes.
MS. TRACEY: Can you scroll down a little bit?
Q. (By Ms. Tracey) In the last two paragraphs of this email you say,
"The issues I've listed above, as well as Blue Sky's intent if I'm deemed fit to practice, with or without accommodation, need to be set forth before I

agree to and have testing performed. In other words, I need to know the outcome if I am being deemed fit to practice. Will I remain employed as a practicing optometrist with Blue Sky Vision, LLC, in a non-hostile work environment that accommodates me?

This needs to be set forth in writing. If that is the case, I selected Dr. Glisson to examine me. I will set the appointment. It will occur after my meeting with the EEOC which will occur in the next 2 to 4 weeks."

So correct me if I'm wrong, is what you're saying now if Blue Sky Vision addresses your concerns about the testing overreaching in scope and Blue Sky Vision won't delve into medical history that's not germane to your health condition and you would remain employed as a practicing optometrist in a non-hostile work environment that accommodates you if all those things happen, and Blue Sky Vision puts that in writing, then you would move forward with the medical examination with Dr. Glisson?

A. Absolutely.

MS. BROOKS: Objection, compound.

Q. (By Ms. Tracey) You said absolutely?

MS. BROOKS: I said objection, compound.

You may answer.

THE WITNESS: Yes.

MS. TRACEY: James, can you scroll up to the next document?
Q. (By Ms. Tracey) Okay. I'm looking at an email from Melissa Dabrowski to you dated October 24th?
A. Uh-huh. Yep, I should say.
Q. Is that Melissa's response to you?
A. I believe so.
MS. TRACEY: James, can you scroll down a little bit? Actually, scroll down a little further. Okay.
Q. (By Ms. Tracey) At the bottom of this page, Melissa says, "I also want to make it clear that Blue Sky is not interested in any medical information about you beyond whether the nature and extent of your homonymous hemianopia prevents you from safely performing your job duties. If you are deemed safe to return to work, with or without reasonable accommodations, you may return and will not be subjected to a hostile work environment."
Didn't that address your concerns about the scope of testing and how you would be treated if you returned?
A. Yes, but --
Q. But what?
A. It's not there in writing. She didn't change the form. Nothing is different.
Q. Well, it's in writing that she just told you in writing, right? Is this email a written document?

A. I told her I would never sign something unless those things were taken out and I needed to see it in writing.
Q. What things were taken out?
A. Gall darn, really? The dental records, counseling, everything that was overarching there, okay? Like my entire life's history that they want to go over.
Q. Did you go through the document with her and say I would like these items removed or did you sort of broadly object to the scope of the document?
A. I said it needed to pertain just to my eye condition.
Q. What did you say?
A. It needed to pertain just to my eye condition.
Q. Okay. So was the conversation, what you said in the conversation, was that similar to what you said in your email to her?
A. Yes.
MS. TRACEY: James, could you scroll up, please?
Q. (By Ms. Tracey) I'm looking at an email dated October 29, 2018, Melissa to you and it looks like she is attaching forms updated with Dr. Glisson's name, as you had indicated you would be seen by him and then she states that they are in the process of securing an appointment for you. Is that accurate?
A. All right.
Q. Is that accurate?

A. That's what I see.
Q. And then she asks you to return a copy of the HIPAA authorization?
A. Okay.
Q. Did you respond to this email from her?
A. I don't know.
MS. TRACEY: James, can you scroll up to the top.
Q. (By Ms. Tracey) I'm looking at an email dated November 8, 2018, from Melissa to you. In this email she states, "I have not yet received a response from my not on the 29th...", I think maybe she means note -- "...but I wanted to let you know that they would be in contact with you if they have not already been in touch to schedule this appointment at BSV's expense."
A. Okay.
Q. Did you receive that communication?
A. I guess, probably.
Q. Did you respond to it?
A. I don't know. Do you -- never mind, I can ask you that.
MS. TRACEY: James, can you pull up Plaintiff's Exhibit 16?
Q. (By Ms. Tracey) Can you take a moment to review that, please?
A. Okay.
Q. Can you identify this document for me?

A. Yes.
Q. Earlier you said you were requesting a scribe because you needed it for the two new EMR systems and because you were working in different locations, right?
A. Yes.
Q. Is it fair to say that you did not request this as an accommodation of your disability?
A. Yes, and if I can say something?
Q. Sure.
A. I didn't know quite how to answer this question, to be honest, on the form, okay? I've never done anything like this before. I didn't know quite how to answer it, so I did it the best way I could. I didn't know whether to put yes or no.
Q. Okay. Fair enough. Dr. Jansma, after you left Blue Sky Vision on December 5th, 2018, what, if anything, did you do to secure other income?
A. Well, first of all, of course, I had to be outside of the 25-mile radius of each location and that wipes you out for quite a ways. So I ended up working at a LensCrafters in Traverse City. I did that because I have a friend that lives up there and so I did it so I can work -- anyway, I go up there Sunday-Monday and worked them back-to-back and spend overnight with him.
Q. When did you start working there?

A. Right.
Q. You chose to leave there to go work at Walmart?
A. Yes.
Q. What about LensCrafters?
A. LensCrafters, we did have a little disagreement there and so I was terminated there.
Q. What was the disagreement about?
A. A woman came in with two daughters, they were both very overweight. The younger one was three years old. She just wouldn't behave. She was so heavy that she actually got caught under the legs of the chair, couldn't get out and she was pretending she was a monkey and so I finally coaxed her out and got her there, but she was literally swinging from the equipment and that kind of thing, so when the exam was done I said to the mom, could you have the girls just stand out of the hallway for just a second and she said yeah and was sort of funny about it.
I said, hey, maybe I can just give you a couple of tips with your girls on how to help a little bit, just things I'd learned in raising my kids, you know. And she just took real offense to that and wrote in a complaint letter and they didn't like that. They thought I shouldn't be schooling parents and so they terminated me.
Q. Was that just a single incident or was there more than one incident?

A. There was another with the man and his son that came in and, you know, they came in and I said, hey, guys, how are you doing and, boy, just no response and the father sat in the corner real sullen and the boy was there and he was probably middle school age and at one point he was having trouble making up his mind with answers and so I to break the ice because he was just very noncommunicative and so I sort of leaned over in front of the phoropter, the bank of lenses there and I sort of tapped him on the knee with the back of my hand and I just -- I make this joke sometimes, I said, now, you're not going to do that woman thing on me, are you, and change your mind?

I always get a laugh out of that, whether it's a woman or a man. You know, women laugh and say, well, it's my prerogative, isn't it, and we laugh or if it's a guy, we laugh, and that's it, you know.

Well, this guy took offense to it and wrote and said I was making a sexist joke and I'm, like, oh, my gosh. So anyway, yeah, those two things and they went, well, okay. So people are just so touchy about things nowadays. So that was it.

Q. So fair to say you don't perceive that to be a sexist joke, but the owners did perceive that to be a sexist joke?

A. They did, yeah, and like I said, I've done that forever

and everybody has just laughed at that. This guy was taking offense, so yeah.
Q. Well, has everybody always thought that your jokes were funny? I mean, in one of the earlier emails we discussed, one of the criticisms was that you seemed sexist, right?
A. I'm not sexist at all. I mean, you know, I grew up with -- my folks split up when I was 11. I've always been a champion of women's causes and, you know, I helped my mom and whatnot. I'm not sexist in the least. I don't consider that still at this point a sexist joke. It's, you know, when I did that with women, they'd laugh. Nobody took offense to it. This guy just happened to. I'm not sexist in the least. Yeah, one of those things.
Q. Now, you said you are currently working at Walmart Optical and you obtained that position on, what, on September 15th, 2019; is that right?
A. September 15.
Q. I probably misstated that.
A. That's okay.
Q. How much are you earning there?
A. 100,200 a year plus bonus.
Q. Are you currently working there?
A. I'm not right now. I'm off on disability leave because they have so much PPE equipment. I have to wear a double mask, my glasses, fit-over glasses, a shield, my lab coat

Q. Okay, but you do recall something in Florida?
A. Well, there was the house that we had down there where we did a deed in lieu of foreclosure, but that was all tied up with the bankruptcy thing.
Q. Okay. Who was the dealership? You mentioned to her earlier there was a dealer or something, who was that?
A. That was Coopersville Motors in Coopersville.
Q. Was that a lawsuit, as well?
A. Yeah, Chrysler Motors came after us for 5.5 million and then reduced it to one point something million, yeah. That was scary.
Q. But that was a lawsuit you were involved in?
A. Right.
Q. Anything else you could think of?
A. No.
Q. So Florida. Any lawsuits in Ottawa County that you can think of, related to a contract?
A. No.
Q. I'm not trying to make you out to be -- I'd just like complete accurate testimony because, you know. Anyway, so we talked about Florida and we talked about the bankruptcy and we talked about what you testified to earlier which was Chrysler and so those were the --
A. Right.
Q. Okay. That's my questioning about that. I'm not trying

REDIRECT EXAMINATION

BY MS. TRACEY:

Q. So, Dr. Jansma, you just said as of September 25th, you did not intend to resign, but when we spoke earlier, you indicated that you were going to resign as long as the conditions that you identified in your letter of resignation or in your communications with Surya were met, correct?

A. Yes, but I think the keyword is voluntary.

Q. Okay. So those conditions weren't satisfied, right?

A. Correct.

Q. And you were not, in fact, terminated as of September 28th, correct?

A. Correct.

Q. Instead, you remained on a paid leave of absence until December 5th, correct?

A. Correct.

Q. Earlier, you testified that an optometrist can perform their job duties without an EMR system, right?

A. Correct.

Q. And you did that in your prior life, right?

A. Correct.

Q. But at Blue Sky Vision they do use EMR, correct?

A. Correct.

Q. So to practice at Blue Sky Vision, you do need to use the

EMR system, correct?
A. Correct.
Q. You also mentioned that Blue Sky Vision expressed fear of the potential lawsuit in case you missed something because of your vision, right?
A. Correct.
Q. You had told people in Blue Sky Vision that you had trouble seeing the computer screen, right, or portions of the computer screen, right?
A. Incorrect.
MS. BROOKS: Objection, foundation, misstates testimony.
MS. TRACEY: Okay.
Q. (By Ms. Tracey) You can answer. Did you answer?
A. Incorrect.
Q. Okay. I'll rephrase it. You testified that you told individuals at Blue Sky Vision that you had trouble seeing portions of the computer screen, correct?
A. Incorrect.
Q. What's incorrect about that?
A. There were pop-ups that would occur that I didn't realize they were there. Once I realize that, all I had to do was turn my head or my eye and can see them.
Q. Were the pop-ups on the computer screen?
A. Yes. There's a difference --

Q. You also disclosed that you had this condition called homonymous hemianopia --
A. Correct.
Q. -- that limits your vision. No, I understand that you could mitigate for that by turning your head. Did you feel like Blue Sky Vision should just take your word for it that you could see appropriately?
A. Yes.
Q. So your position, then, you testified earlier that in the textbooks it would suggest that if you had homonymous hemianopia, you couldn't see, but your personal experience was different, right?
A. I can't answer that question the way you phrased it.
Q. Well, let me clarify. Earlier you testified that in textbooks it would suggest that a person with your condition wouldn't be able to see, correct?
A. Incorrect.
Q. Okay. Tell me what you meant by that.
A. As long as I was straight ahead and you placed it in that area of deficit I couldn't see it, but if I turned my head or turned my eye, I could see it.
Q. I understand. What I'm trying to contrast is your personal experience versus what textbooks would tell providers about your condition.
A. Okay.

Q. And I believe Ms. Tracey earlier asked you, you objected to the scope of the testing, correct?
A. I objected to the fact that they could weigh in on future employment, perhaps with other employers. Also Ms. Dabrowski indicated they were going to scale back just exactly what they're looking for. However, I was never shown that. She wanted me to sign the HIPAA release to the doctor without being shown that form. She said the form was changed, but I was never shown that form and at that point, I was not going to take her word for it because they had lied about so many other things, I couldn't trust them. So without me being shown that form, I was not going to sign on and say, sure, I'll go see this doctor. Show me the form first. And she didn't do that.
Q. Okay. I just want to make sure the record is clear that you didn't -- you weren't objecting to Blue Sky Vision's desire to have a test at all, an evaluation at all, correct?
A. Right.

MS. BROOKS: I'm through with the questions.

MS. TRACEY: I'm through, too.

(Whereupon the deposition was concluded at about 4:00 p.m.)