# 11

Blue Sky VISION

VISION OUR PARTNERS TEAM PROCESS NEWSROOM CONTACT

# Lead the Way.
# Improve Sight. Change Lives.

World-Class Support for Leading Eye Care Providers

PENGAD 800-631-6989
EXHIBIT
#1
Hamilton
10-28-20

Blue Sky VISION



## OUR PURPOSE

Lead the Way.
Improve Sight.
Change Lives.

## OUR VISION

To be the model for unsurpassed patient experience, inspiring and empowering our team through innovation, dedication to excellence, and the creation of opportunity through growth.

## OUR VALUES

Teamwork | Integrity | Respect
Communication | Compassion
Positive Attitude



# Our Partners

Blue Sky VISION THREE RIVERS

Blue Sky VISION COLDWATER

Blue Sky VISION STURGIS

Optometrists OF LANSING

Shoreline Vision

EyeCare Associates OF HASLETT & PERRY

VRA Vitreo-Retinal Associates

VisionCare ASSOCIATES

LAKESHORE EYE GRAND RAPIDS OPHTHALMOLOGY

MICHIGAN OPTICAL GRAND RAPIDS OPHTHALMOLOGY

WALKER SURGICAL CENTER

SURGICAL CARE CENTER of Michigan

SKIN SOLUTIONS

GRAND RAPIDS OPHTHALMOLOGY

# Our Leadership Team

Blue Sky Vision is dedicated to providing world-class support to leading providers of eye care services. Blue Sky Vision was created in early 2017 and is a partnership among doctors, members of the leadership team, and Sterling Partners. Our Purpose is to Lead the Way, Improve Sight, and Change Lives; our Vision is to be the model for unsurpassed patient experience, inspiring and empowering our team through innovation, dedication to excellence, and the creation of opportunity through growth. To date, Blue Sky Vision partners include: Optometrists of Lansing, VisionCare Associates; EyeCare Associates, Sussex Vision Centers; Vitreo-Retinal Associates; Michigan Optical; Shoreline Vision; Walker Surgical Center; Lakeshore Eye; Surgical Care Center of Michigan; and Grand Rapids Ophthalmology.



**Dan Shoemaker**
President

Blue Sky VISION

VISION OUR PARTNERS TEAM PROCESS NEWSROOM CONTACT



**Melissa Dabrowski**
VP Human Resources



**Jenny Fanning**
VP Information Technology



**Colleen Mulder**
VP Marketing



**Shane Rodgers**
VP Finance & Accounting

Blue Sky VISION

VISION OUR PARTNERS TEAM PROCESS NEWSROOM CONTACT

## Board of Directors

Roger Valine - Chairman of the Board
Thomas Cowden, MD
Rick Elfman
Michael Gershenzon
Parin Gohel, MD
John Oltean, DO
Bryan Pinciaro
Philip VanderLugt, OD
Christy Vitulli

Opening Your Eyes to the Future of Eye Care

Blue Sky VISION



# The Partnership Process

01 STEP

**INTRODUCTION**

02 STEP

**EVALUATION**

03 STEP

**DUE DILIGENCE**

04 STEP

**CLOSING**

At BSV, our partnership process begins with determining alignment on our respective values and principles. Once alignment is determined, both groups have the opportunity to evaluate and discuss life after the partnership. After the evaluation, we complete due diligence and work with you on the next steps of our partnership. Finally, we begin our journey together.

From: RANDY JANSMA <doc2020@comcast.net>

Sent: Tuesday, March 27, 2018, 3:41 PM

To: "Brian A. Hamilton" <bhamilton@BlueSkyVision.com>

Subject: RE: Update

---

Hi Brian,

That sounds good. Thank you for getting the 126k approved. I would like to accept that offer, along with the other salary and benefits we discussed. Talking with Phil would be welcomed. Just let me know when.

Thank you very much,

Randy

On March 27, 2018 at 3:08 PM "Brian A. Hamilton" <bhamilton@BlueSkyVision.com> wrote:

Hi Randy,

Thanks for reaching out. Based on our discussion, I was able to get approval to do the $101 + $25K (for the non-compete) or $126k at close. I understand the structure will need to be a little different, so we can work with your CPA and our side on the best structure for you, as well as the future payments.

I would like you to spend some time with Phil VanderLugt, maybe a late morning for an hour or so, and then grab lunch. That way you two can discuss what life may be like here, and make sure you believe it's a fit!

How does that sound?

-Brian

**From:** RANDY JANSMA [mailto:doc2020@comcast.net]
**Sent:** Tuesday, March 27, 2018 12:02 PM
**To:** Brian A. Hamilton <bhamilton@BlueSkyVision.com>
**Subject:** RE: Update

EXHIBIT #2 Hamilton 10-29-20 PENGAD 800-631-6989

Hi Brian,

Any updates for me since talking to Dan last week?

Randy

On March 19, 2018 at 5:52 PM "Brian A. Hamilton" <bhamilton@BlueSkyVision.com> wrote:

Hi Randy,

Thanks for your patience!

As I am sure Peggy mentioned, I sat behind her on the plane to NY the other day. Although, I didn't run into her at all at the Expo, funny enough. I do believe that Camille and Casandra did run into Peggy though! I did run into the Kenmark Eyewear guy on the flight on the way home, so plenty of folks coming back to GR from the conference.

Okay, so here's the skinny, I was able to include the $7,000 of additional frame inventory and able to include the 75% of the patient files. However, as we discussed this situation, we wanted to make sure that we both had some "skin" in the game. So, we would want to pay about 50% upfront and the other 50% at the end of the first year. Here's the reasoning, if you decide that after 3 weeks, you really want to retire and we paid all of it up front, we would be holding the bag. So, hopefully you understand that reasoning. Here's how it would breakdown:

| | | |
|---|---|---|
| Pre-Pay Patient Files | $45,360 | (A) |
| Non-Compete | $25,000 | (B) |
| Frame Inventory Value | $51,000 | (C) |
| Equipment Value (optical and furniture) | $50,000 | (D) |
| Business Value | $171,360 | (A)+(B)+(C)+(D) |
| Plus: Patients Converted (less prepaid) | | |
| Total Payout for business | $183,498 | (A)+(B)+(C)+(D)+(E) |
| Payment at Close (1st Payment) | $101,000 | |
| Payment after 1 year (2nd Payment) | $70,360 | |

| Compensation as Employee | | |
|---|---|---|
| Total Patients seen in one year | 2880 | |
| Average Revenue per visit | $98 | |
| Professional Fees | $282,240 | |
| Optical Conversion Rate | 50% | |
| Patients that will purchase lenses or contact lenses | 1440 | |
| Average Revenue per optical job / contact lenses | $212 | |
| Optical Revenues | $305,280 | |
| | | |
| Professional Fee Compensation | $84,672 | 30% |
| Optical Revenue Compensation | $27,475 | 9% |
| Total Compensation | $112,147 | |
| Plus: Company provided health care | $13,475 | |
| **Total Compensation Package** | **$125,622** | |

As you know, if more patients convert, you receive more dollars, and the more patients you see and the better you are at capture rate, the higher the optical revenue. Lastly, we would like to propose that you work 3x/wk and you work opposite schedules, so 1x/GR and 2x/Fremont on week one, and 2x/GR and 1x/Fremont, week two. Once we all get into a rhythm, we can see what is better for you long term.

If everything looks acceptable, I will get this put into an LOI, and we can send it over.

Brian Hamilton

Senior Associate – Business Development

M: 616.690.6919

E: bhamilton@blueskyvision.com

Blue Sky VISION

4020 East Beltline NE

Grand Rapids MI 49525

This message contains confidential information and is intended only for the individual named If you are not the named addressee you should not disseminate, distribute or copy this e mail Please notify the sender immediately by e-mail if you have received this e mail by mistake and delete this e-mail from your system E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted corrupted, lost, destroyed, arrive late or incomplete, or contain viruses The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission If verification is required please request a hard-copy version Grand Rapids Ophthalmology, 750 East Beltline NE, Grand Rapids, MI www seeitclear com

---

This message contains confidential information and is intended only for the individual named If you are not the named addressee you should not disseminate, distribute or copy this e-mail Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted corrupted lost, destroyed arrive late or incomplete, or contain viruses The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission If verification is required please request a hard-copy version Grand Rapids Ophthalmology, 750 East Beltline NE, Grand Rapids MI www seeitclear com

From: RANDY JANSMA <doc2020@comcast.net>

Sent: Monday, March 12, 2018, 10:37 AM

To: Peggy Jansma <peggyjansma@yahoo.com>; "Brian A. Hamilton" <bhamilton@BlueSkyVision.com>

Subject: RE: Update

---

Hi Brian,

After reviewing your update, I feel we are close, but I have some new information for you, and I think your calculations need a slight teak. I would like to close on this deal and move forward.When can a closing take place? My wife will be here through at least March 23th, and possibly the next week.

Please call me at your earliest convenience, so we can either meet in person, or speak on the phon about my thoughts. Thank you, Dr. Randy Jansma

616-550-0900

> On March 9, 2018 at 5:12 PM "Brian A. Hamilton" <bhamilton@BlueSkyVision.com> wrote:
>
> Hi Randy,
>
> Thanks for your patience!
>
> As we discussed previously, I wanted to get a better idea of the value of the equipment and frame inventory before we could lock down the total value for you.
>
> I was able to increase the amount of patient files upfront as well!
>
> Once you review, please let me know if this is acceptable. If so, I will put this into a Letter of Intent.
>
> Best,

Brian Hamilton

Senior Associate – Business Development

M: 616.690.6919

E: bhamilton@blueskyvision.com

BLUE SKY
vision

750 East Beltline NE

Grand Rapids MI 49525

---

This message contains confidential information and is intended only for the individual named If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission If verification is required please request a hard-copy version. Grand Rapids Ophthalmology, 750 East Beltline NE, Grand Rapids, MI www.seeitclear.com

From: RANDY JANSMA <doc2020@comcast.net>
Sent: Wednesday, March 14, 2018, 11:42 AM
To: Peggy Jansma <peggyjansma@yahoo.com>; "Brian A. Hamilton" <bhamilton@BlueSkyVision.com>
Subject: RE: Update

---

Hi Brian,
I understand how those meetings go. Thank you for keeping us informed. I look forward to hearing from you soon with good news, so we can move forward.
Randy

> On March 13, 2018 at 9:31 PM "Brian A. Hamilton" <bhamilton@BlueSkyVision.com> wrote:
>
> Hi Randy,
> We had a 6 hour senior management meeting today and I shared my template that I put together for ODs that choose the partnership path (sign on for 2-years as an employee and migrate their patients to us). There was some good feedback, mostly positive, but I wasn't able to confirm some of your questions that we discussed yesterday.
> I have some windshield time with Dan tomorrow, so we should be able to discuss. Sorry for extending this, but don't have all of the answers yet.
> Thanks,
> Brian Hamilton
> Senior Associate – Business Development
> M: 616.690.6919
> E: bhamilton@blueskyvision.com
>
> Blue Sky VISION
>
> 4020 East Beltline NE
> Grand Rapids MI 49525
>
> ---
>
> This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Grand Rapids Ophthalmology, 750 East Beltline NE, Grand Rapids, MI www.seeitclear.com

From: RANDY JANSMA <doc2020@comcast.net>
Sent: Thursday, March 29, 2018, 11:20 AM
To: "Phil Vanderlugt, OD" <PVanderlugt@seeitclear.com>; "Brian A. Hamilton" <bhamilton@BlueSkyVision.com>
Subject: Re: Meeting

---

Hi Phil,
That sounds good. Sorry I didn't see this until just now-busy. I will give you a call today.
Randy

> On March 27, 2018 at 8:02 PM "Phil Vanderlugt, OD" <PVanderlugt@seeitclear.com> wrote:
>
>
> Hey Randy! Hope your well! It will be fun to catch up again after our trip East. I am gone all next week. I think it would be good to catch up the following week. Let's maybe talk things out on the phone sometime in the next couple days. Give me a call at your convenience! Have a great weekend!
> Phil
>
> Sent from my iPhone
>
> On Mar 27, 2018, at 7:50 PM, Brian A. Hamilton <bhamilton@BlueSkyVision.com<mailto:bhamilton@BlueSkyVision.com>> wrote:
>
> Hi Phil and Randy,
>
> I thought I would get the ball rolling by sending an email to the both of you. It sounds like both of you believe it makes sense to get together. So, I will let you two decide on what works best for schedules. I know that Spring Break will be next week, so not sure how that may affect your schedules.
>
> Cheers!
>
> Brian Hamilton
> Senior Associate – Business Development
> M: 616.690.6919
> E: bhamilton@blueskyvision.com<mailto:bhamilton@seeitclear.com>
>
> <image002.png>
>
> 4020 East Beltline NE
> Grand Rapids MI 49525
>
>
>

PENGAD 800-631-6989 EXHIBIT #3 Hamilton 10-29-20

> ________________________________
>
> This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Grand Rapids Ophthalmology, 750 East Beltline NE, Grand Rapids, MI www.seeitclear.com

From: RANDY JANSMA <doc2020@comcast.net>
Sent: Thursday, March 29, 2018, 11:21 AM
To: "Phil Vanderlugt, OD" <PVanderlugt@seeitclear.com>; "Brian A. Hamilton" <bhamilton@BlueSkyVision.com>
Subject: RE: Meeting

---

Thanks Brian. That sounds great! Cheers to Us!!!

On March 27, 2018 at 7:50 PM "Brian A. Hamilton" <bhamilton@BlueSkyVision.com> wrote:

Hi Phil and Randy,
I thought I would get the ball rolling by sending an email to the both of you. It sounds like both of you believe it makes sense to get together. So, I will let you two decide on what works best for schedules. I know that Spring Break will be next week, so not sure how that may affect your schedules.
Cheers!

Brian Hamilton
Senior Associate – Business Development
M: 616.690.6919
E: bhamilton@blueskyvision.com
Blue Sky VISION
4020 East Beltline NE
Grand Rapids MI 49525

---

This message contains confidential information and is intended only for the individual named If you are not the named addressee you should not disseminate, distribute or copy this e-mail Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted lost, destroyed, arrive late or incomplete, or contain viruses The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission If verification is required please request a hard-copy version Grand Rapids Ophthalmology, 750 East Beltline NE Grand Rapids, MI www seeitclear com

From: RANDY JANSMA <doc2020@comcast.net>
Sent: Monday, May 28, 2018, 5:31 PM
To: Dan Hosler <dhosler@BlueSkyVision.com>; "Brian A. Hamilton" <bhamilton@BlueSkyVision.com>
Subject: RE: APA

---

Hi Brian,
Regarding the schedule, I believe it would be best for me to start the week of June 11, rather than the 4th. Also, as far as Fremont, I think 9am-6pm would work. Let's try that for starters.
Best,

Randy

> On May 24, 2018 at 1:30 PM "Brian A. Hamilton" <bhamilton@BlueSkyVision.com> wrote:
>
> Hi Randy,
> Here's some answers to your questions. I will call you a little later so we can discuss.
> #1 – You have seen our standard employment agreement, that is what we would have you sign.
> #2 – The total purchase price when we start the partnership is $126k. Then you will receive $15/file for every patient that becomes a new patient at BSV. We will pay this quarterly in arrears for the next two years. So, when we did this analysis, we believed that this # is probably between $50-75k, but could be higher if more transition. That will be paid out as they convert.
> #3 – All of the BSV doctors that have sold into our partnership have signed 25 mi restriction for every location. They are the ones who asked us for this, so that doctors don't sell their practice and then quit and try and set up shop across the street. I was able to get them comfortable with just doing the two locations we discussed. There was some uneasiness because it would be possible for you to set up shop in Muskegon or Grand Haven at some point and we are already in those markets. I hope that makes sense.
> #4 – Here's what I know about the schedule now:
> Week #1
> Tuesday – Fremont
> Wednesday – 68th Street
> Friday – Grandville
> Week #2
> Tuesday – Fremont
> Wednesday – Grandville
> Friday – 68th Street
> *You will swap your locations on Wed and Fri for now. Also, our normal work shift at GRO 8-5. There is a request at Fremont if you could work 9:30-6:30, as they believe this is best for current patient needs, but are also able to do 8-5.

EXHIBIT
#5
Hamilton
10-29-20
PENGAD 800-631-6989

#5 – Let me ask the attorneys regarding the winding down and use of the name during that period, not sure if and what should be added to make this clear.
#6 – You can tentatively start June 4th. The first week would be orientation, so you wouldn't see patients, and then June 11th, you would begin to see patients. If this timing is or should be different let me know. The clinic managers are tentatively planning on June 4th, unless you tell me different.
We too are looking forward to partnership, it has been fun getting to work with you as well!
Brian

**From:** RANDY JANSMA [mailto:doc2020@comcast.net]
**Sent:** Thursday, May 24, 2018 12:34 PM
**To:** Dan Hosler <dhosler@BlueSkyVision.com>; Brian A. Hamilton <bhamilton@BlueSkyVision.com>
**Subject:** RE: APA
Hi Brian & Dan!!!
Yay, it's here!
I have read through the document, and understand it quite well. Did I mention that I was pre-law at one time. I know...STOP! Anyway, just a few things to address.
1. I don't see an employment agreement.
2. I don't see the total purchase price, or the balance being paid at the end of my first year of employment, and a clause leaving the balance to my estate in the event of my demise prior to my first year of employment.
3. I would like the radius to be 5 miles. I believe 25 is too much. I don't think this will ever come in to play, but can we adjust this?
4. Would you please let me know my schedule, if you have it.
5. I need to be able to use my company name to wind things down, and collect accounts receivable for some time. Of course this would not be done in an active manner, as in promoting Jansma Family Eyecare Inc., only to put things to bed. I hope that is OK. Do we need to add verbiage to that effect?
Other than that things look great!!!
It looks to me that closing would occur on May 31st, am I correct? If so, do we have a time for that? And it appears that maybe this may be done electronically, and not face to face. Tell me if I am wrong.
Also, is there a projected start date for me?
I am very excited to enter this new phase of my career and my life with all of you! I appreciate all of your efforts in bringing this to fruition. You both have been great to work with, as have all of the staff I have encountered under the Blue Sky umbrella. Everything flows very well, like a well oiled machine. That has made this a pleasure.

Many heartfelt thank yous, and appreciation,

Dr. Randy Jansma

> On May 24, 2018 at 11:06 AM "Brian A. Hamilton" <bhamilton@BlueSkyVision.com> wrote:

Hi Randy,
Here is the document that we have been waiting for! Please review. Also, I believe that we are close on the schedule now, I will confirm later today but it is similar to our discussion yesterday. And lastly, what we can do about the radius of the non-compete, instead of doing 25 mi from any location, we can do it from your primary location(s). So, it would be from Fremont and the 68th street location. That should give you more flexibility!
Thanks!

Brian Hamilton
Senior Associate – Business Development
M: 616.690.6919
E: bhamilton@blueskyvision.com
Blue Sky
VISION
4020 East Beltline NE
Grand Rapids MI 49525

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Grand Rapids Ophthalmology, 750 East Beltline NE, Grand Rapids, MI www.seeitclear.com

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Grand Rapids Ophthalmology, 750 East Beltline NE, Grand Rapids, MI www.seeitclear.com

EXHIBIT
PENGAD 800-631-6989
#6
Hamilton
10-29-20

# PURCHASE AGREEMENT AND BILL OF SALE

This PURCHASE AGREEMENT AND BILL OF SALE (this ***"Agreement"***) dated as of May 31, 2018 (the ***"Closing Date"***) is by and among BLUE SKY VISION, LLC, a Delaware limited liability company (***"Buyer"***), JANSMA FAMILY EYE CARE, INC., a Michigan corporation (***"Seller"***) and Randall H. Jansma, a Michigan resident (***"Owner"***; and with Seller, the ***"Selling Parties"***).

**WHEREAS**, Buyer desires to purchase from Seller, and Seller desires to sell and transfer to Buyer, the Purchased Assets, free and clear of any Encumbrances.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. Capitalized Terms. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Annex A hereto.

2. Purchase Price. In exchange for the Purchased Assets, Buyer shall pay to Seller (a) on the Closing Date, purchase price in an amount in cash equal to $126,000.00, and (b) contingent compensation in an amount equal to (the ***"Contingent Payments"***) fifteen dollars ($15.00) per Converted Patient, up to a maximum of $120,000.00 (the ***"Max Earn-Out"***), which will be earned, if at all, during that period commencing on the Closing Date and ending on the earlier of (i) the second (2nd) anniversary hereof, (ii) the end of Owner's employment with the Client Practices, and (iii) the end of the quarter (if any) in which Seller earns the Max Earn-Out (such period being the ***"Earn-Out Term"***). The Contingent Payments will made, if at all, in cash within ninety (90) days of the end of each fiscal quarter. Notwithstanding the foregoing, if Seller has not earned $20,000.00 by the end of the first year of the Earn-Out Term, then Buyer shall make a Contingent Payment to Seller in an amount equal to Twenty Thousand Dollars less the Contingent Payments actually made for such first year, which payment shall be a credit for the first Contingent Payments made in respect of the second year of the Earn-Out Term.

Buyer shall have the right to withhold and set off against the Contingent Payments any amounts to which Buyer may be entitled from any Selling Party under this Agreement or any other agreements entered into pursuant to this Agreement. The parties hereto understand and agree that (w) if not earned by the second (2nd) anniversary of the Closing Date, any right to receive the Contingent Payments shall be null and void, (x) the contingent rights to receive any Contingent Payments shall not be represented by any form or certificate or other instrument, are not transferable, and do not constitute an equity or ownership in Buyer, (y) no Selling Party shall have any rights as a securityholder of Buyer as a result of Seller's contingent right to receive any Contingent Payment hereunder, and (z) no interest is payable with respect to any Contingent Payment.

3. Closing. The closing of the purchase and sale of the Purchased Assets (the ***"Closing"***) shall occur via the electronic exchange of signatures, effective on the date hereof (the ***"Closing Date"***). At the Closing, [Buyer / GRO / Shoreline] and Owner shall deliver to each other an Employment Agreement in substantially the form of Exhibit A attached hereto.

4. Allocation of Purchase Price. The purchase price (as determined for tax purposes) shall be allocated in accordance with Annex B hereto (the ***"Allocation"***). Buyer and Seller shall, except as required by Law (i) be bound by the Allocation for all tax purposes, (ii) prepare and file all tax returns in a manner consistent with the Allocation, and (iii) take no position inconsistent with the Allocation in any tax return; provided that this shall not limit the parties' ability to settle audits or other proceedings.

5. Bill of Sale.

(a) Buyer hereby purchases from Seller and Seller hereby sells, assigns, conveys, transfers and delivers to Buyer and its successors and assigns, to have and to hold forever, all right, title and interest in and to the Purchased Assets, free and clear of all Encumbrances.

(b) For the avoidance of doubt, Buyer is not assuming, agreeing to pay, discharging or performing any liabilities of any nature (as further defined herein, the ***"Excluded Liabilities"***).

6. Representations and Warranties. In order to induce Buyer to enter into and perform this Agreement, the Selling Parties jointly and severally represent and warrant to Buyer as follows:

(a) Organization; Authority; Capitalization. Seller is duly organized, validly existing and in good standing under the Laws of the State of Michigan. The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Seller and have been duly authorized by all necessary action on the part of Seller. This Agreement (i) has been duly executed and delivered by Seller and (ii) is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms. Owner owns all of the equity interests of Seller.

(b) Non-contravention. The consummation of the transactions contemplated by this Agreement will not: (i) violate any Law or require any action by (including any authorization, consent or approval), notice to, or filing with, any Authority or any other person; (ii) result in the modification, acceleration, termination, early expiration, breach or violation of, the default or addition of any fees or charges under, the vesting or phasing out of any rights under, or default under, any contractual obligation of Seller or any other material agreement of Seller or by which the assets of Seller may be bound or subject or by which the assets of Seller may be bound or subject; (iii) result in the creation or imposition of an Encumbrance upon any Purchased Asset; or (iv) result in a breach or violation of, or default under, the organizational documents of Seller.

(c) Ownership of Purchased Assets; Sufficiency. Seller has sole and exclusive, good and marketable title to, the Purchased Assets, free and clear of any Encumbrances. The Purchased Assets are adequate and sufficient to conduct the Business.

(d) No Brokers. Except as set forth on Schedule 6(d), n**Error! Bookmark not defined.**either of the Selling Parties has any Liability of any kind to any broker, finder or agent in connection with the transactions contemplated by this Agreement.

(e) Compliance with Laws.

(i) Seller is, and has been, in compliance with all Laws applicable to the operation, use, occupancy or ownership of its assets and the conduct of the Business, including all Health Care Laws and environmental Laws, and no Selling Party has received notice from any Authority regarding, nor has any Knowledge of, any possible failure to so comply. No Selling Party or any officer, manager, director, employee or agent of Seller, nor any other Person or entity acting on behalf of Seller, acting alone or together, has: (A) received, directly or indirectly, any rebates, payments, commissions, promotional allowances or any other economic benefits, regardless of their nature or type, from any patient, governmental employee or other Person or entity with whom Seller has done business directly or indirectly; or (B) directly or indirectly, gave or agreed to give any contribution, gift, bribe, rebate, payoff, influence payment, kickback or similar benefit to any patient, governmental employee or other Person or entity regardless of form, whether in money, property or services. Seller has instituted and maintains policies and procedures designed to ensure compliance with any Health Care Law to which it and/or the Business is subject.

(ii) No Selling Party, or any of Seller's or Owner's directors, shareholders, employees, agents, officers and managers, have been convicted of, charged with or investigated for, or have engaged in conduct that would constitute, a Medicare or other federal health care program (as defined in 42 U.S.C. §1320a-7(b)(f)) (***"Federal Health Care Program"***) related offense or been convicted of, charged with or investigated for, or engaged in conduct that would constitute, a violation of any Law related to fraud, theft, embezzlement, breach of fiduciary duty, kickbacks, bribes, other financial misconduct, obstruction of an investigation or controlled substances, and none of such parties have received notice in respect of any such matters. No Selling Party, or any of their directors, employees, agents, officers or managers, has been excluded from participating in any government program, been subject to any sanction pursuant to 42 U.S.C. §1320a-7a or §1320a-8 or been convicted of a crime described at 42 U.S.C. §1320a-7b, nor, to the Knowledge of any Selling Party, are any such exclusions, sanctions or charges threatened or pending. No Selling Party has received any written communication from an Authority, commercial payor or patient that alleges any of the Selling Parties or the Purchased Assets are not in compliance with any Law. Seller (A), to the extent its operations are subject to the administrative simplification provisions of HIPAA, and the

implementing regulations contained in 45 CFR Parts 160, 162 and 164, is in compliance with those administrative simplification provisions and implementing regulations, including, in conducting any of the standard transactions set forth in 45 CFR Part 162 and (B) is in compliance with all other applicable Information Privacy or Security Laws. None of the Selling Parties is under investigation by any Authority for a violation of any Information Privacy or Security Laws, including receiving any notices from the United States Department of Health and Human Services Office of Civil Rights, FTC or Justice Department relating to any such violations. Seller has not had a Breach of Unsecured Protected Health Information (as such terms are defined in 45 CFR §164.402). Solely for purposes of this Paragraph, HIPAA and the HITECH Act as included in the definition of ***"Information Privacy or Security Laws"*** or as otherwise referenced in this Paragraph shall be applied and interpreted as of the Closing Date without giving effect to any new or modified standards or implementation specifications set forth under the HIPAA Omnibus Rule.

(iii) No Person performing services to or on behalf of the Business has: (A) made or caused to be made a false statement or representation of a material fact in any application for any benefit or payment under a Federal Health Care Program; (B) made or caused to be made a false statement or representation of a material fact in determining rights to any benefit or payment under a Federal Health Care Program; (C) presented or caused to be presented a claim for reimbursement for services that is for an item or service that was known or should have been known to be (1) not provided as claimed, or (2) false and fraudulent; (D) failed to disclose Knowledge of the occurrence of any event affecting the initial or continued right to any benefit or payment with intent to fraudulently secure such benefit or payment under a Federal Health Care Program; or (E) engaged in any other activity that violates any Health Care Laws prohibiting fraudulent, abusive or unlawful practices with respect to the provision of health care items or services or the billing for such items or services provided to a beneficiary of any Federal Health Care Programs.

(iv) Seller has maintained all material records required to be maintained by (A) the Medicare and Medicaid programs and (B) the Laws of all other applicable Authorities.

(f) Financial Matters. Attached as Schedule 6(f) are true and correct copies of each of (i) the internally-prepared balance sheet of Seller as of March 31, 2018, and the related income (profit & loss) statement Seller for the 3-month period then ended and (ii) the internally-prepared balance sheets of Seller as of December 31, 2017 (the ***"Most Recent Balance Sheet"***) and December 31, 2016, and the related income statements for the fiscal years then ended (collectively, the ***"Year End Financial Statements"*** and together with the internally prepared reported financial statements which is referenced in clause (i) above, the ***"Financial Statements"***. The Financial Statements (including any notes thereto) are accurate and complete and were prepared in accordance with the books and records of Seller (which books and records are accurate and complete, represent actual, *bona fide*, arm's length transactions, and have been maintained in accordance with sound business practices) and have been prepared in accordance with Seller's historical accounting principles and consistent with past practices. The Financial Statements fairly present, in all material respects, the financial position of Seller as at the respective dates thereof and the results of the operations of Seller and cash flows for the respective periods covered thereby. Other than salary to (x) Owner and (y) Peggy Jansma, both of whose entire compensation is reflected in IRS Form W-2 statements and is as set forth in the Financial Statements, there are no Affiliate transactions of any nature with respect to the Business.

(g) Absence of Undisclosed Liabilities. Seller has no Liabilities of any nature except for (i) Liabilities set forth on the Most Recent Balance Sheet, (ii) Liabilities incurred in the ordinary course of business since the date of the Most Recent Balance Sheet (none of which results from, arises out of, or relates to any tort or infringement or breach or violation of, or default under, any contract or agreement, any Law, and (iii) Liabilities set forth on Schedule 6(g). All Liabilities identified shall be discharged by Selling Parties when due.

(h) Litigation. Except as set forth on Schedule 6(h), (i) there is no, and since January 1, 2015 there has been no, Action pending by or against or, to the Knowledge of the Selling Parties, threatened by or against, the Purchased Assets or Seller or any of its officers, directors, employees and/or agents with respect to their business activities, and (ii) Seller is not, nor has it been since January 1, 2015, subject to or bound by any order, judgment, writ, stipulation, settlement, award, injunction, decree, arbitration award or finding of any Authority. Except as expressly indicated on Schedule 6(h), Seller is fully insured (subject to applicable non-material

retentions) with respect to each of the matters required to be set forth therein.

(i) Employees. Except as set forth on Schedule 6(i), with respect to the Business, Seller is not a party to or obligated with respect to any (i) outstanding contracts or arrangements (whether written or oral) with current or former employees, agents, consultants, advisers, sales representatives, distributors, independent contractors, or dealers, or (ii) any benefits provided for by any such agreement. No strike, union organizational activity, unfair labor practice, grievance, allegation, charge or complaint of employment discrimination, wage and hour violations or other similar occurrence has occurred or is pending or threatened against Seller. There are no administrative charges or court complaints pending or threatened against Seller or the Business before the U.S. Equal Employment Opportunity Commission or any state, county, municipal or Federal court or agency concerning alleged employment discrimination, wage and hour or any other matters relating to the employment of labor. All employees are employed by Seller on an "at will" basis and, will be terminated by Seller effective as of the close of business on the Closing Date. On the Closing Date, Seller shall have paid all personnel all amounts that are due and owing under applicable Law and all accrued and vacation pay and paid time off (PTO). Selling Parties shall be solely liable and responsible for all accrued salary, vacation and other accrued compensation benefits of any nature accrued and/or payable up to the Closing Date. All compensation of any nature paid to all personnel is reflected in the Financial Statements, and all such compensation has been reported to applicable Authorities (*e.g.*, the Internal Revenue Service, Social Security Administration and state and local taxing Authorities) in accordance with applicable Law.

(j) Inventory. All inventory owned by Seller or used in the Business is (i) at levels normally maintained in the ordinary course of business, (ii) free of defect or other deficiency and consists of a quality and condition usable and salable in the ordinary course of business, and (iii) located entirely in the two (2) Office Locations.

(k) Absence of Certain Developments. Since the date of the Most Recent Balance Sheet, the Business has been conducted only in the ordinary course of business and no event or circumstance has occurred which, individually or in the aggregate, has had, or is reasonably likely to have, a material adverse effect on the Business, operations, Purchased Assets or condition (financial or otherwise) of Seller, or on Seller's relationships with its current or potential patients, customers, payors, suppliers or employees or on the ability to operate the Business immediately after the Closing in the manner operated before the Closing.

(l) Contracts. Attached as Schedule 6(l) are true and complete copies of all outstanding contracts, agreements, leases, licenses, instruments or arrangements (whether written or oral) to which Seller is a party (or is subject or participates in) or that relates to the Purchased Assets. For the avoidance of doubt, Buyer is not assuming any such contracts.

(m) Patient Files. True and complete copies of all Patient Files have been provided to Client Practices and Buyer. Any database entries or other summaries of the Patient Files are not duplicative. Patient Files have been acquired and maintained in accordance with applicable Law, and the disclosure to Client Practices and Buyer will not violate any Law or legal obligation.

7. Indemnity. The Selling Parties jointly and severally will indemnify and hold harmless Buyer and each of its affiliates, from, against and in respect of any and all Liabilities, Encumbrances, and other losses (in each case, including reasonable attorneys' fees), arising out of or directly or indirectly relating to: (a) any breach of or inaccuracy in any representation or warranty made by Seller in this Agreement; (b) any breach or violation of any covenant or agreement of either of the Selling Parties in this Agreement; or (c) any of the Excluded Liabilities.

8. Restrictions.

(a) As of the Closing Date, the Selling Parties shall cease using the names of Seller (which constitute part of the Purchased Assets), whether registered or not, and cause Seller to change its name. Notwithstanding the foregoing, Sellers shall be able to use such names for ninety (90) days after Closing for the sole, limited purpose of collecting Sellers' accounts receivable in such name(s), and only with respect to ordinary course collection purposes, i.e., for the purpose of sending collection letters or instituting litigation or contracting with outside collection firms, then Selling Parties will do so in their new names and shall indemnify and hold Buyer harmless from any Losses Buyer suffers in connection with or arising out of such collection efforts.

(b) During that period commencing on the date hereof and ending on the fifth (5th) anniversary of the date on which Owner's employment with the Client Practices terminates for any reason (the ***"Restricted Period"***), each Selling Party shall refrain from, and shall prevent each of their Affiliates and representatives to from, directly or indirectly:

(i) engaging (whether as an owner, operator, stockholder, partner, manager, employee, officer, director/manager, consultant, or otherwise) directly or indirectly in the Business, anywhere within 25 miles of any Office Location or Client Practice facility; provided that passive ownership of less than 2% of the outstanding equity of any publicly-traded company shall not be deemed to be engaging solely by reason thereof in the Business; or

(ii) inducing or attempting to induce any existing or former patient, vendor or customer of Seller, Owner or any Client Practice into any business relationship (except pursuant to a general solicitation to the public at large not specifically directed at any particular Person), discouraging such Persons from doing business with Buyer or any Client Practice, or advising such Persons from removing their patient records from any Client Practice.

(c) Each Selling Party shall keep, and shall cause each of their Affiliates and representatives to keep, all Confidential Information of Seller, Buyer, the Client Practices and each of their Affiliates (the ***"Protected Persons"***) confidential, except that such Persons may disclose Confidential Information as required by Law or to their attorneys and accountants to the extent necessary in connection with their representation of any Protected Person(s). The term ***"Confidential Information"*** means any non-public information concerning the operations or affairs of any Protected Person(s); provided that Confidential Information shall not include (i) information that is or becomes generally available to the public (other than as a result of disclosure in breach of this Agreement), (ii) information received on a non-confidential basis from a Person who is not known to be legally prohibited from transmitting the information, or (iii) information that has been independently developed without use of the Confidential Information.

(d) The parties hereto agree that the covenant set forth in this paragraph is reasonable and is necessary to protect the value of the goodwill being sold pursuant to this Agreement. If the final judgment of a court of competent jurisdiction declares that any term of this paragraph is invalid or unenforceable, the parties agree that the court shall have the power to reduce the scope, duration, or area with a term or provision that is valid and enforceable.

9. Satisfaction of Liabilities. Seller shall pay and satisfy all Excluded Liabilities, immediately upon the due date thereof.

10. Miscellaneous.

(a) Further Transfers. Each of the Selling Parties hereby covenants that, from time to time after the delivery of this instrument, at Buyer's reasonable request, they will do, execute, acknowledge, and deliver, or will cause to be done, executed, acknowledged and delivered, such further acts, conveyances, transfers and assignments at Buyer's sole expense as Buyer may reasonably require to convey, transfer to and vest in Buyer, and to put Buyer in possession of, the Purchased Assets.

(b) Amendment. The parties may amend this Agreement only pursuant to a written agreement executed by all of such parties.

(c) Severability. If any court of competent jurisdiction holds any provision of this Agreement invalid or unenforceable, then the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable, and the parties will work in good faith to replace the invalid or unenforceable provision with valid and enforceable provisions, the economic effect of which comes as close as possible to the economic effect intended by the invalid or unenforceable provision.

(d) Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that neither

this Agreement nor any of the rights, interests, or obligations hereunder may be assigned by any party without the prior written consent of the other parties; provided further that Buyer may assign its rights under this Agreement to (i) any Affiliate of Buyer, (ii) any purchaser of all or substantially all of the assets or equity of Buyer or its parent or (iii) to lenders of Buyer as collateral security for borrowings, at any time whether prior to or following the date hereof.

(e) Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(f) Jurisdiction. Each party to this Agreement, by his, her, or its execution hereof, hereby irrevocably submits to the exclusive jurisdiction and venue of the courts of the State of Illinois located in Chicago, Illinois (or, if but only if such court lacks jurisdiction, the United States District Court for the Northern District of Illinois) for the purpose of any action between any of the parties hereto arising in whole or in part under or in connection with this Agreement.

(g) Governing Law. This Agreement is governed by the laws of the State of Delaware, without regard to conflicts of laws principles.

(h) Counterparts. This Agreement may be executed in multiple counterparts, each of which will be deemed an original and all of which, when taken together, will constitute one and the same agreement. Signature pages to this Agreement may be delivered by facsimile or e-mail transmission, and the use of a facsimile or e-mail transmission to deliver a signature will not be a defense to the enforceability of this Agreement.

(i) Waiver of Jury Trial. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HERETO HEREBY WAIVE, AND COVENANT THAT THEY SHALL NOT ASSERT ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT.

*Signature page follows*

The undersigned have caused this Purchase Agreement and Bill of Sale to be executed as of the date first set forth above.

**BUYER**:

**BLUE SKY VISION, LLC**

By__________________________
William Hughson, CEO

**SELLER**:

**JANSMA FAMILY EYECARE, INC.**

By__________________________
Randall H. Jansma, President

**OWNER**:

____________________________
Randall H. Jansma, individually

The undersigned have caused this Purchase Agreement and Bill of Sale to be executed as of the date first set forth above.

**BUYER**

**BLUE SKY VISION, LLC**

By______________________
William Hughson, CEO

**SELLER**

**JANSMA FAMILY EYECARE, INC.**

By Randall H. Jansma, President
Randall H. Jansma, President
6/5/18

**OWNER**

Randall H. Jansma, individually
Randall H. Jansma, individually

## Annex A

### Definitions

As used herein, the following terms shall have the following meanings:

***"Action"*** shall mean any legal, administrative, arbitral or other suit, claim, demand, action, inquiry, mediation, proceeding, audit, investigation or other similar proceeding of any nature.

***"Affiliate"*** means with respect to any person, a Person directly or indirectly controlling or controlled by or under common control with such Person and with respect to a Person who is an individual, each other member of such individual's family, any Person that is directly or indirectly controlled by such individual or any one or more members of such individual's family, any Person in which members of such individual's family hold (individually or in the aggregate) a material interest, and any Person with respect to which one or more members of such individual's family serves as a director, officer, partner, manager, executor, trustee or similar capacity. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities or by Contract or otherwise. For purposes of this definition, the "family" of an individual includes the individual, such individual's spouse, any other natural Person who is related to such individual or such individual's spouse within the second degree, and any other natural Person who resides with such individual.

***"Authority"*** means any court, tribunal, arbitral body, administrative or governmental body, entity, department, commission, board, agency or instrumentality, legislative, executive or regulatory authority or agency of any nature.

***"Business"*** means the business currently operated by Seller or Owner, including without limitation that business involving eye exams, testing and imaging services (including retinal photography, corneal topography, perimetry), foreign body removal, eye infection cultures and treatment, emergency eye services and general eye care, optical sales, fitting of contact lenses and glasses, limited manufacturing of glasses (including edge grinding, lens replacement, soldering, and minor technical adjustments of frames), repair services of frames, contact lens polishing and modifications and all services related thereto

***"Client Practice"*** means GRAND RAPIDS OPHTHALMOLOGY, P.C., a Michigan professional corporation (***"GRO"***) and SHORELINE OPHTHALMOLOGY, PLLC, a Michigan professional limited liability company (***"Shoreline"***).

***"Converted Patient"*** means any Patient identified in the Patient Files who is examined, treated, or otherwise serviced by either (or both) of the Client Practices after the Closing Date, and who has not been a Patient of either Client Practice since May 31, 2015 (or who has never been a Patient of either Client Practice).

***"Encumbrance"*** means any charge, claim, community or other marital property interest, condition, equitable interest, lien, license, option, pledge, security interest, mortgage, deed of trust, right of way, easement, encroachment, right of first offer or first refusal, buy/sell agreement and any other restriction, encumbrance or covenant with respect to, or condition governing the use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of, any other attribute of ownership.

***"Excluded Liabilities"*** means any Liability of any nature whatsoever relating to Seller or the Purchased Assets, including without limitation with respect to any leases, patient issues, taxes, debts, product warranty claims, employee compensation and benefits, the use of brokers in connection with this transaction, workers' compensation, violation of Law, any tort or breach of contract, any litigation, or any environmental liability.

***"Health Care Laws"*** means any and all Laws of any Authority pertaining to health regulatory matters applicable to the operations of Seller including (a) fraud and abuse (including the following statutes, as amended, modified or supplemented from time to time and any successor statutes thereto and regulations promulgated from time to time thereunder: the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); the civil False Claims Act (31 U.S.C. §

3729 et seq.); Sections 1320a-7,1320a-7a and 1320a-7b of Title 42 of the United States Code; the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173)); (b) Medicare, Medicaid, TRICARE or other governmental health care or payment program; (c) quality, safety certification and accreditation standards and requirements; (d) the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (e) all Information Privacy or Security Laws as defined herein; (f) any other Law or regulation of any Authority which regulates kickbacks, government programs, claims processing, medical record documentation requirements, the hiring of employees or acquisition of services or products from those who have been excluded from governmental health care programs, licensure, accreditation or any other aspect of providing health care applicable to the operations of Seller.

***"HIPAA"*** means the Health Insurance Portability and Accountability Act of 1996 as amended by the HITECH Act, and as otherwise may be amended from time to time, including the Privacy Standards (45 C.F.R. Parts 160 and 164), the Electronic Transactions Standards (45 C.F.R. Parts 160 and 162), and the Security Standards (45 C.F.R. Parts 160, 162 and 164) promulgated under the Administrative Simplifications subtitle of the Health Insurance Portability and Accountability Act of 1996, as amended by the HIPAA Omnibus Rule, issued on January 25, 2013, effective as of March 26, 2013.

***"HITECH Act"*** means the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009, Pub. Law No. 111-5 and its implementing regulations 42 C.F.R. §§ 412, 413, 422 and 495, as amended by the HIPAA Omnibus Rule, issued on January 25, 2013, effective as of March 26, 2013.

***"Information Privacy or Security Laws"*** means HIPAA and its implementing regulations and any other Law concerning the privacy or security of Personal Information, including state data breach notification Laws, state health information privacy Laws, the FTC Act, the FTC Red Flag Rules and state consumer protection Laws.

***"Knowledge"*** means the actual knowledge of a Person and the knowledge that Person would have after a reasonable investigation or inquiry.

***"Law"*** and, collectively, ***"Laws"*** means each and every law, statute, rule, regulation, order, permit, by-law, enactment, ordinance, directive, judgment, injunction, decree or other decision of any Authority.

***"Liability"*** means all liabilities and obligations (whether pecuniary or not, including obligations to perform or forebear from performing acts or services), including all debts, taxes, commissions, duties, fees, salaries, performance or delivery penalties, liabilities, warranty liabilities (whether implicit or explicit or whether granted orally or in writing), fines or penalties, in each case whether asserted or unasserted, accrued or unaccrued, absolute or contingent, matured or un-matured, liquidated or unliquidated determined or determinable, incurred or consequential, known or unknown, and whether due or to become due.

***"Office Location"*** means any of Seller's office locations as of the Closing Date, which are: (i) 5491 South Division Street, Grand Rapids, MI, 49548; and (ii) 85 West State Road, Newaygo, MI, 49337.

***"Patient"*** means those individuals to whom Owner or any other Person acting on behalf of the Seller or the Business has provided services, including optical examinations and treatments.

***"Patient Files"*** means the records of all Patients, however reflected.

***"Person"*** means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated association, corporation, entity or government (whether Federal, state, county, city or otherwise, including any instrumentality, division, agency or department thereof).

***"Personal Information"*** means any information with respect to which there is a reasonable basis to believe that the information can be used to identify an individual, including "individually identifiable health information" as defined in 45 C.F.R. § 160.103, demographic information, and Social Security numbers.

***"Purchased Assets"*** means all right, title and interest in all of the assets, properties, rights, titles and interests of every kind and nature owned, used, licensed, leased or otherwise used by Selling Parties in the operation of the

Business, in each case whether tangible or intangible (including, but in no way limited to, the name "Jansma Family Eye Care" and derivations thereof, the phone and facsimile numbers, social media pages, email addresses, and domain registrations of the Business), real or personal and wherever located and by whomever possessed; provided, that any real property interests (including, but in no way limited to, any leasehold or other estates at 5491 South Division Street, Grand Rapids, MI, 49548 and 85 West State Road, Newaygo, MI, 49337), accounts receivable, tax refunds, rights under this Agreement, and the organizational documents and corporate records of Seller shall not constitute Purchased Assets and shall not be transferred to Buyer pursuant to this Agreement.

**Annex B**

**Allocation**

| | |
|---|---|
| Tangibles | $20,000.00 |
| Goodwill | $106,000.00 |
| **Total** | **$126,000.00** |

**Exhibit A**

## OPTOMETRIST EMPLOYMENT LETTER AGREEMENT

(June 5, 2018 … the "***Effective Date***")

Dear Dr. Jansma:

I am pleased to offer you employment as an optometrist through Grand Rapids Ophthalmology and Shoreline Ophthalmology (collectively the "***Company***"), on the terms and conditions of this letter agreement (the "***Letter Agreement***").

**Position**: You will be employed by the Company as an optometrist working three (3) days per week. During your employment, you are expected to devote all of your business time and attention to the business and affairs of the Company unless agreed otherwise in writing by the Company, and to perform your duties and responsibilities faithfully and diligently.

**Base Compensation:** You will receive a monthly base salary for the initial term of this Agreement which is a minimum compensation and is also a draw in an amount which is less than your anticipated Earnings (as defined in Exhibit A hereto) as reasonably calculated by the Company after consultation with you (the "***Monthly Draw***"). The base compensation amount described above is two thousand nine hundred sixteen and 67/100 dollars ($2,916.67) semi-monthly. Following completion of every calendar quarter, Earnings for the quarter will be determined. If total Earnings for the quarter exceed the total Monthly Draw for that calendar quarter, such excess will be paid promptly to you as compensation (the "***Quarterly True-Up***"). If total Earnings for the quarter are less than the total Monthly Draw already paid in respect of such quarter, then an Earnings deficit will be created and carried forward and such Earnings deficit shall offset and reduce on a dollar-for-dollar basis future Monthly Draws until such Earnings deficit is reduced to zero. However, it should be noted that no adjustments will be made prior to July 1, 2018 and progress with be reviewed periodically during the interim. All compensation under this Letter Agreement will be paid in accordance with the Company's general payroll practices and schedules, and will be subject to all tax and other withholdings required by applicable law.

**Employee Benefits**: You will be eligible to participate in all employee benefit plans extended to optometrists of the Company, pursuant to the terms and conditions of those plans including any requirements for specific hours worked, and subject to the Company's right to amend, alter, terminate or eliminate any such programs from time to time.

**Approved Time Off**: Subject in all cases to the Company's time off policies, you shall be entitled to a total of fourteen and one half (14 ½) days of approved time off for vacation and continuing medical education time each calendar year. Such time off may be taken, in your discretion, subject to the reasonable business needs of the Company. Time off may not be carried over from one calendar year to the next, but rather must be used in the calendar year in which it is earned. Time off shall be prorated the first calendar year of your employment, based upon the number of days remaining in such calendar year after the commencement of your employment divided by 365.

**Reimbursement of Expenses**: Subject to Internal Revenue Code Section 409A ("***Section 409A***"), the Company will pay or reimburse you for reasonable expenses incurred in the course of your duties, subject to the Company's policies in effect from time to time and corroborating documentation reasonably satisfactory to the Company. You may attend continuing medical education courses of study or seminars which are approved by Company. Company shall also reimburse you for your expenses of attending the courses or seminars, up to a maximum of Six Hundred Fifty Dollars ($650.00) per calendar year.

**Fair Market Value:** The compensation provided pursuant to this Letter Agreement has resulted from arm's length negotiations between you and the Company, has not been determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between you and the Company, and is to the best knowledge of each of you and the Company consistent with fair market value for the services to be rendered. You expressly represent, warrant and covenant that no part of the payments made pursuant to this Letter Agreement

shall at any time be paid directly or indirectly by or on behalf of you to any third party as an inducement or remuneration for the referral or admission of a patient to the Company or any Affiliate of the Company.

**Fees**: All fees, compensation, monies, and other things of value received or realized by you or any Affiliate of yours due to services rendered by the you for the Company under this Letter Agreement shall belong to and be paid and delivered to the Company, it being specifically acknowledged that all things of value arising from Outside Activities (as defined below) are not subject to this paragraph. The Company shall have exclusive authority to determine the fees, or a procedure for establishing the fees, to be charged patients, even though such patients may be treated by you in the course of your employment by the Company. You shall, on behalf of the Company, enter into and execute any and all agreements, documents, and instruments necessary or otherwise beneficial to the Company and take such other actions and provide such other further assurances as may be reasonably necessary, to provide the Company with the authority and ability to participate in Third Party Payor (as defined below) programs and to bill and collect from such Third Party Payor programs. For the purpose of this Letter Agreement, ***"Third Party Payor"*** shall mean Medicare, Medicaid, or any other federal or state-funded health care program, as well as any commercial payor or other third party that pays or otherwise reimburses the Company for items or services that it renders. Solely for the purposes of effectuating the provisions of this paragraph, in accordance with applicable law, you hereby grant to the Company an exclusive special power of attorney coupled with an interest, and you appoint the Company as your exclusive true and lawful agent and attorney-in-fact, and the Company hereby accepts such special power of attorney and appointment.

**Malpractice Insurance**: During the Term of your employment, the Company will maintain on your behalf, malpractice insurance coverage insuring you and the Company for your acts and omissions for so long as you remain insurable at commercially reasonable rates, as reasonably determined by the Company and consistent with the Company's determination as to all other doctors of optometry providing services to the Company or any Affiliate of the Company. As of the date of this Agreement, the coverage is provided through an occurrence-based policy providing coverage of One Million Dollars ($1,000,000) per incident and Three Million Dollars ($3,000,000) annual aggregate. At Company's option and at its cost, it will either (a) maintain existing occurrence-based insurance coverage, or (b) obtain claims-made coverage from a different carrier with "tail" malpractice insurance with the same limits and coverage following the termination of your employment with the Company and continuing through the expiration of any applicable statutes of limitation with respect to your professional activities for the Company or any Affiliate of the Company.

**Confidentiality**: You agree to keep all Confidential Information of the Company (including any of its Affiliates and subsidiaries), including the terms of this Letter Agreement, confidential, and you shall not use or disclose any such Confidential Information without the prior written consent of the Company. You may disclose Confidential Information to your attorneys and accountants to the extent necessary in connection with their representation of you. Any Confidential Information provided to or developed by you in the performance of this Letter Agreement shall be kept confidential and shall not be disclosed or made available to any individual, entity or organization. Notwithstanding the foregoing, you may respond to a lawful subpoena or other legal process but shall (x) give the Company prompt notice thereof, (y) make available to the Company and its counsel the documents and other information sought, and (z) use commercially reasonable efforts to assist such counsel at the Company's expense in resisting or otherwise responding to such process, in each case to the extent permitted by applicable laws or rules. You also may disclose Confidential Information to support Company's efforts to market Company and its services to other physicians and/or facilities.

**Permitted Communications**: Nothing in this Letter Agreement shall be construed to prohibit you from providing truthful information to any government agency in connection with an investigation by such agency into a suspected violation of law. You shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

**Term**: The initial term of employment under this Letter Agreement (the ***"Initial Term"***) shall be for the period beginning on the Effective Date and ending on June 30, 2020, unless earlier terminated as provided in the "Termination" paragraph below. The Initial Term shall automatically be extended for successive one-year periods

(***"Extension Terms"*** and, collectively with the Initial Term, the ***"Term"***) unless either party hereto gives notice of non-extension to the other party no later than 90 days prior to the expiration of the then-applicable Term (such 90-day period, the ***"Non-Extension Notice Period"***) and subject to earlier termination as provided in the "Termination" paragraph below. For avoidance of doubt, if the Company terminates your employment by providing you notice of non-extension prior to the expiration of the then-applicable Term in accordance with the preceding sentence, such termination of your employment shall be other than for Cause.

**Termination**: Unless otherwise agreed in writing by an authorized agent of the Company, at all times your employment is at-will, meaning that you or the Company can terminate the employment relationship with or without Cause, subject to the terms and conditions of this Letter Agreement, including: (a) the Company may terminate your employment for Cause or by reason of death or Disability at any time to be effective immediately or on such date as determined by the Company; (b) you may terminate your employment with the Company for Cause to be effective immediately; (c) you may terminate your employment with the Company for any reason other than Cause by giving the Company at least ninety (90) days' written notice; and (d) the Company may terminate your employment for any reason other than Cause, death or Disability by giving you at least ninety (90) days' written notice of such termination (the ***"Termination Notice Period"***), provided, however, that if your employment is terminated pursuant to subsections (c) or (d) or by providing notice of non-extension under the "Term" section above, the Company shall have the option, at its sole discretion, to either (y) continue to employ you for the entirety of the Termination Notice Period or Non-Extension Notice Period, as applicable, or (z) continue to employ you for some or no portion of the Termination Notice Period or Non-Extension Notice Period.

**Payments upon Termination**: If you terminate your employment under subsections (b) or (c) of the Termination section or the Company terminates your employment under subsections (a) or (d) of the Termination section, including by notice of non-extension under the "Term" section, then the Company will have no further obligation to make any payments to you hereunder except that that Company shall pay and provide you the following amounts or benefits: (i) if total Earnings for the 90-day period following your termination exceed the total Monthly Draw that you received for such period, such excess amount, except if the Company terminates your employment under subsection (a) for Cause (ii) payment of any earned but unused or unpaid vacation for such current year, except if the Company terminates your employment under subsection (a) for Cause, (iii) reimbursements for any un-reimbursed expenses incurred through the date of termination to which you would have otherwise been entitled, and (iv) any amounts due under any benefit plan or arrangement in accordance with the terms of said plan or arrangement due for a period prior to such termination. In the event that the Company elects to employ you for some or no portion of the Termination Notice Period or Non-Extension Notice Period, then the Company will still be obligated to pay you consistent with the terms of this subsection.

**Non-Competition Agreement**: Neither you nor you Affiliates shall engage (whether as an owner, operator, stockholder, partner, joint venture, manager, employee, officer, director/manager, consultant, advisor, representative, or otherwise) directly or indirectly in the Business (other than for the benefit of the Relevant Entities) during the period commencing on the date hereof and ending 24 months after you cease to be employed by or provide services to the Company and/or any Related Entity (the "***Restricted Period***"), anywhere within a 25 mile geographical radius of the 68th Street office of Grand Rapids Ophthalmology and the Fremont location of Shoreline Vision (collectively, the "***Restricted Territory***"); provided that ownership of less than 2% of the outstanding stock of any publicly traded corporation shall not be deemed to be engaging solely by reason thereof in the Business or a violation of this paragraph. The parties hereto agree that the covenant set forth in this paragraph is reasonable with respect to its duration, geographical area, and scope. If the final judgment of a court of competent jurisdiction declares that any term or provision of this paragraph is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed. The restrictions in this Non-Competition Agreement Paragraph are in addition to any other non-competition restrictions to which you may now or in the future be subject pursuant to any other agreements between you and any Relevant Entity or any of their Affiliates.

During the period beginning on the date hereof and ending 24 months after you cease to be employed by or provide services to the Company and/or any Relevant Entities, you may not directly or indirectly solicit any patient of any

of the Relevant Entities or any person who was a patient of any of the Relevant Entities within six (6) months of any such solicitation, except pursuant to a general solicitation not specifically directed at any particular patient.

**Complementary Non-Clinical Activities**: Notwithstanding anything to the contrary contained herein, you will be entitled to engage in the Outside Activities.

**Non-Solicitation Agreement**: You agree that, during the Restricted Period, you will not (i) directly or indirectly contact, approach, or solicit for the purpose of offering employment to (whether as an employee, consultant, agent, independent contractor, or otherwise) or actually hire any employee of the Relevant Entities (including those persons engaged by the Relevant Entities in the Business by employee leasing arrangements) (whether as an employee, consultant, agent, independent contractor, or otherwise), or cause such employee to be hired by any other Person, without the prior written consent of the Company or (ii) induce or attempt to induce any payor, customer, supplier or other business relation of the Relevant Entities into any business relationship which would reasonably be expected to materially harm the Relevant Entities or the Business, or discourage such payor, customer, supplier or business relation from doing business with any of the Relevant Entities after the date hereof, except, in all cases, pursuant to a general solicitation not specifically directed at any particular Person.

**Enforcement**: You acknowledge and agree that the scope of the restrictive covenants set forth above, including the Non-Competition Period, the Non-Solicitation Period and the Restricted Territory, are reasonable in light of the important and legitimate business interests of the Company. Nonetheless, if a court finds any covenant set forth in this Letter Agreement to be unreasonably broad in scope in light of the Company's legitimate business interests, and, thus, unenforceable, in whole or in part, the parties hereto hereby authorize and direct the court to narrow the scope of such covenant only as necessary to render the covenant reasonable, and to enforce the covenant as so modified by the court. You acknowledge and agree that a breach of the restrictive covenants herein will result in irreparable damage to the Company and therefore you consent to the granting of immediate injunctive relief to enforce such provision by the Company, recovery of reasonable attorneys' fees and costs incurred or expended (including the cost of posting any bond in connection with seeking such injunctive relief) in successfully obtaining such relief, and any other legal or equitable relief that a court determines that the Company is entitled to recover, including any monetary damages which a court determines that the Company is entitled to recover as a result of your breach.

**Limitations on Covenants**: Notwithstanding anything contained in this Letter Agreement: (a) under no circumstances shall any provision of this Letter Agreement be deemed to deny you access to a list of patients to which you may be entitled as a matter of law; (b) after termination of your employment with the Company, the Company shall provide you access to medical records of any or all of your patients upon authorization of such patient or patients and shall provide copies of any such medical records for a reasonable fee as established by applicable law; (c) the provisions of this Letter Agreement shall not be deemed to deny you access to medical records when compelled by applicable law to defend a professional liability claim of any kind, provided that you shall provide prior written notice to the board of directors of the Company; (d) any access by you to a list of patients or to patients' medical records after termination of your employment with Company shall not require that such list or records be provided in a format different than that by which such records are maintained, except by mutual consent of you and the Company; and (e) in no event shall you be prohibited by this Letter Agreement from providing continuing care and treatment to a specific patient or patients during the course of an acute illness, even after your employment with the Company has terminated.

**Intellectual Property**:

(a) You represent to the Company that there are not any inventions, original works of authorship, developments, improvements or trade secrets which were made by you prior to the commencement of your employment with the Company, which belong solely to you or belong to you jointly with others which relate in any way to any of the Company's actual or proposed businesses, products, services or research and development and which are not assigned to the Company.

You will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company and hereby assign to the Company or its designee, all your right, title and interest throughout the world in and to any and all inventions, original works of authorship, developments, concepts, know-

how, improvements or trade secrets, whether or not patentable or registerable under copyright or similar laws, which you may solely or jointly conceive or develop or reduce to practice, or cause to be developed or reduced to practice, during your employment with the Company (whether during the Term or thereafter) that (i) relate at the time of conception, development or reduction to practice to the actual or demonstrably proposed business or research and development activities of the Company, (ii) result from or relate to any work performed for the Company, whether or not during normal business hours or (iii) are developed through the use of Confidential Information (collectively referred to as ***"Inventions"***). You further acknowledge that all Inventions which are made by you (solely or jointly with others) within the scope of and during the period of your employment with the Company (whether during the Term or thereafter) are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by the compensation provided herein, unless regulated otherwise by law.

You will assist the Company or its designee, at the Company's expense, in every proper way to secure the Company's rights in any Inventions and any copyrights, patents, trademarks, trade secrets, moral rights or other intellectual property rights relating thereto in any and all countries, including without limitation, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, records and all other instruments which the Company will deem necessary in order to apply for, obtain, maintain and transfer such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, trademarks, trade secrets, moral rights or other intellectual property rights relating thereto. You acknowledge that your obligation to execute, or cause to be executed, when it is in your power to do so, any such instrument or papers will continue after the termination of your employment with the Company until the expiration of the last such intellectual property right in any country. If the Company is unable after reasonable efforts, because of your mental or physical incapacity or unavailability for any other reason, to secure your signature to apply for or to pursue any application for any patents or copyright registrations covering Inventions assigned to the Company above, then your hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as your agent and attorney in fact, to act for and in your behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent or copyright registrations thereon with the same legal force and effect as if originally executed by you. You hereby waive and irrevocably quitclaim to the Company any and all claims, of any nature whatsoever, which you now or hereafter have for infringement of any and all Inventions assigned to the Company.

**Definitions**: For purposes hereof, the following terms used in this Letter Agreement shall have the respective meanings assigned to them below:

***"Affiliate"*** of, or a Person ***"Affiliated"*** with, a specified Person means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise. Without limiting the foregoing, the ownership of fifty percent (50%) or more of the voting securities of a Person shall be deemed to constitute control. For the avoidance of doubt, each of Grand Rapids Ophthalmology, P.C., a Michigan professional corporation, EBSC, Inc., a Michigan corporation and GRO Optical, L.L.C., a Michigan limited liability company, Shoreline Ophthalmology, PLLC, a Michigan limited liability company, Shoreline ASC, LLC, a Michigan limited liability company (or their successors in interest) (the "***Relevant Entities***") shall be deemed to be an Affiliate of each other Relevant Entity.

***"Cause"*** means:

(a) with respect to the Company's right to terminate this Letter Agreement for Cause, that you (i) are, for any reason, restricted or prohibited from either practicing optometry or assisting a physician in the practice of ophthalmology in the State of Michigan, unless otherwise determined by the Company, (ii) are excluded or debarred from participation in any federal or state health program, or convicted of any program-related offense, (iii) habitually failing to appear for work on a regular basis and such neglect is not cured to the Company's reasonable satisfaction within thirty (30) days after written notice from the Company, (iv) are convicted of fraud,

misappropriation, embezzlement, or a crime involving moral turpitude, dishonesty, or bearing upon the practice of optometry, (v) fail to qualify for professional liability insurance as required by this Letter Agreement, (vi) are grossly negligent in the performance of your duties or engage in a pattern of negligence such that the health and safety of patients is placed at risk, and such negligence is not cured to the satisfaction of the Company within thirty (30) days after written notice from the Company, or (vii) materially breach this Letter Agreement in any other way, and such breach is not cured to the Company's reasonable satisfaction within thirty (30) days after written notice from the Company; and

with respect to your right to terminate this Letter Agreement for Cause, that the Company (i) is excluded or debarred from participation in any federal or state health program, or convicted of any program-related offense, (ii) materially breaches this Letter Agreement in any other way, and such breach is not cured to your reasonable satisfaction within thirty (30) days after written notice from you, (iii) is dissolved, or (iv) discontinues all clinical operations and other material business activities.

***"Confidential Information"*** shall mean any non-public information, in whatever form or medium, concerning the operations or affairs of the Company or any of its subsidiaries, including, but not limited to, (A) documents and other materials, including but not limited to, memoranda, clinical manuals, handbooks, production books, educational material and audio or visual recordings, which contain information relating to the operation of Company, its subsidiaries or their programs, (B) all methods, techniques and procedures utilized in providing services to patients of the Company and its subsidiaries not readily available through sources in the public domain, (C) financial information of the Company or its subsidiaries, (D) medical records of patients receiving services from the Company or its subsidiaries, (E) data relating to patient care and outcomes (whether individually identifiable with respect to any one patient or aggregated with information relating to multiple patients), (F) software owned or developed (or being developed) for use in or relating to the Company, (G) risk management records, and (H) such other information that specifically pertains to the Company or its subsidiaries; provided, however, that Confidential Information shall not include (1) knowledge, data and information that is generally available or becomes available to the public or in the trade or industry of the Company (other than as a result of disclosure by you in breach of this Letter Agreement or other agreement or instrument to which you are bound), and (2) knowledge, data and information gained without a breach of this Letter Agreement on a non-confidential basis from a person who is not known by you to be legally prohibited from transmitting the information to you, or (c) has been independently developed by you or by others without violating this Letter Agreement.

***"Disability"*** means incapacity due to a physical or mental impairment or a combination of both, rendering you unable to perform the essential functions of your duties (with or without reasonable accommodation) for 90 days out of any one-year period. This provision shall be interpreted and applied in a manner consistent with all applicable laws, including laws regarding workers' compensation, disability, and family and medical leave laws.

***"Division"*** means the ophthalmology/optometry division of the Company.

***"Outside Activities"*** means teaching, writing, lecturing, and/or providing expert witness testimony on matters related to the practice of optometry and such other activities as approved by the Company, which approval shall not be unreasonably withheld.

***"Permissible Share of the Division DHS Revenues"*** means the total cash receipts, net of Product Costs, all refunds, overpayments and sales tax, generated from DHS for patients of the Division from all optometrists, divided among the optometrists of the Division equally or otherwise in a manner that is allowed by law.

***"Person"*** means and includes any individual, corporation, partnership, association, limited liability company, trust, estate, custodian, nominee or any other individual or entity in its own or any representative capacity.

"***Personal Net Collections***" means cash receipts, net of Pharmaceutical Collections, all refunds, overpayments and sales tax, generated from direct patient care services personally performed or incident to services personally performed by you, but shall exclude any receipts attributable to you for any service which is defined as a "designated health service" in 42 CFR § 411.351, paid by any payor, which are not personally performed by you

(each, a ***"DHS"***). For purposes of clarity, your Personal Net Collections shall not include any amounts related to any services which the Company reasonably determines are not allowed by law.

"***Pharmaceutical Collections***" shall mean the cash receipts of the Company for the reimbursement of the costs for injectable drugs used for direct patient care services personally performed or incident to services personally performed by you. For the avoidance of doubt, Pharmaceutical Collections shall exclude (i) any markup charged and received by the Company for such injectable drugs and (ii) any professional service fees received by the Company for direct patient care services personally performed or incident to services personally performed by you.

***"Business"*** means the Grand Rapids Business, the ASC Business and the GRO Business and any other businesses in which the Relevant Entities are engaged in, or planned business for which they have spent substantial resources and taken affirmative steps to implement or launch, as of the time of the termination of your employment. As used herein:

> ***"ASC Business"*** means the business of EBSC, Inc., a Michigan corporation, which is an AAAHC certified ambulatory surgery center that provides ocular surgical procedures.
>
> ***"Grand Rapids Business"*** means the business of Grand Rapids Ophthalmology, P.C., a Michigan professional service corporation, which includes owning, operating and managing an ophthalmology medical practice and other ophthalmology and optometry-related businesses that provide ophthalmological, optical and other related services, including, without limitation, providing or assisting as a closely allied healthcare professional in the provision of (i) clinical, cosmetic, medical care of eye disease associated with ophthalmology and optometry services, (ii) surgical ophthalmology, laser treatment, and other such treatment and manipulations of the eyes, visual system, and ocular cavity (iii) cosmetic optical examination and retail services, (iv) developing and implementing the infrastructure related to the above activities, and (v) related services, inventions, procedures and techniques for the above activities.
>
> ***"GRO Business"*** means the business of GRO Optical, LLC, a Michigan limited liability company, which is an optical manufacturing and retail business.

**Termination of Prior Agreements**: You acknowledge and agree that any employment agreement or other employment arrangement (including, without limitation, any bonus plan) between you and the Company and/or any of its Affiliates entered into prior to the date hereof is hereby terminated and is of no further force or effect and that you have no rights under any of the foregoing.

**Entire Agreement; Other**: This Letter Agreement (along with the Letter of Intent dated 05/10/2017) expresses the entire understanding between the Company and you with respect to your employment, and supersedes any prior or contemporaneous agreement between the Company and you relating to your employment, whether such agreement was oral or written. This Letter Agreement may only be amended, modified, supplemented or canceled by a writing signed by you and an executive officer of the Company (other than you). If any provision of this Letter Agreement is adjudged unenforceable, such adjudication shall in no way affect any other provision of this Letter Agreement or the validity or enforcement of the remainder of this Letter Agreement, and the provision affected shall be altered only to the minimum extent necessary to make it conform to applicable law. The terms and provisions of the sections of this Letter Agreement entitled "Malpractice Insurance", "Confidentiality" "Payments upon Termination", "Non-Competition Agreement", "Non-Solicitation Agreement", "Enforcement", "Limitations on Covenants", "Definitions", "Termination of Prior Agreements", "Entire Agreement; Other", "Section 409A", "Section 280G", "Advice of Counsel" and "Choice of Law" shall each survive the expiration or termination of this Letter Agreement.

**Section 409A**: To the maximum extent permitted, this Letter Agreement is intended to not constitute a "nonqualified deferred compensation plan" within the meaning of 409A but in any event will be interpreted to comply with Section 409A. While it is intended that all payments and benefits provided under this Letter Agreement (or otherwise) to you will be exempt from or comply with Section 409A, the Company makes no representation or covenant to ensure that the payments under this Letter Agreement (or otherwise) are exempt from or compliant with Section 409A. The Company will have no liability to you or any other person or entity if a

payment or benefit under this Letter Agreement is challenged by any taxing authority or is ultimately determined not to be exempt or compliant. You further understand and agree that you will be entirely responsible for any and all taxes on any benefits payable to you as a result of this Letter Agreement (or otherwise). For purposes of this Letter Agreement, a termination of employment means a "separation from service" as defined in Section 409A. Each payment made pursuant to any provision of this Letter Agreement shall be considered a separate payment and not one of a series of payments for purposes of Section 409A. To the extent any nonqualified deferred compensation payment to you could be paid in one or more of your taxable years depending upon you completing certain employment-related actions, then any such payments will commence or occur in the later taxable year to the extent required by Section 409A

**Section 280G**: Notwithstanding anything to the contrary, in the event that it is determined that any payment or benefit of any type to or for the benefit of you (whether under this Letter Agreement or otherwise) would (or could) be a "parachute payment" (as defined under Internal Revenue Code Section 280G) (collectively, the ***"Total Payments"***), then such Total Payments shall instead be reduced and paid only as to such lesser amount in the aggregate which would result in no portion of such Total Payments constituting a "parachute payment".

**Advice of Counsel**: You acknowledge that you have had independent legal counsel for advice regarding the effect of this Letter Agreement, and you have obtained such advice of independent legal counsel.

**Choice of Law**: This Letter Agreement shall be construed under and governed by the laws of the State of Michigan without giving effect to any choice or conflict of law provision or rule.

**Submission to Jurisdiction**: Any legal suit, action or proceeding arising out of, based upon or relating to this Letter Agreement, the other transaction documents or the transactions contemplated hereby or thereby shall be instituted in the federal courts of the United States of America in the State of Michigan or the courts of the State of Michigan located in Kent County, Michigan, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other documents shall be effective service of process for any suit, action or other proceeding brought in any such court. You and the Company irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

**Waiver of Jury Trial**: BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS EMPLOYMENT AGREEMENT HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS LETTER AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIP ESTABLISHED AMONG THE PARTIES HEREUNDER.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Please indicate your acceptance of this Letter Agreement by signing in the space provided below and returning one copy of this Letter Agreement to my attention at your earliest convenience. You should retain the other copy for your files.

Should you have any questions, please feel free to give me a call.

Sincerely,

GRAND RAPIDS OPHTHALMOLOGY and SHORELINE OPHTHALMOLOGY

By:____________________
Name: William Hughson
Title: Authorized Agent

ACCEPTED AS OF THE DATE FIRST SET FORTH ABOVE

______________________________
Randall Jansma, O.D.

Please indicate your acceptance of this Letter Agreement by signing in the space provided below and returning one copy of this Letter Agreement to my attention at your earliest convenience. You should retain the other copy for your files.

Should you have any questions, please feel free to give me a call.

Sincerely,

GRAND RAPIDS OPHTHALMOLOGY and SHORELINE OPHTHALMOLOGY

By:________________________
Name:______________________
Title:_______________________

ACCEPTED AS OF THE DATE FIRST SET FORTH ABOVE

Randall Jansma, O.D.

EXHIBIT A

EARNINGS

I. Definition of Earnings

"***Earnings***" a base pay for the first two years of this Agreement in the amount of $2,916.67 paid semi-monthly. In addition, you could possibly receive a quarterly bonus in the amount of (a) 30% of the Personal Net Collections and (b) 30% of the Permissible Share of the Division DHS Revenues and (c) 9% of contact lens and spectacle sales resulting from your practice, less base pay payments made during the calendar quarter. Your Earnings shall be calculated quarterly, and any Quarterly Bonus will be paid no later than thirty (30) days following the end of each calendar quarter. It should be noted that the semi-monthly draw would be the minimum of your compensation for the initial term of this Agreement.

From: RANDY <doc2020@comcast.net>
Sent: Tuesday, June 12, 2018, 1:05 PM
To: "Brian A. Hamilton" <bhamilton@BlueSkyVision.com>
Subject: Re: Happy New Week

---

Hi Brian,
I wanted to let you know things are going well here in Fremont. I met the entire staff this morning and enjoyed them all.

There is one fly in the ointment. It appears they are not providing a scribe for me, or at least not all the time. They cite lack of staff for this. They are pushing me to learn their EMR. This is not what we agreed on. I am in hopes you can rectify this situation.
Thank you,

Randy

Sent from XFINITY Connect App

------ Original Message ------

From: Brian A. Hamilton
To: Randy Jansma
Sent: June 11, 2018 at 9:07 PM
Subject: Happy New Week

Hi Randy, I am still be asked by folks for a CV. Can you send me at least bullet points or something that I can share? Thanks, Brian Hamilton Blue Sky Vision bhamilton@blueskyvision.com C: 616-690-6919 ________________________________ This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Grand Rapids Ophthalmology, 750 East Beltline NE, Grand Rapids, MI www.seeitclear.com

EXHIBIT
#7
Hamilton
10-29-20
PENGAD 800-631-6989

From: "Randy H. Jansma, OD" <RJansma@seeitclear.com>
Sent: Tuesday, June 26, 2018, 8:31 AM
To: "Brian A. Hamilton" <bhamilton@BlueSkyVision.com>
Subject: Re: Last week

---

Hi Brian,
Thank you for the clarification. I feel a couple months would be needed to learn both systems, however I would really appreciate making the scribe permanent.
I am certain this would be the best fit overall.

Best,

Randy

Sent from my iPhone

On Jun 25, 2018, at 2:06 PM, Brian A. Hamilton <bhamilton@BlueSkyVision.com> wrote:

> Hi Guys,
> When we worked things out with Randy coming onboard, we talked about having a scribe to help him get up to speed. We felt this would be best for the patients, and candidly for Randy coming onboard. All of this being said, our intent was that this was not to be permanent (I am not sure we discussed a timeframe, but would assume a couple of months would be required to get a new OD acclimated to the different EMR systems).
> If a permanent scribe is being requested, than I would deflect that question to Amy (as I know we are in the middle of training additional scribes because we don't have enough for the ODs that have requested them to-date).
> Thanks guys!
> Brian
>
> **From:** Randy H. Jansma, OD
> **Sent:** Monday, June 25, 2018 10:28 AM
> **To:** Amy Dunleavy <adunleavy@seeitclear.com>; Brian A. Hamilton <bhamilton@BlueSkyVision.com>
> **Subject:** Re: Last week
> Good morning Amy,
> I wish to make you aware of circumstances regarding the sale of my practice and subsequent employment by Blue Sky Vision. During negotiations I was promised a scribe, as I would be dealing with two different EMR's, and three locations. It was agreed this would provide the best in patient care and satisfaction.
> I contacted Brian Hamilton to let him know that I felt Shoreline Ophthalmology in Fremont was not going to be providing a scribe as promised. He said he would go to work on things, and I believe that situation is turning around.
> Please feel free to speak with Brian, or Bill Hughson about this.
> And, of course you can contact me at your convenience.
> Best regards,
> Dr. Randy Jansma.

EXHIBIT
#8
Hamilton
2-6-20
PENGAD 800-631-6989

Sent from my iPhone

On Jun 25, 2018, at 7:22 AM, Amy Dunleavy <adunleavy@seeitclear.com> wrote:

Good morning Dr. Jansma,
Wonderful news! I am so glad that your first week went well.
Please keep me posted on your progress. As discussed, we will be adding additional exam spots to your template when you feel confident.
I also plan to remove the scribe but we can reassess after this week to see how you are feeling.
Have a wonderful week and please reach out with any needs that may arise.
Leading the way. Improving sight. Changing lives

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
Clinic Manager
<image001.png>
6050 Northland Drive
Rockford, Michigan 49341
Seeitclear.com
616.949.2600

**From:** Randy H. Jansma, OD
**Sent:** Sunday, June 24, 2018 9:17 PM
**To:** Amy Dunleavy <adunleavy@seeitclear.com>
**Subject:** Re: Last week
Good evening Amy,
Yes, I had a very nice weekend. I hope yours was equally as good.
Things went extremely well in both locations last week.
Everyone there is very helpful, and I appreciate having scribes who are excellent at their jobs!
Having the scribes is helping immensely in my exam flow. They have also been very helpful in helping me navigate the EMR.
The office managers at both locations, Georgie, and Mary, were also very welcoming and accommodating and a pleasure to work with.
Best regards,
Dr. Randy Jansma

Sent from my iPhone

On Jun 24, 2018, at 10:48 AM, Amy Dunleavy <adunleavy@seeitclear.com> wrote:

Good morning Dr. Jansma,
I hope you were able to have a restful weekend.
I wanted to check in to see how your first week of clinic went at 68th street and Grandville.
How are you adjusting to the computer based medical records?

Any concerns that you may have or requests for support?
I look forward to hearing from you soon.
Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
Clinic Manager
<image001.png>
6050 Northland Drive
Rockford, Michigan 49341
Seeitclear.com
616.949.2600

From: Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
Sent: Friday, September 28, 2018, 5:10 PM
To: Randy Jansma <doc2020@comcast.net>
Cc: Surya Desiraju <SDesiraju@BlueSkyVision.com>; "Phil Vanderlugt, OD" <PVanderlugt@seeitclear.com>
Subject: RE: follow up

---

Dr. Jansma,
I am so sorry to hear about your loss. Thanks for letting us know and we will be in touch next week.

Regards,

Melissa Dabrowski
VP of Human Resources

Blue Sky
VISION

4020 East Beltline Ave NE
Grand Rapids, MI 49525

Office 616.588.6574
Mobile 989.492.4906

**From:** Randy Jansma [mailto:doc2020@comcast.net]
**Sent:** Friday, September 28, 2018 5:09 PM
**To:** Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
**Cc:** Surya Desiraju <SDesiraju@BlueSkyVision.com>; Phil Vanderlugt, OD <PVanderlugt@seeitclear.com>
**Subject:** Re: follow up

Please excuse my tardiness in sending my letter of resignation. My father in law passed away unexpectedly 2 days ago, and our family has been quite consumed with this.
I will send it to you after the weekend.
Thank you for your understanding.
Dr. Jansma

Sent from my iPhone

EXHIBIT
#9
Dabrowski
3-11-21
PENGAD 800-631-6989

On Sep 28, 2018, at 4:10 PM, Melissa Dabrowski <mdabrowski@BlueSkyVision.com> wrote:

Dr. Jansma:

Based on your recent meeting with Surya Desiraju and Phil Vanderlugt, Blue Sky Vision was under the impression that you intended to resign from your employment with BSV. We have not, however, received a letter of resignation from you. We are working on next steps and will be in contact with next week.

Please reach out to us if you have any questions.

Regards,

Melissa Dabrowski
VP of Human Resources

<image001.jpg>

4020 East Beltline Ave NE
Grand Rapids, MI 49525

Office 616.588.6574
Mobile 989.492.4906

**From:** Surya Desiraju
**Sent:** Wednesday, September 26, 2018 7:55 PM
**To:** RANDY JANSMA <doc2020@comcast.net>
**Cc:** Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
**Subject:** RE: follow up

Hi Randy,
Please see answers/additional information below:

**Balance of your salary**
The definition if earnings in your employment contract reads: "***Earnings***" a base pay for the first two years of this Agreement in the amount of $2,916.67 paid semi-monthly. In addition, you could possibly receive a quarterly bonus in the amount of (a) 30% of the Personal Net Collections and (b) 30% of the Permissible Share of the Division DHS Revenues and (c) 9% of contact lens and spectacle sales resulting from your practice, less base pay payments made during the calendar quarter. Your Earnings shall be calculated quarterly, and any Quarterly Bonus will be paid no later than thirty (30) days following the end of each calendar quarter. It should be noted that the semi-monthly draw would be the minimum of your compensation for the initial term of this Agreement.

Your salary draw is based on your base salary of $70,000 per year. The last day that you saw patients at GRO was on 9/14/18. The last day that you saw patients at Shoreline was on 9/25/28. Tomorrow 9/27 is our next pay day and it is through the week ending 9/21. The balance salary would be for the days that you worked this week. So it will be for one day that you worked at Shoreline on 9/25/18 which is the last day of your employment.

**Lifting all restrictive covenants**

Blue Sky leadership team reviewed your contract and your request. We cannot lift and adjust the restrictive covenants as spelled out in your employment agreement

**Balance due for patient files**

The terms pertaining to contingency compensation described in your 'purchase agreement and bill of sale' document are applicable based on your active employment status with Blue Sky Vision at the end of the term. Keeping in line with those terms, the balance due for patient files will be applicable for the files that got transferred during the period of your employment (June 5, 2018 through Sept 25, 2018). As per our records, a total of 17 patient files got transferred to GRO and 43 files got transferred to Shoreline Vision. So the amount payable would be $900 (=(17+43)*15).

**Continued health insurance**

In alignment with the Blue Sky Vision employment agreement and standard practice all benefits will terminate as of the last day of the month following termination of employment. COBRA continuation paperwork will be issued to you upon the termination of benefits in accordance with the law.

If you would still like to tender your resignation based on our mutual agreement as discussed, please let us know by close of business on Thursday, September 27th so that we can process the change in a timely manner. Let Melissa or me know if you have any additional questions.

Surya Desiraju
Chief Operating Officer

<image003.jpg>

M: 469.426.4602
E: SDesiraju@BlueSkyVision.com

4020 East Beltline Avenue NE
Grand Rapids, MI 49525

**From:** Randy Jansma <doc2020@comcast.net>
**Sent:** Wednesday, September 26, 2018 12:06 PM
**To:** Surya Desiraju <SDesiraju@BlueSkyVision.com>
**Subject:** Re: follow up

Hello Surya,
I am formulating a letter of resignation. I know we are both in need of getting this process underway and over.
There are some things we talked about yesterday that either need to be in my letter, or I need to see in writing, from Blue Sky Vision, LLC.
These things include paying me the balance of my salary, and lifting all restrictive covenants. I would also like the balance due for patient files, which is 20k, and my health insurance continued until the end of my proposed contract, or the prorated amount of the 13-14k allotted for this.
If this is agreeable to Blue Sky, and I have this in writing, I am prepared to resign immediately.
Sincerely,

Dr. Randall Jansma

Sent from my iPhone

On Sep 25, 2018, at 7:03 PM, Surya Desiraju <SDesiraju@BlueSkyVision.com> wrote:

> Hello Randy,
> Thank you for meeting with Phil and me this evening. From our conversation, I conclude that you would prefer sending in your letter. Please reply-all. I CCed my colleague Melissa Dabrowski, she is the VP of HR for Blue Sky.
>
> Surya Desiraju
> Chief Operating Officer
>
> <image002.jpg>
>
> M: 469.426 4602
> E: SDesiraju@BlueSkyVision.com
>
> 4020 East Beltline Avenue NE
> Grand Rapids, MI 49525
>
> This message contains confidential information and is intended only for the individual named If you are not the named addressee you should not disseminate, distribute or copy this e-mail Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted corrupted lost destroyed, arrive late or incomplete, or contain viruses The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission If verification is required please request a hard-copy version Blue Sky Vision, 4020 Beltline Ave NE Grand Rapids MI www.BlueSkyVision.com

This message contains confidential information and is intended only for the individual named If you are not the named addressee you should not disseminate distribute or copy this e mail Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted corrupted, lost, destroyed, arrive late or incomplete, or contain viruses The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission If verification is required please request a hard-copy version Blue Sky Vision, 4020 Beltline Ave NE, Grand Rapids, MI www BlueSkyVision com

From: Surya Desiraju <SDesiraju@BlueSkyVision.com>

Sent: Wednesday, September 26, 2018, 12:07 PM

To: Melissa Dabrowski <mdabrowski@BlueSkyVision.com>

Subject: Fwd: follow up

---

Please see the email below. We should discuss.

Surya Desiraju
Chief Operating Officer
Blue Sky Vision

Begin forwarded message:

> **From:** Randy Jansma <doc2020@comcast.net>
> **Date:** September 26, 2018 at 12:05:37 PM EDT
> **To:** Surya Desiraju <SDesiraju@BlueSkyVision.com>
> **Subject: Re: follow up**
>
> Hello Surya,
> I am formulating a letter of resignation. I know we are both in need of getting this process underway and over.
> There are some things we talked about yesterday that either need to be in my letter, or I need to see in writing, from Blue Sky Vision, LLC.
> These things include paying me the balance of my salary, and lifting all restrictive covenants. I would also like the balance due for patient files, which is 20k, and my health insurance continued until the end of my proposed contract, or the prorated amount of the 13-14k allotted for this.
> If this is agreeable to Blue Sky, and I have this in writing, I am prepared to resign immediately.
> Sincerely,
>
> Dr. Randall Jansma
>
> Sent from my iPhone
>
> On Sep 25, 2018, at 7:03 PM, Surya Desiraju <SDesiraju@BlueSkyVision.com> wrote:
>
>> Hello Randy,

Thank you for meeting with Phil and me this evening. From our conversation, I conclude that you would prefer sending in your letter.
Please reply-all. I CCed my colleague Melissa Dabrowski, she is the VP of HR for Blue Sky.

Surya Desiraju
Chief Operating Officer
M: 469.426.4602
E: SDesiraju@BlueSkyVision.com
4020 East Beltline Avenue NE
Grand Rapids, MI 49525

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission If verification is required please request a hard-copy version. Blue Sky Vision, 4020 Beltline Ave NE, Grand Rapids, MI www BlueSkyVision.com

From: Surya Desiraju <SDesiraju@BlueSkyVision.com>
Sent: Wednesday, January 16, 2019, 1:25 PM
To: Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
Subject: FW: follow up

---

Surya Desiraju
Chief Operating Officer

Blue Sky
VISION

M: 469.426.4602
E: SDesiraju@BlueSkyVision.com

4020 East Beltline Avenue NE
Grand Rapids, MI 49525

**From:** Surya Desiraju
**Sent:** Wednesday, September 26, 2018 7:55 PM
**To:** 'RANDY JANSMA' <doc2020@comcast.net>
**Cc:** Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
**Subject:** RE: follow up

Hi Randy,
Please see answers/additional information below:

**Balance of your salary**

The definition if earnings in your employment contract reads: "***Earnings***" a base pay for the first two years of this Agreement in the amount of $2,916.67 paid semi-monthly. In addition, you could possibly receive a quarterly bonus in the amount of (a) 30% of the Personal Net Collections and (b) 30% of the Permissible Share of the Division DHS Revenues and (c) 9% of contact lens and spectacle sales resulting from your practice, less base pay payments made during the calendar quarter. Your Earnings shall be calculated quarterly, and any Quarterly Bonus will be paid no later than thirty (30) days following the end of each calendar quarter. It should be noted that the semi-monthly draw would be the minimum of your compensation for the initial term of this Agreement.

Your salary draw is based on your base salary of $70,000 per year. The last day that you saw patients at GRO was on 9/14/18. The last day that you saw patients at Shoreline was on 9/25/28. Tomorrow 9/27 is our next pay day and it is through the week ending 9/21. The balance salary would be for the days that you worked this week. So it will be for one day that you worked at Shoreline on 9/25/18 which is the last day of your employment.

**Lifting all restrictive covenants**

Blue Sky leadership team reviewed your contract and your request. We cannot lift and adjust the restrictive covenants as spelled out in your employment agreement

**Balance due for patient files**
The terms pertaining to contingency compensation described in your 'purchase agreement and bill of sale' document are applicable based on your active employment status with Blue Sky Vision at the end of the term. Keeping in line with those terms, the balance due for patient files will be applicable for the files that got transferred during the period of your employment (June 5, 2018 through Sept 25, 2018). As per our records, a total of 17 patient files got transferred to GRO and 43 files got transferred to Shoreline Vision. So the amount payable would be $900 (=(17+43)*15).

**Continued health insurance**
In alignment with the Blue Sky Vision employment agreement and standard practice all benefits will terminate as of the last day of the month following termination of employment. COBRA continuation paperwork will be issued to you upon the termination of benefits in accordance with the law.

If you would still like to tender your resignation based on our mutual agreement as discussed, please let us know by close of business on Thursday, September 27th so that we can process the change in a timely manner. Let Melissa or me know if you have any additional questions.

Surya Desiraju
Chief Operating Officer

Blue Sky
VISION

M: 469.426.4602
E: SDesiraju@BlueSkyVision.com

4020 East Beltline Avenue NE
Grand Rapids, MI 49525

**From:** Randy Jansma <doc2020@comcast.net>
**Sent:** Wednesday, September 26, 2018 12:06 PM
**To:** Surya Desiraju <SDesiraju@BlueSkyVision.com>
**Subject:** Re: follow up

Hello Surya,
I am formulating a letter of resignation. I know we are both in need of getting this process underway and over.
There are some things we talked about yesterday that either need to be in my letter, or I need to see in writing, from Blue Sky Vision, LLC.
These things include paying me the balance of my salary, and lifting all restrictive covenants. I would also like the balance due for patient files, which is 20k, and my health insurance continued until the end of my proposed contract, or the prorated amount of the 13-14k allotted for this.
If this is agreeable to Blue Sky, and I have this in writing, I am prepared to resign immediately.

Sincerely,

Dr. Randall Jansma

Sent from my iPhone

On Sep 25, 2018, at 7:03 PM, Surya Desiraju <SDesiraju@BlueSkyVision.com> wrote:

Hello Randy,
Thank you for meeting with Phil and me this evening. From our conversation, I conclude that you would prefer sending in your letter.
Please reply-all. I CCed my colleague Melissa Dabrowski, she is the VP of HR for Blue Sky.

Surya Desiraju
Chief Operating Officer

<image002 jpg>

M: 469.426.4602
E· SDesiraju@BlueSkyVision com

4020 East Beltline Avenue NE
Grand Rapids, MI 49525

This message contains confidential information and is intended only for the individual named If you are not the named addressee you should not disseminate, distribute or copy this e-mail Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e mail from your system E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission If verification is required please request a hard-copy version Blue Sky Vision, 4020 Beltline Ave NE, Grand Rapids, MI www BlueSkyVision com

# Optometrist

**Purpose:**

Diagnose, manage, and treat conditions and diseases of the human eye and visual system. Examine eyes and visual system, diagnose problems or impairments, prescribe corrective lenses, and provide treatment. May prescribe therapeutic drugs to treat specific eye conditions.

**Education:**

Doctor of Optometry Degree

**Primary Responsibilities:**

- Examine eyes, using observation, instruments and pharmaceutical agents, to determine visual acuity and perception, focus and coordination and to diagnose diseases and other abnormalities such as glaucoma or color blindness.
- Analyze test results and develop a treatment plan.
- Prescribe, supply, fit and adjust eyeglasses, contact lenses and other vision aids.
- Prescribe medications to treat eye diseases if state laws permit.
- Educate and counsel patients on contact lens care, visual hygiene, lighting arrangements and safety factors.
- Consult with and refer patients to ophthalmologist or other health care practitioner if additional medical treatment is determined necessary.
- Perform minor procedures such as foreign body removal, punctual plugs, and epilation.
- Provide patients undergoing eye surgeries, such as cataract and laser vision correction, with pre- and post-operative care.
- Prescribe therapeutic procedures to correct or conserve vision.

**Knowledge/Skills/Abilities:**

- Knowledge of the information and techniques needed to diagnose and treat human injuries, diseases, and deformities. This includes symptoms, treatment alternatives, drug properties and interactions, and preventive health-care measures.
- Knowledge of principles and processes for providing customer and personal services. This includes customer needs assessment, meeting quality standards for services, and evaluation of customer satisfaction.
- Understanding the implications of new information for both current and future problem-solving and decision-making.
- Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate.
- Using logic and reasoning to identify the strengths and weaknesses of alternative solutions, conclusions or approaches to problems.
- Talking to others to convey information effectively.
- Communicating effectively in writing as appropriate for the needs of the audience.

EXHIBIT
PENGAD 800-631-6989
# 11
Dabrowski 3-1-21

From: Melissa Dabrowski <mdabrowski@BlueSkyVision.com>

Sent: Monday, October 8, 2018, 1:29 PM

To: Randy Jansma <doc2020@comcast.net>

Cc: Surya Desiraju <SDesiraju@BlueSkyVision.com>

Subject: Letter / Release

Attachments: BSV - Dr. Randall Jansma.pdf; Optometrist.pdf

Dr. Jansma,

Good Afternoon. I apologize for the delay in getting this to you. There are two physicians outside of the BSV provider network that our physicians are suggesting would be the right specialty. The two are Dr. Glisson or Dr. Santos. Per your request last Friday I've attached a copy of the letter and release form that that will be sent to either Dr. Glisson or Dr. Santos.

Can you please let me know which you would prefer to see and then I will update the attached letter and address to them accordingly? Thanks!

Regards,

Melissa Dabrowski
VP of Human Resources

Blue Sky
VISION

4020 East Beltline Ave NE
Grand Rapids, MI 49525

Office 616.588.6574
Mobile 989.492.4906

EXHIBIT #14 Dabrowski 3-1-21
PENGAD 800-631-6989

Blue Sky VISION

ADDRESS LINE 1
ADDRESS LINE 2

Dear Dr. ___________:

Dr. Jansma has notified BSV that he has homonymous hemianopia, which has created concerns about whether Dr. Jansma can safely perform his job as an Optometrist, with or without reasonable accommodation.

In order to appropriately evaluate and respond to this issue, we need more information about Dr. Jansma's impairment(s) and whether he can perform his job with or without any accommodation.

To assist you in responding to the questions below, we have attached a list of the essential functions of Dr. Jansma's position. Specifically, is he able to thoroughly exam the eye to find pathology, including seeing the entire surface and internal structures of the eye without missing areas of concern which can lead to irreversible loss of vision or missing systemic diseases that could be diagnosed based on ocular findings. We want to be sure that Dr. Jansma is not placed in a job position that he is unable to perform and/or that could place patients or others at risk. Please note that the attached list is specific to Dr. Jansma's current job at BSV. In the event that he seeks a different position, BSV will likely ask you to provide an opinion with regard to that particular position.

Please answer the below questions. We have enclosed a release signed by Dr. Jansma giving you permission to respond directly to BSV.

1. Does Dr. Jansma have a physical or mental impairment? If so, please describe such impairment(s) in detail.

2. What is causing Dr. Jansma's impairment?

3. Do you expect that impairment to change for the worse or for the better? If so, please explain how it might change and the expected timeframe for that change to occur.

4. Using the attached list, can Dr. Jansma perform the essential functions of his job?

5. If Dr. Jansma cannot perform one or more of his essential job functions, is there a reasonable accommodation that would allow him to perform the function? Note that a continuous leave of absence might be a reasonable accommodation in some circumstances but that permission to have unreliable and unpredictable attendance is generally not. Please answer with regard to each job function separately, identifying the proposed accommodation and how that accommodation will assist Dr. Jansma.

6. How long do you expect that Dr. Jansma will need each accommodation?

7. Do you expect that the needed accommodation(s) will change? If so, what is the expected time frame?

8. Is Dr. Jansma currently able to safely perform each of the job functions in the attached list?

9. Is there a significant risk that any of the job functions in the attached list could cause substantial harm to Dr. Jansma or others? If so, please explain.

10. Is there an accommodation that could eliminate or reduce the risk of harm to Dr. Jansma or others? If so, please explain.

Should you have any questions or need any additional information, please feel free to contact me. Please send your response directly to my attention at BSV.

Sincerely,

Melissa Dabrowski
VP of Human Resources

**AUTHORIZATION FOR RELEASE**

**OF HEALTH INFORMATION**

1. Individual's Name: Dr. Randall Jansma
   Date of Birth: 03/19/1953

2. I authorize ____________________________ to release or disclose health information (as disclosed below) of the above named individual to: Blue Sky Vision ("BSV").

3. This authorization is made in accordance with federal and state law and is valid for twelve (12) months after being signed or at the conclusion of this legal action, which is either pending or contemplated, whichever occurs later.

4. I understand that I may revoke this authorization at any time by sending a written revocation to the provider listed in paragraph 2, except to the extent that action has already been taken in reliance on this authorization.

5. I understand that once information is used or disclosed pursuant to this authorization, it may be subject to re-disclosure or release by BSV and may no longer be protected by federal or state law.

6. A description of the information I authorize for use or disclosure is: All pharmacy records; dental records; any and all records and documents pertaining to any treatment/consultation rendered or performed, including but not limited to: complete in-patient and outpatient hospital records, surgical records, emergency room records, rehabilitation records, therapy, lab studies, radiographic films and reports, actual office notes, patient files, narrative reports, billings, and medications prescribed and/or filled. This authorization includes alcohol, mental health and substance abuse records, including psychotherapy notes; records protected under the regulations of 42 Code of Federal Regulations, Part 2, if any; HIV and AIDS records, and all records defined by statute and MDPH Rules (Public Act 174, 1989), if any. This authorization also permits oral communications regarding the listed information between agents of BSV and the provider identified in paragraph 2. This authorization includes information prior to and following the date of this authorization not to exceed the expiration defined in paragraph 3.

7. I understand that my continued or future treatment by or payment to the provider listed in paragraph 2 is not conditioned upon my providing or signing this authorization.

9. A photo static copy of this authorization is as valid as the original.

10. I have been provided a copy of this authorization.

Dated: ____________, 2018 ________________________________________

MJ_DMS 30092420v1

From: Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
Sent: Wednesday, December 5, 2018, 10:34 AM
To: RANDY JANSMA <doc2020@comcast.net>
Cc: Surya Desiraju <SDesiraju@BlueSkyVision.com>
Subject: Notice of Termination
Attachments: Dr_ Jansma.pdf

---

Dr. Jansma,
Please see the attached. You will also receive an official copy via mail to your address of record.

Regards,

Melissa Dabrowski
VP of Human Resources

Blue Sky VISION

4020 East Beltline Ave NE
Grand Rapids, MI 49525

Office 616.588.6574

EXHIBIT
#16
Dabrowski 3-11-21
PENGAD 800-631-6989

Blue Sky
VISION

TO: Dr. Randy Jansma
3504 Earle Ave SW
Grandville, MI 49418

FROM: Surya Desiraju, Chief Operating Office

CC: Human Resources
Personnel File

DATE: December 5, 2018

RE: Termination Notice

After repeated attempts to engage with you regarding scheduling of a fitness of duty assessment to allow for your return to work, as of today, we are still not in receipt of the authorization for release of information about your fitness for duty. Nor have you cooperated with our repeated attempts to schedule an appointment with the physician you chose for the evaluation. Our initial discussions took place over two months ago, and despite repeated attempts to obtain the signed release and schedule an appointment, we have not been able to progress this forward. You have not responded to the HR teams last 2 emails to you dated 10/29 and 11/8.

This letter serves as official notification that your last day of active work was September 25th and your employment with BSV will be terminated effective immediately. We remind you at this time of all policies, including noncompete and nondisclosure agreements, that you may have signed at the beginning of your employment and the fact that many retain your commitment beyond the duration of your employment.

You will be in receipt of information regarding any 401(k) funds and COBRA benefits notification, as applicable.

Should you have any questions beyond today's discussion, you may contact me at 469-426-4602 or Melissa Dabrowski VP of Human Resources at 616-588-6574.

Regards,

Surya Desiraju
Chief Operating Officer

From: Bill Hughson <bhughson@BlueSkyVision.com>
Sent: Friday, August 3, 2018, 5:26 PM
To: Surya Desiraju <SDesiraju@BlueSkyVision.com>; Zachary Smith <ZSmith@seeitclear.com>; Dan Hosler <dhosler@BlueSkyVision.com>; "Brian A. Hamilton" <bhamilton@BlueSkyVision.com>
Subject: Call from Sam May

---

Surya and Zach, for your consideration as we try to solve this somewhat knotty situation:

Sam worked with Randy Jansma this afternoon, and it sounds like while she handled it extremely well and professionally (no surprise there!), it was still a very difficult situation.

She reports that none of the other scribes have been able to get him to touch the computer at all. Sam has gotten him to (reluctantly) try a little bit, but he was very negative about the system and his ability to us it, complaining that he's a slow typer, that if we're going to force him to use the system we need to adjust his template to fewer patients, etc. Fundamentally, he's really not happy. At the same time, Sam reports that some of the other OD's without scribes are griping because Jansma is getting a scribe and they aren't, even though they're seeing more patients.

I don't see any great solution here. While Sam believes that Jansma could learn to use the system, it's clear that he really doesn't want to.

Last we spoke we thought the best thing was to have Amy and Phil sit down with him to talk about it. That's probably still the best next step, but based on what I just heard from Sam I'm not so optimistic...

Bill Hughson
Chief Executive Officer
Blue Sky
VISION
M: 331.645.3906
O: 616.588.6583
Assistant: Stephanie Preston |616.799.1167 | spreston@BlueSkyVision.com
4020 East Beltline, NE Suite 200
Grand Rapids, MI 49525

EXHIBIT
PENGAD 800-631-6989
#19
Desiraju
1-28-21

**Amy Dunleavy**

**From:** Amy Dunleavy
**Sent:** Friday, October 5, 2018 12.52 PM
**To:** Melissa Dabrowski
**Subject:** FW: Jansma

**From:** Amy Dunleavy
**Sent:** Monday, September 17, 2018 10:34 AM
**To:** Phil Vanderlugt, OD <PVanderlugt@seeitclear.com>
**Cc:** Zachary Smith <ZSmith@seeitclear.com>
**Subject:** Jansma

Good morning,
I had a nice conversation with Dr. Gohel last week regarding Dr. Jansma.
He expressed concerns in his clinical ability, specifically those that were referred to Gohel for pathology when there was nothing present after Dr. Gohel's exam. He would like to discuss further at your convenience.
I have also been given some information from Melissa Anderson that you may want to touch base with her on feedback from her optical team. Her team has expressed some of the same concerns I am getting in clinic.
Derogatory comments and an uneasiness when with him.
Thank you for your continued efforts to make for a great work environment and fantastic patient experience.

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

EXHIBIT #25 Vanderlugt 3-29-21
PENGAD 800-631-6989

**Amy Dunleavy**

**From:** Amy Dunleavy
**Sent:** Friday, October 5, 2018 12:52 PM
**To:** Melissa Dabrowski
**Subject:** FW: Dr. Jansma

**From:** Maylyn Apsey
**Sent:** Tuesday, September 4, 2018 8:18 AM
**To:** Amy Dunleavy <adunleavy@seeitclear.com>
**Subject:** RE: Dr. Jansma

Laura feels that he is condescending towards scribes and patients at times. Also, feels he is sometimes sexist.

Megs was told by Sam May that he's horrible.

Maylyn Apsey, COA, OSC
Walker Clinic Manager

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

3300 Walker View Dr.
Walker, MI 49544

P 616.949.2600
F 616.588.6516
www.seeitclear.com

**From:** Amy Dunleavy
**Sent:** Tuesday, September 04, 2018 6:50 AM
**To:** Maylyn Apsey <mapsey@seeitclear.com>; Georgie Shaw <gshaw@seeitclear.com>
**Subject:** Dr. Jansma

Maylyn and G-
In response to the lack of scribe for Dr. Jansma on Friday, I am collecting specific data on why our scribes do not want to work with him.
Although it not an easy conversation, I am looking for details of what exactly he said or has done to make these great team members free uncomfortable.
Thank you for your help!

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

EXHIBIT #32 Dunleavy 12-17-20 PENGAD 800-631-6989

GRAND RAPIDS OPHTHALMOLOGY

Eye Care | Surgery | Laser Correction

**Amy Dunleavy**

**From:** Amy Dunleavy
**Sent:** Friday, October 5, 2018 12.52 PM
**To:** Melissa Dabrowski
**Subject:** FW: Jansma

**From:** Amy Dunleavy
**Sent:** Monday, September 17, 2018 10:34 AM
**To:** Phil Vanderlugt, OD <PVanderlugt@seeitclear.com>
**Cc:** Zachary Smith <ZSmith@seeitclear.com>
**Subject:** Jansma

Good morning,
I had a nice conversation with Dr. Gohel last week regarding Dr. Jansma.
He expressed concerns in his clinical ability, specifically those that were referred to Gohel for pathology when there was nothing present after Dr. Gohel's exam. He would like to discuss further at your convenience.
I have also been given some information from Melissa Anderson that you may want to touch base with her on feedback from her optical team. Her team has expressed some of the same concerns I am getting in clinic.
Derogatory comments and an uneasiness when with him.
Thank you for your continued efforts to make for a great work environment and fantastic patient experience.

*Leading the way. Improving sight. Changing lives.*

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

**Amy Dunleavy**

| | |
|---|---|
| **From:** | Amy Dunleavy |
| **Sent:** | Friday, October 5, 2018 12:53 PM |
| **To:** | Melissa Dabrowski |
| **Subject:** | FW: Dr. Jansma |
| **Importance:** | High |

**From:** Amy Dunleavy
**Sent:** Wednesday, August 15, 2018 12:46 PM
**To:** Phil Vanderlugt, OD <PVanderlugt@seeitclear.com>
**Cc:** Zachary Smith <ZSmith@seeitclear.com>
**Subject:** FW: Dr. Jansma
**Importance:** High

PLEASE READ

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

**From:** Georgie Shaw
**Sent:** Wednesday, August 15, 2018 11:02 AM
**To:** Amy Dunleavy <adunleavy@seeitclear.com>
**Subject:** Dr. Jansma

Hey lady. I wanted to let you know that it's been a little rough for Jared and Dr. Jansma today. Jared has been insisting Dr. Jansma do computer work himself and there's been some tension. There was also some back and forth bickering about a contact lens patient and whether Dr. Jansma was supposed to be seeing them. Jared has been putting his foot down with Dr. Jansma pretty hardcore today (which I really really think needs to happen more often as he seems to think he's running the joint). I thought I'd let you know.

☺ Happy thoughts! ☺

Georgianna Shaw, COA
Clinic Manager of Grandville Office

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

4475 Wilson Ave SW
Grandville, MI 49418

616-588-6528

**Amy Dunleavy**

| | |
|---|---|
| **From:** | Amy Dunleavy |
| **Sent:** | Friday, October 5, 2018 12:53 PM |
| **To:** | Melissa Dabrowski |
| **Subject:** | FW. SV Dr. Jansma |

**From:** Amy Dunleavy
**Sent:** Wednesday, July 25, 2018 10:14 AM
**To:** Zachary Smith <ZSmith@seeitclear.com>
**Cc:** Surya Desiraju <SDesiraju@BlueSkyVision.com>
**Subject:** SV Dr. Jansma

Good morning,
I had a conversation with Jeanine from Shoreline Vision this morning and would like to include Michelle Cassens in the meeting that I have requested with Dr. Jansma.
It seems they are also having the same challenges with him as we are on the GRO side.
We would like to be on the same page, sooner than later please.
It is beginning to affect staff in the clinic.
I think we just need clear direction from all parties so that we can move forward in a positive manner.
Thank you for expediting this for both locations.

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

**Amy Dunleavy**

**From:** Amy Dunleavy
**Sent:** Friday, October 5, 2018 12:53 PM
**To:** Melissa Dabrowski
**Subject:** FW: Dr. Jansma

-----Original Message-----
From: Amy Dunleavy
Sent: Wednesday, July 25, 2018 8:01 AM
To: Dan Hosler <dhosler@Blueskyvision.com>; Joel Catlin <jcatlin@Blueskyvision.com>
Cc: Brian A. Hamilton <bhamilton@Blueskyvision.com>; Zachary Smith <ZSmith@seeitclear.com>
Subject: RE: Dr. Jansma

Good morning,

May I suggest that we meet with him to review this as well as his expectations for clinic? I am getting conflicting information.
He has let me know that he will "not back down" on having a scribe full time immediately.
I do not have the staff for this and cannot, in good conscience, offer this since I have several OD's that are in the process of earning a scribe per patient load (and are seeing twice the patients per day) and are next in line for a full time scribe.

Please let me know how to proceed.
Thank you.

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA Director of Clinical Operations
616.949.2600

-----Original Message-----
From: Dan Hosler
Sent: Tuesday, July 24, 2018 7:49 AM
To: Joel Catlin <jcatlin@BlueSkyVision.com>; Amy Dunleavy <adunleavy@seeitclear.com>
Cc: Brian A. Hamilton <bhamilton@BlueSkyVision.com>
Subject: Re: Dr. Jansma

That is not correct, all of the fixtures and furnishings were included in the purchase. For tax purposes we did not allocate any value to those items, but the asset purchase agreement was all assets.

I confirmed this with counsel.

Dan

Daniel Hosler
Chief Development Officer

M: 312.218.3966
E: dhosler@BlueSkyVision.com

4020 East Beltline NE
Grand Rapids, MI 49525

On 7/24/18, 7:44 AM, "Joel Catlin" <jcatlin@BlueSkyVision.com> wrote:

Peggy Jansma told us the furnishings weren't included in the contract. Is this correct?

She said that they are selling everything and would sell us the chairs for $50 each. Not sure that's worth it.

Thank you,
Joel Catlin

**Amy Dunleavy**

**From:** Amy Dunleavy
**Sent:** Friday, October 5, 2018 12:53 PM
**To:** Melissa Dabrowski
**Subject:** FW: Dr. Jansma

-----Original Message-----
From: Amy Dunleavy
Sent: Tuesday, July 24, 2018 9:15 AM
To: Surya Desiraju <SDesiraju@BlueSkyVision.com>; Zachary Smith <ZSmith@seeitclear.com>
Subject: FW: Dr. Jansma

Zach/Surya,
Can we meet with Dr Jansma.
It seems we continue to find conflicting expectations.
As you can see from my email yesterday, he is displeased with the clinical expectations.

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA Director of Clinical Operations
616.949.2600

-----Original Message-----
From: Dan Hosler
Sent: Tuesday, July 24, 2018 7:49 AM
To: Joel Catlin <jcatlin@BlueSkyVision.com>; Amy Dunleavy <adunleavy@seeitclear.com>
Cc: Brian A. Hamilton <bhamilton@BlueSkyVision.com>
Subject: Re: Dr. Jansma

That is not correct, all of the fixtures and furnishings were included in the purchase. For tax purposes we did not allocate any value to those items, but the asset purchase agreement was all assets.

I confirmed this with counsel.

Dan

Daniel Hosler
Chief Development Officer

M: 312.218.3966

E: dhosler@BlueSkyVision.com

4020 East Beltline NE
Grand Rapids, MI 49525

On 7/24/18, 7:44 AM, "Joel Catlin" <jcatlin@BlueSkyVision.com> wrote:

Peggy Jansma told us the furnishings weren't included in the contract. Is this correct?

She said that they are selling everything and would sell us the chairs for $50 each. Not sure that's worth it.

Thank you,
Joel Catlin

**Amy Dunleavy**

| | |
|---|---|
| **From:** | Amy Dunleavy |
| **Sent:** | Friday, October 5, 2018 12:53 PM |
| **To:** | Melissa Dabrowski |
| **Subject:** | FW: Scribe |

**From:** Amy Dunleavy
**Sent:** Friday, July 20, 2018 1:45 PM
**To:** Randy H. Jansma, OD <RJansma@seeitclear.com>
**Subject:** RE: Scribe

Hello again,

To clarify, 12-14 is a full optometrist template and 15-18 is to qualify for a scribe.
My apologies if I was not clear in our conversation.

Thank you.

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

**From:** Randy H. Jansma, OD
**Sent:** Friday, July 20, 2018 1:18 PM
**To:** Amy Dunleavy <adunleavy@seeitclear.com>
**Subject:** Re: Scribe

Good afternoon Amy,
I believe what you said before was 12-13 patients per half day to retain a full time scribe. I am ready, willing, and able to do that for you.
I feel that would be much more productive than me acting as a scribe and a doctor.
Best,

Dr. Randy Jansma

Sent from my iPhone

On Jul 20, 2018, at 1:13 PM, Amy Dunleavy <adunleavy@seeitclear.com> wrote:

Good afternoon Dr. Jansma,

I wanted to let you know that I spoke to Surya and we are unable to offer you a full time scribe in clinic at this time.
I do plan to offer one for 2 more weeks to allow you to get acclimated to the Nextgen system.
I would like to offer more one on one time for you with Sam May in Nextgen training if you feel this would be helpful.
We can certainly offer a full time scribe once we build your schedule to the 15-18 patients per ½ day.
I will plan to touch base with you next week at some point so that we can discuss your concerns.

Thank you for your understanding.

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

<image001.png>

From: Amy Dunleavy <adunleavy@seeitclear.com>
Sent: Friday, October 5, 2018, 12:52 PM
To: Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
Subject: FW: Jansma

---

This was a day I could not find anyone that would work with Dr. Jansma due to the previous complaints. Jared changed his plans for the day to accommodate.

**From:** Amy Dunleavy
**Sent:** Wednesday, September 5, 2018 1:24 PM
**To:** Jared W. Holmes <jholmes@seeitclear.com>
**Subject:** Jansma

THANK YOU SO MUCH for agreeing to stay this afternoon to help in Dr. Jansma's clinic.
I would like to buy you lunch. Please tell me your favorite place!
You are the best!

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

From: Amy Dunleavy <adunleavy@seeitclear.com>
Sent: Friday, October 5, 2018, 12:53 PM
To: Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
Subject: FW: Jansma

---

**From:** Amy Dunleavy
**Sent:** Monday, July 16, 2018 7:47 AM
**To:** 'Jeanine Schmiege' <JSchmiege@shorelinevision.com>
**Subject:** RE: Jansma

Good morning Jeanine,
I will keep you posted on Dr. Jansma when I get ahold of his contract.
As far as drops, we can always use them. Thank you for the offer.
I will reach out to my inventory manager to see if we can share some of our injectable IV fluorescein.

Have a great day!

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

**From:** Jeanine Schmiege [mailto:JSchmiege@shorelinevision.com]
**Sent:** Thursday, July 12, 2018 2:05 PM
**To:** Amy Dunleavy <adunleavy@seeitclear.com>
**Subject:** RE: Jansma

Amy,

I too had this conversation with Dr. Jansma that I cannot offer him a full time scribe. I explained that my supervisor is there to assist him until he is up and running. I do not have the extra staffing to staff him with a workup tech and a scribe. He alluded to me as well, that he was "promised" a scribe. Hopefully as things settle down for him he will come to realize that EHR is not that bad once you get in there and start using it.

On another note, we have an abundance of Tropicamide 15ml that we will not use. Are you interested in us sending you some. They have been opened and used once. (If you call I can explain where they came from)
Also, we have been informed that the injectable IV fluorescein is on backorder until the end of this month or early August if we were to run out before we receive a shipment do you think that we could barrow from GRO in a pinch, providing that you have extra to spare?

*Thanks,*
*Jeanine*

**From:** Amy Dunleavy [mailto:adunleavy@seeitclear.com]
**Sent:** Thursday, July 12, 2018 11:28 AM
**To:** Jeanine Schmiege
**Subject:** RE: Jansma

Jeanine,
We have had the same experience and he is insisting that he was promised a full time, long term scribe.
I am working on getting clarification on this.
Also, Dr. Jansma did say that he met with Dr. Riker and was pleased with their visit.
Have a great day!

Leading the way. Improving sight Changing lives

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care Surgery | Laser Correction

**From:** Jeanine Schmiege [mailto:JSchmiege@shorelinevision.com]
**Sent:** Thursday, July 12, 2018 8:45 AM
**To:** Amy Dunleavy <adunleavy@seeitclear.com>
**Subject:** RE: Jansma

Amy,

Thank you for getting back with me. We too, have a plastic bin overflowing with returned letters. We can certainly suggest to Dr. Jansma that we can do additional training with maneuvering through IMW during his down times. He was a bit reluctant with the one-on-one training we offered him prior to going live with patients. It is certainly worth offering him more training if he is open to it. I think it has been very overwhelming for him. Dr. Riker also offered to assist him

with the Fremont flow and assistance with the OCT interpretation. He seemed open to this idea but I am not sure if he has met with Dr. Riker or not.

*Thanks,*
*Jeanine*

**From:** Amy Dunleavy [mailto:adunleavy@seeitclear.com]
**Sent:** Thursday, July 12, 2018 7:55 AM
**To:** Jeanine Schmiege
**Subject:** Jansma

Good morning Jeanine,
So sorry for the delay in responding to your voicemail regarding Dr. Jansma.
I have moved out of the Rockford clinic and have a desk at the Admin building but have not spent much time there.
With my new "freedom" I have been traveling from clinic to clinic hosting 1:1 with doctors and managers. It has been fun but my voicemails are suffering.
As far as Dr. Jansma goes, Surya said he would reach out to Michelle when she is back from vacation.
In a nutshell, no, he does not have to stay if you do not need him. Perhaps he would be open to more Eyemedic training in downtime?
Our hope was that he would fill his day with his previous patients. We have been getting a large number of the letters we sent out, back.
I hope this is helpful.
Have a great day!

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

---

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Blue Sky Vision, 4020 Beltline Ave NE, Grand Rapids, MI www.BlueSkyVision.com.com

**Total Control Panel** Login

To. jschmiege@shorelinevision com
From adunleavy@seeitclear com

Message Score 1
My Spam Blocking Level Medium

Block this sender
Block seeitclear com

High (60) Pass
Medium (75) Pass
Low (90) Pass

*This message was delivered because the content filter score did not exceed your filter level*

Disclaimer: This e-mail and any attachments are intended for the sole use of the addressee listed. It may contain confidential, proprietary and/or legally privileged information. If you are not the intended recipient please notify the sender by return e-mail or call our corporate Information Technology Manager at (231) 739 9009 and delete the e-mail. Unauthorized use, dissemination, distribution or copying of this e-mail or attachments, in whole or in part is strictly prohibited and may be unlawful. Please note that emails are susceptible to change and we shall not be responsible or liable for the proper and complete transmission of the information contained herein, delay in its receipt or damage to your systems. We do not guarantee that the integrity of this email has been maintained or that this email is free of viruses, interception or interference.

---

This message contains confidential information and is intended only for the individual named If you are not the named addressee you should not disseminate distribute or copy this e-mail Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted corrupted, lost, destroyed, arrive late or incomplete, or contain viruses The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission If verification is required please request a hard-copy version Blue Sky Vision 4020 Beltline Ave NE, Grand Rapids MI www BlueSkyVision com com

---

**Total Control Panel** Login

To jschmiege@shorelinevision.com
From adunleavy@seeitclear.com

Message Score· 50
My Spam Blocking Level Medium

Block this sender
Block seeitclear com

High (60) Pass
Medium (75) Pass
Low (90) Pass

*This message was delivered because the content filter score did not exceed your filter level*

Disclaimer: This e-mail and any attachments are intended for the sole use of the addressee listed. It may contain confidential, proprietary and/or legally privileged information. If you are not the intended recipient please notify the sender by return e-mail or call our corporate Information Technology Manager at (231) 739 9009 and delete the e-mail. Unauthorized use, dissemination, distribution or copying of this e-mail or attachments, in whole or in part is strictly prohibited and may be unlawful. Please note that emails are susceptible to change and we shall not be responsible or liable for the proper and complete transmission of the information contained

herein, delay in its receipt or damage to your systems. We do not guarantee that the integrity of this email has been maintained or that this email is free of viruses, interception or interference.

From: Amy Dunleavy <adunleavy@seeitclear.com>
Sent: Friday, October 5, 2018, 12:52 PM
To: Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
Subject: FW: Jansma Pt complaint

---

**From:** Amy Dunleavy
**Sent:** Monday, September 3, 2018 6:49 PM
**To:** Georgie Shaw <gshaw@seeitclear.com>
**Subject:** FW: Pt complaint

FYI

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care Surgery | Laser Correction

**From:** Ruth N. Aguilar
**Sent:** Thursday, August 30, 2018 11:02 AM
**To:** Amy Dunleavy <adunleavy@seeitclear.com>
**Subject:** Pt complaint

Good morning,

Pt Katy Karsten MRN 533730 was seen 8/29 with Dr.Jansma at the Grandville office. She complained that Dr.Jansma had bad bedside manner and didn't really trust his diagnoses. Pt stated that that Dr. Jansma told her that there was a change in her prescription but didn't say what to do about it. Pt is scheduled for a cornea check with TholenAs on 8/31 at GDVL for a second opinion. Please contact Katy at 616.581.7755. Thank you

Ruth Aguilar Patient Relations
GRAND RAPIDS OPHTHALMOLOGY

2822 E. Beltline Lane NE
Grand Rapids, MI 49525
seeitclear.com

616.588.6541

From: Amy Dunleavy <adunleavy@seeitclear.com>
Sent: Friday, October 5, 2018, 12:52 PM
To: Melissa Dabrowski <mdabrowski@BlueSkyVision.com>
Subject: FW: Dr. Jansma
Attachments: DrJansma feedback.docx

**From:** Amy Dunleavy
**Sent:** Wednesday, September 5, 2018 9:43 AM
**To:** Zachary Smith <ZSmith@seeitclear.com>; Phil Vanderlugt, OD <PVanderlugt@seeitclear.com>
**Subject:** Dr. Jansma

Good morning,
Zach, you had asked that I get feedback from some of the scribes regarding Dr. Jansma.
I have made a document and attached.
Getting a scribe for him has become increasingly difficult as some are refusing to work with him due to these complaints.
I am not comfortable forcing someone to work with him.
Please let me know how you would like me to proceed.
I am working on finding a scribe for him this afternoon but may have to resort to paper again if I am unable to find someone.
Thank you for making this a priority.

Leading the way. Improving sight. Changing lives.

Amy J. Dunleavy, CPO COA
Director of Clinical Operations
616.949.2600

GRAND RAPIDS OPHTHALMOLOGY
Eye Care | Surgery | Laser Correction

Dr. Jansma Complaints from staff and managers:

- From a lead tech: XXX contacted me and said that Dr.Jansma was getting frustrated with the contact lens page and sending in medications to pharmacy's and started raising his voice at a tech. This is not the 1st time he has done this when he gets frustrated with the system. He also will walk away and tell us to figure it out when something happens that he does not like. He has done this with me several times and also with the scribes. I feel that he is very capable of learning the system and knows how to do most of it but he feels that he is entitled to a permanent scribe so he is taking advantage of it until the 14th. Also, I have had several employees come up to me and tell me that he is being very rude with making comments about patients ethnicity, race and sexual orientation. If something could be addressed with him that would be great because it has been a continuous struggle trying to find someone to scribe with him and employees at this office are not fond of working with him.
- Tech/scribe XX feels that he is condescending towards scribes and patients at times. Also, feels he is sometimes sexist. (this has come up with 3 of the scribes)
- Dr. can be condescending to patients and makes snide comments after patient leaves the room related to hygiene, gender, income (insurance).