**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br>Plaintiff,<br>v.<br>BLUE SKY VISION, LLC,<br>Defendant. | Case No. 1:20-cv-285-PLM-RSK<br>Honorable Paul L. Maloney |

**Plaintiff Equal Employment Opportunity Commission's Brief in Opposition to Defendant Blue Sky Vision's Motion for Summary Judgment**

## I. INTRODUCTION

Under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-17, the Equal Employment Opportunity Commission ("the Commission") filed suit against Defendant Blue Sky Vision, LLC ("Defendant" or "BSV") on behalf of the charging party, Randall Jansma ("Jansma"). BSV violated the ADA by placing Jansma on a leave of absence because it regarded him as disabled; subjecting Jansma to an unlawful, disability-related medical inquiry; and terminating his employment because it regarded him as disabled. BSV has filed a Motion for Summary Judgment. However, as fully discussed below, summary judgment is inappropriate because, viewing the record in the light most favorable to the Commission, there are material facts in

dispute that demonstrate BSV is not entitled to judgment as a matter of law. The Commission therefore requests that the Court deny Defendant's motion and allow this lawsuit to proceed to trial.

## II. STATEMENT OF UNDISPUTED FACTS

### A. Company Information

Defendant was established in 2017 and is "a partnership among" several optometrist and ophthalmologist practices. (Exh. A, Hamilton Dep. Tr., at 13:22-24) (Exh. B, BSV Website). Grand Rapids Ophthalmology ("GRO") and Shoreline Vision ("SV) were two practices that were a part of BSV's organization.[1] Although BSV has over 500 employees, Melissa Dabrowski, BSV's Vice President of Human Resources, was the only member of BSV's human resources department during the company's first year. (Exh. C, Dabrowski Dep. Tr., at 10:4-7; 12:4-5; 91:1-4). In 2017 and in 2018, BSV did not have one uniform employee handbook that applied to all BSV employees who worked at its various doctors' offices. (Exh. C at 14:8-12). Instead, each office's handbook that was in effect before it joined BSV would later apply to the BSV employees working there. *Id.* These offices had "managers" who acted as "pseudo-HR" people in dealing with employee issues; however, they generally did not have the authority to hire or terminate employees. (Exh. C at 11:15-24; 12:6-13;13:20-14:2). For example, at GRO, Amy Dunleavy was employed as director of clinical

[1] BSV sold some of its "partnership" practices to Eye Care Partners in December of 2020. Consequently, GRO is no longer a part of BSV. (Exh. M at 11:3-9).

operations and Zachary Smith was the executive director. (Exh. D, Dunleavy Dep. Tr. at 11:2-8). Michelle Cassens was the Executive Director at SV. (Exh. E, Cassens Dep. Tr. at 11:10-15). They looked to Dabrowski for guidance on handling employee issues. (Exh. C at 14:1-2). Cassens, Dunleavy, and Smith reported to Surya Desiraju, BSV's Chief Operating Officer. (Exh. E at 18:6-7; 46:8-10) (Exh. D. at 52:5-7) (Exh. K, Desiraju Dep. Tr. at 27:15-20).

### B. Jansma Has Practiced Optometry For Over Thirty Years

Jansma has practiced optometry since 1989. (Exh. F, Press Release) (Exh. G. Jansma Dep Tr., at 10:4-5). In 1998, Jansma established his own practice, Jansma Family Eye Care, Inc. (JFEC"). (Exh. F) (Exh. G at 12:1-5). At JFEC, Jansma examined patients for general optometry issues and provided other services. (Exh. G at 12:14-15). At JFEC, Jansma did not use an electronic health or medical record ("EHR" or "EMR") system to record his examination findings. Jansma's patient files were all on paper. (Exh. G at 14:1-6; 82:18). Accordingly, Jansma did not employ any "scribes," whose job is to key-in a doctor's dictated findings into an EMR system. (Exh. G at 150:24-25) (Exh. E at 24:21-25).

### C. Jansma Was Diagnosed With Homonymous Hemianopsia But His Condition Did Not Affect His Ability to Do His Job

On August 31, 2012, Jansma woke up with a headache (Glazer Dep. Tr., Exh. I at 11:15-18). (Exh. O, VRA Med. Records, VRA00006). When his headache persisted, he suspected that he had a retinal detachment (Exh. G. at 16:7-13). Jansma went to be

examined by Dr. Louis Glazer, an ophthalmologist who specializes in retinal disease. (Exh. G at 16:5;; 17:2-3) (Exh. I at 8:17; 21-23). The examination revealed that Jansma likely had a "stroke" because "he had a right hemianopia where you get visual loss in both eyes on the right side." (Exh. I at 14:9-11). Glazer sent Jansma to the emergency room where a stroke was confirmed (Exh. I at 14:14-18 (Exh. O, VRA000010). (Exh. G at 15:1-8). The stroke caused Jansma to have homonymous hemianopsia ("Medical Condition"), which affects his "side vision" (Exh. I at 14:6; 14:19-15:7; 15:16-17) ("[w]hen you look straight ahead, that means half of your side vision is gone . . . even though you can see well straight ahead"). Homonymous hemianopsia is a "specific pattern of visual field loss" that can improve. (Exh. L, Glisson Dep. Tr. at 9:3-5) (Exh. I at 29:9-11) ("people with visual field defects . . . can get a little better over time").

According to Glazer, Jansma's "vision was good in 2012 [his "visual acuity was 20/30 and 20/25] and *it has been good in subsequent exams* even though . . . the peripheral vision is diminished."(Exh. I at 16:20-23; 17:14-16) (emphasis added). Despite his diagnosis, Jansma "sees pretty well using his central vision," i.e., when he looks "straight ahead." (Exh. I at 17:1-11). But when he is looking straight ahead, he cannot "see well to the right" of either eye. (Exh. I at 17:21-23). Jansma can, however, compensate for his right-side vision by simply turning his head to the right. (Exh. I. at 17:24-18:9) ("if he turns his head to the right, . . . he . . . [can] see what's to the right of him. . . "if you tilt your head in the direction you want to look at, then the

side vision doesn't come into play. If he moves his head to the right, he can see to the right."). Jansma was therefore able to work as an optometrist even after he received his diagnosis. (Exh. I at 29:21-30:6; ).

In 2018, Jansma began considering retirement. So he and his then-wife placed an advertisement in a local publication to sell JFEC. (Exh. G at 29:9-18) (Exh. A at 24:14-16). Brian Hamilton ("Hamilton"), BSV's Managing Director, contacted them in response to the ad. (Exh. A at 15:25; 24:18-25:8 ) (Exh. G at 30:13-17). Before Hamilton called, Jansma had previously heard about BSV while attending a convention. (Exh. G at 28:1-2) (Exh. M, Vanderlugt Dep. Tr. at 19:5-20:12). At the convention, Dr. Phil Vanderlugt, a BSV optometrist, told Jansma that BSV was looking to purchase optometrist practices. (Exh. G at 28:1-11). BSV "had hired or partnered with other practices where physicians were looking at exit strategies from their current situation." (Exh. M at 20:4-5).

When buying a practice, BSV has a due-diligence process, but it does not obtain references of the practice's doctors. Nor does BSV speak to the doctors' patients about the treatment they have received. (Exh. A at 22:9-14). At closing, BSV compensates the doctors for their practice and they become BSV employees. (Exh. A at 22:15-21).

Hamilton met with Jansma in January of 2018. (Exh. A at 24:20-25:2). During negotiations, BSV learned that, unlike the doctors at BSV, Jansma did not use an EMR system in his practice. (Exh. A at 49:6-9). Nevertheless, by March 19, 2018

(approximately two months after meeting Jansma), BSV offered to purchase JFEC, and Hamilton brought Vanderlugt into the discussions shortly after. (Exh. N at BSV 89-91; 104-06). Vanderlugt recommended that Jansma receive a scribe to help with the EMR system. (Exh. A at 49:8-14). However, the length of time a scribe would be available was not discussed. (Exh. A at 52: 13-18; 53:1-3). The use of the EMR system is not listed as a job duty on BSV's job description. (Exh. H, Job Description). (Exh. M at 14:18-23).

Jansma believed the scribe would be permanent, even though, in general, only ophthalmologists were guaranteed a scribe. (Exh. G at 46:2-5) (Exh. N, BSV 267) (Exh. E at 22:19-23:7) (Exh. K at 60:23-61:1). Optometrists who examined at least 30 patients a day qualified for a full-time scribe. (Exh. E at 23:12-16) (Exh. D at 45:18-23).

In June of 2018, BSV and Jansma executed a Purchase and Employment Agreement ("Agreement"). (Exh. J, Purchase Agreement Excerpts, BSV 000287). Jansma was required to work at GRO two days a week and SV once a week. (Exh. G at 34:24-35:13) (Exh. E at 14:20-24). Jansma was "unique" because he was the first doctor at SV who was bringing in his own patients. (Exh. E at 33:3-34:4). In addition to his salary, Jansma would receive bonuses depending on the revenue received from patients he examined. (Exh. K at 106:13-15; 108:11-13) (Exh. J, BSV 297).The Agreement also contains a Non-Competition/Restrictive Covenant clause, which

prohibited Jansma from working within 25 miles of the two offices where he physically worked after the employment relationship ended. (Exh. J, BSV 000289).

### D. Jansma Was Able to Use BSV's EMR Despite His Medical Condition

Jansma began working for BSV on June 11, 2018. (Exh. N at BSV 000057). BSV issued a press release, stating, among other things, that Jansma "has positive interactions with patients" (Exh F.) In fact, BSV observed that some of Jansma's patients were very fond of him. (Exh. E at 48:9-10) (Exh. N, BSV 183).

At first, BSV provided Jansma with a scribe to help acclimate him to two different EMR systems. (Exh. N, BSV 267). Jansma was told, however, that the scribe would not be permanent. (Exh. N, BSV 182). Although Jansma was capable of both using the EMR and working without a scribe, he was disappointed because he believed that BSV promised him one. (Exh. G at 83:11-16; 151:1-4). Consequently, he continued to ask for a permanent scribe until he realized he was not going to receive one. (Exh. G at 58:11-13).

There was no established deadline by which a doctor had to learn the EMR system at BSV. The speed at which a doctor learned the system depended upon several factors, including experience with EMR. (Exh. E at 49:20-50:8). However, Jansma was a "slow typer", and it took him longer than BSV would have liked. (Exh. G at 65:11-12) (Exh. E at 49:7-19).

Jansma realized that the EMR system had "pop-ups" on the right of the screen that he did not initially see. (Exh. G at 82:22). The pop-ups required Jansma to select a choice concerning the examination, and the scribes began pointing them out. (Exh. G at 82:9-12; 83:3-4). However, once Jansma knew to look for the pop-ups, he had "no problem" because he would "either turn his head or scan with [his] eyes"). (Exh. G at 82:12-14).

Also during this timeframe, BSV's staff members began to complain to Desiraju that Jansma was making hurtful comments towards staff (Exh. N, BSV 183). Although GRO and Shoreline had employee manuals in place that either required progressive discipline or claimed such conduct would not be tolerated, there is no written documentation in Jansma's personnel file or otherwise that shows anyone at BSV even made Jansma aware of these allegations. (Exh. C at 96:4-16) (Exh. Q, SV Employee Manual Excerpts) (Exh. R, GRO Employee Manual Excerpts). In fact, Jansma denies these allegations and states that no one at BSV ever spoke to him about him making such comments. (Exh. G at 76:6-14; 17-20).

### E. BSV Did Not Request Jansma's Resignation Until He Disclosed His Medical Condition

In September of 2018, Jansma told Vanderlugt about his Medical Condition. (Exh. K at 69:20-21) (Exh. P, Def. Interrogatory Responses at p. 3 and 2(b)) (Exh. G at 81:23-82:2) (Exh. M at 36:8; 43:8-9;18-23; 47:16-20). Jansma said that his condition affected "the periphery of the right side" of his vision. He explained that, because he

did not realize that pop-ups appeared to the right of the screen, he initially had difficulty seeing them, but since then, he made sure that he was "looking over to the right." (Exh. G at 82:5-14; 83:8-10). Vanderlugt asked Jansma if he "thought [he] should have said something about" his Medical Condition before he became employed. (Exh. G at 85:1-3). In response, Jansma explained that his Medical Condition did not affect his ability to do his job. (Exh. G at 85:5-6).

After Jansma disclosed his Medical Condition, Vanderlugt was "concerned" and shared the conversation with Dunleavy and another doctor at GRO. (Exh. M at 46: 22-25; 47:3-48:1). He told them that Jansma's Medical Condition "could be a concern for performing an eye exam safely," even though BSV had no knowledge of Jansma missing anything during the patients' examinations, and he had not placed any patient in danger. (Exh. M at 47:5-11); (Exh. C at 46:24-47:1; 50:1-4).

Soon after Jansma disclosed his Medical Condition, BSV determined that Jansma was "no longer a good fit." (Exh. M at 48:23-24). On September 25, 2018, BSV requested that Jansma resign[2] during an in-person meeting between Desiraju, Vanderlugt[3] and Jansma. ("Initial Meeting"). (Exh. S, BSV 000131)(Exh. K at 71:24-

---

[2] BSV admitted that in most circumstances, when an employer gives an employee an "opportunity" to resign, it is in lieu of termination (Exh. C at 30:12-14; 32:1-11). Although BSV now claims that the purpose of the meeting was not to end the employment relationship, BSV admits that Desiraju (not Jansma) brought up the subject of resigning. (Exh. K at 71:24-72:4).

[3] According to Vanderlugt, the Initial Meeting was "Surya's meeting" and that he was just "there to be present." (Exh. M at 52:8-13).

72:4). BSV told Jansma that his Medical Condition created concerns about his "ability to safely perform [his] job duties" and "the impact his homonymous hemianopsia may have on patient safety." (Exh. S, at BSV 000130). BSV also questioned whether Jansma "could safely perform his job as an Optometrist if his condition prevented him from seeing a computer screen." (Exh. P at pp. 4-5). Although Jansma responded by stating that he "could safely perform his job duties, despite [his] condition", BSV insisted the employment relationship "was not working out" and stated that Jansma was a "liability." (Exh. S, BSV 000130) (Exh. K at 65:16-18) (Exh. G at 89:6-7; 12-14). (Exh. T, EEOC Questionnaire, at EEOC00087). BSV did not ask Jansma to undergo a medical evaluation during the Initial Meeting. (Exh. C at 35:17-36:11).

Jansma felt "blindsided" but agreed to send a resignation letter. (Exh. S) (Exh. G at 89:16-17) (Exh. M at 49:7-8). Jansma did request, however, that BSV "lift" the 25-mile-radius Restrictive Covenant. (Exh. G at 91:12-13; 18-19). The next day, Desiraju informed Jansma that BSV would not lift the Restrictive Covenant and asked Jansma for his resignation letter again. (Exh. U,BSV000254; EEOC00099). According to BSV, Jansma's Medical Condition "contributed" to its decision not to lift the Restrictive Covenant because BSV was concerned about liability. (*See* Exh. K at 83:23-85:18). BSV reasoned that since it knew about Jansma's Medical Condition, it questioned whether it would be "acting responsibly" if it permitted Jansma to practice within 25 miles of BSV. *Id.* Jansma did not resign from BSV, but he never worked

again after the Initial Meeting. (Exh. K at 91:10-11; Exh. Y). Instead, Jansma informed BSV that he had consulted an attorney.(Exh. G at 119:6).

### F. BSV Postponed Its Termination of Jansma, Converted Its Resignation "Offer" Into A Leave of Absence and Commenced A Broad, Disability-Related Medical Inquiry

Eleven days after the Initial Meeting, on October 5, 2018, Dabrowski called Jansma on her cell phone and gave him two choices - - resign or undergo a medical evaluation.[4] (Exh. P). (Exh. C at 41:4-12; 41:23-42:5). If Jansma chose to be examined, he could remain employed and BSV would "continue to evaluate his behavioral concerns" because he previously had not received any "feedback.[5]" (Exh. C at 43:15-19; 45:24-46:3); *See also* (Exh. K at 103:7-10; 104:7-10). Jansma agreed to be examined. (Exh. C at 50:18-20). However, Jansma still could not return to work because BSV placed him on a leave of absence, pending the medical examination. (Exh. C at 49:4-6; 49:11-15; 50:5-10). (Exh. S). Although BSV continued to pay

[4] BSV has submitted an exhibit, which shows that approximately one week before the discovery deadline, it sought Jansma's phone records from Comcast (whom Jansma testified was his phone carrier); however, Comcast could not locate any records related to Jansma. The absence of phone records that prove Jansma and Dabrowski communicated by cell phone does not support BSV's Motion. BSV cannot dispute that Dabrowski testified that she spoke to Jansma about the Questionnaire and Release at least once on her cell phone, and that BSV has always had Dabrowski's cell phone records in its possession or control.

[5] The two people BSV claims spoke to Jansma about his alleged behavior concerns—Dunleavy and Vanderlugt— did not have any authority over Jansma. Although Dunleavy claimed that she was Jansma's "supervisor," she did not even know BSV terminated Jansma. Moreover, Vanderlugt was adamant that when he allegedly spoke to Jansma, he did so informally, describing it as a "conversation between two colleagues." (Exh. D at 78:1-4) (Exh. M. at 38:9-22).

Jansma his base salary, Jansma lost bonus money that he could have earned if he had been allowed to continue to examine patients. (Exh. K at 110:6-12;114:18-20).

On October 8, 2018, Dabrowski e-mailed Jansma and provided the names of two neuro-ophthalmologists who could examine him. (Exh. V). She also sent Jansma two documents that she indicated would be sent to the physician he chose - a letter containing ten questions ("Questionnaire"), and an "Authorization of Release of Health Information" ("Release") for Jansma to sign. (Exh. V) (Exh. C at 59:15-16; 62:6-7; 70:2-16;75:23-25). The Questionnaire asked if Jansma has "physical or mental impairment(s)" and asks for the causes of those impairments. (Exh. V). The Release permitted disclosure of records that pre-dated Dr. Jansma's employment with BSV, and included, but was not limited to, *all* of Jansma's in-patient and outpatient records. *Id.* The Release also allowed for oral communication with BSV about those records. *Id.*

Jansma contacted Dabrowski by email and phone to object to the scope of the documents. He told her the documents were "overreaching" and that BSV was attempting to "delve into [his] entire medical history." He explained that "[o]nly history germane to his condition may be accessed," and asked her to limit the scope of the documents to pertain "just to [his] eye condition." (Exh. G at 94:24; 95:19-20; 126:10-12) (Exh. S) (Exh. C at 76:19-77:12).). Nevertheless, he did select Dr. Christopher Glisson to examine him. (Exh. S). Dabrowski updated the Release with

Glisson's name as the physician, but she did not change anything else. (Exh. C at 86:8-20).

In response to Jansma's objections, Dabrowski told Jansma that "BSV is not interested in any medical information . . . beyond whether [the Medical Condition] prevents you from safely performing your job duties." (Exh. S). However, she refused to limit the scope of the medical inquiry to Jansma's eye condition because she believed that it was not her obligation to do so. (Exh. C at 67:15-68:19; 74:5-75:3). BSV contends that the Release was a "general release form that . . . could be used . . . for a provider doing an evaluation or assessment of a patient" and that it was up to the physician to determine what information is needed. (Exh. C at 69:12-18; 71:24-72:5; 72:18-24; 73:22-25) (Exh. C at 75:14-17) (testifying that the Release is a "standard form" "and it included things that may or may not be necessary for that particular provider . . . .") (Exh. C at 66:15-20) (assuming that the physician would have only disclosed information that was relevant to Jansma's Medical Condition).

Despite BSV's refusal to change the scope of the Questionnaire and Release, BSV admits that (1) it did not need all of Jansma's inpatient and outpatient records; (2) there was no particular reason why BSV asked whether Jansma had a mental impairment; and (3) it was not concerned about Jansma's HIV status, alcohol use, mental health or any substance abuse. (Exh. C at 63:16; 76:1-6; 76:7-10; 81:14-22; 72:25-73-2). BSV further admits that the Release, if signed, would have given BSV

*access* to records that were unrelated to Jansma's Medical Condition.(Exh. C at 67:15-68:19; 74:5-75:3).

**G. BSV Fired Jansma For Failing to Sign the Release After Dr. Glisson's Office Requested Only Medical Documents That Were Related to Jansma's Vision**

On November 8, 2018, Dabrowski sent the unchanged Questionnaire and Release, as well as a Consultation Request Form Release to Dr. Glisson. (Exh. W) (Exh. X, Glisson Med. Records at Glisson0001) (Glisson00007-10). Glisson recommended that Jansma be examined by a general ophthalmologist (like Dr. Glazer) if he had not already been. (Exh. X at Glisson 00003). (Exh. L, Glisson Dep. Tr. at 17:7-8; 17:23-18:1). Conversely, if Jansma had been examined by an ophthalmologist, Glisson wanted to review records related to Jansma's vision. (Exh. X at Glisson00003); (Exh. L at 13:13-14:4; 14:1-2; 19:5-22; 20:6-7; 21:3-6; 22:7-10). Glisson did not need to review medical records related to Jansma's entire medical history. Nor did he need to review any records related to Jansma's mental health. (Exh. L at 20:8-23; 20:24-25:2).

On November 26, 2018, Dr. Glisson's office advised Dabrowski to fax over Jansma's vision-related records. (Exh. L at 21:8-22:2). (Exh. X at Glison00003). However, instead of changing the scope of the Release, and informing Jansma that BSV only needed Jansma's vision-related records to proceed with the medical evaluation, Dabrowsi told Glisson's office that Jansma would go "elsewhere." *Id.*

(Glisson00003). BSV terminated Jansma approximately a week later, on December 4, 2018, for failing to sign the Release. (Exh. Y, Termination Letter).

## III. LAW AND ARGUMENT

### A. Summary Judgment Standard

Summary Judgment is not proper unless, viewing the facts and drawing all inferences in a light most favorable to the nonmoving party, there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011). In considering a summary judgment motion, the court should evaluate the evidence to determine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sheve v. Franklin County, Ohio*, 743 F.3d 126, 131-132 (6th Cir. 2014) (citation omitted and quotation omitted).

### B. BSV Cannot Dispute That It Engaged In A Disability-Related Medical Inquiry

Section 102(d)(4)(A) of the ADA states in pertinent part:

> A covered entity . . . shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature of the severity of the disability, unless such examination or inquiry is shown to be job-related and consisted with business necessity.

42 U.S.C. §12112(d)(4)(A) (emphasis added). *See also* 29 C.F.R. §§1630.13(b) ("unlawful . . . to make inquiries as to whether an employee is an individual with a

disability or as to the nature or severity of such disability."). To avoid liability, the employer bears the burden of proving a medical examination or disability-related inquiry is job-related and a business necessity. *Bates v. Dura Automotive Sys., Inc.*, 767 F3d 566, 581 (6th Cir. 2014). *See Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003) (quoting *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) ("The business necessity standard is quite high, and is not [to be] confused with mere expediency").

The record shows that BSV commenced a disability-related medical inquiry. In its Questionnaire, BSV asks: (1) "Does Dr. Jansma have a physical or mental impairment. If so, please describe such impairment(s) in detail:" and (2) "What is causing Dr. Jansma's impairment?" (ECF. No. 1 – Complaint – PageID. 6, ¶¶20-22)) (Exh. V). Also, the Release that BSV required Jansma to sign authorized broad disclosure of Jansma's medical history:

> A description of the information I authorize for use or disclosure is: All pharmacy records; dental records; any and all records and documents pertaining to any treatment/consultation rendered or performed, including but not limited to: complete in-patient and outpatient hospital records, surgical records, emergency records, rehabilitee records, therapy, lab studies, radiographic films and reports, actual office notes, patient files, narrative reports, billings and medications prescribed and/or filled. This authorization includes alcohol, mental health and substance abuse records, including psychotherapy notes . . . HIV and AIDS records . . . all records defined by statute….This authorization also permits oral communications regarding the

> listed information between agents of BSV and the provider . . . . This authorization includes information *prior to* and following the date of this authorization not to exceed the expiration defined in paragraph 3 [i.e. 12 months.])

(ECF. No. 1 – Complaint – PageID. 6-7 ¶¶21-22) (emphasis added). (Exh. V). Both documents are "disability-related inquiri[es]" because they are "likely to elicit information about a disability." *See* EEOC, *Enforcement Guidance*: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA) Part B.2 (July 27, 2000) ("EEOC Guidance"); *see also Lee v. City of Columbus, Ohio*, 635 F.3d 245, 264 (6th Cir. 2011) (quoting *Doe v. Salvation Army in the U.S.*, 531 F.3d 355, 357 (6th Cir. 2008) ("'questions . . . about illnesses, mental conditions, or other impairments [an employee] has or had in the past . . . . trigger the ADA's protections'") (citing *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1084-85 (S.D. Calf. 2010) (questions requiring "complete transcript" of plaintiff's medical records were disability-related inquiries).

### C. BSV Cannot Establish That Its Disability-Related Inquiry Was Job-Related and Consistent With Business Necessity

BSV claims that its Questionnaire and Release was appropriately narrow because the Release does not authorize BSV or Glisson "to gather" all of Jansma's medical records. Therefore, it argues, BSV could only "receive" relevant health information provided by Dr. Glisson. (ECF No. 25, PageID 98-100). BSV also contends that Jansma's concerns about the scope of the documents were remedied by BSV's

statement disclaiming interest in his entire medical history. As discussed below, however, BSV's claims fail to satisfy its burden of proving job relatedness and business necessity to justify the disability-related inquiry at issue. *Bates, supra* at 581.

### 1. The Scope of the Medical Inquiry Was Not Limited to the Information BSV Needed to Determine Whether Jansma Could Still Work As an Optometrist

A disability-related inquiry is job-related and consistent with business necessity if it "is no broader or more intrusive than necessary," and is a "reasonably effective method of achieving the employer's goal." *Conroy*, 333 F.3d at 98. Here, the record does not support job relatedness. When Dabrowski asked Jansma to assent to the Questionnaire and Release, she understood that BSV questioned whether Jansma was able to work as an optometrist with his vision impairment. (Exh. C at 65:7-66:2). Thus, BSV should have limited the Questionnaire to Jansma's homonymous hemianopsia, rather than broadly asking about all physical or mental impairments. (*Id.* at 63:21-23; 64:9-14). Furthermore, BSV was not concerned about Jansma's mental health, or whether he had HIV or AIDS, or abused alcohol or other substances. (Exh. C at 63:13-17; 76:1-10). Yet, Dabrowski admitted that BSV asked Jansma to sign a Release that would have permitted disclosure of Jansma's *complete* medical history (Exh. C at 81:20-22) ("I don't disagree that it could be read as though that's what it's doing, but the intent was not to get information that was not relevant to his issue") (Exh. V). Consequently, the Court should reject BSV's attempt to cherry-pick language from the Release. (ECF No. 25, PageID 98-100). BSV cannot deny that, had

Jansma signed the Release, he would have "authorized for disclosure" his complete medical history. (Exh. V, BSV 000152).

In addition, BSV cannot deny that the Release provides both BSV and Dr. Glisson with access to records that are unrelated to Jansma's vision. (Exh. C at 67:15-68:19) (the Release provides a physician who is with a hospital network access to records that are beyond his specialty). Similarly, the Questionnaire asks about *any* impairments that Jansma may have, not just the vision impairment at issue. *See, e.g.* *Kroll* v. *White Lake Ambulance Auth.*, 691 F.3d 809, 819 (6th Cir. 2012) (the "uncovering of . . . health defects at an employer's direction is the precise harm that §12112(d)(4)(A) is designed to prevent."). *Jackson v. Regal Beloit America*, 2018 WL 3078760, *9, *10 (E.D. Ky. Jun. 21, 2018) (emphasis added) (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999) (employer's request for past medical history is unlawful because an "inquiry under §12112(d)(4) . . . must be '*restricted to discovering whether the employee can continue to fulfill the essential functions of the job*.'" An inquiry that delves into "the nature and severity of *any* disabilities" is therefore improper *Id.* at *10 (emphasis added) (citation omitted).

To justify the broad scope of its Release and Questionnaire, BSV argues that there would have been no actual disclosure of Jansma's entire medical history because Dr. Glisson would have only acquired medical information relevant to Jansma's vision and shared the same with BSV. (ECF No. 25, PageID 86, 98-100, 112) (Exh. C at 66:15-20; 69:12-18; 71:24-72:5; 72:18-24; 73:22-25; 75:14-16). The Court should reject

this argument for two reasons. First, actual production or disclosure of medical information need not occur for an employer to violate Section 102(d)(4)(A) of the ADA. On the contrary, a violation is triggered once an unlawfully broad *inquiry* is made, regardless of whether such inquiry results in disclosure of all information sought. 42 U.S.C. §12112(2); *Jackson*, 2018 WL 3078760 at *9-12 (summary judgment was granted in favor of employee who was terminated for refusing to submit to employer's overly broad medical inquiries); *Scott*, 717 F. Supp. 2d at 1080-85 (plaintiff's motion for summary judgment granted where employer fired plaintiff for refusing to sign the release and answer broad, disability-related questions on medical exam form). Second, Dr. Glisson's intent to limit the scope of his medical evaluation of Jansma does not mean that BSV's inquiry (Release and Questionnaire) was compliant with the ADA. BSV has not cited to any legal authority to support the proposition that, if the third-party physician's examination will be limited in scope, there can be no violation of the ADA due to an employer's overbroad, disability-related medical inquiry.

Finally, BSV's claim that Jansma's concerns with the scope of the Release were sufficiently addressed by the e-mail, in which Dabrowski stated that BSV was "not interested" in medical information that was unrelated to Jansma's Medical Condition, (ECF No. 25, PageID. 112), is inconsistent with Jansma's deposition testimony:

18 "Didn't that address your concerns about the scope of
19: the testing and how you would be treated if you returned?

20: A. Yes, but -
21: Q. But what?
22: A. It's not there in writing. She didn't change the form.
23 Nothing is different.
24. Q: Well, it's in writing that that she just told you in writing,
25: Right? Is this email a written document?

1: [A:] I want to see the document. I don't trust them anymore.
2: [Q:] Did you ask her to revise the document itself?
3: A. We talked on the phone.
4. Q. When did you talk on the phone?

5: [A:] After this.

……
1 A. I told her I would never sign something unless those
2 things were taken out and I needed to see it in writing.
3 Q. What things were taken out?
4 A. Gall darn, really? The dental records, counseling,
5 everything that was overarching there, okay? Like my
6 entire life's history they want to go over.
…..
10 A. I said it needed to pertain just to my eye condition.

(Exh. G at 122:18-25; 123: 1-5; 126: 1-6, 10). More importantly, even if Jansma was satisfied with how BSV addressed his concern with the documents' scope, the Commission, as the Plaintiff, maintains that the scope of the documents violated the ADA.[6] BSV should have narrowed the broad and intrusive language of the Questionnaire and Release to comply with the ADA.[7] In this regard, Dabrowski's

[6] Similarly, BSV claims that *Jansma* mistakenly believed that BSV sought to weigh in on his future employment opportunities. The Commission, however, has never asserted that claim.

[7] The Commission takes exception to BSV's statement that it sent Jansma "updated forms" after assuring Jansma that they would not seek overly broad information. This statement is misleading and suggests that BSV changed the scope of the documents. However, the only update BSV made

email to Jansma was insignificant. *See, e.g., Scott*, 717 F. Supp. 2d at 1083 ("[u]sually, inquiries . . . . related to the specific medical condition . . . will be all that is warranted. The employer may not . . . mak[e] far-ranging disability-related inquiries . . . ."); *Conroy*, 333 F.3d at 97 (quoting *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 515 (3d Cir. 2001) ("[inquiry] must . . . be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue")).

The record shows that BSV's medical Questionnaire and Release were overbroad in scope and in time. Despite the limited nature of the medical examination that Dr. Glisson would have conducted, BSV required Jansma to sign the Release and authorize unlimited disclosure of his medical history. Because there is evidence that BSV's medical inquiry of Jansma was not narrowly tailored to assess whether Jansma could perform the essential functions of his job, BSV cannot show, as a matter of law, that the inquiry was job related and consistent with business necessity. Consequently, BSV's motion for summary judgment should be denied.

### 2. BSV's Grounds For Requesting a Medical Examination Does Not Justify the Unlawful Scope of Its Medical Inquiry

BSV argues that, because it had a reasonable basis for inquiring whether Jansma was still able to perform his job or whether he was a risk to the health or

---

to the inquiry documents is that it added Dr. Glisson's name after Jansma selected him. (ECF No. 25, PageID. 107) (Exh. V) (Exh. W)

safety of others, the medical inquiry at issue was lawful, job-related and consistent with business necessity. The problem with this argument is that it does nothing to rebut the basis for the Commission's claim under Section 102(d)(4)(A) of the ADA. The Commission does not contend that BSV had no reasonable grounds for deciding that Jansma should undergo a medical evaluation, or that such decision was unlawful. *See* (Exh. Z, Determination) (finding reasonable cause to believe Jansma's allegations "that he was subject to a prohibited medical inquiry when the Respondent requested his entire medical file . . . and discharged due to his disability".) (Complaint, ECF No. 1, PageID. 7, ¶¶23-25); (ECF No. 10, PageID. 37) ("the medical release was too broad, [and] Defendant refused to change the language"). Instead, the violation of Section 102(d)(4)(A) is based on the broad and intrusive scope of BSV's medical inquiry. Rather than limit its inquiry to whether Jansma's vision impairment impacted his ability to perform the essential functions of his job, BSV's Release required Jansma to authorize the disclosure of his complete medical history and its Questionnaire inquired about all impairments that Jansma may have. Because BSV's medical inquiry was so broad, it was not job-related and consistent with business necessity. Therefore, it was unlawful.

### D. There is Direct Evidence that BSV Asked Jansma to Resign and Later Terminated Him Because of His Medical Condition

The ADA prohibits employers from terminating an employee "on the basis of a disability." 42 U.S.C. §12112(a). An employer may not "discharge" an employee

"because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §12102(3). "ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *Fisher v. Nissan North Am. Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 855, 891-92 (6th Cir. 2016). "Direct evidence of disability discrimination 'does not require the fact finder to draw any inferences [to conclude] that the disability was at least a motivating factor.'" *Fisher*, 951 F.3d at 416 (quoting *Hostettler v. Coll of Wooster*, 895 F.3d 844, 849 (6th Cir. 2018) (alteration in original). Consequently, the distinction between direct and indirect [evidence] is 'vital'". *Fisher*, 951 F.3d at 416.

Because direct evidence and circumstantial evidence are "mutually exclusive," a plaintiff need only prove one or the other, not both. *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452-53 (6th Cir. 2004). "[T]he McDonnell Douglas burden shifting approach" is inapplicable to cases where "the employer acknowledges that it relied upon the plaintiff's handicap in its employment decision . . . ." *Fisher*, 951 F.3d at 416 (quoting *Ferrari*, 826 F.3d at 892). In such cases, "the issue of the employer's intent, the issue for which McDonnell Douglas was designed, has been admitted by the defendant and the *plaintiff has direct evidence of discrimination on the basis of his or her disability*." *Fisher*, 951 F.3d at 416 (quoting *Ferrari*, 826 F.3d at 892) (emphasis added).

As discussed below, there is "direct evidence" of discrimination under the ADA. As such, BSV's attempt to use McDonnell Douglas's burden shift analysis is improper. *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018) ("A defendant may use a legitimate, nondiscriminatory rational as a shield against *indirect or circumstantial* evidence of discrimination . . . but [such explanation] is of no moment" in a direct evidence case). Instead, where there is direct evidence of disability discrimination, a prima facie case requires the Commission to only establish (1) Jansma was disabled; (2) he was "otherwise qualified" to perform the essential functions of the position with or without a reasonable accommodation; and (3) BSV terminated him because of his disability. *Ferrari,* 826 F.3d at 891.

**1. BSV "Regarded" Jansma As Disabled**

The Commission maintains that Jansma is "disab[led]" under the ADA because he has been "regarded as" such. 42 U.S.C. §12102(C). "For an employee to make out a 'regarded as' claim, the employee must establish "that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." *Harrison v. Soave Enterprises*, *LLC*, 826 Fed. Appx. 517, 526 (6th Cir. Sept. 10, 2020) (quoting 42 U.S.C. §12102(3)(A) (emphasis in original)). "Ultimately, then, 'to state the threshold condition of a 'regarded as' ADA claim, an employee need only show that [her] employer believed [she] had a 'physical or mental impairment,' as that term is defined in federal regulations." *Harrison*, 826 Fed. Appx. At 526 (quoting *Babb*

*v. Maryville Anesthesiologists,* P.C., 942 F.3d 308, 318 (6th Cir. 2019). "The employer may then rebut this showing by pointing to objective evidence 'that the impairment is . . . or would be . . . both transitory and minor.'" *Harrison*, 826 Fed. Appx. at 526 (citation omitted).

Here, BSV believed Jansma was disabled and because of that belief, it asked Jansma to resign during the Initial Meeting. (Exh. S) ("BSV asked Jansma to resign because it had concerns about his ability to safely perform his job duties . . . due to [his] homonymous hemianopia" (Exh. P at 3(e), pp. 4-5) (Exh. T) (BSV stated Jansma "posed a liability" and questioned whether Jansma could work as an Optometrist "if his condition prevented him from seeing a computer screen."). BSV also refused to release Jansma from the restrictive covenant in his employment contract because it believed that it would not be acting "responsibly" because it knew about Jansma's Medical Condition. (*See* Exh. K at 83:23-85:19). Jansma is therefore "disabled" within the meaning of the ADA. *Babb v. Maryville Anesthesiologist*, P.C., 942 F.3d 308, 319 (6th Cir. 2019) (finding that employer "who openly expressed concern about [the employee's] degenerative [eye condition]," met with employee about her vision, and "asked [employee] whether she had disability insurance . . . genuinely believed [the employee] had a 'physiological . . . condition' affecting . . . her vision").

**2. Jansma Was Otherwise Qualified to Work as An Optometrist**

Under the ADA, an individual is 'otherwise qualified' if he or she can perform

the essential functions of the job with or without reasonable accommodation. *Keith v. City of Oakland*, 703 F.3d 918, 925-26 (6th Cir. 2013) (citing 42 U.S.C. §12111(8)). An employee who has been "regarded as" disabled, however, must be able to perform the "essential functions" without a reasonable accommodation. (42 U.C.C. §12201(h)).

"'Essential functions refer to job duties that are 'fundamental' rather than 'marginal.'" *Keith*, F.3d at 3d at 925-926 (quoting 29 C.F.R. §1632.2(n)(1)). "A job function may be considered essential because: (1) the position exists to perform that function; (2) there are a limited number of employees available among whom the performance of that job function can be distributed; or (3) the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Keith*, F.3d at 925-926 (quoting 29 C.F.R. §1632.2(n)(2)). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Keith*, 703 F.3d at 925-926.

The facts indicate that Jansma was otherwise qualified. First, Jansma has the "requisite skill, experience, education and other job-related requirements" of the optometrist position, as he has practiced optometry for over thirty years. *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 456 (6th Cir. 2004) (quoting) (29 C.F.R. §1630.2(m); (Exh. F); (Exh. G at 10:4-5). Second, because BSV hired Jansma and knew of his background and experience, it cannot credibly argue that Jansma is not otherwise

qualified. Third, Jansma's Medical Condition does not prevent him from performing his job duties because his vision is "pretty good", and when he performs examinations, everything he does is "right in front of him." (Exh. I at 16:20-23; 17:1-11; 29:21-30:6) (Exh. G at 19:10; 20:15-17; 22:10-16). Lastly, despite BSV's "concerns," there is no evidence that Jansma placed any patient in danger or that he "missed anything" during his examinations. (Exh. M at 47:5-11); (Exh. C at 46:24-47:1; 50:1-4).

BSV argues that Jansma was not qualified to hold the optometrist position because it was "dissatisfied" with Jansma's behavior and because Jansma failed to properly communicate with it about the forms to which he objected in a timely manner. (ECF No. 25, PageID 106-07). Neither of these complaints, however, renders Jansma unqualified within the meaning of the ADA. 42 U.S.C. §12111(8). *See, e.g., Khan v. Bank of America, N.A.*, 572 F.Supp.2d 278, 290 (N.D. N.Y. Aug. 21, 2008) (plaintiff's "behavior issues may have been grounds for termination, [but] they do not indicate that he was unable to perform the essential functions of his job").[8]

To the extent BSV argues that using the EMR system is an essential job function which Jansma could not do because he could not see the screen due to his

[8] BSV claims that despite its "dissatisfaction," his behavioral problems would not have prevented him from returning to work after the Initial Meeting, they did not fire him because of his conduct after he refused its "offer" to resign, and his behavior was not the reason BSV terminated him. BSV's inconsistent positions demonstrates summary judgment is improper. *See, e.g. Griffin v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 383 (6th Cir. 1998).

medical condition, or lacked the knowledge to use the system (ECF No. 25, PageID 93), there is evidence on the record that refutes this assertion. Use of BSV's EMR system is not listed as a job responsibility on BSV's job description for an optometrist. (Exh. H) (Exh. M at 14:19-23). Jansma was not hired for the purpose of entering data into the EHR. When Jansma began to work for BSV, BSV provided him scribes. And Jansma understood from his discussion with Vanderlugt that a permanent scribe would be assigned to him. Thus there is evidence from which a reasonable trier of fact could conclude that Jansma's use of the EMR system was not an essential function of his job. *Keith,* 703 F.3d at 926 ("[w]hether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment"). Furthermore, the number of employees available to perform that function is not "limited," as evidenced by the scribes employed by BSV. 29 C.F.R. §1632.2(n)(2); (Exh. E at 24:19-25) (scribes at BSV use key in doctor's findings into EMR).

Even if use of the EHR system was an essential job function, BSV has no established timeline by which employees must master their use of the system. Furthermore, contrary to BSV's claim, Jansma was able to use the EHR system and was doing so at the time he was asked to resign. (Exh. E. at 49:20-50:9) (BSV 000173). Once Jansma learned about the EMR's screen's "pop-ups," he knew to "turn to the right" to see them. (Exh. G at 79:11-12; 82:12-14); (Exh. I at 17:24-18:9). *See Keith v. County of Oakland*, 703 F.3d 918, 925-26 (6th Cir. 2013) (citing 42 U.S.C. §12111(8) (finding that despite the employee's inability to hear, he could effectively

communicate and could therefore perform the essential functions of the job). Regardless, whether the EHR is an "essential function" is an issue that should be resolved at trial. *Rorrer v. City of Stow,* 743 F.3d 1025, 1039 (6th Cir. 2014) (quoting *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012) ("At the summary judgment stage, the employer's judgment will not be dispositive on whether a function is essential when evidence on the issue is 'mixed'").

Finally, BSV should be estopped from arguing that Jansma was unqualified because it failed conduct an individualized inquiry into Jansma's Medical Condition *before* asking for his resignation on September 25, 2018, and firing him on December 4, 2018. *EEOC v. M.G.H Family Health Ctr.*, 230 F.Supp.3d 796, 812 (W.D. Mich. 2017). The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000). Similarly, the determination that an employee poses a direct threat must "be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." *See* 29 C.F.R. §1630.2(r).

Here, during the Initial Meeting, BSV said nothing about a medical evaluation, and could not identify any primary job responsibility listed on the job description that Jansma could not do. (Exh. C at 35:22-36:11; 34:17-21). And even when Jansma told BSV that his Medical Condition did not prevent him from working, BSV asked for his resignation anyway. (*See* Exh. S).

For the reasons stated above, a reasonable jury may reject BSV's argument that Jansma was not "qualified" to work as an optometrist.

**3. There is Direct Evidence That But For Jansma's Medical Condition, BSV Would Not Have Taken Any Adverse Action Against Him**

**a. There is Direct Evidence That BSV Asked Jansma to Resign on September 25, 2018 Because of His Medical Condition**

BSV has asked this Court to believe that during the Initial Meeting, it was not its intent to end the employment relationship with Jansma because of his Medical Condition, and that the purpose was simply to discuss BSV's concerns with Jansma's behavior. However, the record shows that (1) the Initial Meeting took place within weeks of BSV learning about Jansma's Medical condition; (2) BSV initiated the "conversation" about Jansma resigning and (3) BSV believed Jansma's medical condition made him a liability. More importantly, there is an email in which BSV states that it gave Jansma the "opportunity to resign" because it was concerned about his "ability to safely perform [his] job duties . . . due to [his] homonymous hemianopsia." (Exh. S). Consequently, BSV cannot dispute there is direct evidence that BSV asked Jansma resign due to his Medical Condition. In addition, a reasonable jury may reject BSV's claim that its request for Jansma's resignation was not meant to end the employment relationship.

**b. After The Failed Attempt to Obtain Jansma's Resignation, BSV Placed Jansma On A "Leave of Absence" Due To His Medical Condition**

BSV did not immediately suggest that Jansma be evaluated by a physician once it learned about Jansma's Medical Condition. BSV did not mention an evaluation at the Initial Meeting. (Exh. C at 35:22-36:11). Rather, soon after it learned of Jansma's Medical Condition, BSV asked for Jansma's resignation. When BSF first mentioned a leave of absence on October 5, 2018, Jansma had not worked for ten days. At that time, BSV told Jansma that he either had to resign (due to his Medical Condition) [9] or be examined by a physician. (Exh. C at 41:4-12; 41:23-42:4-5). Thus, the reason why Jansma was displaced from work in the first place was because BSV was pursuing his resignation due to his Medical Condition— not so that he could undergo a medical evaluation. (Exh. P at p. 7) ("Because Jansma did not immediately submit his resignation and was still receiving pay, he was effectively on a paid leave of absence at that time, but it was not discussed in those terms")[10].

**c. BSV Terminated Jansma Because of His Medical Condition**

In the Termination Letter, BSV admits that it terminated Jansma for refusing to sign the Release. Thus, BSV's reason for firing Jansma is inextricably tied to his Medical Condition and the impermissible medical inquiry (Exh. Y). There was no other reason why BSV terminated Jansma. (Exh. C at 90:12-15). But for Jansma's

[9] By October 5, 2018, BSV had already determined that Jansma's alleged behavioral concerns would not prevent Jansma from coming back to work. Therefore, the only reason Dabrowski could have had for demanding that Jansma resign on October 5, 2018 was his Medical Condition.

[10] Indeed, BSV did not treat Jansma's status as a leave of absence pending a medical evaluation until after Jansma indicated he consulted an attorney.

medical condition, BSV would not have commenced a broad, intrusive medical inquiry or discharged Jansma for not submitting to the inquiry. The Commission has therefore demonstrated, by direct evidence, that BSV terminated Jansma because of his Medical Condition. *Lewis v. Humboldt Acquisition Corp.*, 651 F.3d 312, 315-17 (6th Cir. 2012) (a plaintiff must show that she suffered an adverse employment action "because of" her disability).

BSV inappropriately uses the *McDonnell Douglas* framework, applicable to circumstantial cases, to argue that its decision to fire Jansma for not cooperating with the medical inquiry was legitimate and non-discriminatory. Because BSV's reasoning is directly related to Jansma's medical condition and the impermissible medical inquiry, it constitutes direct evidence of disability discrimination. *See White v. Honda of America Mfg.*, 191 F. Supp. 2d 933, 945-46 (S.D. Ohio 2002) (rejecting defendant's contentions under a circumstantial-evidence framework because its own explanation for its actions – plaintiff's absence from work due to disability – was direct evidence). As such, BSV's reliance on the circumstantial framework, its argument that the reason for firing Jansma was non-discriminatory, and its suggestion that the Commission must show that such reason is pretextual, are all misplaced.

In sum the Commission has demonstrated that there is direct evidence of disability discrimination because Jansma's Medical Condition is directly linked to all of BSV's adverse employment actions: pursuing his resignation, displacing him from

work while waiting for the resignation, making an overbroad and intrusive medical inquiry, placing him on a leave of absence pending such unlawful inquiry, and eventually firing Jansma because he objected to the impermissible scope of the inquiry rather than submit to it.

Because a reasonable jury may find that BSV took adverse employment action against Jansma because of his vision impairment, BSV is not entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Commission respectfully requests that this Court deny BSV's Motion for Summary Judgment in its entirety.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

KENNTH L. BIRD
Regional Attorney

OMAR WEAVER
Supervisory Trial Attorney

/s/Karen L. Brooks (IL ARDC# 6285816)
Trial Attorney – Detroit Field Office
477 Michigan Avenue, Room 865
Detroit, Michigan 48226
(313)226-7597
Karen.Brooks@eeoc.gov

Dated: June 24, 2021

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of W.D. Mich. L. Civ. R 7.2(b)(i) because this brief contains 8,755 words, excluding the parts of the brief exempted by W.D. Mich. L. Civ. R. 7.2(b)(i).
2. This brief has been prepared using Microsoft Office Word 2010 for Windows in 14-point Garamond font (footnotes are in 12-point Garamond font).

Dated: June 24, 2021