# EXHIBIT C

A. **No.**
Q. What, if anything, did you do to prepare for this deposition?
A. **Had a brief meeting, just an update meeting with Kathy and Sandy and they sort of covered what you just did, which is what to expect in a deposition.**
MS. TRACEY: Don't discuss what we talked about.
Q. (By Ms. Brooks) I'm not going to -- well, she'll stop me anyways, but I'm not going ask anything communication-wise between you and your counsel, okay?
A. **Okay.**
Q. So I'm not asking that question. I'm just asking what did you do. Did you review any documents?
A. **Yes.**
Q. Were there emails that you reviewed?
A. **Yes.**
Q. Did you review the complaint in this action?
A. **No, I did not.**
Q. Did you review the answer in this action?
A. **The answer, meaning the -- I guess is that meaning the information that we exchanged in preparation for this from months ago?**
A. **Well, no. It's an actual -- there's an answer once a complaint is filed.**
A. **No, I didn't review any of that documentation.**



Q. So we'll proceed. What is your current address?
A. **My home address?**
A. **Yes.**
Q. 12876 Windy Ridge Drive, Caledonia, Michigan 49316.
Q. Do you plan on moving anytime soon?
A. **Possibly.**
Q. Okay. Well, as this action is currently pending, can you please update your attorney with that new information?
A. **Yes.**
Q. Tell me about your education, starting with any college which you may have attended.
A. **So I have a bachelor's from Saginaw State University in business management and then I went -- several years later went back to Central Michigan for a master's in HR.**
Q. Okay. Are you a member of the Society of Human Resources Management?
A. **Yes, just recently.**
Q. Do you have any certifications from that organization?
A. **No, I do not.**
Q. Do you intend on getting them?
A. **No, I do not.**
Q. So what is your current position?
A. **Yeah, I'm currently staying home with my daughter.**
Q. Okay.
A. **So I'm a stay-at-home mom.**



Q. And how long have you been doing that?
A. **Just since January 1st.**
Q. Of this year?
A. **Yeah, of this year.**
Q. All right. So tell me, when did you graduate with your master's?
A. **2010.**
Q. Okay. So tell me about your work history after you obtained your master's.
A. **So -- I'm trying to remember. I worked at Delphi, actually, when I got my master's, so I was in HR there and then I transitioned from there to Dow Corning up in Midland, then I spent seven years in different HR capacities and then business process roles for Dow Corning, left there and went back into automotive and spent a year at Federal Mogul in a talent role, then I actually had my daughter and my husband's job moved us to West Michigan, so I was home with her for the first year and then had an opportunity to go to work for Blue Sky and started there as their vice president of HR.**
Q. Okay. So how many years experience would you say you have in HR?
A. **I started as a student, so probably 21.**
Q. 21 years in HR, in human resources?
A. **Yes.**



Q. Okay. And you mentioned Blue Sky Vision. What year did you start with Blue Sky?
A. **I started with Blue Sky in 2017.**
Q. Wasn't the company formed in 2017?
A. **Yeah. I started in October of that year.**
Q. Were you their first VP of HR?
A. **Yes.**
Q. So did you just resign from Blue Sky Vision in January?
A. **Yeah, so we transacted with another organization in early December and my dad actually got sick this past fall. He passed away, and I was planning to have some time with him so I decided to take a minute for my family.**
Q. So in December, can you say that again?
A. **So in December we merged with another large eye care platform who's across the country and they had CHRO and an HR team in place. I could have stayed on, but I chose to exit at the end of the year after the transaction was completed.**
Q. Could you have stayed on as the VP of HR?
A. **That was my understanding from them, but I wasn't given an offer because I had asked to be done.**
Q. Had the merger already taken place then?
A. **Yes.**
Q. What's the name of the company?
A. **EyeCare Partners.**





**EXHIBIT C**

Q. Okay. When you were VP of HR, did you have a staff? Can you hear me? I'm sorry.
**A. Yes.**
Q. Did you have a staff, an HR staff working under you that reported to you?
**A. When I started, no. I was the only person for almost the first year and then we hired an HR director, shortly after that we hired a recruiter and then shortly after that we hired an HR generalist.**
Q. So you started October of 2017?
**A. Correct.**
Q. And who was the HR director you hired?
**A. Her name was Jesse LaHaye.**
Q. And when did she come on board with Blue Sky?
**A. She started in the middle of July of 2018.**
Q. Who was the recruiter you hired?
**A. The recruiter is Kalee Van Camp.**
Q. And when did she start?
**A. She started spring of 2019. I think she started in early May.**
Q. And who was the HR generalist?
**A. Katie Tomlinson, and she started in October of '19.**
Q. Okay. So did you hire all three of these individuals?
**A. Yes.**
Q. When you left this year in January -- you left in December or January?



**A. My last day was December 31st.**
Q. Were these three individuals still working there?
**A. Kalee and Katie, yes. Jesse had left in March of 2020.**
Q. How did you like working for Blue Sky Vision?
**A. I loved it. I mean, it started up a little rocky and busy, but I really learned a lot and I feel like I grew a lot personally and professionally, so I had a good experience.**
Q. So my understanding of Blue Sky Vision is that at least, you know, in 2018, right, there's a lot of doctors' offices or ophthalmologists' and optometrists' offices under the Blue Sky Vision umbrella. Is that accurate?
**A. Yes.**
Q. So as VP of HR, did you have anybody in place at these offices to help you with HR matters?
**A. There wasn't anyone local on-site. The only person -- the only group that had an HR leader at one point was Shoreline. That was the largest merger we had done. She left shortly after I started, though, so from an HR team perspective, no, but there were managers and leaders at each of the locations who were kind of pseudo-HR people, right, dealing with day-to-day employment issues and attendance issues and things like that.**
Q. Who was the person at Shoreline?



**A. Tiffany and her last name has changed. She was married. Zahrt was her prior name, but I don't know what her new married name is.**
Q. So you were the VP of HR over how many employees?
**A. In 2018, it would have probably been maybe 550.**
Q. You mentioned something like pseudo-HR people. Did that vary from practice, from doctor's office to doctor's office?
**A. I would say no. I mean, we had some type of a management or a lead at every location, so there was always someone there that was in charge of the team in that location.**
Q. And can you provide something like the titles of the leads because they weren't -- and correct me, please, if I'm wrong. I'm trying to understand. They weren't in a human resources role technically, right, so can you give me some of the examples of the position titles of these people?
**A. Yes, so they were clinic managers or clinic supervisors. Some of them actually had a lead title. So in some of the smaller locations, we might have someone who was a tech, a front desk person who also took the role of a lead and did a small portion of management for that small location.**
Q. Okay. And would these clinic managers and clinic supervisors have the authority to hire people?
**A. So they would be involved in the hiring process and in the selection process for individuals for their location, but we would ultimately, you know, be the ones reviewing once we had the recruiter, viewing and phone screening and with the front end of that process.**



Q. We, as in?
**A. The HR team. So the recruiter, once I hired her would help with that, like, initial review of resumes and getting those things to the clinic managers or the leads.**
Q. And that was Kalee and she was hired in the spring of 2019, correct?
**A. Correct.**
Q. So what did you do as far as -- how were you involved in hiring, if at all, in 2017 and 2018?
**A. So similar. I actually had access to our Indeed accounts and I would send resumes to the hiring managers, the clinic operations director, so Amy Dunlevy played a pretty heavy role for our GRO. Our executive directors at the VRA and Shoreline and their management teams played a pretty heavy role in that, in reviewing resumes for their teams.**
Q. Do they or did they have the same authority in connection with terminating employees?
**A. Similarly, if there were an issue that, you know, was clear-cut, you know, if it was an attendance issue or something that was in the handbook that clearly was stated as these things happened, that someone can be released,**





EXHIBIT C

**then yes. If it wasn't clear, then typically those individuals would come to me and ask for some guidance.**
Q. Okay. So was there a process by which they -- or an incident or a time period which they always contacted you or it was just up to them when they would contact you?
**A. Yeah, I would say there wasn't. It wasn't necessarily clear processes, as you can imagine when you bring together 11 or 12 different practices with different processes and different handbooks. We worked hard on that to get one handbook by 2019 and ultimately landed on that in January of '19, but prior to that, they were sort of living by their prior handbooks in some cases, so it wasn't necessarily all of these things come to me and these things don't for every group that was under Blue Sky at that time.**
Q. What do you understand this lawsuit to be about?
**A. So my understanding is that Dr. Jansma has filed a complaint with the EEOC regarding a discrimination suit.**
Q. Have you met Dr. Jansma before?
**A. I met him one time in person to do his new hire paperwork.**
Q. Have you seen him since?
**A. No, I have not.**
Q. Were you involved in his hiring?
**A. No, I was not.**
Q. When you met him, what did you think of him?



**A. It was an interesting interaction. He shared that he was planning to go on a trip with his wife and I can't remember where they were going, Hawaii or somewhere and I remember jokingly saying pack me in your suitcase, I'll go with you, and he made a fairly inappropriate comment that, quote, I was into that or something along those lines and I quickly responded with feeling like that's really inappropriate, so I had a little bit of an odd one-time in-person interaction with him.**
Q. And was that when he was first hired?
**A. Yes, that would've been just before his first day when we were completing new hire paperwork.**
Q. So do you remember when he was first hired?
**A. He started in June, I think, of 2018.**
Q. Where was that interaction? Where did that take place?
**A. In our board room at our Blue Sky Vision office.**
Q. And the Blue Sky Vision office, is that where you worked every day?
**A. Yes.**
Q. The corporate office?
**A. Correct.**
Q. So in June of 2018, did any employee at Blue Sky Vision bring anything to you about Dr. Jansma that was concerning to you?
**A. I don't recall anything brought to me in June.**



Q. Okay. What about July of 2018?
**A. I don't recall having anything brought to me in July, either.**
Q. The same for August 2018?
**A. Yeah, I think that was probably the first time that I got some indications from Amy and others that there were some concerns, like behavioral concerns with Dr. Jansma with staff and with patients.**
Q. How did they communicate -- how did Amy communicate that with you?
**A. I actually don't remember. I remember reaching out at some point requesting information or requesting, you know, anything that she had documented from individuals and I can't remember if that was in August or September, to be honest.**
Q. So was there anybody else other than Amy and right now I'm talking about the August 2018 timeframe, that you can recall brought anything to you concerning about Dr. Jansma?
**A. I don't think any specific team members reported directly to -- anything directly to me. I think what came to me actually came to me through Amy from managers or team members that had reported things to her.**
Q. Okay. And as you sit there right now, you're not sure of the date?



**A. I'm not sure of the date.**
Q. In September of 2018, did anybody from Blue Sky Vision bring something to your attention that was concerning to you about Dr. Jansma?
**A. So in September I think is really when the conversation started about needing to have a more serious sit down with Dr. Jansma about the behaviors. So that would've been maybe Surya letting me know that he and Phil had planned, you know, to meet with him later in that month.**
Q. Okay. At some point, did you learn that Dr. Jansma was diagnosed with a condition called homonymous hemianopsia?
(Discussion off the record.)
Q. (By Ms. Brooks) I'm sorry.
**A. That's okay. Pretty good saying of it, I would say. It's a difficult one.**
**I learned about that after the meeting that Surya and Phil had with Dr. Jansma. I don't recall ever having known that there was a medical or any other concern with him prior to that.**
Q. So tell me about this meeting that you just referred to. What do you know about -- did this meeting take place in September of 2018?
**A. Yes.**
MS. BROOKS: James, if you can pull document A and mark it Plaintiff's Exhibit 9.



EXHIBIT C

but I just want to stay focused. I'm talking about just your understanding, right?
**A. Yes.**
Q. So just to be clear, your understanding is that the reason he was given an opportunity to resign was because of the behavioral concerns. Do I have that -- is that what you're saying?
**A. Yes, that was my understanding.**
Q. Was it also your understanding that they knew about these behavioral concerns before they went to the meeting?
**A. Yes.**
Q. So your understanding of them giving him the opportunity to resign in lieu of what, being fired?
**A. So yes.**
Q. What do you know, if anything, about this part about the restrictive covenant discussion?
**A. I don't know. Again, what I learned from them after the meeting, I think the only thing that was shared was there was discussion or a question as to whether or not, you know, that could happen and my understanding was that he was told that that would be discussed with leadership because it wasn't a decision that they could make.**
Q. Okay. I'm now going to read to you the second paragraph, the first sentence. It says, "During the meeting with Surya and Dr. Vanderlugt, when they expressed concern



about the impact your homonymous hemianopia may have on patient safety, you shared your belief that you could safely perform your job duties, despite your eye condition." Who told you that? Was it Surya or was it Dr. Vanderlugt?
**A. I don't recall. Honestly, I feel like it likely came from Surya, again, because he worked in the office with me, but Dr. Vanderlugt may have mentioned it. I'm not sure.**
Q. Did either one of them tell you how they responded to Dr. Jansma's, according to you, belief that he could safely perform his job duties despite his eye condition?
**A. I don't recall getting into detail about what his response to that was.**
Q. But your understanding is, definitely on this date, that they gave him the opportunity to resign in lieu of being terminated, correct?
**A. So on the September 25th meeting, my understanding is they gave him an opportunity to resign. I don't know if -- I don't know that he would have been terminated September 25th had he chose not to. I think the behaviors that he was exhibiting, if not changed, would have led to an eventual termination of his employment.**
Q. Just in general you told me that you've been in HR for several years, like 21 years?
**A. Uh-huh.**



Q. When you hear "opportunity to resign," is it customarily a choice of the person to -- isn't it in lieu of being terminated?
**A. Yes, it's typically there's a mutual agreement that something isn't working out and so they're given a mutual opportunity to part ways and decide if that's the right decision for both parties.**
Q. And typically, does that employer give a person the opportunity to resign so that it will benefit -- it looks better for the employee, rather than to be fired?
**A. Correct, typically.**
Q. Right. But in this situation, is that what occurred?
**A. Again, I don't think there was a plan to -- sorry, Cathy, are you talking?**
MS. TRACEY: Objection based on foundation. Can you hear me? I'm sorry. I moved my phone. I objected based on foundation, lack of personal knowledge.
MS. BROOKS: Can she answer?
MS. TRACEY: Yes, go ahead and answer.
THE WITNESS: Sorry. I want to make sure I hear the question again because I lost my train of thought when that glitched.
Q. (By Ms. Brooks) I guess it's kind of simple. I'm saying there's a statement here that says he was given an opportunity to resign. Typically, in an HR setting or any



employment setting, that when someone gives them the opportunity to resign, that is in lieu of being fired.
**A. Correct.**
Q. Do you agree with that?
**A. Yes.**
Q. But you're not sure if that happened here. You don't know if they were giving him the opportunity to resign or be fired, right, in this situation? That's what I'm asking.
**A. Correct. I wasn't in the meeting so I don't know if the discussion -- I don't know what the discussion, specific discussion in that meeting was. So I don't know if the word fired or any of those things came up there. I'm not sure what was said.**
Q. Did you ask them what was said?
**A. I don't recall them talking about firing ever in any conversations that I had. The conversations I had are what's documented here, which was they were giving him an opportunity to resign because of the behavioral problems and the fit with the practice.**
Q. Okay. I'll come back to it.
MS. BROOKS: James, can you pull up document C, please?
(Whereupon Plaintiff's Deposition Exhibit Number 11 was marked for identification.)
Q. (By Ms. Brooks) Do you know what this document is,



EXHIBIT C

Ms. Dabrowski?
**A. Yes.**
Q. Have you seen it before?
**A. Yes.**
Q. What is it?
**A. It's the optometrist's job description.**
Q. At Blue Sky Vision?
**A. At Blue Sky Vision, yes.**
Q. Is it the job description that has the responsibility that Dr. Jansma had to fulfill during his appointment there?
Are you reading, Ms. Dabrowski, are you reading it?
**A. Yes.**
MS. TRACEY: Are you still reading it, Melissa?
THE WITNESS: No, I'm all set. Sorry. I didn't know if you were waiting for me to say I was done reading. Yeah, I've seen it. I'm familiar. Sorry.
Q. (By Ms. Brooks) Ms. Dabrowski, based on your talks or your knowledge about the September 25th meeting, do you know if there were any primary responsibilities that Dr. Jansma was not performing on that date?
**A. I'm not aware of that.**
MS. TRACEY: Are you talking September 25th if he was performing?
MS. BROOKS: I hope I didn't say September. I said September --



MS. TRACEY: Yes, were you asking if on September 25th there were any primary responsibilities that he wasn't performing? I guess I'm confused by the question.
Q. (By Ms. Brooks) Ms. Dabrowski, did you understand the question?
**A. What Cathy just restated is what I thought you had asked. Were there concerns on September 25th of him performing primary responsibilities and I'm not sure if there were concerns.**
Q. Yeah, that was my question. The question was, again, and you answered it, on September 25th, 2018, on the day of that meeting, right, was there any primary responsibilities listed that he could not perform, and your answer was that you didn't know, right?
**A. Yeah, I don't know if on that day there were any that he could not. I'm not sure.**
Q. Okay. And on that day, September 25th, 2018, had there been an attempt to determine through a medical evaluation whether he could perform the primary responsibilities listed?
**A. On the 25th or prior had there been?**
Q. Yes. September 25th, 2018, the day of the meeting, the initial meeting that you referred to in the email in the prior exhibit, had there been a request for a medical evaluation?



**A. No, not that I'm aware of.**
Q. Not that you are aware of?
**A. Correct.**
Q. Who would be aware of it if you weren't at that time?
**A. I'm not aware what was discussed so I don't know, again, in that meeting if there was any discussion with regard to that. My understanding is no, but I wasn't in the meeting.**
Q. If there had been a medical evaluation requested, would you know about it as the head of HR?
**A. It should eventually come to me, yes.**
Q. Okay. Is the same information, does the same hold true for the knowledge, skills and abilities? I'll just restate that.
On September 25th, 2018, are you aware of any knowledge, skills and abilities that Dr. Jansma lacked or did not have?
**A. I don't know if any of those things were specific on September 25th, but there were concerns relative to some of these things prior.**
Q. Okay. Tell me what you are talking about when you say that?
**A. So things like processes and providing customer and personal services, customer's needs and services. I think there were some concerns raised, you know, with regard to**



**his treatment of patients, treatment of staff, so his communication maybe was lacking in terms of communication effectiveness with people and being able to, you know, understand the points and make appropriate questions of individuals. I think there were some concerns raised with regard to those things.**
Q. Earlier, you testified that you weren't sure of the date that you became aware of the behavioral concerns. Do I have that correct?
**A. That's correct.**
Q. So on September 25th, 2018, what you described, could it have been at a later time, your knowledge about them?
**A. My knowledge of the behavioral concerns?**
Q. Uh-huh.
**A. Possibly, like the written information, but I knew, I believe sometime in September or possibly late August, I don't remember exact timing, that there were some behavioral concerns.**
Q. And that was through Amy, did you say earlier?
**A. That would have likely been through Amy or Surya, just that there were concerns with, you know, patients and treatment of patients and staff.**
Q. Okay. Earlier I believe you testified that you learned it through documentation you requested from Amy. Is that right?





EXHIBIT C

A. **So I learned the specific, you know, like individual complaints. I hadn't received any complaints from team members prior to that, but I do believe there had been something shared or conversation, right, about behavioral concerns that they were working to address with regard to treatment of patients and staff.**
Q. And they came and told you that information, Surya or Amy?
A. **One of them or I heard it in a leadership huddle. I mean, I honestly don't recall exactly how I became aware of that concern.**
Q. What is a leadership huddle?
A. **So we would have weekly leadership meetings and, like, daily five-minute kind of touch base on things that -- and those started, I can't remember, even when we started those. It may have actually been late '18 or early '19. We had at least a weekly leadership meeting with our executive team, so it could have possibly come up in that.**
Q. And you were a member of the executive team?
A. **Yes.**
Q. Who were the other members?
A. **At that time, it was Surya Desiraju, Dan Hossler, Bill Hughson, Colleen Mulder and I'm trying to think of when people were hired. Jenny Fanning would've been there at that time, too, I believe.**
Q. Jenny Fanning?



A. **Fanning, yeah, she was our IT lead.**
Q. Dan Hossler, is he still with Blue Sky Vision?
A. **No, he's not.**
Q. Bill Hughson, is he still with Blue Sky Vision?
A. **No, he's not.**
Q. Is there anybody on that list you just gave that's still with Blue Sky Vision?
A. **Yeah, the only two that are still there are Jenny Fanning and Colleen Mulder.**
Q. And Colleen Mulder does what?
A. **Marketing. She was our marketing lead.**
Q. Is Brian Hamilton still at Blue Sky Vision?
A. **He was as of when I left, but I honestly don't know.**
Q. So tell me, after the meeting of September 25th and after, if you recall, you received an email or you sent Dr. Jansma an email on September 28th, 2018, do you recall that, looking at that?
A. **That's the one that we just reviewed a few minutes ago?**
Q. Well, we reviewed it in the beginning.
A. **Yes.**
Q. So what happened after you emailed to Dr. Jansma and said we were under the impression that you were going to resign? Tell me what happened after that.
A. **My recollection is that he -- he hadn't responded to an email and then when I got a response he had indicated that**



**he had a family loss and that was why he hadn't got the information to us, so I apologized for that and, you know, obviously, sorry for the loss that he and his family experienced and told him that I would reach back out to him the next week.**
Q. And did you reach out that --
A. **Yes, I believe I reached out the following week sometime.**
MS. BROOKS: James, if you could pull document K.
(Whereupon Plaintiff's Deposition Exhibit Number 12 was marked for identification.)
MS. BROOKS: And if you could scroll down to -- let me just go to the top and maybe ask her about it.
Q. (By Ms. Brooks) Ms. Dabrowski, have you seen this document before?
A. **Yes.**
Q. And the title of the document, well, is this Defendant's Responses to Plaintiff's First Set of Interrogatories?
A. **Yes.**
MS. BROOKS: James, what exhibit are we on? Plaintiff's exhibit?
COURT REPORTER: We are up to 12.
MS. BROOKS: If you could please scroll down to page 7, James.
Q. (By Ms. Brooks) Ms. Dabrowski, the fourth sentence down, it reads, "On or about October 5th, 2018, after



Surya Desiraju and Jansma were unable to reach an arrangement on the terms of the resignation, including Jansma's proposal that Blue Sky release Jansma from his noncompete, Melissa Dabrowski contacted Jansma to provide two alternatives, resign under terms offered by Blue Sky Vision or continue employment on leave pending a medical evaluation to determine whether Jansma could safely perform his job duties."
Do you see that?
A. **Yes.**
Q. Is that statement correct?
A. **Yes.**
Q. Okay. Then I want to talk with you about where it says one of the alternatives was to resign under terms offered by BSV or Blue Sky Vision. Tell me about that.
A. **So my understanding would be that he would resign as a fit issue, right? He wasn't feeling like this was going to be a long-term fit for him where he wasn't going to be able to make the behavioral corrections that were discussed or if he chose to continue he would make sure the concerns that were raised with regard to his vision were evaluated and that he could safely perform the essential functions.**
Q. But it said that you contacted him. Is that correct?
A. **Correct.**
Q. You contacted him on October 5th, 2018; is that correct?





EXHIBIT C

A. **Correct.**
Q. All right. So you have personal knowledge about this conversation, right?
A. **Yes, and I believe this may have been a phone call with Dr. Jansma. I don't -- I don't remember this being an email, but I could be wrong, but I believe I had a phone conversation with him saying that, you know, if he wasn't going to resign under the terms I wanted to make sure that he had a fitness for duty and that the concerns that he raised with regards to the eye condition were evaluated because our optometrists perform at the top of their license and are responsible for diagnosis of, you know, medical conditions, retinal detachments and other things and I want to make sure that he would be able to do that so that our patients would have positive outcomes.**
Q. What are the terms? When you say resign under terms offered by Blue Sky Vision, what were the terms that were offered?
A. **Yeah, so my recollection of that was that it's basically what was in his employment contract, so he would be paid for any hours worked. He would've received, you know, whatever payment that would be. He would have had his benefits through the end of the month and then been offered COBRA, just like any other employee and then I believe there was some arrangement or agreement when his**



**practice was purchased with regard to patient transfer, so whatever the patient file transfers or patients that ended up coming to Blue Sky who used to go to his practice, he received so much per patient transfer, so I believe that there was an agreement that that would be paid out, you know, through that time.**
Q. Okay, but what you just said does not concern any behavioral issue that you talked about just a second ago, so what I want to know is did the terms offered by Blue Sky Vision during your conversation on October 5th, 2018, include anything about the behavioral issues that you say Dr. Jansma had?
A. **Yes, and my recollection of his response to that, he had a lot of questions with regard to not necessarily the resignation, but if he chose to do the evaluation, would his employment be allowed to continue and so my recollection of that conversation was that if he could safely perform his duties the answer was, you know, yes, and we would need to continue to evaluate the behavioral concerns and if those continued then, as I stated earlier, you know, if the behaviors were not going to improve, it could lead to termination of his employment if, in fact, he wasn't able to correct those.**
Q. So resign under terms offered by BSV not only included -- the terms offered by BSV included discussion



about behavioral concerns and discussion about what was included in his contract; is that correct?
A. **Yeah, any terms for our physician's employment are stated in their contract, in their employment agreement.**
Q. No, ma'am. I'm specifically saying resign under terms offered by Blue Sky Vision. Resign under terms offered by Blue Sky Vision. What terms were offered by Blue Sky Vision, based on your conversations?
A. **Yeah, so I believe what I stated was it was his pay which would have been a standard, you know, term or practice by our organization and then any pay agreed for patient transfers, which I believe was actually part of his initial contract and benefits through the end of the month.**
Q. Anything else?
A. **Nothing that I can recall specifically. Again, I remember him requesting changes to the noncompete and some of those things, but that's not something that we'd ever changed for anyone, so --**
Q. So I just want to be clear that we were talking about the same thing, right, because I asked specifically about under terms offered by Blue Sky Vision and you've answered it now but I just was unclear and it could be me. That's why I keep my -- you know, I'm just trying to make sure I understand.



A. **Yep.**
Q. So the terms were the salary, the benefits, things that were in his employment contract, that is what you were talking about here?
A. **Correct.**
Q. All right. So you believe this was a phone call?
A. **Yes.**
Q. And do you remember what time this took place?
A. **I don't remember. I don't remember.**
Q. Did you take notes about this conversation that took place on October 5th, 2018?
A. **I don't recall taking notes. Actually, I seem to remember being in my car, actually, at the time this conversation took place. I think I may have been driving.**
Q. What changed between, I guess, September 26, 2018, and October 5th, 2018, such that Blue Sky Vision was willing to continue employment, continue Dr. Jansma's employment?
MS. TRACEY: Object to the foundation.
You can answer.
Q. (By Ms. Brooks) You can answer.
A. **So I guess it really wasn't a change. It was more of he was offered to resign because of the behavioral concerns. He raised this issue and, you know, as an HR professional, I view that as you want to give someone an opportunity to improve and so if -- I don't know what happened in that**





EXHIBIT C

46

**meeting, but if this is the first time he received that feedback, I think it's fair to give someone the chance to right that before they exit, but if they mutually agree that they, you know, this is who I am and how I am and they don't have a plan to change, it may be better for the organization and the person to decide that they part ways.**
Q. So is that what you told Dr. Jansma?
**A. Probably something along those lines, honestly, because that would be common for me to say and I remember discussing, again, this concerned that he had. Obviously, if someone has that type of concern, I want to make sure that we give them the opportunity to do an evaluation and make sure that they are fit for the job that we are asking them to do.**
Q. And you were concerned that he may be unfit for the job that you were asking him to do because why?
**A. Well, both concerns, right? I mean, if the behaviors aren't improved, that's a concern. Treatment of the patient, treatment of staff, and if you have a medical condition like this and you are performing, you know, vision checks and looking for disease and that there may be a chance that you miss something that could result in blindness or worse for a patient outcome.**
Q. At that point, had you received any information that he had missed anything in his examinations?

47

**A. No, no information about anything missed.**
Q. Okay. So the concern was triggered by that knowledge of what the condition was, correct?
**A. Correct.**
Q. All right. So September 25th, going back to that, just so I understand, there was a meeting in which you were not present, correct?
**A. Correct.**
Q. But your understanding is that -- well, who initiated the meeting, was it Blue Sky Vision?
**A. Yes, I believe that Surya or Dr. Vanderlugt both reached out and asked Dr. Jansma for the meeting.**
Q. Okay. And that meeting took place on September 25th, 2018, right?
**A. Correct.**
Q. And at some point during that meeting one of them asked Dr. Jansma to submit his resignation, correct?
**A. That's my understanding.**
Q. Right, just so that I can understand.
**A. Yes.**
Q. You weren't there, right?
**A. Right. I wish I had been.**
MS. TRACEY: Karen, you can finish this line of questioning, but we've been at this for about an hour and a half so maybe we could take a break pretty soon?

48

MS. BROOKS: Okay. Cathy, you are still going in and out. I'm afraid, like, sometimes you are talking and I don't hear you and then I look up and I see you moving and I hope I didn't miss anything. Did you say you wanted to take a break?
MS. TRACEY: Yeah, yeah. I mean, you can finish this line of questioning, but then if we could take a break?
MS. BROOKS: No, I can get back to it. It's tedious and she wasn't there. Do you want to take a break? I'll come back to it.
MS. TRACEY: Okay. All right. Yeah, let's take a quick break. What do you want to say, like, five minutes, 10 minutes, how long do you want?
THE WITNESS: I'm fine with whatever. I'll just use the restroom and I'm fine to come back.
MS. BROOKS: Five minutes?
MS. TRACEY: Five sounds good.
(Brief recess.)
Q. (By Ms. Brooks) Ms. Dabrowski, picking back up on what occurred on October 5th, 2018, and now I want to draw your attention to paragraph two, number two, where it says continue, you gave an option to continue employment on leave pending a medical evaluation to determine whether Jansma could perform his job duties. So why was he placed on leave?

49

**A. He was placed on leave because there were concerns about his ability to perform those duties and he hadn't at that point resigned, so he was continuing to receive pay.**
Q. Okay. So he was placed on leave because of his medical condition?
**A. Correct.**
MS. BROOKS: James, if you could please pull back up, let's see, this would be Plaintiff's Exhibit 10, so document B. Plaintiff's Exhibit 10 now.
And if you could scroll down, please. That's fine.
Q. (By Ms. Brooks) Ms. Dabrowski, the third sentence, second paragraph, do you see where it says, "...because the nature of your condition created patient safety concerns, you have been on a leave of absence." Do you see that?
**A. Yes.**
Q. Do you have any information or did you have any information that there was a specific incident or something that occurred that created patient safety concerns?
**A. The only knowledge I had of specific incidents were with, like, the EMR and his comments in some of the emails from Amy and others that he was having difficulty seeing certain areas of the screen, so that condition and that combination with that condition were some of the concerns that we had.**



American Reporting, Inc.
248-559-6750

EXHIBIT C

Q. All right. But as far as patient safety concerns, do you have any information that a specific patient was placed in danger as a result of Dr. Jansma's condition?
**A. No, no specific patient information.**
Q. So the only thing about -- well, I won't say the only, but according to this, he was placed on a leave of absence because the condition itself creates patient safety concerns?
**A. So the condition and then the fact that he had expressed concerns about his ability to see the EMRs.**
Q. Did he express that to you?
**A. No, it was an email from Amy and I believe the first person that he maybe reported that to or had conversation with was one of his scribes.**
Q. What is EMR?
**A. It's the electronic medical record system where all the patient information is captured.**
Q. Did Dr. Jansma agree on October 5th to undergo the medical evaluation?
**A. My recollection is that he did and that we told him that we would select two providers outside of the network for him to choose from.**
MS. BROOKS: Before we leave October 5th, James, if you could mark the next exhibit document E, so that would be Plaintiff's Exhibit 13, I believe.



(Whereupon Plaintiff's Deposition Exhibit Number 13 was marked for identification.)
Q. (By Ms. Brooks) Do you see this document, Ms. Dabrowski?
**A. Yes.**
Q. Okay. What is the document?
**A. So this is an email from Amy, just sort of outlining some of the concerns that had been raised with regard to Dr. Jansma.**
Q. Okay. And the first sentence says, "Good morning, Melissa." It's sent from Amy, "Phil Vanderlugt contacted me last night to let me know you needed all documentation regarding my experience with Dr. Jansma." Did you contact Phil Vanderlugt for that information?
**A. I don't remember if Phil maybe mentioned to me that Amy had documentation I may want and Phil and Amy often worked in clinic together, so that may be how that came up.**
Q. Okay. And she forwarded you this email the same day that you spoke to Dr. Jansma, correct, on October 5th, 2018?
**A. Correct.**
Q. Okay. Do you remember if you received this email before or after the conversation you had with Dr. Jansma?
**A. I don't remember. I don't recall the time that we talked to Dr. Jansma.**
Q. She said, "I will forward all emails shortly that I have on file." Do you recall getting those emails from her?



**A. Yes.**
Q. And then she says, "To recap, please see below." The recap that she described, would you characterize it as a summary of her documentation, of her experience with Dr. Jansma? You can take your time and read it.
**A. Yeah. Yeah, I think knowing Amy it was likely just a recap of some of the things that she had experienced during the time working with him.**
Q. Okay. When you received this email, you know, it talks about some of the things that she was doing, correct, so once you received this email, what did you do?
**A. I didn't hear what you said when you were looking away. It faded so --**
Q. Once you received this email, what did you do? Did you do anything with the information that you received?
**A. Read it, filed it and I think waited for the rest of the emails probably to come, so I could get more specifics of what were the emails and who were they coming from.**
Q. Did anything in the emails concern you?
**A. Yeah, I mean, there's several things, like we've talked about the behavioral concerns, the treatment of patients and staff. The rubbing of the back and shoulders of one of the techs. I think in this actually it even mentions the fact that he was having some difficulty with the EMR, so there were a number of things in this that are**



**concerning when it's one of your providers, yeah.**
Q. And so did you speak to Dr. Jansma about the emails that you received or about the content of the information in the emails?
**A. I don't remember speaking to him specifically about those emails or the contents. I think the only thing, again, that maybe came up as part of discussions with him was the fact that there were some behavioral concerns, but he knew that. That's why Phil and Surya met with him.**
Q. Well, what did he say to you, though, about -- if anything, about what you discussed with him?
**A. On the 5th?**
Q. Yes.
**A. Just, I mean, his main questions to me were with regard to what his options were if he resigned and what his options were if he were to do the medical evaluation. Would he be able to continue employment? What would that look like? I mean, I think that was more the discussion that he and I had.**
Q. Okay. So I guess what I'm trying to figure out is, so was there a discussion about his behavioral concerns on the 5th from you to him or was it just what was described in our interrogatory responses, the terms that were in the contract and the medical leave? Did you personally discuss behavioral concerns with Dr. Jansma on the 5th?





EXHIBIT C

shared with me, that you are a firm believer that things need to be clear if you're going to discipline somebody? Did you share that with him?
**A. I don't know if I shared it with him that day, but it's likely that there was discussion at some point with me that that was how I felt about it.**
Q. Who made the decision to place him on medical leave? I mean, leave, a leave of absence, I'm sorry.
**A. My recollection is that myself and in conversation with Surya, I felt like we needed to put him on a leave and allow him an opportunity to do the fitness for duty.**
Q. So do you believe you received the forwards or the emails or the documentation that you asked for on the same -- around the same time that you received this summary?
**A. I don't recall, but my guess based on the fact that she says she was out of the office until the next week is that it may have been early the following week before I had all of that.**
Q. Okay, but you definitely recall receiving them?
**A. Yes, I do remember her giving me all of those email correspondence.**
Q. So he could not come back, Dr. Jansma could not come back to work as of October 5th, 2018, because he was on leave pending the medical evaluation, correct?



**A. Correct.**
Q. But based on what you just said, that outside of that medical evaluation, he would be permitted to come back to work or keep working despite the behavioral concerns, correct?
**A. That was my understanding.**
Q. Well, let's talk about the medical evaluation now.
MS. BROOKS: James, if you could bring up document G. And what exhibit are we on now?
COURT REPORTER: We are on 14.
(Whereupon Plaintiff's Deposition Exhibit Number 14 was marked for identification.)
Q. (By Ms. Brooks) Can you see that, Ms. Dabrowski?
**A. Yeah.**
Q. Is this an email you sent to Dr. Jansma on October 8th, 2018 at 1:29 p.m.?
**A. Yes.**
Q. Okay. And is the subject of the email Letter/Release?
**A. Yes.**
Q. And I'll just read it and you can confirm if I'm right. It says, "Dr. Jansma, good afternoon. I apologize for the delay in getting this to you. There are two physicians outside of the BSV provider network that our physicians are suggesting would be the right specialty."
Who were the physicians that made the suggestions



about the physicians in the right specialty?
**A. I believe it was Dr. Gindzin and possibly Dr. Vanderlugt, but I think Dr. Gindzin was actually the one because he's one of our retina specialists and was familiar with that particular medical term, so he knew what type of subspecialist would need to see that.**
Q. Does Blue Sky Vision have any type of relationship with Dr. Glisson?
**A. No, not that I'm aware of.**
Q. What about Dr. Santos?
**A. No.**
Q. And then you said, "The two are Dr. Glisson or Dr. Santos. Per your request last Friday I've attached a copy of the letter and release form that will be sent to either Dr. Glisson or Dr. Santos." So it sounds like that when you spoke to Dr. Jansma, he agreed to undergo the medical evaluation. Does that sound right?
**A. Correct.**
Q. And this is Blue Sky Vision 000148 through 000153.
MS. BROOKS: James, if you could scroll down and show her. And if you can go up to 000149.
Q. (By Ms. Brooks) So what is this attachment?
**A. So this was basically the letter and the questions that we were going to send to whichever physician he selected for the evaluation.**



Q. Okay. Who wrote this letter?
**A. I think this was a standard form letter that I had worked -- I'm just trying to remember back. I actually don't know who specifically wrote it. I just believe it was a standard form letter that could be used for a fitness for duty.**
Q. Where did you get it from?
**A. I don't remember if -- we had access to BHS HR forms and SHRM, so possibly pulled something from there.**
Q. You said BHS, what was that?
**A. It was a group that we partnered with for consulting that had an HR arm.**
Q. What does BHS stand for?
**A. I don't know that it stands for anything. It's the name of the consulting firm.**
Q. Okay. I didn't know if -- like SHRM means something.
**A. Yeah, I don't think that BHS actually has anything, it's just an acronym that they used for their organization.**
COURT REPORTER: Did you say SHRM?
MS. BROOKS: Yes, S-H-R-M. Society of Human Resource Management.
COURT REPORTER: Thank you.
Q. (By Ms. Brooks) So you are the one that selected this form? Are you the person that selected this form to send to the physician Dr. Jansma selected?



EXHIBIT C

**A. Yeah, I likely would've had one of our providers or someone review this to make sure that, you know, in terms of what I was saying for the homonymous hemianopia or whatever, that those things were correct because that's clearly not my area of specialty.**
Q. Okay, but you were the one that picked it to use and to give to Dr. Jansma?
**A. Yes.**
Q. All right. I want to ask you about it, ask you about this first. I'm looking at the questions. Number one, it says, "Does Dr. Jansma have a physical or mental impairment?" Why did you need to know if he had a mental impairment?
**A. I think it was just a standard part of that question, so it's physical or mental. Kind of open-ended for the physician to make that determination.**
Q. So there was no particular reason that you wanted this question answered?
**A. No. I guess if the mental portion didn't apply, they wouldn't describe that portion.**
Q. But it asks them to determine whether he has a physical or mental impairment, right? That's what the question asks, correct?
**A. It asks if he has either of those things, correct.**
Q. And so you're kind of guessing whether or not, you said I



guess if it didn't apply, they wouldn't fill it out. That's a guess on your part, right?
**A. Well, that physician wasn't an individual for mental health, so they would've been looking at -- specifically, they were neuro-ophthalmologists. They would have been looking at neurology which, I guess, could be mental in some form or fashion, but they are ophthalmologists so they are really looking at vision.**
Q. So your position is that because he was in a particular specialty, these physicians, that they would not have determined anything beyond their specialty?
**A. Correct.**
Q. But as you sit here today, you don't have a particular reason why you asked? You don't know why it was important for you to know whether he had a mental impairment?
**A. No, I think it was just the standard way that this question is asked on the form.**
Q. Now, was it the type of form that, if you could recall, that you just kind of grabbed somewhere or could it be edited?
**A. I think this was an editable form because I was able to edit and add the doctors' names and addresses to it, but I think for the most part these were standard questions.**
Q. I'm glad you said that because did you add the -- if you look on the paragraph above that says, "To assist you, we



have attached a list of the essential functions of Dr. Jansma's position. Specifically, it is he able to thoroughly examine the eye to find pathology." Did you add that information?
**A. Yeah, I think we had attached the optometrist's job description to this so the individual would see, like, what the essential functions were and that's what that's referencing.**
Q. Okay. So for number one, could you have said does Dr. Jansma have homonymous hemianopsia instead of just a broad physical or mental impairment? Did that form allow you to do that?
**A. Yes, I'm assuming I would've been allowed to have done that.**
MS. BROOKS: Why don't we turn to -- same exhibit, but, James, if you could go to the Authorization for Release of Health Information.
Q. (By Ms. Brooks) What is this document, Ms. Dabrowski?
**A. So this is the general HIPAA release form.**
Q. Had you used this form before?
**A. I don't believe I've given this form to anyone before, no.**
Q. Okay. And at the time when you pulled this form -- well, where did you pull it from?
**A. Cathy, this may actually be something I requested from Miller Johnson or somewhere. That's my recollection. I**



**didn't have a standard HIPAA release form outside of the one used in our practice for patient release. I may have pulled this also from a site, like SHRM or somewhere.**
Q. Okay. You believe you pulled it from SHRM or similar sites that you pulled the letter from?
**A. Yeah.**
Q. Now, when you provided this authorization for release of health information to Dr. Jansma, you were aware at that time what his job was, right, that he was an optometrist?
**A. Correct.**
Q. And what was your understanding of the medical issue, what his medical issue was?
**A. My understanding was basically that he was having issues with visual fields, like being able to see certain portions of an EMR screen or things like that.**
Q. And that condition was called what?
**A. The thing that none of us can say, homonymous hemianopia.**
Q. I just want somebody else to say it.
**A. Yeah, I know. I needed to look for like the phonetic way to say it, like, where's the healthcare.**
Q. Okay. So we can agree, you agree with me that it's a condition that affects, as you understood it, Dr. Jansma's vision?
**A. Correct.**
Q. And you provided him with this release for the purpose of





EXHIBIT C

obtaining information related to his health, correct?
A. **Correct.**
Q. All right. So I want you to look at paragraph six. Do you see that?
A. **Yes.**
Q. And you can read it?
A. **Barely. Thank you.**
Q. I mean, I have my little copy here, but I'm, like, that's amazing. All right. So I'm going to ask you some questions about paragraph number six, okay?
A. **Uh-huh.**
Q. It says, "A description of the information I authorize for use or disclosure is: All pharmacy records..." Why did Blue Sky Vision need all of Dr. Jansma's pharmacy records?
A. **So my understanding, this form was going to be made out to a specific physician of his choosing and the only information that that physician would have disclosed to us was information that was relevant to the condition that we were looking at in determination of whether or not he could complete the essential functions of his job safely, so --**
Q. Does that form say that?
A. **The other form that you just had pulled up went along with this and the job description as a packet to whichever physician he was choosing, so I think the first letter**



**actually states that we're looking to identify, you know, whatever -- I think it actually called out the specific medical condition and then this, too, I'm sorry now it's in, but I feel like there's a spot at the top authorizing that particular provider to disclose what they feel necessary to make sure that he could perform the essential functions of the job.**
Q. Where does it say that they are able to disclose what they feel necessary?
A. **So if you look, it's authorizing them to disclose. So if that provider didn't have pharmacy records or didn't require any of those records to make a determination for his fitness for duty for the role, he wouldn't have access to those things to disclose to Blue Sky.**
Q. So if a -- whatever is in this -- but if he did, let's say that the doctor that this was sent to was a part of a health network, okay, like a hospital system, right, and he conceivably could have access to records that were beyond the eye condition. Would you agree? He could have access to it. That's all I'm asking. He may have access to his records.
THE WITNESS: Cathy, were you talking? She's muted.
MS. BROOKS: Go ahead, Cathy. I don't want to talk until you -- do you have an objection?
MS. TRACEY: I am the worst at Zoom depositions.



Yes, I just objected it's speculative, but you can answer, Melissa.
THE WITNESS: Okay. Yeah, I don't know what network they were part of, but the other form was clearly really intending to look at what are the things specific to that eye condition that we create an issue for Dr. Jansma to safely perform his job.
Q. (By Ms. Brooks) But right now, Ms. Dabrowski, I'm just talking about what's in front of us, paragraph six, and the question I asked was really in response to a statement you made that if you were sending it to a specific provider who was a specialist and they didn't need this information, then I was just saying conceivably they could have access to it. I was asking you, do you agree that they could have access to records that were part of their healthcare system even if it was beyond -- those records were beyond their specialties?
A. **Yes, they could have access to that if they were part of the hospital network.**
Q. So let me just finish. Why did you need, why did Blue Sky Vision need his pharmacy records, Dr. Jansma's pharmacy records?
MS. TRACEY: Objection, asked and answered. Melissa, you can respond.
THE WITNESS: We didn't -- I guess we weren't



requesting these specific things. It was really the doctor's decision based on what we were trying to determine that he would need to try and complete that form and let us know if Dr. Jansma was able to perform the essential functions of his job.
Q. (By Ms. Brooks) So you answered that you didn't need them; is that right?
A. **Well, to my knowledge, we likely wouldn't need them, but I'm not the physician that's trying to determine whether or not there's an issue there.**
Q. Why did Blue Sky Vision need Dr. Jansma's dental records?
A. **I don't think that this really -- I guess the way that I read number six isn't really us saying we need all of these records, it's really Dr. Jansma releasing a physician to make a determination on what, if any, of those records would be needed to determine whether or not he could safely perform the essential functions of his job.**
Q. Does paragraph six authorize the disclosure of dental records?
A. **Yes, but it says for use or disclosure, so --**
Q. Right.
A. **-- my, as a non-provider, my understanding would be that they would only use or disclose information that would be necessary for us to have in order to make a determination**



EXHIBIT C

**on his fitness for duty for the role.**
Q. But this is a disclosure that you asked Dr. Jansma to sign, right, correct?
**A. In conjunction with the letter and the questions.**
Q. Right.
**A. Yes.**
Q. I understand that, but we're talking about this form.
**A. Yes.**
Q. And I'm just asking questions right now about this form and you asked Dr. Jansma to sign this release of health information, right?
**A. Correct.**
Q. And the "I" in the description of information, "I authorize for use or disclosure...," the I would be talking about Dr. Jansma, right?
**A. Correct.**
Q. So he would be authorizing you based on what you sent him, use or disclosure of his pharmacy records, dental records and any and all records and documents pertaining to any treatment/consultation rendered or performed. Let's stop there. Why did you ask for any and all records and documents pertaining to any treatment or consultation rendered or performed when you're only purported interest is vision? So why did you ask that question?
MS. TRACEY: Objection, compound question.



Q. (By Ms. Brooks) Did you understand it?
**A. No, I'm actually looking for -- are we in the next part of this?**
Q. We are on paragraph six.
**A. Right. Is that the next part of that same thing after dental records?**
Q. I'll restate it.
**A. Okay.**
Q. So I'm asking now, I'm on the second sentence, it says, "...any and all records and documents pertaining to any treatment/consultation rendered or performed...," and I stopped right there.
**A. Okay.**
Q. Why did you ask for any and all of Dr. Jansma's records and documents pertaining to any treatment and consultation rendered or performed when the only condition at issue was related to his vision?
MS. TRACEY: Objection, foundation.
Q. (By Ms. Brooks) You can answer.
**A. I'm, like, I'm okay to answer? Okay.**
MS. TRACEY: I'm sorry.
THE WITNESS: That's okay. The last few times you said that, like, you're okay to answer.
So I guess, again, my understanding of that is any treatment and consultation rendered or performed was



specific to anything that the provider that we were directing this to would have, whether it was testing he felt was needed or anything else that he felt was needed to be able to tell us if this individual was safe to perform the essential functions of the job.
Q. (By Ms. Brooks) But why did Blue Sky need all of his records concerning any treatment or consultation he's ever had or he's had within this timeframe?
MS. TRACEY: Objection, it's asked and answered. She's told you three times that she didn't need those records and she's explained to you how she thinks these forms work together.
MS. BROOKS: I disagree with that, but I'm going to go on to the next sentence. I don't believe I asked it three different times.
Q. (By Ms. Brooks) Why did Blue Sky Vision ask for his complete inpatient and outpatient records?
**A. Again, my understanding of this paragraph, the whole thing, anything that's being requested here is that it's being requested for that physician to make a determination on what, if any, of this information would be relevant based on his diagnosis and based on whatever he needed to do to determine whether or not Dr. Jansma could safely perform his job as an optometrist.**
Q. So Blue Sky Vision didn't need his inpatient and



outpatient hospital records? That's kind of a simple --
**A. Yeah, not if it wasn't relevant to the condition and to his ability to perform the job.**
Q. Is that similar for surgical records?
**A. Yes. I mean, again, going into this, I'm not that specialist. I don't know a lot about the condition other than its eye-related. I don't know what, if any, records they may request or they may get that would give them information relevant to that condition, so I feel like this is an open-ended think so that physician is able to access what they need and determine whether or not he can safely do the role.**
Q. So you feel like pretty much you do not have to limit what you ask Dr. Jansma to provide to you at all because, again, he is the one that was asked for this information?
**A. Dr. Jansma never questioned --**
Q. No, no, I'm asking you. I'm not asking you what he questioned, I'm asking you to answer my question. Is it your position that you don't have to limit an authorization like this based on the job position? I'll just stop there. Based on the job position.
**A. So my understanding of this release is it was a pretty general release form that was used or could be used as a general release of information for a provider doing an evaluation or assessment of a patient.**





EXHIBIT C

Q. Okay, but that doesn't answer my question, right? I'm asking you just your understanding and maybe, you know --
MS. BROOKS: Cathy, did you say something?
MS. TRACEY: No.
Q. (By Ms. Brooks) It's just based on your understanding, your position, are you saying that Blue Sky Vision in this case was not required to limit the information it asked for, based on his job position or the condition at issue? And that's just kind of -- that's the question. It really doesn't have to do with what the physician will do with the information. I'm asking what's your role, what's your understanding of what you could ask in an authorization?
**A. So being a non-provider, I don't feel like I could make a determination on what to exclude from this type of authorization that may or may not be needed to make a determination of someone's fitness for duty for a role, so I don't know that I could have changed this to be specific to which records that person may need for that.**
Q. Okay. So the answer is no?
**A. On my ability to limit what the authorization is specifically asking the doctor to look for?**
Q. No, not your ability, what you believe your obligation is. I'll say it this way. The way I said it was confusing. Do you believe you had an obligation or not to limit this disclosure at all? Let's just start at the top. Were you



obligated to do so?
**A. I don't feel like we were obligated to limit an authorization for a provider, no.**
Q. So I left off, I believe -- I'll just go here. Do you see where it says, "This authorization includes alcohol, mental health and substance abuse records, including psychotherapy notes, records protected under the regulations of 42 Code Of Federal Regulations, Part 2, if any; HIV and AIDS records and all records defined by statute..." Taking just that section right there, why did you ask Dr. Jansma to disclose those records?
MS. TRACEY: Objection, asked and answered.
THE WITNESS: Yeah, so, again, this isn't Melissa Dabrowski writing an authorization release. This is an authorization release that was a standard form and it included things that may or may not be necessary for that particular provider to determine fitness for duty.
Q. (By Ms. Brooks) Prior to sending this authorization to Dr. Jansma, had you in your years of working in human resources sent out authorizations for health records before?
**A. I don't recall having done a lot of these in my past, no.**
Q. But you agree that this was the form that you asked Dr. Jansma to fill out, correct?
**A. Correct.**



Q. Was HIV and AIDS a concern for Blue Sky Vision in connection with Dr. Jansma?
MS. TRACEY: Objection, asked and answered.
You may respond.
THE WITNESS: Yeah, no. I mean, not specifically, no, there wasn't a concern there.
Q. (By Ms. Brooks) Was alcohol, mental health and substance abuse a concern that Blue Sky Vision had in connection with Dr. Jansma?
**A. No, not specifically.**
MS. BROOKS: Can you pull up document B, again? James, if you could scroll to the last page, Blue Sky Vision 000132.
Q. (By Ms. Brooks) Can you see that, Ms. Dabrowski?
**A. Yes.**
Q. I'm going to direct you to the third --
MS. BROOKS: Well, actually, if you could go to, James, Blue Sky Vision 000131 at the bottom.
Q. (By Ms. Brooks) Ms. Dabrowski, is this an email from Randy Jansma to you dated October 24, 2018, at 1:55 p.m.?
**A. Yes.**
Q. And the subject is Letter/Release?
**A. Yes.**
Q. And do you remember ever receiving this email, Ms. Dabrowski?



**A. Yes.**
Q. And you received it in connection with your human resources position?
**A. Correct.**
MS. BROOKS: If you could look at 00132, James? Is that the last page? Oh, no, there it is. I'm sorry.
Q. (By Ms. Brooks) Do you see where it says, did Dr. Jansma tell you that, "The testing Blue Sky has proposed is overreaching in its scope. It seeks to delve into my entire medical history, which is an invasion of my privacy. Only history germane to my condition may be accessed." Do you see where it says that?
**A. Yes.**
Q. How did you respond to him telling you, giving you his thoughts about the testing that Blue Sky proposed?
**A. I believe it was an email response back basically just reassuring him that our intent wasn't to delve into, you know, information and medical history that wasn't relevant to his condition and to his ability to perform the essential functions of his role.**
Q. Okay. Why didn't you just change the release or the letter?
**A. There wasn't a request here from Dr. Jansma with regard to what needed changed and, as I mentioned earlier, I'm not a provider, so for me to make a determination as to what**





EXHIBIT C

**information, if any, that provider might need to determine his fitness for duty, I think would be wrong for me, you know, to try to do.**
Q. So you said there wasn't a request. Did he have to request that of you in order for you to attempt to address his issues? Why was that necessary? I'm sorry.
**A. That's okay. So my recollection from this is this was almost a month or more if it was the 24th or whatever date we just said, after he had received the initial form and --**
Q. He received the initial form on October 8th, correct?
**A. Yeah, October 8th, and this was two or three weeks later that he is only now raising this concern?**
Q. Okay.
**A. I guess I just -- he didn't specifically state what in there he felt was too much and, again, I'm not a provider, so I don't know, I don't know that I would have tried to attempt to change a standard form not knowing what information that provider may need to be able to determine whether or not he could safely perform his job.**
Q. Okay, but you were able to talk to someone at Blue Sky Vision to determine what providers to send this form to, correct? What type of a specialty, right?
**A. Yeah. I think the way the question was asked is for someone with this type of condition, you know, what is the**



**appropriate subspecialty that would need to see that individual and make a determination on fitness for duty.**
Q. And what I want to know is did you make a similar attempt to ask someone at Blue Sky Vision or anywhere about the scope of this medical release once Dr. Jansma raised that concern?
**A. I don't know that I specifically shared that release. Again, I felt like it was a pretty standard release form, so it wasn't something that I -- I don't recall going and asking individuals to review the release form.**
Q. Okay. So that's what I want to know. So you didn't make an attempt to look into his concern with anyone at Blue Sky Vision?
**A. I don't recall sharing that release form and asking for anyone to try and make a determination on what to change, no.**
Q. Why is it that you just brought up -- like, this was dated October 24, this email is dated October 24th, 2018, correct?
**A. I don't see the date on my screen, but I think that's what it said.**
Q. And the email that we just went over that contained -- I don't know the exhibit number, but contained the release that you sent to Dr. Jansma was October the 8th, the 8th of October, so why, I'm just curious, you just said



something that -- why does it matter that it was two weeks apart when he said something?
**A. I just feel like he had it for several weeks and there had been some back and forth and the concern didn't come up and so I would think if that was your concern, it would come up before two and a half weeks later. I mean, if I received something and I had concern, I probably would raise it immediately if I was trying to resolve something like this.**
Q. Okay, but he did raise it with you within less than three weeks, right?
**A. Yeah, if it was the 8th to the 24th, yes.**
Q. So 16 days?
**A. Yeah, and I believe after my response to his request, I don't think I ever heard back from Dr. Jansma, so I actually at that time after my response felt like he was feeling okay about things and he was going to do the assessment.**
Q. So let me make sure. The last thing he -- not the last thing, one of the last things he said to you was related to -- what did he say -- he said, "The testing Blue Sky has proposed is overreaching in its scope. It seeks to delve into my entire medical history, which is an invasion of my privacy. Only history germane to my condition may be assessed." If you didn't hear from him after that,



could it also not be the reason why it's because he still has a problem with this? I mean, right now -- well, go ahead. Answer the question.
**A. Yeah. So the last -- I see that, but I also see his last thing says it needs to be set forth, if this is the case, this is the doctor I'm selecting and I don't remember my exact response. If we have it, it would be helpful for me to see it, but I feel like my response was that we weren't trying to delve into or get information that was not relevant to his role and I believe after that email, I never received any additional correspondence from Dr. Jansma indicating that he still had a concern about the form.**
Q. Okay. Let's back up. So you're not a doctor, I'm not a doctor, but as you read that form, do you disagree with him that the form as written, not as who he was going to go to, but the form as written, do you disagree with him that the form as written seeks information about his medical history, his entire medical history?
**A. I don't disagree that it could read as though that's what it's doing, but the intent was not to get information that was not relevant to his issue.**
Q. I believe I know the email you're talking about if you'll just bear with me.
MS. BROOKS: James, can you pull up I think it's 10,



EXHIBIT C

THE WITNESS: Thank you.
(Brief recess.)
Q. (By Ms. Brooks) Ms. Dabrowski, if you look at Blue Sky Vision 000129 and that's at the bottom of the screen you will see an email from you Monday, October 29th, 2018, at 12:02 p.m. to Randy Jansma regarding the Letter/Release?
**A. Yes.**
Q. And is this the form we were just speaking about where the only changes made was you updated the name to Dr. Glisson and you can look at the next page which is Blue Sky Vision 000144 through 147?
**A. Yes, so it was the letter, the authorization for him to disclose the information in the letter and I believe the optometrist job description.**
Q. Yeah, it should be.
MS. BROOKS: Can you scroll down to the last page?
Q. (By Ms. Brooks) Other than the optometrist job position, which I believe was attached to this, the only thing that's changed is the name on the letter, correct?
**A. Correct.**
Q. Okay. And this was again sent on October 29, 2018, to Randy Jansma, correct?
**A. Correct.**
Q. And Dr. Jansma told you on October 24th, 2018, that he believed that the testing Blue Sky has proposed is



overreaching in scope; is that right?
**A. So his email says that the testing is -- yes.**
Q. It was just the date. I was just confirming that it's the date he said the testing Blue Sky has proposed is reaching in its scope, that was prior to this email you sent with the updated form with Dr. Glisson's name?
**A. Correct. In that same email he made the election for it to be Dr. Glisson, the 24th, yes.**
Q. So, Ms. Dabrowski, what happened after you sent the forms and the release and the letter to Dr. Glisson?
**A. My recollection is the next email I sent to Dr. Jansma was that that office would be reaching out to him to schedule an appointment.**
MS. BROOKS: James, can you scroll up to the first page?
Q. (By Ms. Brooks) Ms. Dabrowski, do you see that email dated November 8th, 2018, from you to Randy Jansma?
**A. Yes.**
Q. And it says Appointment Scheduling Update?
**A. Correct.**
Q. Okay. Is this the email you were just referring to?
**A. Yes.**
Q. So what happened after you sent that email?
**A. I don't believe I ever heard back from Dr. Jansma in November or December and then eventually -- he pretty much**



**stopped communicating with us completely and after two and a half months of him being off and not being able to progress things forward, we terminated his employment.**
Q. So is this November 8th, 2018, email the last email you sent to him, to Dr. Jansma?
**A. That's my recollection, yes.**
Q. Did you reach out to Dr. Jansma by phone after November 8th, 2018?
**A. No, I don't recall reaching out to him by phone again.**
Q. Now, you just said that Dr. Jansma was terminated, correct?
**A. Correct.**
Q. Did you make that termination decision?
**A. So in partnership with Surya and others on the leadership team at the time, I think it was Bill Hughson who was our CEO, yes, because he -- he had stopped responding to our requests and our emails and so after -- like I said, we've been paying him on a leave for two and half months, we made the determination that we weren't going to be able to progress forward to bring him back.**
Q. Okay. I need you to go back because -- so you were involved in the termination, Surya was involved in the termination or made the decision to terminate Dr. Jansma and -- okay.
MS. BROOKS: James, can you pull up Plaintiff's



Exhibit 12 again and go to page 8. That's document K, if that helps you. I don't know if it does or not at this point.
Q. (By Ms. Brooks) Okay. Ms. Dabrowski, in response to interrogatory number seven, "Identify all persons who made the decision to terminate Jansma on December 5th, 2018." The answer is, "Surya Desiraju and Melissa Dabrowski made the decision to terminate Jansma." Is this incomplete?
**A. No. Maybe my recollection is we made our CEO aware. He would've been aware of that decision, so I think maybe I just confused that.**
Q. Well, that's why I want to make sure, you know, I just wanted to make sure. I didn't know.
**A. Yes.**
Q. So there's no one else that you recall at this time made the decision to terminate Jansma?
**A. Correct.**
MS. BROOKS: That's all I needed for that. Thank you, James. James, can you mark the next exhibit? What are we on?
COURT REPORTER: We are up to 16.
MS. BROOKS: Document J.
(Whereupon Plaintiff's Deposition Exhibit Number 16 was marked for identification.)
Q. (By Ms. Brooks) Ms. Dabrowski, is this Blue Sky Vision



EXHIBIT C

000118, an email that you sent on December 5th, 2018, and 10:34 to Randy Jansma with the subject of Notice of Termination?
**A. Yes.**
Q. And do you recall sending that?
**A. Yes.**
MS. BROOKS: If you go to the next page, James, 000119.
Q. (By Ms. Brooks) Is this the termination notice that you sent that was attached?
**A. Yes.**
Q. So for this document, I just want to know, is there anything else, is there any reason other than what is stated in this document why you terminated Dr. Jansma?
**A. No. He had stopped communication with us and we were not able to determine whether or not he could safely perform the essential functions of his job.**
Q. Okay.
MS. BROOKS: James, if you could pull up document M as Plaintiff's Exhibit 17.
(Whereupon Plaintiff's Deposition Exhibit Number 17 was marked for identification.)
Q. (By Ms. Brooks) Ms. Dabrowski, we are kind of going backwards here, but I just wanted to go back to some things you said about the processes that were in place



when you worked as VP of HR for Blue Sky. You indicated that for the first year or so, maybe two years, it was just you in the HR department; is that correct?
**A. Yeah, for about most of the first year it was just me.**
Q. Okay. So was this employee handbook the only one in place? Was it in place at all in 2018 when Dr. Jansma worked there?
**A. So this handbook, in 2018 we would have partnered with Shoreline, so Shoreline Vision would've had a different handbook and I believe CRA even had some form of a handbook at the time, as well, and we had completed those partnerships, so yes, this still existed. It hadn't been updated in quite some time, but it was still in existence at the time.**
Q. So Shoreline has a handbook, as well?
**A. Yeah, Shoreline originally had their own handbook prior to us merging with them.**
MS. BROOKS: Cathy, I don't think that's been produced to me.
MS. TRACEY: Yeah, I don't think I knew that.
MS. BROOKS: So if you'd get that for me.
MS. TRACEY: Yeah.
MS. BROOKS: James, if you could scroll down to 320, Bates number 320.
Q. (By Ms. Brooks) Ms. Dabrowski, I am reading under



Discipline and the fourth paragraph and it says, "Most often, however, discipline will be undertaken in a progressive manner. Most misconduct or improper actions will be addressed first with a verbal warning followed by one or more written warnings and/or dismissal. However, all employees must be aware that the employer at his discretion would determine what disciplinary action is appropriate for a specific situation. Any one or more of the steps noted above may be used or an employee may be discharged for a first offense depending on employer's sense of the seriousness of a situation."
Does it say that? Did I read that correctly?
**A. Yes.**
Q. You spoke earlier about the documentation that you believed was necessary when it comes to performance or in this case, in your words, behavior concerns. Do you remember that line of testimony?
**A. Yes.**
Q. So based on this, what I just read, would you have liked to have seen a verbal warning or written warning -- let me just start over. Have you reviewed Dr. Jansma's personnel file?
**A. I don't know that he had much of a file. I mean, he was only with us a little over three and half months, so I think mostly what was in there was his new hire paperwork**



**and the documentation that we received from Amy ultimately would have been in my tickler files.**
Q. Okay. A personnel file was produced to me. Where would his personnel file have been kept?
**A. So it would've been electronic and on one of our drives, I'm thinking, in our HR drive.**
Q. Okay. So did Blue Sky Vision use any type of HRIS system?
**A. No, we didn't have an HRIS system.**
Q. Should he have received, based on what you learned about his behavior, what you called behavioral concerns, a verbal warning or should there be some type of documentation writing him up, addressing him directly as result of the concerns you learned about?
**A. I don't believe that in every instance there was written documentation and if there were verbal conversations with leaders, you know, at a practice level, I may not be privy to all of those or what was documented outside of what Amy shared.**
Q. Okay, but in your view as an HR professional, should there be? Should there be documentation of any employee, should there be a practice in place where there is documentation of an employee's performance concerns?
**A. Yes. I think I stated earlier that I feel it's appropriate to tell people what the issue is and give them an opportunity to improve upon that.**





**EXHIBIT C**