# EXHIBIT L

don't understand a question, just tell me and I'll rephrase it. Otherwise, unless you say that, I'm going to expect that you understood it correctly. Okay?
Can you describe your education for me beginning at college?
**A. I attended Hillsdale College in Hillsdale, Michigan, where I received a BS degree in biology. I did a Master of Sciences in Neurophysiology at Wayne State University Medical School at the Michigan State College of Osteopathic Medicine followed by a neurology residency at MSU and Sparrow Hospital and then a Neuro-ophthalmology Fellowship at the University of Pennsylvania.**
Q. Okay. When was your fellowship at University of Pennsylvania?
**A. 2006 to 2007.**
Q. After that, did you obtain a medical license?
**A. Yes.**
Q. What year?
**A. My final board certification was completed in 2009.**
Q. Go over your certifications with me.
**A. I am board certified in neurology by the Osteopathic Board of Neurology and Psychiatry.**
Q. Are you currently employed?
**A. Yes.**
Q. Where do you work?



**A. I work at Mercy Health St. Mary's in Grand Rapids, Michigan.**
Q. How long have you worked there?
**A. 13 years.**
Q. So did you start working there around 2007?
**A. Correct.**
Q. I would like to show you a document that I'm going to mark Plaintiff's Exhibit 27.
(Whereupon Plaintiff's Deposition Exhibit Number 27 was marked for identification.)
MS. BROOKS: And if you could show that document, James.
Q. (By Ms. Brooks) And I'll represent that this is a document that I have received from your counsel, but I have done what's called Bates-label these documents on the bottom.
MS. BROOKS: If you could scroll down.
Q. (By Ms. Brooks) So those identifiers, Glisson 1, it goes to Glisson 4, just so that we can make sure that we are looking at the same page and so I'll sometimes refer to those identifiers. Did you see where I was talking about at the bottom?
**A. Yes.**
Q. If you want to review this four-page document -- have you seen this document before?



**A. Yes.**
Q. Well, if you want to quickly review it and let me know when you're finished.
MS. BROOKS: James, if you could you scroll to make sure that he knows what I'm looking at.
MR. TAKACS: Karen, in the interest of time and since it is on the computer, maybe it's best just to ask him the questions and then we can go to the specific reference or the page if that might streamline things.
MS. BROOKS: This is going to go real fast. This is going to be fast, okay?
Q. (By Ms. Brooks) Sir, when did you review this document? When did you see this document?
**A. If we could scroll down to the next page. It looks as if I first saw it on November 8th of 2018.**
Q. Are you looking at the first line, the first row?
**A. Correct, the first column.**
MR. TAKACS: It looks like the first column on the left and then the fifth column down.
MS. BROOKS: Okay. I see. So if you could scroll back to the first page, James?
Q. (By Ms. Brooks) Doctor, I only want to talk about this first page for now. Is this first page a consult requested November 5th, 2018, concerning Randall Jansma?
**A. Yes.**



Q. And what does it say is the reason for the referral on this page?
**A. It indicates homonymous hemianopsia.**
Q. And what is that?
**A. It's a specific pattern of visual field loss.**
MS. BROOKS: If you can go to the next page, James?
Q. (By Ms. Brooks) So it looks like the remaining pages, two, three, four, seem to be of a history of some sort. Is this the history of what events occurred with respect to the patient or the potential patient?
**A. With regard to the referral, yes.**
Q. With regard to the specific referral, all right. So this would not be considered an electronic medical record, correct?
MR. TAKACS: Object to the form.
You can answer if you know.
THE WITNESS: I don't know.
Q. (By Ms. Brooks) Do you know what an electronic medical record is?
MR. TAKACS: Same objection.
You can respond if you know.
THE WITNESS: Yes.
Q. (By Ms. Brooks) Okay, but as you sit here today, you're not sure if this is an EMR?
**A. Correct.**





EXHIBIT L

MS. BROOKS: James, if you could scroll up just a little. Yes, right there.
Q. (By Ms. Brooks) So what I'm looking at, I just want you to tell me if I have this right. So I'm looking at the Action By column and the Assigned To, so if I'm looking at where it says Assigned To cglisson, for example, did the person who is under Action By, which is mcortez13, is that the person who wrote the action note next to it?
**A. Yes.**
Q. So it's really as if she's asking you for that instruction or please review and advise to you, correct?
**A. Correct.**
Q. So can you just tell me who mcortez13 is, the full name, if you know?
**A. She is a member of our office staff.**
Q. Okay. And her name is?
**A. Marta Cortez.**
Q. And on that first row, m-m-i-k-u-l-i-c, what is that person's full name?
**A. I don't know.**
Q. Do you know who rsantos19 is?
**A. Yes.**
Q. Who is that?
**A. Dr. Ronel Santos.**
Q. Is he a doctor in your office?



**A. Yes.**
Q. All right. So I want to go -- I want to ask you about the row where your name is, the fourth row. It says, "Marked urgent. Please review and advise thank you. Pin to top." So when it says, "Pin to top," and I also want to direct you to the first row. It also says, "Image attached. Pin to top." Do you see that?
**A. Yes.**
Q. So does that mean that you could press a button and then go to the top and see some type of image?
**A. No. I believe that allows you to pin the message that proceeds the parentheses to the top of the page.**
Q. Okay.
MS. BROOKS: If you could scroll down, please, James, to the last row?
Q. (By Ms. Brooks) Dr. Glisson, I'll read it. I'm looking at the entry November 13th, 2018 at 10:02 a.m. Do you see where I am?
**A. Yes.**
Q. Okay. Do you know who this person is chavens2?
**A. Yes.**
Q. Who is that?
**A. A member of our office staff.**
Q. And the full name?
**A. Cheryl Havens.**



Q. I'll read what is under the action note. It says, "Melissa from Blue Sky Vision is calling. They are the ones who are requesting this patient see Dr. Glisson to see if he is still fit to see patients. Her number is 616-588-6574."
First of all, at this time, November 13th, 2018, had you heard of Blue Sky Vision?
**A. Yes.**
Q. Okay. Do you know anyone who worked at Blue Sky Vision?
**A. Yes.**
Q. Who do you know?
**A. The physicians who work with Grand Rapids Ophthalmology who refer me patients from time to time.**
Q. Any particular one?
**A. No.**
Q. Do you know them all?
**A. I don't know that I know them all.**
Q. Are there any names that you can recall that you know?
**A. I know several of them.**
Q. Okay. Can you just say some of the names that you know?
**A. Dr. Gindzin.**
Q. Anyone else?
**A. No.**
Q. Okay. So there's no one else that you can recall at this time that you know?



**A. Correct.**
Q. Have you worked with Dr. Gindzin before?
**A. We have cared for the same patients from time to time.**
Q. Have you spoken with anybody at Blue Sky Vision about this deposition?
**A. No.**
Q. All right. So I'm also going to go to the next page and ask you about -- in conjunction with what we just read which, again, says Blue Sky Vision, they are the ones requesting this patient see Dr. Glisson to see if he is still fit to see patients. In conjunction with that, I want to direct you to the third row and I will read it. The entry date is November 19th, 2018, at 11:35 and does this entry look like it's assigned to you?
**A. Yes.**
Q. Go ahead.
**A. Assigned to me, not written by me.**
Q. Right, assigned to because if you scroll up that's clear. Well, we agree that it's assigned to you. You need not write it, correct?
**A. Correct.**
Q. All right. So it says, "I spoke with Melissa. Potential patient is a doctor himself and has been having some vision issues. The company he works for wants him to have a determination made if he is still fit to practice as a





EXHIBIT L

provider knowing vision issues are occurring. Patient has some vision notes that we will work on getting, but my question would be is this something we would schedule new patient visit for or is it more like an IME." What is an IME, sir?
**A. My understanding is that an IME is an independent medical examination.**
Q. Okay. So I'll continue reading. "I know you have not been doing recently so please let me know how you would like to proceed with this info and if we are to schedule him in clinic, we would definitely do so. Also, please note that in the patient's chart, is the request for medical or disability condition questionnaire can be found which may help to determine the answer of how to proceed."
Sir, did you read this message, this entry?
**A. Yes.**
Q. Okay. And who is dsullivan36?
**A. A former member of our office staff.**
Q. What is the full name?
**A. Dylan Sullivan.**
Q. That's a guy, a male?
**A. Correct.**
Q. So you read Mr. Sullivan's entry and after reading the consult page and Mr. Sullivan's entry, what -- well, I'll ask you this, were you doing IMEs at the time?



**A. No.**
Q. You were not. Okay. So do you believe that was what he was saying, you weren't doing these at the time based on what you read here, IMEs?
**A. Yes.**
Q. But you were taking new patients at the time, correct?
**A. Correct.**
Q. So after reading the first page, the referral and this note, in your view, what was the reason why Blue Sky Vision wanted you to or referred Randall Jansma to you?
MS. TRACEY: Objection, form.
Q. (By Ms. Brooks) You can answer.
**A. The indication was for homonymous hemianopsia.**
Q. Okay. That was the indication so you're saying that that was the reason why he was being referred because of that. Anything else that you --
**A. That's the only information that we had documented at that time.**
Q. Okay. So this entry also says, "Please note in the patient's chart...", and it says the, "...is the request for medical or disability condition questionnaire can be found, which may help to determine the answer of how to proceed." Do you recall looking at the questionnaire that Mr. Sullivan refers to?
**A. No, I do not.**



MS. BROOKS: James, if you can pull up Plaintiff's Exhibit 15. It was previously marked in a deposition as Plaintiff's Exhibit 15.
Q. (By Ms. Brooks) Sir, you can review all five pages, if you want. My questions will be limited to pages two, three and four. So if you could review these and let the court reporter know when you are finished reviewing the page. So we are now on I believe this was Bates number BSV 144, I believe.
MS. BROOKS: If you could scroll down and confirm that, James?
Okay.
Q. (By Ms. Brooks) So if you can review this and let him know when you are finished.
**A. You can scroll again, please. Scroll again, please. Thank you.**
Q. Sir, do you ever recall seeing this document?
**A. I don't recall.**
MS. BROOKS: James, if you can go back to Plaintiff's Exhibit 27.
Q. (By Ms. Brooks) Sir, I'm going to direct you to the entry that has your name, cglisson, in both the Action By and Assigned To. This entry, which is --
MR. TAKACS: You need to go to the next page.
MS. BROOKS: Yes.



Q. (By Ms. Brooks) Which is dated November 19, 2018, at 6:16 p.m. Do you see where I'm looking?
**A. Yes.**
Q. Would this be something that you would have written or typed?
**A. Yes.**
Q. And here you say, "I would suggest that this evaluation start with general ophthalmology, with request for us to evaluate if there is suspicion of a neuro-ophthalmic issue. They may have already been done, but without records to review it is impossible to make a determination." Do you see that, sir?
**A. Yes.**
Q. Okay. So I just want to ask you a couple questions about that. Is there a difference between general ophthalmology and what you do?
**A. Yes.**
Q. Can you describe that for me?
**A. Neuro-ophthalmology is focused on disorders of vision that arise from disorders within the central nervous system. Ophthalmology treats disorders that are the result of disorders within the eye.**
Q. Okay. So where you say make a determination, did you mean to make a determination about whether this patient should see you at all, this referral? Is that what you meant?





**EXHIBIT L**

**A. Yes.**
Q. Is the reason why you were trying to determine whether you should see this patient at all, is that because the condition homonymous hemianopsia does not necessarily require a neuro-ophthalmologist? Is that right?
MS. TRACEY: Objection, compound question.
You can answer if you understood it.
THE WITNESS: James, if I could ask you to scroll up just a bit to the entry from 11:35 a.m. on November the 19th.
What was recorded there was, "I spoke with Melissa. Potential patient is a doctor himself and has been having some vision issues." "Vision issues" is very nonspecific.
Q. (By Ms. Brooks) Okay. So I'm talking about the entry that you wrote, right? And I was just trying to make sure I understood that -- maybe you are answering my question. Are you saying that the answer to my question of whether this patient should see you at all, you know, make a determination whether the patient is to see you at all is based on what Mr. Sullivan said? Do you understand?
Like, I asked you, so when you say make a determination, did you mean to make a determination about whether this patient should see you at all and you said yes and now I'm asking you is the reason for that because homonymous hemianopia does not necessarily require at all



times a neuro-ophthalmologist?
**A. I have no clinical documentation at this point in time to indicate that the patient does have an homonymous hemianopsia.**
Q. I see. So now I'm going to segue into that you said -- let's see -- I am still on that same entry where you typed the entry, 11-19-2018 at 6:16 and you said, "This may have already been done..." -- well, I'll start from the beginning. "I would suggest that this evaluation start with general ophthalmology, with request for us to evaluate if there is suspicion of a neuro-ophthalmic issue. This may have already been done, but without records to review it is impossible to make a determination."
What records would you have wanted to review at this time on this date?
**A. Some sort of a clinical examination that had been provided by a medical provider.**
Q. So if this patient had seen a general ophthalmologist, would that be the type of record that you would've wanted to see?
**A. Yes.**
Q. Are there any other records that you may have wanted to review at this time, other than what I just described?
MR. TAKACS: Object to form.



You can answer, if you know.
THE WITNESS: Any sort of a clinical examination would've been helpful.
Q. (By Ms. Brooks) A clinical examination with respect to the condition itself or any examination?
**A. Anything that was pertinent to the vision issues that were reported by Melissa at Blue Sky Vision.**
Q. Would you have wanted to review records relating to this patient's entire medical history on this date at this time? If you understand my question.
**A. Is your question, would I have needed to review his entire medical record to determine whether the patient needed to see a neuro-ophthalmologist?**
Q. No. My question is, on this date, which is November 19th, you're saying that without records to review, so I'm talking about the records you wanted to review and you're just telling me that you would want to see clinical records related to the vision.
What I'm asking now is, would you have wanted to see on this date records related -- like, all his inpatient and outpatient records, records related to his entire medical condition?
**A. Not at this time, no.**
Q. And that's what I'm talking about, this particular time.
At this particular time, would you have wanted to see



any mental health records that this patient may have had?
**A. No.**
Q. So the records that you wanted to see at this time, the records you wanted would be limited to his vision, to this patient's vision?
**A. Yes.**
Q. All right. So I'm going to --
MS. BROOKS: If you could scroll down to the last line, James, please? Actually, it's the second to the last line that I'm going to talk about. It's dated November 26, 2018, at 3:36 p.m. and it looks like it is written by Mr. Sullivan and it says, "Melissa called back and left me a voicemail asking if PT...", which I believe is patient, should get outside doctor notes. I called back to --
MS. TRACEY: Objection. That was a misstatement of the text.
MS. BROOKS: PT should get outside doctor notes. What was the misstatement?
MS. TRACEY: You missed eye. It says the patient should get outside eye doctor notes.
MS. BROOKS: Thank you.
Q. (By Ms. Brooks) "Melissa called back and left me a voicemail stating if PT should get outside eye doctor notes. I called back and let her know to have the other

eye notes to send to our fax at 616-685-8925 with attention Dylan. Once received, I will have Dr. Glisson review. If PT has not seen regular eye doctor they have been directed to start there being seeing us in neuro op."
Do you see that?
**A. Yes.**
Q. Do you recall directing anyone at your office to ask for the eye doctor notes?
**A. I believe that that would've been understood based on my entry from November 19th at 6:16 p.m.**
Q. Okay. And do you understand reading this, I know you didn't write it, other -- let me just say it right. I'm looking at the third line where Mr. Sullivan says other eye notes, do you understand that to mean records relating to this patient's vision?
**A. Yes.**
Q. Specifically, I want to direct you to the same entry, but it says, "If PT has not seen regular eye doctor, they have the directive to start there being seeing us in neuro-op." Do you understand this to say that this was a direction to Blue Sky Vision to have the patient's regular eye doctor examine him, given that you are a neuro-ophthalmologist?
**A. Can you please restate your question?**
Q. Sure. So do you understand that sentence that I read to state that if -- state an instruction to Melissa that if



this patient, which is Randall Jansma, has not seen his regular eye doctor, then Melissa and Blue Sky Vision have been directed to start with the regular doctor as far as the examination?
MR. TAKACS: Form.
You can answer.
THE WITNESS: I would say that "directed" was Mr. Sullivan's term. Earlier, on November 19th at 6:16, I had suggested that the evaluation start with the primary eye care provider. And I believe that the word "being" in that last sentence is a typographical error. I think what he meant was before seeing us.
Q. (By Ms. Brooks) That was my next question. Thank you.
Now, your office, to your knowledge, you never received any records from this patient's eye doctors, correct?
**A. To my knowledge, that's correct.**
Q. And you've never examined this patient, correct?
**A. No, I have not.**
MS. BROOKS: I'm finished with my questioning. Cathy?
MS. TRACEY: I have no questions.
MS. BROOKS: All right. Sir, thank you for your time today. I really appreciate it.
THE WITNESS: Thank you.



MS. TRACEY: Thank you.
MS. BROOKS: Nice to meet you, Mr. Takacs.
MR. TAKACS: Thank you, everyone.
(Whereupon the deposition was concluded at about 12:40 p.m.)



CERTIFICATE OF NOTARY - COURT RECORDER

STATE OF MICHIGAN)
)
COUNTY OF OAKLAND)

I, James A. Hengstebeck, a Notary Public in and for the above county and state, do hereby certify that witness CHRISTOPHER GLISSON, D.O., remotely appeared before me at the time hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and foregoing answers made by the witness which were duly recorded by me; that it was later reduced to written form under my direction and supervision, and that this is, to the best of my knowledge and belief, a true and correct transcript.

I further certify that I am neither of counsel to either party nor interested in the e of this case.

James A. Hengstebeck, CER 4623,
Notary Public, Oakland County,
Michigan
My Commission Expires: 10-30-2022



EXHIBIT L