UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN MICHIGAN

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

Case No. 1:20-cv-00285

V

HON. JUDGE PAUL L. MALONEY

BLUE SKY VISION, LLC,

Defendant.

Karen L. Brooks (IL ARDC#6285816)
Equal Employment Opportunity Commission
477 Michigan Ave., Room 865
Detroit, MI 48226

Catherine A. Tracey (P63161)
MILLER JOHNSON
Attorneys for Blue Sky Vision, LLC
45 Ottawa Ave. SW, Ste. 1100
Grand Rapids, MI 49503
(616) 831-1700
traceyc@millerjohnson.com

**DEFENDANT BLUE SKY VISION LLC'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

****ORAL ARGUMENT REQUESTED****

## Table of Contents

**ARGUMENT** ........................................................ 1

**I. BSV's Medical Examination and Inquiry Did Not Violate the ADA.** ........................ 1

**A. BSV's Medical Examination and Inquiry Did Not Violate the ADA.** ........................ 1

**B. BSV's Evaluation Forms Were Not Broader or More Intrusive Than Necessary** ... 1

**II. The EEOC Cannot Establish Through Direct (or Circumstantial) Evidence That BSV Took Any Adverse Action Against Jansma Because of His Disability.** ................ 6

**A. There is No Direct Evidence That But For Jansma's Medical Condition, BSV Would Not Have Taken Any Adverse Action Against Him.** .................................. 7

**1. There Is No Direct Evidence That BSV "Asked Jansma to Resign On September 25, 2018 Because of His Medical Condition."** ................................. 7

**B. There is No Direct Evidence That "After the Failed Attempt to Obtain Jansma's Resignation, BSV Placed Jansma on a Leave of Absence Due to His Medical Condition."** ........................................ 10

**C. There is No Direct Evidence That BSV Terminated Jansma Because Of His Medical Condition.** ........................................ 11

**D. Jansma Was Not "Otherwise Qualified" To Perform the Essential Function of His Position With or Without Accommodation.** ........................................ 12

**CONCLUSION** ........................................ 14

# Index of Authorities

**Cases**

*Conroy v. New York State Dep't of Corr. Servs*., 333 F.3d 88, 98 (2nd Cir. ) .............................. 1

*Haulbrook v. Michelin North America*, 252 F.3d 696, 707 (4th Cir. 2001) ................................ 13

*Jackson v. Regal Beloit America*, 2018 WL 3078760 (E.D.Ky. 2018) .......................................... 6

*James v. Goodyear Tire & Rubber Co*., 354 Fed.Appx.246, 248-9 (6th Cir. 2009) .................... 10

*Mitchell v. Vanderbilt Univ.,* 389 F3d 177, 182 (6th Cir. 2004) ................................................. 10

*Rowan v. Lockheed Martin Energy Sys. Inc*., 360 F.3d 544, 548 (6th Cir. 2004) .......................... 7

*Scott v. Napolotino*, 717 F.Supp.2d 1071 (S.D. Cal. 2010) ........................................................... 6

# ARGUMENT

## I. BSV's Medical Examination and Inquiry Did Not Violate the ADA.

BSV acknowledges that it made disability-related inquiries when it asked Dr. Glisson to examine Jansma and answer questions about whether his homonymous hemianopia would prevent him from safely performing his essential job functions, with or without accommodation. (ECF No. 25, PageID 108-111). As explained below, however, that inquiry was not unlawful because it was job-related and consistent with business necessity. *Id*. at 108-113.

### A. BSV's Evaluation Forms Were Not Broader or More Intrusive Than Necessary.

The EEOC concedes that BSV had reasonable grounds for deciding that Jansma should undergo a medical examination. (ECF No. 26, PageID.446). In the EEOC's Response Brief, however, the EEOC "cherry-picks" sentences and phrases from BSV's Evaluation Forms and argues that they amount to an overbroad medical "inquiry." But BSV's actual "inquiry" - when considered in context - was "no broader or intrusive than necessary" and a "reasonably effective method of achieving [BSV's] goal" of ensuring patient safety. (ECF No. 26, PageID.441, citing *Conroy v. New York State Dep't of Corr. Servs*., 333 F.3d 88, 98 (2nd Cir. ).

The word "inquiry" is defined as the "act of asking a question or seeking information." *Inquiry,* Merriam Webster Dictionary (11th ed. 2003). To determine whether BSV's "inquiry" about Jansma's medical condition was sufficiently narrow, the Court must therefore examine what information BSV actually sought about his medical condition.

The Evaluation Forms that BSV presented to Jansma consisted of three documents, which referred to one another and worked together as a package – a letter to Dr. Glisson, which included 10 questions for Glisson to answer after examining Jansma's homonymous hemianopia ("the Letter"); Jansma's Optometrist job description; and a medical

authorization form ("the Authorization"). (ECF No. 26-23, PageID.624-630). The EEOC argues that BSV should have limited the questions in the Letter to Jansma's homonymous hemianopia and suggests that a question contained in the Letter – "*Does Dr. Jansma have a physical or mental impairment? If so, please describe such impairment(s) in detail*. – amounted to BSV "broadly asking about all physical or mental impairments" that Jansma might have. (ECF No. 26 PageID.441). The EEOC, however, ignores two undisputed facts that are critical to understanding what medical information BSV actually requested.

First, in the introductory paragraphs to the Letter, where BSV provided background "*to assist [Dr. Glisson] in responding to the questions below*," BSV clearly explains that that the "impairment" BSV is concerned about is Jansma's homonymous hemianopia. (ECF No. 26-23, PageID.626-628). The Letter asked Dr. Glisson to evaluate Jansma's homonymous hemianopia and provide an opinion on whether the hemianopia – and any impairment(s) it created – presented concerns about whether Jansma could safely perform his job as an Optometrist at BSV, with or without reasonable accommodation; "<u>specifically, is he able to thoroughly exam the eye to find pathology, including seeing the entire surface and internal structures of the eye without missing areas of concern which can lead to irreversible loss of vision or missing systemic diseases that could be diagnosed based on ocular findings</u>." *Id.* (emphasis added). While the question about Jansma's "physical or mental impairment" may seem broad when pulled from the Letter and read in a vacuum, the instructions made it clear that the inquiry was limited to information about Jansma's homonymous hemianopia that Dr. Glisson would have gathered from his examination of Jansma. Notably, this is exactly how Dr. Glisson understood the inquiry. (ECF No. 26-13, PageID.566). Dr. Glisson testified that he interpreted "the reason why Blue Sky Vision… referred

Randall Jansma to [Dr. Glisson]" was "for homonymous hemianopia" and that reason was "the only information that [his office] had documented at that time." *Id*. at 15:17.

Second, even if the question in isolation could be interpreted as requesting information about "any" physical or mental impairment that Jansma had (which it cannot), the fact that the question was being asked of Dr. Glisson, in and of itself, limited the scope of the inquiry. This is because, as a neuro-ophthalmologist whose only interaction with Jansma would have been evaluating Jansma's homonymous hemianopia, Dr. Glisson would not have had information about "all physical or mental impairments" that Jansma might have. (ECF 26-13, PageID.567). And as explained in BSV's summary judgment brief, nothing in either the Letter or the Authorization gave Dr. Glisson (or BSV) the right to access any medical records that Dr. Glisson did not have as part of the vision examination. (ECF No. 25, PageID.99).

The EEOC attempts to diminish the importance of this fact – as well as Dr. Glisson's undisputed testimony that he did not (and would not) have any medical information unrelated to Jansma's vision – by arguing that if Dr. Glisson had been part of a large hospital network where Jansma had been treated for other medical issues, Dr. Glisson might have been able to "access" medical information about Jansma that was unrelated to his homonymous hemianopia. That argument is a red herring. The undisputed fact is that Dr. Glisson was not part of a large hospital network where Jansma had been treated, and did not have access to any information about Jansma apart from what Jansma would have provided in connection with the vision examination.[1] Moreover, even if Dr. Glisson would have technically had "access" to other medical records through some sort of hospital-wide electronic medical system, it would have been unethical – and

[1] Dr. Glisson's records reflecting communications with Dabrowski show that he did not even have access to records related to Jansma's vision. (ECF No. 26-25, PageID.637-648).

a violation of HHS directives – for Glisson to dig through Jansma's medical records and access information outside the scope of his examination. See HIPAA Privacy Rule definition of "treatment" at 45 CFR 164.501; see HHS directives regarding HIPAA Use and Disclosures for Treatment, Payment, and Health Care Operations related to developing role-based access policies and procedures (https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/disclosures-treatment-payment-health-care-operations/index.html); see American Medical Association guidelines regarding doctors disclosing medical records to third parties (https://www.ama.com.au/articles/guidelines-doctors-disclosing-medical-records-third-parties-2010).

The EEOC's hypothetical scenario where a medical inquiry was made to a different healthcare provider who had access to different medical information cannot be used to conclude that BSV made an overly broad medical inquiry in this case because that is not the inquiry that was actually made. In other words, "the act of asking a question or seeking information" was the act of seeking information from Dr. Glisson, the neuro-ophthalmologist who had been asked to examine Jansma's homonymous hemianopia, not some hypothetical healthcare provider who would have access to (and decide to improperly access and share) medical information about a patient that had no bearing on the evaluation the healthcare provider performed. It is undisputed that Dr. Glisson understood the scope of BSV's inquiry. (ECF No. 25-9, PageID.292-293). Even Jansma understood it and had no concerns about the questions in the Letter. (ECF No. 25-3, PageID.199, 204, 206).

Likewise, the EEOC takes issue with the Authorization form that BSV provided to Jansma because the "description" of medical information subject to release included irrelevant information like "pharmacy records" and "HIV and AIDS records" (ECF No. 26, PageID.441).

BSV agrees that it had no right to or interest in that type of medical information. (ECF No. 26-4, PageID.488-489). But again, context is critical. While the Authorization does contain a broad "description" of medical information because it is a standard HIPAA authorization form, the Authorization itself does not amount to a broad "inquiry" because it did not seek any medical information; it only allowed Dr. Glisson to answer the 10 questions in the Letter and send those responses directly to BSV. (ECF 25-11, PageID.358-361). Thus, as a practical matter, even though the Authorization may have defined "medical information" broadly enough to allow Dr. Glisson to share "AIDS/HIV records" with BSV, the Evaluation Forms presented to Jansma could never have resulted in that type of disclosure because (1) the Authorization did not give Dr. Glisson (or anyone else) the right to access or gather medical information about Jansma; (2) as a neuro-ophthalmologist, Dr. Glisson did not otherwise have access to Jansma's entire medical record; and (3) even if Dr. Glisson did have access, BSV did not ask for – or inquire about – AIDS/HIV records in the Letter. *Id.* As explained in the Letter, the only reason for the Authorization was to enable Glisson answer the specific questions in the Letter and provide them to BSV; there was no general request for Glisson to provide BSV with all records he had access to.[2] *Id.*

The EEOC argues that BSV's medical inquiry was overbroad and intrusive, even though there would have been no *actual* disclosure of Jansma's entire medical history, because "actual production or disclosure of medical information need not occur for an employer to violate…the ADA." (ECF No. 26, PageID.443). BSV agrees that actual disclosure of medical information need not happen in order for a medical inquiry to be overbroad. However, the EEOC's argument incorrectly focuses on the result (i.e. whether or not information was actually disclosed) instead of how *the inquiry itself* is shaped by whether, and to what extent, the person from whom

[2] As stated in Paragraph 4 of the Authorization, Jansma had the right to revoke the Authorization at any time.

medical information is requested would have medical information that's not relevant to the employee's ability to do the job. For instance, in the cases cited by the EEOC, the employers discharged the plaintiff-employees after *the employees themselves* refused to provide irrelevant medical records and information about their personal medical history. (ECF No. 26, PageID.443; *Jackson v. Regal Beloit America*, 2018 WL 3078760 (E.D.Ky. 2018); *Scott v. Napolotino*, 717 F.Supp.2d 1071 (S.D. Cal. 2010). In this case, the 10 questions were posed to the neuro-ophthalmologist who BSV had asked to conduct an examination of Jansma's homonymous hemianopia; BSV did not ask Jansma questions about "any" impairments he might have. Clearly, the inquiry would have been far more "intrusive" if directed to Jansma, who would have had information about his complete medical history, including history not relevant to his vision; therefore, the caselaw cited by the EEOC is inapplicable.

The EEOC also argues that "Dr. Glisson's intent to the limit the scope of his medical evaluation of Jansma does not mean that BSV's inquiry (Release and Questionnaire) was compliant with the ADA." (ECF No. 26, PageID.443). The limited scope of Dr. Glisson's medical evaluation, however, is inextricably tied to BSV's inquiry because it was BSV that requested an evaluation of Jansma's homonymous hemianopia and the questions in the Letter (i.e., the inquiries) were intended to derive from that limited examination. (See ECF 25-11, PageID.358-361). BSV was therefore not simply relying on Dr. Glisson's intentions with respect to the scope of the evaluation and how he would be expected to respond to the inquiries in BSV's Letter.

## II. The EEOC Cannot Establish Through Direct (or Circumstantial)[3] Evidence That BSV Took Any Adverse Action Against Jansma Because of His Disability.

[3] The EEOC relies entirely on its "direct evidence" theory, and offers no response to the arguments BSV made in its summary judgment brief regarding the EEOC's inability to demonstrate disability discrimination through circumstantial evidence; the EEOC has therefore conceded those arguments. *Cunningham v. Tennessee Cancer Specialists, PLLC,* 957 F.Supp.2d 899, 921 (E.D. Tenn. July 12, 2013) ("It is well understood... that when a plaintiff

The EEOC claims that there is "direct evidence" of discrimination in this case, which is defined as evidence that proves the existence of a fact without requiring any inferences. *Rowan v. Lockheed Martin Energy Sys. Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (emphasis added). This means that "the employer acknowledge[d] that it relied upon the plaintiff's handicap in its employment decision." *Fisher v. Nissan North Am. Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). However, the EEOC has not offered any evidence that would prove – without requiring any inferences – that BSV relied upon Jansma's medical condition in deciding to discharge him.

### A. There is No Direct Evidence That But For Jansma's Medical Condition, BSV Would Not Have Taken Any Adverse Action Against Him.

#### 1. There Is No Direct Evidence That BSV "Asked Jansma to Resign On September 25, 2018 Because of His Medical Condition."

Despite consistent and uncontroverted testimony to the contrary, the EEOC argues that "BSV believed Jansma was disabled and *because of that belief*, it asked Jansma to resign during the Initial Meeting" on September 25, 2018. (ECF No. 26, PageID.449) (emphasis added). However, the only individuals with personal knowledge of why BSV met with Jansma and gave him the opportunity to resign testified that it was because of his behavior issues and BSV's impression that the partnership did not seem to be meeting either party's expectations. (ECF No. 25-5, PageID.248-250; ECF No. 26-14, PageID.576). While the conversation happened to occur "within weeks" after BSV learned of Jansma's medical condition, that timing is not meaningful given Jansma had only been employed for three months. Moreover, there is no dispute that well before Jansma disclosed his condition in September 2018, there had been numerous email

files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that plaintiff failed to address as conceded.")

communications among BSV management that demonstrate they were concerned about Jansma's behavior and the parties' mutual dissatisfaction with the partnership, including Jansma's refusal to learn the EMR systems; continued demands for a permanent scribe; and rude, disrespectful and sexist treatment of staff and patients. (ECF No. 25-11, PageID.364-387; ECF No. 25-12, PageID.389-410). Finally, BSV's communications with the administrators from both Shoreline and GRO show that the meeting was intended to focus on Jansma's behavior, not his medical condition; both administrators testified that they knew that the meeting was going to occur and understood it would pertain to performance. Shoreline's Practice Manager even sent an email to Desiraju about those concerns in advance of the meeting so he could incorporate it. (Dunleavy 33-35[4], Cassens 53-54[5]; Pls. Ex. 20[6]).

Studiously ignoring the overwhelming evidence of BSV's legitimate concerns about Jansma's behavior – including Jansma's own testimony that VanderLugt complained that Jansma was "not taking advantage of the collegial atmosphere" during the September 25th meeting – the EEOC argues that there is "direct evidence" that Jansma was asked to resign due to his medical condition because, during the meeting, VanderLugt also mentioned that some providers thought Jansma was a "liability," which Jansma interpreted to mean "they feared a potential lawsuit, that perhaps I would miss something because of my vision." (ECF No. 26, PageID.433; ECF No. 26-8, PageID.528; Jansma 149[7]). That is certainly not an "acknowledgement" that Jansma was being asked to resign "because of" his impairment, as would be required for it to be "direct evidence." *Fisher*, 951 F.3d at 416.

---

[4] Attached as Exhibit 1.
[5] Attached as Exhibit 2.
[6] Attached as Exhibit 3.
[7] Attached as Exhibit 4.

The EEOC also offers as "direct evidence" an email in which BSV allegedly "states that it gave Jansma the 'opportunity to resign' because it was concerned about his 'ability to safely perform [his] job duties…due to [his] homonymous hemianopia." (ECF No. 26-20, PageID.613-616) (emphasis added). There are two problems with this argument.

First, the EEOC cut and pasted phrases from that email in a way that misleadingly suggests that BSV gave Jansma the "opportunity to resign" because it was "concerned about his ability to safely perform his job." *Id*. The email says no such thing; on the contrary, it specifically addresses the concerns about Jansma's work performance, and explains that he was sent for a medical evaluation "because of" the concerns about his condition, not asked to resign. *Id.*

Second, the EEOC's argument about the "concerns" BSV acknowledged in the email reflects an ongoing flaw in its analysis – namely, the EEOC does not differentiate between valid, lawful "concerns" for patient safety and unsubstantiated "conclusions" about how Jansma's condition would impact patient safety. For instance, in support of the EEOC's argument that BSV had discriminatory animus, the EEOC repeatedly cites instances in which various BSV providers and administrators expressed some "concern" over the "potential" that Jansma's condition could create patient safety issues. But BSV's "concerns" were perfectly valid, reasonable and lawful, given Jansma's disclosure that he has a condition that prevents him from seeing out of one half of the visual field in each eye and had trouble seeing part of the computer screen. Frankly, if BSV was *not* concerned about Jansma's disclosure, BSV's patients should have been. Being "concerned" that an Optometrist responsible for identifying abnormalities of the eye which could cause patients' blindness or worse is not unlawful, nor does it reflect discriminatory animus. It would only be unlawful if BSV learned of Jansma's condition, and based on an unsubstantiated assumption about its severity or impact, discharged him. That is the opposite of what happened

here. As soon as BSV learned that Jansma had decided not to voluntarily resign because they could not come to terms on his separation, BSV placed him on paid leave and requested an examination by a neuro-ophthalmologist.

Finally, even if BSV did offer Jansma the opportunity to resign due to concerns about his medical condition, that would not be sufficient to support a claim of disability discrimination because it is not an "adverse employment action." *Mitchell v. Vanderbilt Univ.*, 389 F3d 177, 182 (6th Cir. 2004); *See also James v. Goodyear Tire & Rubber Co*., 354 Fed.Appx.246, 248-9 (6th Cir. 2009) (no adverse action where employer did not insist upon resignation but rather insisted that continued employment required the employee submit to a proper medical examination). And contrary to the EEOC's claim that "a reasonable jury may reject BSV's claim that its request for Jansma's resignation was not meant to end his employment relationship," no reasonable jury could consider BSV's offer tantamount to a termination because it is undisputed that – once Jansma decided not to voluntarily resign – his employment (and pay) continued for another two months.

**B. There is No Direct Evidence That "After the Failed Attempt to Obtain Jansma's Resignation, BSV Placed Jansma on a Leave of Absence Due to His Medical Condition."**

The EEOC argues that, because BSV did not require Jansma to undergo a medical evaluation before it offered him the opportunity to resign, that that is "direct evidence" of discrimination. (ECF No. 26, PageID.455). Again, that is not "direct evidence" because numerous inferences would need to be drawn in order to conclude that BSV offered resignation "because of" his medical condition. Indeed, there is not even circumstantial evidence of discrimination. As explained above, it is undisputed that BSV offered Jansma the opportunity to resign because of his behavior issues and the parties' mutual dissatisfaction with how the partnership was going. It is

perfectly reasonable and appropriate that BSV would not go through a medical evaluation process intended to determine whether Jansma could safely perform his Optometrist duties at BSV when, for completely separate reasons, the relationship between Jansma and BSV did not seem to be working out.

The EEOC's attempt to portray the October 5, 2018 conversation between Jansma and Dabrowski as a "demand" for Jansma's resignation and "direct evidence" of discrimination is also incompatible with the undisputed facts. (ECF. No. 26, PageID.455, n. 9). It is undisputed that Dabrowski called Jansma on October 5th because, based on Jansma's representations, BSV still understood that Jansma intended to resign; Jansma asked Dabrowski what his options were if he did not resign; and Dabrowski explained that he would need to undergo a medical examination to determine whether he could safely perform his job because BSV had legitimate patient safety concerns due to his disclosure that he has homonymous hemianopia. (ECF No. 26-4, PageID484; ECF No. 25-11, Page ID.346-355, 357-361). Dabrowski's October 8, 2018 written communication to Jansma substantiates those undisputed facts. (ECF No. 25-11, PageID.357-361). There was no "demand" for his resignation.

**C. There is No Direct Evidence That BSV Terminated Jansma Because Of His Medical Condition.**

The EEOC alleges that, in BSV's termination letter to Jansma, "BSV admits that it terminated Jansma for refusing to sign the Release." (ECF No. 26, PageID.455). The termination letter, however, says no such thing; rather, it lists examples of all of the ways in which Jansma was uncooperative in BSV's attempt to determine his fitness for duty, including his failure to schedule an appointment, return the release or even respond to the last two email communications from Human Resources. (ECF No. 25-11, PageID.362-363). The EEOC also cites Dabrowski's

deposition testimony for the proposition that "[t]here was no other reason [apart from refusing to sign the release] why BSV terminated Jansma," but that is not accurate; Dabrowski actually testified that the reason for termination was that Jansma "had stopped communication with us and we were not able to determine whether or not he could safely perform the essential functions of his job." (ECF No. 26-4, PageID.492). This Court should not find the EEOC's attempt to mischaracterize the contents of the termination letter or Dabrowski's testimony persuasive.[8]

### D. Jansma Was Not "Otherwise Qualified" To Perform the Essential Function of His Position With or Without Accommodation.

Jansma was not "otherwise qualified" to perform the essential functions of his job because (as the EEOC concedes) BSV had reasonable grounds to require Jansma to undergo a medical examination, and Jansma refused to cooperate. (ECF No. 26, PageID.446). The EEOC suggests that BSV should be "estopped from arguing that Jansma was unqualified because it failed to conduct an individualized inquiry into Jansma's medical condition" (ECF 26, PageID.453). However, it is undisputed that this was precisely what BSV did before placing Jansma on leave and was trying to do when it contacted Glisson about conducting an examination of Jansma's homonymous hemianopia. Because the decision to require the examination was undeniably reasonable, and Jansma unreasonably refused to cooperate in any way, he was not qualified to work as an Optometrist at BSV. *Haulbrook v. Michelin North America*, 252 F.3d 696, 707 (4th Cir. 2001) ("the ADA does not abrogate the general duty of an employee to respond to direct and

[8] The EEOC also mischaracterizes Dabrowski's communication with Glisson's office about Jansma's vision-related records. The EEOC suggests that BSV decided to send Jansma elsewhere for the medical examination after Glisson's office communicated that it only needed records related to Jansma's vision, insinuating that BSV was angry at Glisson's office for not providing BSV more of Jansma's medical records. (ECF No. 26, PageID 437). However, Glisson's records reflect that Dabrowski was attempting to coordinate between Glisson's office and Jansma to ensure that Glisson's office had the records it had requested prior to Jansma's visit (which they could only have gotten from Jansma). The next note entry was on January 8, 2019 ***after Jansma was terminated***, and correctly reflects that Dabrowski no longer believed that Jansma would be coordinating BSV's requested medical examination with Glisson's office. (ECF No. 26-25, PageID.640).

reasonable request of his employer for information and cooperating regarding a potentially disabling condition”).

During Jansma’s paid leave of absence, he also failed to meet several expectations stated in his job description, including: “giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate;” “talking to others to convey information effectively;” and “communicating effectively in writing as appropriate for the needs of the audience.” (ECF No. 26-9, PageID.536). The EEOC’s position seems to be that, because Jansma interpreted the Authorization as granting BSV access to his entire medical record (which it did not), it absolved him of any obligation to regularly or professionally communicate with BSV while on paid leave of absence. The EEOC, for instance, took the position that Jansma “objected to the [Evaluation] forms in a timely manner,” even though the undisputed evidence shows that Jansma had the Evaluation Forms for two and a half weeks – from October 8, 2018 to October 24, 2018 – before he first raised any objection. And even then, he never clearly communicated in his email that he had concerns about “the forms;” he merely complained that “the testing” was “overreaching in scope” and would “delve into his entire medical history.”[9] (ECF No. 25-12, PageID.413-414).

It is undisputed that BSV did not interpret any of the Evaluation Forms as an inquiry into Jansma’s entire medical record, had no intention of trying to obtain records that did not pertain to his homonymous hemianopia, and communicated this to Jansma. Nevertheless, when Dabrowski emailed Jansma the updated Evaluation Forms with Glisson’s name added, and invited

---

[9] Jansma also testified that he had a telephone conversation with Dabrowski; originally, he testified that he specifically referenced the forms and what should be removed, but later acknowledged he merely “said it needed to pertain just to [his] eye condition” and that “what he said in the conversation…was similar to what [he] said in [his] email to [Dabrowski].” (ECF No. 26-8, PageID.533 at 126:16). The email to Dabrowski did not mention the forms.

him to respond with any questions, he remained silent. He could easily have responded to share that he still had concerns about the Evaluation Forms, but he did not. Instead, he ignored two emails from Dabrowski and sat on paid leave for an additional 5 weeks with no contact. Even if BSV should have been able to read Jansma's mind and discern the exact nature of his concerns, it does not excuse Jansma's complete lack of communication with BSV for over 5 weeks, including his failure to respond in any way to Dabrowski's emails on October 29, 2018 and November 8, 2018. (ECF No. 26-26, Page ID.651). For these reasons, Jansma was not qualified for his position, and summary judgment is appropriate.

## CONCLUSION

For the aforementioned reasons, as well those referenced in Defendant's Brief in Support of its Motion for Summary Judgment, Defendant respectfully requests that this Court grant it's Motion.

Dated: July 8, 2021

By *__/s/ Catherine A. Tracey__*

Catherine A. Tracey (P63161)
45 Ottawa Ave. SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1700
traceyc@millerjohnson.com

**CERTIFICATION OF SERVICE**

I HEREBY CERTIFY that on July 8, 2021 the foregoing document was electronically served upon all parties and/or attorneys of record to the above cause herein via email correspondence as disclosed on the pleadings on July 8, 2021 via ECF Filing.

Date: July 8, 2020 By: */s/ Catherine A. Tracey*
Catherine A. Tracey (P63161)

**Certificate Of Compliance**

1. This brief complies with the type-volume limitation of W.D. Mich. LCivR 7.2(b)(i) because this brief contains 4292 words, excluding the parts of the brief exempted by W. D. Mich. LCivR 7.2(b)(i).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 for Windows in 12-point Times New Roman font.

Dated: July 8, 2021

By *<u>/s/ Catherine A. Tracey</u>*

Catherine A. Tracey (P63161)
45 Ottawa Ave. SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1700